UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Criminal No. 12-20607

v.                                  District Judge Thomas L. Ludington

                                  Magistrate Judge Charles E. Binder

D-3 GARY A. WILSON,

        Defendant.

_____/

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM REGARDING GARY WILSON

On October 10, 2013, the court filed a sealed order directing the parties to file supplemental briefing regarding various specific sentencing issues.  In response to the court's order and the supplemental briefing memorandum filed by Gary Wilson (R. 73), the government submits the following response.  The government also incorporates by reference the government's objections to the presentence report and its sentencing memorandum (R. 68), and all attachments to those documents.

### Role Adjustment

The first issue that the court directed be addressed regarding Gary Wilson is his role in his offenses of conviction.  He mischaracterizes his role as minimal or minor, claiming that he did not benefit financially from his participation in the

scheme and that he did not know how much money Robert Pochmara was receiving in Railroad Retirement Board disability benefits. (R. 73: Supplemental Briefing Memorandum, PgId 454-55). Since Gary Wilson has told the court that he does not intend to provide additional evidence regarding this issue at his sentencing hearing (*id.* PgId 455), the record apparently is complete as to him on this issue. That record shows that Gary Wilson played a part in the operation of the fraud scheme that was inconsistent with a role reduction of any kind for him and consistent with an increase in his offense level based on his role.

Gary Wilson signed an agreement dated January 5, 1998 that brought Robert Pochmara and Maxine Pochmara into partnership with Gary Wilson and Sue Wilson in the Roger's City NAPA auto parts store. (Govt. ex. 24(c)). In July of 2004, Gary Wilson joined with Sue Wilson, Robert Pochmara and Maxine Pochmara in signing a signature card for a business account at Huron National Bank. (Govt. ex. 40). The bank statements for that account were addressed to all four owners. ( govt. exs. 41A-F). Though the bank statements initially were mailed to the auto parts store, starting in 2006 the statements were mailed to Gary Wilson's home address, apparently for the convenience of Sue Wilson because she who chose to do the books for the business out of her residence. (*Compare* Govt. exs. 41A and B *with* Govt. exs. 41C-41F). Gary Wilson also repeatedly joined with his wife and the Pochmaras in signing business loans. (Govt. exs. 42-45, 47-48).

Government's exhibit 29 contains weekly paychecks written to Maxine Pochmara for work done by Robert Pochmara at the NAPA auto parts store owned by Sue Wilson, Gary Wilson, Robert Pochmara and Maxine Pochmara. Those paychecks were signed by either Gary Wilson or Sue Wilson.

Likewise, Gary Wilson signed a majority of the corporate tax return for the business. (*Compare* Govt. ex. 40 *with* Govt. exs. 51-55). It is significant that Gary Wilson signs those tax returns attesting to their accuracy even though Robert Pochmara is omitted from the list of corporate officers.

Gary Wilson's willingness to make paychecks using Maxine Pochmara's name and social security number for Robert Pochmara's work resulted in the issuance of W-3s and W-2s that falsely reported to the IRS and Social Security that Maxine Pochmara, not Robert Pochmara, was earning wages for working at the auto parts store. (Govt. exs. 60A, 68A, 74A, 84A, 89A ). Gary Wilson also caused the accountant to prepare the federal corporate tax returns, based on the documents provided to the CPA, without listing Robert Pochmara as a corporate officer but treating the wages paid to Maxine Pochmara for Robert Pochmara's work as an expense for the business. (Govt. exs. 50-57, 63, 70, 81, 83, 86). The same false information is found on the reports made to Michigan listing corporate officers and shareholders based on the false records that Gary Wilson participated in creating. (Govt. exs. 59, 65, 72, 87).

Gary Wilson has submitted to the court a set of documents that he claims shows that Robert Pochmara's association with the auto parts store was reported to the government. (R. 73: Supplemental Briefing Memorandum, PgId 456, 467-73). Those documents do not withstand scrutiny. They are in fact a set of annual state reports. While the reports include Robert Pochmara's name up until 2010, they do not contain his social security number, Maxine Pochmara's name or social security number, nor reflect that Robert Pochamara received any compensation for his reported position as an officer with the auto parts store.

The fact that the Wilsons were knowledgeable and sophisticated enough to understand that a state document without social security numbers would never be connected to the documents they regularly prepared, falsely substituting Maxine Pochmara's name and social security number for Robert Pochmara's name and social security number in reports to the IRS and Social Security, reveals the Wilsons' culpability for the crimes for which they stands convicted. Such knowledge and sophisticated comprehension is a ground for an upward departure, or at least a sentence at the high end of the recommended range, rather than a reason to depart below that range.

The documents discussed above, considered alone, refute Gary Wilson's claim that he was a minor or minimal participant in the scheme. There is additional evidence that discredits his claim, however, that he did not benefit from the scheme.

As the IRS revenue agent testified at trial, Sue and Gary Wilson benefitted on their tax returns by characterizing the money paid to Maxine Pochmara as wages rather than shareholder dividends.  The wages were deductible expenses on the corporate tax returns that flowed through to the Wilsons' personal income tax returns.  If the compensation paid to Maxine Pochmara for Robert Pochmara's work had in fact been dividends -- the type of compensation normally made to pay shareholders for their capital investments -- those payments would not have been deductible.  Gary Wilson directly benefited from the fraud scheme because he received a share of the revenue generated by Robert Pochmara's work on behalf of the store.

Finally as to Gary Wilson's role in the fraud scheme, it must be remembered that Gary Wilson had the power to prevent the implementation of the fraudulent scheme and could have terminated it at will.  If he needed to have an employee in the store to do the kind of work that Robert Pochmara performed, Gary Wilsons could have hired someone else to fill that position and paid that person properly, using the person's name and social security number.  Alternatively, Gary Wilson could have agreed to employ Robert Pochmara but without agreeing to deliberately falsify the payroll records by avoiding all reference to Robert Pochmara by name or social security number.  Instead, Gary Wilson used his position as president of the company to provide the falsehoods that were critical to the success of the

scheme.  A role enhancement is appropriate for Gary Wilson for all of these reasons.

Dubious Financial Information/Obstruction of Justice

The second matter that the court directed the Wilsons to address is the dubious financial information provided to their probation officer and the court by the Wilsons, and whether that information was sufficiently dubious to warrant an obstruction of justice enhancement.  Upon consideration of the information provided by the Wilsons in response to the court's order; the information not provided by the Wilsons; and other information available in this case, it is easy to see that an obstruction of justice enhancement is appropriate for both of the Wilsons.  Indeed, the greater difficulty presented to the government is to express coherently the many ways that the Wilsons have afforded the court a basis for applying that enhancement to them.  It appears that one way of accomplishing that task is to return to the presentence reports prepared for the Wilsons and review the information there in light of the available evidence.

In describing their assets to their probation officer, both of the Wilsons listed various financial accounts:  Both list a Chemical Bank account number 5720 and reported that it contains $3,169.79.  Sue Wilson has now provided documentation establishing that that account contains $6,269.74 (R. 72-1: Supplemental

Sentencing brief, PgId 333), or $3,099.95 more than initially reported.[1]  The

Wilsons also list a Chemical Bank account number 4253 and report that it contains

$183.65.  Supplemental information indicates that the current balance in that

account is $3,536.25 (*id.*), or $3,352.60 more than initially reported by the

Wilsons.  The same supplemental information reveals additional unreported

accounts at Chemical Bank:  an account ending in 2697 with a balance of $70.75

(*id.*), an account ending in 2705 with a balance of $14,238.16 (*id.*), an account

ending in 8403 with a balance of $1,988.49 (*id.*), and another account ending in

9354 with a balance of $1,387.26 (*id.*), none of which are included in the Wilsons'

presentence reports.

     Another page of Sue Wilson's submission to the court is supplemental

information from Chemical Bank, dated September 27, 2013.  That document, with

one exception, lists additional accounts belonging to the Wilsons, the exception

being the 9345 account, which is reported as having a balance of $1,037.26.  (*Id.*,

PgId 332).  That document lists accounts belonging to Gary Wilson ending in 9345

and 0718 with balances of $1,038.02 and $1,094.42, respectively, neither of which

are listed in his presentence report.  The document also lists the two IRA accounts

that apparently consist of funds from the Wilsons' former accounts at Lincoln

National.  Gary Wilson's account is FQ7100226 at Lincoln National turned

---

[1] Under-reported and unreported amounts are underlined in this response by the government.

Chemical Bank, while Sue Wilson's account is FQ7100228.  (*Id.*, PgId 332, 334-38, and 452; R. 73: Supplemental Briefing Memorandum, PgId 506).[2]  The September 27, 2013 document and related records list the value of Sue Wilson's account FQ7100228 as $35,487.74,  (R. 72: Supplemental Sentencing Brief, PgId 332, 335, 338), an amount which is missing from the list of assets provided by Sue Wilson to her probation officer.  Note that her Lincoln National account balance in 2010 was $31,662.46, the same amount listed the investment account on a more detailed Chemical Bank record also before the court.  (*Id.*, PgId 335, 338, 339; see also PgId 452 reporting balance of $33,308.91 as of July 8, 2011).  The September 27, 2013 document incorrectly lists the value of Gary Wilson's account FQ7100226 as $49,415.44, which was actually the investment amount.  (*Id.*, PgId 332, 334, 336, 337; 73: Supplemental Briefing Memorandum, PgId 479, 481.  See also *id.*, PgId 506, reporting account balance of $51,985.04 as of July 8, 2011).  The correct balance is $55,385.53 (R. 72: Supplemental Sentencing Brief, PgId 334), and once again that balance is an asset not listed in Gary Wilson's presentence report.   All together, the records from Chemical Bank reveal a total of **$117,142.92** in unreported assets on deposit at that financial institution.

---

[2]  Many but not all of the documents attached to Sue Wilson's response to the court's order (R. 72) are attached to Gary Wilson's response to the same order (R. 73).  In the government's responses the citations generally are to one but not both of the Wilsons' attachments to their responses.

Sue and Gary Wilson contend that the money in the Lincoln National/Chemical Bank account came from the Wilsons' Edward Jones account. (72: Supplemental Sentencing Brief, PgId 327; R. 73: Supplemental Briefing Memorandum, PgId 457-59).   Records regarding Edward Jones checks issued to the Wilsons on June 16, 2010 for $3,019.90, on June 22, 2010 for $0.12, and on June 24, 2010 for $21,656.75 and $19,137.20 are provided.   (*Id.*, PgId 489-92). Those checks total $43,813.97.   In addition, the Wilsons provided records indicating that checks were issued by Lord Abbett on June 15, 2010 in amounts of $24,768.67 and $12,575.26 (*Id.*, PgId 487-88).   Those two checks total $37,343.93. The sum of all of the checks issued in June of 2010 is $81,157.90, an amount that is $80 less than what was used to open accounts FQ7100226 and FQ7100228 in July of 2010.

While these calculations may explain where the Edward Jones account money went, they do not explain nor excuse the Wilsons' failure to report all of their assets now in Chemical Bank accounts.   Nor does the fact that some of the funds are in an IRA entitle the Wilsons to exclude them from their list of assets or shield the money from being applied to their restitution and fine obligations.   Even spendthrift trust funds that are not currently available may be considered by the court for such purposes.   *Unites States v. Hickey*, 917 F.2d 901, 907 (6th Cir. 1990).   See also USSG §5E1.2(e).   Likewise, the Wilsons have not included in

9

their assets the payments they are receiving from the sale of a travel trailer.  (Gary

Wilson's PSR, p. 11, ¶53).

Sue Wilson also listed a Calcite Credit Union number 26115 with a balance

of $1,560.92 in her presentence report.  That amount is $5 less than the $1,565.92

in the account statement for the quarter ending on June 30, 2013.  (*Id.*, PgId 496).

Other Calcite Credit Union accounts in Gary Wilson's name, account number

25888 with $879.61 and account number 10962 with $266.51 on deposit as of June

30, 2013 are part of the supplemental materials.  (*Id.*, PgId 494, 498).  Gary Wilson

listed only one Calcite Credit Union account (without an account number) in his

presentence report with a balance of $266.  An Awakon Federal Credit Union

(Formerly Onaway Community Credit Union) account number 31359 in Gary

Wilson's name had a balance of $203.41 at the end of the same quarter, but is not

listed on either defendant's presentence report. (*Id.*, PgId 475).  The total of the

unreported assets in those accounts is **$1,088.53**.  The Wilsons cannot shield the

money in those accounts from disclosure by claiming that the money is for their

grandchildren unless they can show that the grandchildren obtained the money

from a source other than the Wilsons, which has not been done.

There are good reasons to suspect that other financial accounts used by the

Wilsons have not been reported to the court, however.  Their mortgage application

dated June 2, 2009 includes a Calcite Credit Union account with a balance of

$15,189.03, and lists two Onaway Federal Credit Union accounts with balances of

$9,608.25 and $31,073.53. (Govt. ex. A).[3] The total for those three accounts is $55,870.81, far less than what is reported to be in the Wilsons' accounts in those credit unions today.

Also missing from the assets listings provided by the Wilsons in their presentence reports is the value of their NAPA franchise auto parts store as an operating entity. Gary and Sue Wilson only listed stock in the store worth $100,000. Gary Wilson also reported owning $4,000 worth of stock in the Huron National Bank; Sue Wilson listed an otherwise undocumented and unexplained $21,000 account receivable from the business. Both Wilsons claimed that the value of the real property for the store is $60,000, though the county equalization records report that the SEV is $48,400, indicating a value of $96,800, or $36,800 more than the value ascribed to that asset by the Wilsons. (Govt. ex. B).[4]

The Wilsons currently are the sole owners of that business. Not only did they fail to include the account balance for the business account at Huron National Bank, but they failed to list the value of the business itself. Yet on their mortgage application dated April 17, 2009, they reported the net worth of the business(es)

---

[3] The government's trial exhibits are referenced as they were during the trial. Additional government exhibits provided regarding sentencing issues have been marked with letters A to Z, filed under seal, and digital copies provided to defense counsel.

[4] Based on the bond report prepared by pretrial services on October 10, 2012, the Wilsons told the pretrial officer that the store was worth $240,000, perhaps referring to the building and inventory.

they own as $436,115.32 (Govt. ex. A), a figure suggestive of precise calculation rather than an estimate. Also interesting is the fact that Sue Wilson's other business interest, Perfect Faces by Sue, reported annual sales of $51,000 recently. (Govt. ex. E). The Wilsons' withholding of both accurate and complete information regarding the store that they used to commit their offenses is rather telling.

Still other significant assets appear to have been omitted from their PSR by the Wilsons. Sue Wilson appears to have an interest in property worth $19,229 in Zephyrhills, Florida (Govt. ex. F), plus a 1998 Redman motor home (Government exhibit G), and, until she learned that she was indicted, a 2012 Chrysler Town & Country. (Govt. ex. H). The title to that car was transferred to the Wilsons' adult son, Nathyn, on October 9, 2012 (*id.*, second page), which was shortly after when the Wilsons learned that they had been indicted. (Letters dated September 27, 2012, Govt. exs. I & J). A 2002 Dodge Grand Caravan is apparently owned by Sue Wilson and Nathyn Wilson. (Govt. ex. K). Though affected by cerebral palsy, Nathyn Wilson is able to drive. (Govt. ex. L). Title to a 2005 Chevrolet Silverado pick-up was transferred away from the Wilsons in May of 2013, about the time that the jury was finding them guilty. (Govt. ex. M). Similarly, they transferred title to a 1996 Chevrolet S10 to their daughter Keri as recently as August of 2013. (Govt. ex. N). If properly reported rather than concealed, these assets would increase the

Wilsons' already considerable "total assets" of over $344,910 found in their presentence reports.

The Wilsons have also under-reported the value of the real property that they did list in their presentence reports. Their primary residence, built on two parcels on White Birch Lane in Rogers City, is valued at $125,000 by the county equalization department. (Govt. ex. C). The Wilsons reported to their probation officer that the value of that property was $105,000, but reported the same property's value as $140,000 on their 2009 mortgage applications (Govt. ex. A), and $120,000 when interviewed by a pretrial services officer in October of 2012. Likewise, the Wilsons valued their second home, located on two parcels on Rainy Lake in Millersburg, Michigan, as worth $170,000 free and clear on their mortgage application (*id.*), but as only $52,000 in their presentence report. The Wilsons' evidence that they had a buyer willing to pay $60,000 for that property in April of 2013 (R. 73: Supplemental Briefing Memorandum, PgId 477), is another indication that they under-reported the value of that property in their presentence reports, since there is no indication why that the sale fell through. Meanwhile, their county equalization department values the same property as $74,000. (Govt. ex. D).

In the order filed on October 10, 2013, the court took special note of four matters. (Order, p. 6). One of those four matters was "unexplained income received in prior years from Northwest Mutual Life Insurance and Hartford Life Insurance." Government's exhibit 108 includes 1099s stating that the Wilsons

received $10,406 from Northwestern Mutual Life and $10,000 from Hartford Life in 2006.  Government exhibit 109 includes a 1099 from Hartford Life stating that they received $5,799 from that entity in 2007.  The total for the three transactions is $26, 205.

Sue Wilson's response on that issue suggests yet another instance of the Wilsons concealing assets:  She merely claims that the money in the Wilsons' accounts with those entities was withdrawn because the accounts were declining in value.  (R. 72: Supplemental Sentencing Brief, PgId 327).   That claim is made without documentation and without any attempt at explaining where the money went after it was withdrawn.

Interestingly, Gary Wilson provided a somewhat different but still undocumented response, claiming that the money was used to send two of their children to local community colleges.  (R. 73:  Supplemental Briefing Memorandum, PgId 458-59).  It is somewhat surprising that attendance at local community colleges would cost $20,406 in 2006, even if two students were attending full-time. If such was the case, receipts for those expenditures should be available, but none have been provided.  Once again, there is reason to question the completeness and accuracy of the information provided by the Wilsons regarding their assets.

There is yet one more important matter to consider regarding the finances reported by the Wilsons, and that is the matter of the income reported in their

presentence reports.  They both claim that the only household income available to them now is Gary Wilson's earnings from the auto store, supposedly income of $2,397.20 per month.  That monthly income implies a yearly income of $28,766.40.

The Wilsons' federal income tax returns for the years 2005 to 2009 were received in evidence as exhibits 107 to 111, respectively.  In all of those years, the income received by the Wilsons was well more than $2,397.20 per month or $28,766.40 per year.  In fact, if the court reviews Gary Wilson's W-2s for those years, the court can see that his earnings from the auto parts store were thousands of dollars more than $28,766.40 in each of those years.  Gary Wilson told a pretrial services officer on October 10, 2012 that his monthly income was $3,456.  Of course, Sue Wilson has voluntarily quit working for the auto parts store, and thereby voluntarily eliminated her often five-figure income from that source, though as mentioned above, she reports elsewhere that her other business has annual sales of $51,000.  (Sue Wilson W-2s from GW & SW for 2006-2009, included in Govt. exs. 108-111; Govt. ex. E).  In addition, the Wilsons report on their tax returns that they received interest and dividend income in the years 2005 to 2009.  The amounts that they reported are consistent with rather sizable investments, especially given the generally depressed interests rates prevailing in the same time period.

It is important to keep in mind the big picture when assessing the veracity of the information provided by the Wilsons to the court via their probation officer. As the court is well aware, and can take judicial notice, the housing bubble burst in 2008. Thereafter, in the spring of 2009, the Wilsons completed mortgage applications verifying, subject to criminal penalties, that their two homes were worth $310,000 and their liquid assets were worth between $115,927.40 and $425,000, all without considering the value of their businesses, vehicles and "toys" such as snowmobiles, four-wheelers, boats and trailers. They also reported on their mortgage application that their total monthly expenses were $2,792.33. The Wilsons certainly did not report a negative cash flow of $1,500 per month.

In contrast, in the spring of 2013, the Wilsons have contrived a different set of financial numbers that indicate that their living expenses are now $3,893 or more per month, or $1,100 per month more than in 2009, even though they no longer incur the costs associated with Sue Wilson's past employment. They have also reported that the aggregate value of their two homes, both of which are located in their home county of Presque Isle, is $157,000 today, despite the slow but steady improvement in the both the general economy (as manifested by the growth in their IRAs at Chemical Bank) and the housing market over the past four years. That $157,000 valuation is roughly half of what the Wilsons claimed their homes were worth on their mortgage application made at an historic low point in the economy. In like fashion, they have under-reported the value of the real property where their

16

store is located and assigned no value to the business franchise they operate at that location.  Significantly, they have not presented any evidence that they have had their real estate taxes on their residential or business properties reduced based on the losses in value they have proclaimed to the court.

In sum, the available information reveals that the Wilsons have understated the value of the assets they have acknowledged and concealed many other assets, and thereby falsely and materially reduced the asset side of their net worth calculations.  At the same time, they have under-reported and voluntarily reduced their income.  They have also have inflated their expenses. For example, they list the cost of leased vehicles when they own multiple passenger cars, a truck and a Harley Davidson motorcycle.  In fact, they claim to be spending $1,274 per month more than their co-defendants, the Pochmaras, to live in the same community, which is also more than $1,500 a month more than the Wilsons admit to earning per month.

It is not by accident that the Wilsons have concealed and understated their assets, understated and voluntarily reduced their income, and artificially inflated their expenses.  All of these measures have been pursued to give the materially false appearance that they will have difficulty paying the restitution that the court will order them to pay.  Their efforts should be recognized, not in the way that they had hoped, but with an assessment for obstruction of justice for both of them.

<u>Loss Amount Calculation</u>

The loss amount calculation for all of the defendants should include the additional Social Security that Maxine Pochmara would have received over her life expectancy as a result of the deliberately false reports of earnings attributed to her by the Wilsons for over 11 years. The court has not provided counsel for any of the parties access to the document obtained by the probation officer from the Social Security Administration regarding the impact of the fraud on Maxine Pochmara's social security benefits. The court is acting in accordance with privacy provisions of the law, and has properly disclosed to the parties the court's access to and reliance on that undisclosed information pursuant to Rule 32(h)(1)(B) of the Federal Rules of Criminal Procedure. The court has, however, shared with the parties the relevant information from that document: Consideration of the additional benefits that Maxine Pochmara would have received as a result of the fraud scheme would increase the loss amount to $400,000 or more. Counsel for the government has no reason to contest the accuracy of the court's information and suspects that the same is true for defense counsel.

But for the discovery of the scheme years after Gary Wilson helped bring the fraudulent arrangement into being, the government would have used Robert Pochmara's earnings, falsely attributed by the Wilsons to Maxine Pochmara and credited to Maxine Pochmara's social security account as a direct result of the Wilsons' actions, when computing the benefits available to Maxine Pochmara

upon her retirement.  That intended loss is properly added to the actual loss incurred by the government in the form of disability payments made to Robert Pochmara.  Those payments were induced by the Wilsons' active participation in the fraud scheme.  As discussed above, without the willingness of the Wilsons to participate, the scheme would never have been implemented and neither the actual loss to the Railroad Retirement Board nor the intended loss to Social Security would be losses for which the Wilsons justifiably are held responsible.

Sue Wilson contends that she and her husband should not be accountable for the fraud against Social Security because they supposedly would have paid social security on behalf of someone else if Robert Pochmara  had not been working at the auto parts store. (R. 72: Supplemental Sentencing Brief, PgId 328).  That contention is no answer to the loss calculation question, however.  For whatever reasons, the Wilsons chose to not hire someone else and to pay that person properly, like they did their employees other than Robert Pochmara.  Likewise, the Wilsons decided to not pay Robert Pochmara for his work using his name and social security number.  It is the consequence of what the Wilsons did until their crimes were discovered that matters in making the loss calculation.

The Wilsons have been convicted by a jury of knowingly submitting false information to the Social Security Administration.  That is exactly what the Wilsons did.  Like other employers, the Wilsons had both the right and obligation to employ workers willing to work for wages paid under the workers' true names

and social security numbers.  The Wilsons, however, deliberately chose to provide false information to the SSA and the IRS rather than to refuse to participate in the fraud scheme with the Pochmaras.

The Wilsons cannot claim that they were deceived by a worker who provided false identity documents or that they were simply negligent in failing to verify the employability of one of a large cadre of employees.  On the contrary, the Wilsons agreed with two – or maybe three -- of their long-time associates to repeatedly and continuously engage in false reporting of information to both the IRS and the SSA for their financial benefit as well as the Pochmaras' gain.  It therefore is entirely appropriate that the potential overpayment of social security benefits to Maxine Pochmara contributes to the loss amount for which the Wilsons are held responsible.

<u>Obstruction of Justice/Attempted Witness Intimidation by Gary Wilson</u>

Gary Wilson has indicated that he intends to offer testimony acknowledging his contacts with the government witnesses who live and work in his home community of Rogers City.  The court has already heard testimony from some of the government's witnesses regarding this matter.  Unless he is able to provide an exculpatory explanation for his conduct, Gary Wilson should be assessed point for obstruction of justice.  Alternatively, his conduct could be recognized by departing above the advisory guideline sentencing range.

<u>Conclusion</u>

Because Gary Wilson has attempted in many ways to deceive the court regarding his finances and role in the offenses, and has attempted to intimidate witnesses who could provide testimony against him at trial, a compelling argument can be made for an upward departure for him.  His lack of acceptance of responsibility and remorse also weigh in favor of an upward departure or a sentence at the high end of the recommended sentence range.  Likewise, the need to deter others who might be tempted to engage in similar fraud schemes against Social Security or the Railroad Retirement Board weighs in favor of a substantial sentence.

For the reasons discussed above, in the government's initial sentencing memorandum, and in the objections to the presentence report previously submitted by the government, Gary Wilson's offense level should be increased by two points to reflect the intended loss amount of at least $400,000, and he should be assessed two points for obstruction of justice.  His offense score thereby will be 22 and, with his criminal history category of I, his guideline range will be 41 to 51 months. The custodial portion of his sentence should be at the top or above that range.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

Dated:  November 8, 2013

s/Janet L. Parker
Janet L. Parker (P34931)

Assistant U.S. Attorney
101 First Street, Ste. 200
Bay City, MI 48708
989-895-5712
janet.parker2@usdoj.gov

Certificate of Service

I certify that on November 8, 2013 I electronically filed the above document with the Clerk of the Court using the ECF system which will automatically serve counsel of record.  In addition, the government's trial exhibits and exhibits provided for sentencing purposes have been submitted to the court in digital and paper copy formats to be filed under seal.  Digital copies of all of those documents were mailed to defense counsel of record today, too.

s/Janet L. Parker
Janet L. Parker (P34931)