Jury Trial, Vol. IV of V

489

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


UNITED STATES OF AMERICA,

          Plaintiff,

v.                          File No. 12-20607

GARY L. WILSON and SUE A. WILSON,

          Defendants.
_____/


JURY TRIAL

VOLUME IV OF V


BEFORE THE HONORABLE THOMAS L. LUDINGTON

United States District Judge

United States Post Office Building

1000 Washington Avenue

Bay City, Michigan  48708

Friday, May 24, 2013

Jury Trial, Vol. IV of V

490

APPEARANCES:


For the Plaintiff:        JANET L. PARKER (P34931)
                          U.S. Attorney's Office
                          Eastern District of Michigan
                          101 1st Street
                          Suite 200
                          Bay City, Michigan  48708
                          Phone: (989) 895-5712
                          janet.parker2@usdoj.gov


                          ANCA POP (P70032)
                          U.S. Attorney's Office
                          Eastern District of Michigan
                          101 1st Street
                          Suite 200
                          Bay City, Michigan  48708
                          Phone: (989) 895-5712
                          anca.pop@usdoj.gov



For Defendant Gary
        Wilson:          STEVENS J. JACOBS (P37740)
                          Jacobs law Office
                          45 N. Tuscola Road
                          Bay City, Michigan   48708
                          Phone:  (989) 892-8611
                          jacobslawoffice@sbcglobal.net


For Defendant Sue
        Wilson:          JAMES F. PIAZZA (P30172)
                          803 Court Street
                          Saginaw, Michigan   48602
                          Phone:  (989) 791-1813
                          jfpia@aol.com


To Obtain a Certified Transcript:

PEG L. GOODRICH, CSR-0258, RMR
Federal Official Court Reporter
www.transcriptorders.com

Jury Trial, Vol. IV of V

491

# T A B L E   O F   C O N T E N T S

PAGE

WITNESSES:

    JEFFREY HACKETT
        Direct Examination (Cont'd) by Ms. Parker      493
        Cross-Examination by Mr. Jacobs          525
        Cross-Examination by Mr. Piazza          535


STATEMENTS WITH DEFENDANTS REGARDING THEIR RIGHTS:     538


RULE 29 MOTION:     541


OBJECTIONS TO JURY INSTRUCTIONS:     546


CERTIFICATE OF COURT REPORTER:     557

EXHIBITS:     IDENTIFIED RECEIVED

GX   1   - summary exhibit     511     512
GX  32   - corporation information 1998     502     503
GX  33   - corporation information 1999     502     503
GX  40   - Huron Bank signature card     493     494
GX  41A  - computerized print-out     493     495
GX  42   - mortgage document     493     496
GX  43   - installment loan agreement     493     496
GX  44   - installment loan agreement     493     496
GX  45   - installment loan agreement     493     496
GX  46   - single payment loan agreement     493     496
GX  47   - single payment loan agreement     493     496
GX  48   - single payment loan agreement     493     496
GX 160A-B - M. Pochmara pay history reports     505     507

Jury Trial, Vol. IV of V

492

1          Bay City, Michigan

2          Friday, May 24, 2013

3          At 8:48 a.m.

4     (Court, counsel and defendants present; out of the

5     presence of the jury)

6     THE COURT:  Good morning.

7     MS. PARKER:  Good morning, your Honor.

8     MR. JACOBS: Good morning.

9     MR. PIAZZA:  Good morning.

10    THE COURT:  Are counsel ready to proceed?

11    MS. PARKER:  Government is ready.

12    MR. JACOBS:  Yes, sir.

13    MR. PIAZZA:  Defense is ready.

14    THE COURT:  Could we have the jury, please.

15    (At 8:51 a.m. - jury enters courtroom)

16    THE COURT:  Good morning.

17    THE JURY:  Good morning.

18    THE COURT:  Please be seated.

19         The government, as I recall, you were about to recall a

20 witness.

21         MS. PARKER:  That is correct.  The government would

22 recall Jeff Hackett to the stand.

23         THE COURT:  Sir, you recall that you were placed under

24 oath and that you will continue to provide testimony in that

25 capacity?

Jury Trial, Vol. IV of V

493

1     THE WITNESS:  Yes, your Honor.

2     THE COURT:  Please have a seat, sir.

3                   JEFFREY HACKETT

4  Having previously been duly sworn on 5/22/13, testified as

5  follows:

6              DIRECT EXAMINATION (Continued)

7  BY MS. PARKER:

8  Q.   All right.  Mr. Hackett, I'm trying to sort of pick up

9  where we left off.  I believe you had testified already regarding

10  Exhibits 24A and B and C and 25 which were the inquiries that the

11  Railroad Retirement Board sent out to NAPA Auto Parts, is that

12  correct?

13  A.   That's correct.

14  Q.   Were there other -- well, you've already indicated there

15  were other subpoenas that you did as part -- or caused to serve

16  as part of the investigation in this case.

17  A.   That's correct.

18  Q.   And over the course of time, you collected other various

19  records relating to the investigation.

20  A.   Correct.

21  Q.   I would like to show you Government's Exhibits 40, 41A and

22  also 42 through 48.  Do you recognize those?

23  A.   Yes, I do.

24  Q.   Are those exhibits that you obtained through subpoenas to

25  the Huron National Bank?

Jury Trial, Vol. IV of V

494

1  A.   Yes, they are.

2  Q.   And is that located in the Rogers City area?

3  A.   Yes, it is.

4  Q.   And are these for -- let me ask it this way.  What is

5  Exhibit 41?

6  A.   Are you referring to 41A?

7  Q.   I'm sorry, 40.  I'm sorry, I misspoke.  Sorry.

8  A.   Forty is a signature card for Huron National Bank.

9  Q.   Is that for the account for GW & SW?

10 A.   Yes, GW & SW, Inc., in parentheses, (NAPA, W.W. Auto

11 Parts).

12 Q.   Okay.

13      MS. PARKER:  Your Honor, I offer Exhibit 40.

14      MR. JACOBS:  No objection.

15      MR. PIAZZA:  No comment.

16      THE COURT:  Forty is received.

17 BY MS. PARKER:

18 Q.   And now we will go to 41A.  I believe I gave you that one.

19 What is 41A?

20 A.   Ah, 41A is a computerized print-out regarding account

21 information, regarding GW & SW, Inc.

22 Q.   For what time period?

23 A.   It's dated September 30 of 2004.

24 Q.   All right.

25      MS. PARKER:  Your Honor, I will offer Government's

Jury Trial, Vol. IV of V

495

1  Proposed Exhibit 41A.

2          MR. JACOBS:  No objection.

3          MR. PIAZZA:  I believe that's already been admitted.

4          MS. PARKER:  No, B through F were admitted.

5          MR. PIAZZA:  Okay, I'm sorry.  Okay.  No comment then.

6          THE COURT:  It will be received into evidence.

7  BY MS. PARKER:

8  Q.   And Exhibit 42 is what kind of document?

9  A.   Forty-two is a document relating to a mortgage.

10 Q.   And who -- is GW & SW involved in that mortgage?

11 A.   It is, yes.

12 Q.   Through Huron National Bank?

13 A.   Yes.

14 Q.   And the time frame of the mortgage?

15 A.   July 22nd, 2004.

16 Q.   And Exhibits 23, 24, and 25, are those installment loan

17 agreements?

18 A.   Forty-three?  I'm sorry.

19 Q.   Excuse me, sorry.  I have dyslexia this morning.  It would

20 be  43, 44 and 45.

21 A.   Yes, 43, 44 and 45 are installment loan agreements.

22 Q.   And 46, 47 and 48 are single payment loan agreements?

23 A.   That's correct.

24          MS. PARKER:  Your Honor, I offer Government's Proposed

25 Exhibits 42, 43, 44, 45, 46, 47 and 48.

Jury Trial, Vol. IV of V

496

1        MR. JACOBS:  I have no objection.

2        MR. PIAZZA:  No comment.

3        THE COURT:  They will be received into evidence.

4   BY MS. PARKER:

5   Q.   All right.  Let's go back to Exhibit 40 then and I will ask

6   that that be displayed, please.

7        MS. PARKER:  I'm sorry, your Honor, can you turn on the

8   system for us?

9        THE COURT:  Yes.

10  BY MS. PARKER:

11  Q.   All right.  While that's being done, can you refer to the

12  middle of that document and read for us what is in the block

13  entitled, Account Owner Name and Address?

14  A.   Yes.  Account Owner Name and Address, GW & SW, Inc., (NAPA

15  W & W Auto Parts), Wilson, comma, Gary or Sue or Pochmara, comma,

16  Robert or Pochmara, comma, Maxine, 1095 West 3rd Street, Rogers

17  City, Michigan, 49779, with an account number listed as

18  10034309.

19  Q.   And are there four signatures below there?

20  A.   There are.

21  Q.   And do they correspond to the four people's names you just

22  read to us?

23  A.   Yes.

24  Q.   Let's go on to 41A briefly.  You said that's a print-out of

25  the first page of the bank statement?

Jury Trial, Vol. IV of V

497

1  A.   Correct.

2  Q.   And, excuse me, at the top, the address is what?

3  A.   The address is 1095 West 3rd, Rogers City, Michigan, 49779.

4  Q.   And the names for that address are given as what?

5  A.   GW & SW, Inc., parentheses, (NAPA W & W Auto Parts), Gary or

6  Sue Wilson, or Robert or Maxine Pochmara.

7  Q.   And the date on this?

8  A.   September 30, 2004.

9  Q.   Turning now to Exhibit 42, you've indicated that was a

10 mortgage dated July 22nd, 2004.

11 A.   Correct.

12 Q.   And the mortgagor listed on the mortgage is?

13 A.   GW & SW, Inc., a Michigan corporation.

14 Q.   And the amount of mortgage?

15 A.   $100,000.

16 Q.   And do you see in the middle four initials, four sets of

17 initials?

18 A.   I do.

19 Q.   Going then to the last -- the front of the second page, I

20 guess I will put it that way -- going to the bottom, do you see a

21 section where it says, "Personally guaranteed by"?

22 A.   I do.

23 Q.   And what are the names that are written in there?

24 A.   The names appear to be Gary Wilson, Sue Wilson, Robert

25 Pochmara and Maxine Pochmara.

Jury Trial, Vol. IV of V

498

1   Q.   And then after that, it says, "GW & SW, Incorporated, signed

2   by"?

3   A.   Correct.

4   Q.   And are those same names represented there?

5   A.   Yes.

6   Q.   Let's go on to Exhibit 43, please.  Now, this is an

7   installment loan agreement?

8   A.   Yes, it is.

9   Q.   And the date of it?

10  A.   July 22nd, 2004.

11  Q.   And the amount financed?

12  A.   The amount financed, $100,208.

13  Q.   And in the middle, do you see where it says, "security"?

14  Maybe above the middle.

15  A.   Yes, I do.

16  Q.   Sorry.

17  A.   Security, yes, I see it.

18  Q.   All right.  And what does it say that is provided as

19  security?

20  A.       "Secured by real estate mortgage dated July

21       22nd, 2004.  Also secured by an all-asset filing

22       dated July 22nd, 2004."

23  Q.   Okay.  And then at the bottom, do you see a guarantor's

24  agreement?

25  A.   I do.

Jury Trial, Vol. IV of V

1  Q.   And the purported signatures there are?

2  A.   Gary Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara.

3  Q.   And to the right of that, it says, "For GW & SW,

4  Incorporated?"

5  A.   Correct.

6  Q.   What does it say there?

7  A.   "GW & SW, Incorporated, NAPA W & W Auto Parts, Gary

8  Wilson --"

9  Q.   Excuse me just for a second.  That NAPA W & W Auto Parts, is

10 that typed in like GW & SW?

11 A.   No, that's handwritten.

12 Q.   Okay.  And what are the purported signatures?

13 A.   Gary Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara.

14 Q.   Going on to Exhibit 44, this is another installment loan

15 agreement, is that correct?

16 A.   Hold on.  Yes.

17 Q.   And the date?

18 A.   December 15th, 2005.

19 Q.   The amount financed?

20 A.   $100,050.

21 Q.   And again, the indication is it's secured by a real estate

22 mortgage?

23 A.       "Secured by real estate mortgage dated July

24         22nd, 2004.  Also secured by an all-asset filing

25         dated July 22nd, 2004."

Jury Trial, Vol. IV of V

1  Q.   And down in the lower left-hand corner, a guarantor's

2  agreement?

3  A.   Correct.  It's dated December 15, 2005.

4  Q.   And the names signed -- purportedly signed?

5  A.   Gary Wilson, Sue Wilson, Robert Pochmara and Maxine

6  Pochmara.

7  Q.   All right.  And to the right of that, it says, "Borrower's

8  agreement," what is typed in there?

9  A.   Typed in there is, "NAPA W & W Auto Parts, GW & SW, Inc."

10 Q.   And then the purported signatures?

11 A.   Gary Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara.

12 Q.   Going on to Exhibit 45, please.  This is yet another

13 installment loan agreement?

14 A.   Correct.

15 Q.   And the date?

16 A.   April 10, 2008.

17 Q.   And the amount?

18 A.   $99,925.

19 Q.   And again, at the bottom in two places, are there purported

20 signatures?

21 A.   Yes, there are.

22 Q.   And for whom?

23 A.   Under guarantor's agreement, Gary Wilson, Sue Wilson, Robert

24 Pochmara, Maxine Pochmara.  And under --

25 Q.   Sorry, go ahead.

Jury Trial, Vol. IV of V

501

1  A.   Sorry -- borrower's agreement, Gary Wilson, Sue Wilson,

2  Robert Pochmara, Maxine Pochmara.

3  Q.   All right.  Let's go on to Exhibit 46.  Is this a single

4  payment loan agreement?

5  A.   Yes, it is.

6  Q.   And what is the date of that agreement?

7  A.   November 21st, 2005.

8  Q.   And the amount financed?

9  A.   $5,000.

10  Q.   And down under the guarantee -- excuse me, guarantor's

11  agreement, how is that purportedly signed?

12  A.   Two signatures, Gary Wilson, Robert Pochmara.

13  Q.   And going to the right under borrower's agreement, what are

14  the signatures purportedly there?

15  A.   Gary Wilson and Robert Pochmara.

16  Q.   No Maxine or Sue?

17  A.   No, not that I see.

18  Q.   Going on to Exhibit 47, this is another single payment loan

19  agreement?

20  A.   Yes, it is.

21  Q.   And the date?

22  A.   January 9, 2007.

23  Q.   The amount?

24  A.   $15,000.

25  Q.   And who are the signatories to this agreement?

Jury Trial, Vol. IV of V

502

1  A.   Gary Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara.

2  Q.   That's on both sides of the exhibit?

3  A.   Yes.

4  Q.   And Exhibit 48?

5  A.   Yes, I have it.

6  Q.   That's a single payment loan agreement again?

7  A.   Yes, it is.

8  Q.   What's the date?

9  A.   January 8, 2008.

10 Q.   And what's the amount?

11 A.   $15,000.

12 Q.   And the purported signatories to the agreement?

13 A.   Gary Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara.

14 Q.   Next, I would like to show you Government's Proposed

15 Exhibits 32 and 33.  Do you recognize those?

16 A.   I do.

17 Q.   What are those two documents?  How are they titled?

18 A.   Corporation Information Update.

19 Q.   And for what corporation?

20 A.   GW & SW, Inc.

21 Q.   And Exhibit 32 is for what date?  Or year, I should ask,

22 perhaps.

23 A.   1998.

24 Q.   And Exhibit 33 is for what date?

25 A.   1999.

Jury Trial, Vol. IV of V

503

1          MS. PARKER:  Your Honor, I offer Government's Proposed

2   Exhibits 32 and 33.

3          MR. JACOBS:  No objection, your Honor.

4          MR. PIAZZA:  No comment.

5          THE COURT:  Exhibits 32 and 33 are received.

6   MS. PARKER:

7   Q.   And I would like to ask that Exhibit 32 be displayed,

8   please.

9          Again, this is a document entitled Corporation

10  Information Update?

11  A.   That's correct.

12  Q.   And it has what address at the top?

13  A.   GW & SW, Inc., 1095 West 3rd Street, Rogers City, Michigan,

14  49779.

15  Q.   And below in Section 5, who are listed as the officers of

16  the corporation?

17  A.   Under President, Gary L. Wilson; Secretary, Sue A. Wilson;

18  Treasurer, Maxine Pochmara.

19  Q.   And what is the address given for Gary Wilson?

20  A.   1329 Klee Road, Rogers City, Michigan, 49779.

21  Q.   Same for Sue?

22  A.   That's correct, same address.

23  Q.   What about Maxine Pochmara?

24  A.   1350 Klee Road, Rogers City, Michigan, 49779.

25  Q.   And is there a purported signature there?

Jury Trial, Vol. IV of V
504

1   A.   There is a signature at the bottom, yes.

2   Q.   I'm sorry?

3   A.   Yes, there is a signature at the bottom.

4   Q.   And what is that -- what's written there?

5   A.   Sue A. Wilson.

6   Q.   Title?

7   A.   Co-owner.

8   Q.   And date?

9   A.   March 2nd, '98, 3/2/98.

10  Q.   All right.  Going on to the next one, Exhibit 33, is for

11  1999?

12  A.   Yes.

13  Q.   The address at the top for the corporate name and mailing

14  address?

15  A.   GW & SW, Inc., 1095 West 3rd Street, Rogers City, Michigan,

16  49779.

17  Q.   And who are the officers listed there?

18  A.   President, Gary L. Wilson; Vice President, Maxine Pochmara;

19  Secretary, Sue Wilson; Treasurer, Sue Wilson.

20  Q.   And the address given for all four?

21  A.   1095 West 3rd Street, Rogers City, Michigan, 49779.

22  Q.   And what is the name signed at the bottom?

23  A.   Sue Wilson.

24  Q.   And title?

25  A.   Sec/Treas.

Jury Trial, Vol. IV of V

505

1  Q.   And the date?

2  A.   3/5/99.

3  Q.   Next, I would like to show you Government's Proposed

4  Exhibits 160A and B.  What are those?

5  A.   These are wages or earnings that were paid to Maxine

6  Pochmara.

7  Q.   By?

8  A.   Northeast Michigan Community Mental Health.

9  Q.   And are they for the period 1997 to 2010?

10  A.   Yes, they are.

11       MS. PARKER:  Your Honor, I would offer Government's

12  Proposed Exhibits 160A and B.

13       MR. PIAZZA:  May I see the exhibit, your Honor?  If I

14  may voir dire?

15       THE COURT:  Yes, if you could use the podium, please.

16       MR. PIAZZA:  Yeah, okay.

17  BY MR. PIAZZA:

18  Q.   In the A exhibit before you, that has sub-records relating

19  to wages and items taken out of Maxine Pochmara, is that

20  correct?

21  A.   Correct.

22  Q.   But those years in Exhibit -- you know, A, is limited to

23  what, 1997, '98, '99?

24  A.   That's correct.

25  Q.   Okay.  And B is a different type of record of those years,

Jury Trial, Vol. IV of V

506

1   is that correct?  Or is that in addition?

2   A.   It appears to be so, yes.

3   Q.   Now, Exhibit A though, you don't have the remaining years in

4   that format, in that exhibit, do you?

5   A.   No.  That format is for '97, '98 and '99.

6        MR. PIAZZA:  I would object to these.  Exhibit, I

7   believe it's 160A, only has three years, one in 1997 which isn't

8   relevant to the proceedings, but only has '98 and '99.  They are

9   missing the other remaining years in that format so they are

10  incomplete.  So I would object.

11       MS. PARKER:  Your Honor, together, they cover the

12  period -- I would represent to the Court, that the entity changed

13  their computers over time and the nature of their print-outs

14  simply changed.  There has been a certificate of authenticity.

15  These documents were provided in discovery months ago.  Copies

16  were given as marked exhibits to counsel a week ago and --

17       THE COURT:  The only question I have is the time period

18  that they cover.

19       MS. PARKER:  Well, they do go from '97 to 2010 but

20  that's sort of the nature of the way they are on the computer

21  print-out.  The pages roll through.

22       THE COURT:  I -- I misunderstood.  I thought they were

23  actually limited to a period of time that was outside of the

24  dates of the indictment.  They actually overlap.

25       MS. PARKER:  They bracket it and slightly exceed by a

Jury Trial, Vol. IV of V

507

1  year at either end.

2       THE COURT:  Did you understand that, sir?

3       MR. PIAZZA:  Yes, I do.

4       THE COURT:  Okay.  I'm going to overrule the

5  objection.

6  BY MS. PARKER:

7  Q.   Let's go to the first page of Exhibit 160A then for display,

8  please.

9       All right.  This document may be a little bit difficult

10 at first look to interpret.  Have you spent a little time looking

11 at this so you can follow through on this?

12 A.   Yes.

13 Q.   All right.  On the top of the page, do you see any columns

14 across the top?

15 A.   Yes.

16 Q.   And do they have any headings?

17 A.   Yes, they do.

18 Q.   Where are those headings located?

19 A.   Going from left to right, the last name, first name, check

20 number, period ending date, total hours, REG/VAC/OC hours,

21 overtime hours, REG/VAC/OC pay, overtime pay, special pay, gross

22 pay, federal tax, FICA tax, state tax.

23 Q.   And is that at the very top of the page or is that --

24 A.   I'm sorry.  That's about a third up from the bottom.

25 Q.   All right.  But is there an entry at the very top of the

Jury Trial, Vol. IV of V

508

1  page on the left with the name?

2  A.   There is.

3  Q.   And that is?

4  A.   Pochmara, Maxine.

5  Q.   Going to the second page of Exhibit 160A, at this point, are

6  there captions going all the way across?

7  A.   Yes, there are.

8  Q.   All right.  And below the caption, there is some -- some

9  dark spots.

10  A.   Correct.

11  Q.   And what's your understanding of what that is?

12  A.   That those were for another employee of the same corporation

13  or business and they removed that employee's name.

14  Q.   So the first couple entries there do not belong to Maxine

15  Pochmara whose records you were subpoenaing.

16  A.   That's correct.

17  Q.   But then the captions would apply throughout the page.

18  A.   Correct.

19  Q.   And to the right of the name, the third column or heading is

20  what?

21  A.   Total hours.

22  Q.   All right.  And then below that, that has the hours for what

23  time period for Maxine Pochmara?

24  A.   From January 3rd, 1998 --

25  Q.   Going to what?

Jury Trial, Vol. IV of V

509

1   A.   On this page, until December 19th of '98.

2   Q.   And then a total number of hours at the bottom?

3   A.   That's correct.

4   Q.   And the next page is 1999?

5   A.   Yes.

6   Q.   And this page is solely for Maxine Pochmara?

7   A.   Yes.

8   Q.   And again, there is a column, total hours?

9   A.   Total hours are listed at the bottom as 2,118.5.

10  Q.   And the time period covered there?

11  A.   January 2nd of 1999 until December 18th of 1999.

12  Q.   And throughout that time, is there at least 80 hours with

13  the exception of one week posted?

14  A.   Yes, with the exception of one week posted, they are all at

15  least 80 hours.

16  Q.   Let's go on to Exhibit 160B.  Exhibit 160A left off in 1999,

17  correct?

18  A.   That's correct.

19  Q.   And 160B picks up where?

20  A.   The date of January 13, 2000.

21  Q.   And again, this is a record for whom?

22  A.   Maxine Pochmara.

23  Q.   And at the top of the document, in the middle, it lists the

24  name of the employer?

25  A.   It does, to the far right.

Jury Trial, Vol. IV of V

510

1   Q.   As?

2   A.   Maxine Pochmara.

3   Q.   And for the employer?  I'm sorry.

4   A.   I'm sorry, employer, Northeast Michigan Community Mental

5   Health.

6   Q.   And below that?

7   A.   Employee pay history report, U.S. payroll.

8   Q.   And is there a column for hours on this document, also?

9   A.   There is.

10  Q.   Okay.  Going on to the next page, does it continue with the

11  hours for 2010?

12  A.   Yes.  It continues that way all the way up until September

13  9th of 2010.

14  Q.   And then the next page goes through -- goes to the end of

15  the year?

16  A.   I'm sorry, which page are you on?  Three?

17  Q.   The third page for 2000.

18  A.   Yes, it goes to September 28 of 2000.

19  Q.   All right.  And the hours would be consistent with a

20  full-time employment?

21  A.   The hours are consistently -- they appear to be at least 80

22  hours for each pay period.

23  Q.   All right.  The next page then would be starting on January

24  11, 2001?

25  A.   January 11, 2001, yes.

Jury Trial, Vol. IV of V

511

1  Q.   Again, for Maxine Pochmara?

2  A.   Yes.

3  Q.   And continuing in the same format through the end of the

4  exhibit, for the various years?

5  A.   Yes.

6  Q.   Next, I would like to show you Government's Proposed

7  Exhibit 1.  Do you recognize that, sir?

8  A.   Yes, I do.

9  Q.   Is that a chart that basically summarizes various matters

10 relating to the investigation in this case?

11 A.   Yes.

12 Q.   Specifically regarding the earnings reported to Social

13 Security for Maxine Pochmara from GW & SW Auto Parts?

14 A.   Yes.

15 Q.   And also from the Northeast Michigan Community Mental Health

16 Authority?

17 A.   Yes.

18 Q.   And also the GW & SW taxable income?

19 A.   Yes, that's correct.

20 Q.   And how was this -- is this chart based on the matters now

21 that are already in evidence?

22 A.   Yes.

23 Q.   Basically taking numbers off the exhibits and plotting them

24 on the chart and then putting them on a graph below and

25 connecting the dots?

Jury Trial, Vol. IV of V

512

1  A.   Correct.

2  Q.   All right.

3       MS. PARKER:  Your Honor, I offer Government's Proposed

4  Exhibit 1.

5       MR. JACOBS:  Brief voir dire on Exhibit 1, your Honor?

6       THE COURT:  All right.

7  BY MR. JACOBS:

8  Q.   Sir, the summary shows, like earnings reported.  Do

9  summaries also show the monies actually paid in, like towards

10 Social Security?

11 A.   Are you referring to column one, earnings as reported?

12 Q.   Yes.

13 A.   No, that just lists what was reported by Maxine Pochmara's

14 employer or from GW & SW Auto Parts to the Social Security

15 Administration.

16 Q.   Earnings reported, not monies paid in, correct?

17 A.   Correct.

18      MR. JACOBS:  No further questions.  No objection, your

19 Honor.

20      MS. PARKER:  Okay.

21      MR. PIAZZA:  No comment, your Honor.

22      THE COURT:   Received.

23      MS. PARKER:  May they be received, your Honor?

24      THE COURT:  It will.

25 BY MS. PARKER:

Jury Trial, Vol. IV of V

513

1  Q.   I would ask that Exhibit 1 be displayed, please.

2       All right.  Let's go to the top of this.  On the far

3  left, there is a column.  What is that first column on the left,

4  please?

5  A.   Reporting year.

6  Q.   And below that, the first year is?

7  A.   1998.

8  Q.   And the last year?

9  A.   Is 2010.

10  Q.   And the next column to the right is what?

11  A.   Earnings as reported to SSA, meaning Social Security

12  Administration, for Maxine Pochmara from GW & SW Auto Parts.

13  Q.   And is there a color outline to that box?

14  A.   Yes, it's red.

15  Q.   What color?

16  A.   Red.

17  Q.   Okay.  To the right of that there is another column labeled

18  what?

19  A.   Summary of earnings from Northeast Michigan Community Mental

20  Health Authority.

21  Q.   And to the right of that?

22  A.   GW & SW taxable income.

23  Q.   All right.  I should have asked you this.  The one box was

24  outlined in red.  The middle box regarding the earnings from

25  Northeast Michigan, how is that outlined, what color?

Jury Trial, Vol. IV of V

514

1    A.    A green.

2    Q.    And the one for GW & SW taxable income?

3    A.    I guess violet, purple.

4    Q.    Okay.  And the numbers below there, some of those are in

5    black and some of those are in red?

6    A.    Correct.

7    Q.    And what -- why is that?

8    A.    Those in red are negative earnings or showing a loss.

9    Q.    And then below that, there is a graph?

10   A.    That's correct.

11   Q.    And there is three different-colored lines.

12   A.    That's correct.

13   Q.    What does the red line correspond to?

14   A.    The red line corresponds to the earnings as reported to

15   the Social Security Administration for Maxine Pochmara from GW &

16   SW Auto Parts.

17   Q.    The green line?

18   A.    The green line is the summary of earnings from Northeast

19   Michigan Community Mental Health Authority.

20   Q.    Again, for Maxine Pochmara?

21   A.    For Maxine Pochmara.

22   Q.    And the violet line?

23   A.    GW & SW taxable income.

24   Q.    And on the vertical access of the graph, the far left side,

25   what numbers are there?

Jury Trial, Vol. IV of V

515

1  A.   At the very top, forty thousand, next, thirty-five thousand,

2  thirty thousand, twenty-five thousand, twenty thousand, fifteen

3  thousand, ten thousand, five thousand, zero, negative five

4  thousand, negative ten thousand.

5  Q.   And then the horizontal access is covering what time

6  periods?

7  A.   The years 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005,

8  2006, 2007, 2008, 2009, 2010.

9  Q.   Okay.  Based on your employment, are you familiar with the

10 threshold earning limits for disability when it changed from four

11 hundred?

12 A.   Yes.

13 Q.   When?

14 A.   In 2007.

15 Q.   And as part of your involvement in the investigation, did

16 you write up reports of your interviews of various witnesses?

17 A.   Yes.

18 Q.   Did you prepare reports for witnesses Stanley Krajnik and

19 Steve Porter?

20 A.   I did.

21 Q.   And make those available for disclosure and discovery?

22 A.   Yes.

23 Q.   And looking at the evidence in this case, was Mr. Pochmara

24 over the threshold for Railroad Retirement Board income for every

25 month between January of 1998 and March of 1999?

Jury Trial, Vol. IV of V

516

1       MR. PIAZZA:  Your Honor, I'm going to object to that.

2   First of all, this witness hasn't been qualified as an expert.

3   Secondly, that's a fact decision for the jury to make a

4   determination.

5       THE COURT:  I don't quite understand the question.

6       MS. PARKER:  Perhaps I can rephrase it.

7       THE COURT:  Okay.

8   BY MS. PARKER:

9   Q.   All right.  You're aware that there were earning limitations

10  for Robert Pochmara relative to his railroad retirement --

11  disability retirement?

12  A.   That's correct.

13  Q.   And have you compared the earnings reported for Maxine

14  Pochmara for that time period that Mr. Pochmara was on railroad

15  disability?

16  A.   Yes.

17  Q.   I should say the earnings from -- reported by GW & SW,

18  Incorporated.

19  A.   Yes.

20  Q.   And how did those earnings, monthly earnings compare to the

21  limit?

22      MR. PIAZZA:  I'm going to object, to that, your Honor.

23  I don't see, you know, comparing what one person got paid to the

24  limit on somebody else that is on disability, that's a question

25  of fact for the jury to make a determination, not for the witness

Jury Trial, Vol. IV of V

517

1  to, you know, make an assumption on.

2            THE COURT:  Well, it's not a complicated equation.  As

3  soon as the witness -- the witness testifies concerning what the

4  amount of limitation it is, respectfully, it's just drawing a

5  conclusion.

6            MS. PARKER:  And I think that's within this witness's

7  province.

8            THE COURT:  I agree.  I will overrule the objection.

9            THE WITNESS:  Can you ask the question again.  I'm

10 sorry.

11           MS. PARKER:  I will try.

12 BY MS. PARKER:

13 Q.   Did the earnings reported as being Maxine Pochmara's

14 earnings from GW & SW between January of 1998 and March of 2009,

15 how did that compare to the earning limitations that applied to

16 Robert Pochmara?

17 A.   Those monthly earnings were in excess of what was allowed

18 for a disability annuitant in the same months and/or year.

19 Q.   In fact, are there earning limitations for people who are on

20 just regular old age retirement?

21 A.   Up to their full retirement age, yes.

22 Q.   All right.  And did those earnings exceed that?

23           MR. JACOBS:  Your Honor, I would object.  That's not

24 relevant whether the earnings exceeded for somebody who is

25 normally on retirement.  I mean, how do we know what earning

Jury Trial, Vol. IV of V

518

1  limits there are for someone who is normally retired?

2         MS. PARKER:  Well, your Honor, I think the assertion

3  that I understood the defense to be making was that they thought

4  he was on retirement.  They didn't know he was on disability

5  retirement.

6         THE COURT:  We have heard that.  The witness can respond

7  to the question.

8         THE WITNESS:  They exceeded -- they would exceed

9  earnings restrictions for someone on a regular retirement as

10  well.

11  BY MS. PARKER:

12  Q.   As part of your investigation, did you talk to Gary Wilson

13  on two different occasions?

14  A.   Yes.

15  Q.   When was the first occasion?

16  A.   November of 2008.

17  Q.   And when was the next time?

18  A.   January of 2010.

19  Q.   So it would be a little more than a year later?

20  A.   That's correct.

21  Q.   Between those two interviews, had you done, as part of your

22  investigation, gathering some of the documents that are now in

23  evidence?

24  A.   That's correct.  There were further Grand Jury subpoenas

25  issued.

Jury Trial, Vol. IV of V

519

1  Q.   All right.  And did you obtain documents from those?

2  A.   Yes.

3  Q.   And did that include records from places such as the Huron

4  National Bank?

5  A.   Yes.

6  Q.   And looking at those records and concerning what you've been

7  told on your first interview, was that -- how did that affect

8  your thinking?

9  A.   It caused me --

10       MR. JACOBS:  I would object to what his thinking was,

11  your Honor.  How would that affect his thinking?

12       MS. PARKER:  I think it's kind of a res gestae thing,

13  judge.

14       MR. JACOBS:  For this witness to testify as to my

15  client's res gestae?

16       THE COURT:  I'm not sure whose mental impression you're

17  asking for.  Is it --

18       MS. PARKER:  The witness's.

19       THE COURT:  -- the witness's?  Could you ask the

20  question one more time.  I need to think about it.

21       MS. PARKER:  I will try to do that.

22  BY MS. PARKER:

23  Q.   Having reviewed the documents that you were collecting in

24  the course of the investigation, including the financial

25  documents from Huron National Bank, how did that affect your

Jury Trial, Vol. IV of V

520

1  thinking on the course of the investigation?

2          THE COURT:  I will sustain the objection.

3          MS. PARKER:  All right.

4  BY MS. PARKER:

5  Q.   Let me ask it this way.  When you went to talk to Mr. Wilson

6  the second time, did you have additional questions you were

7  hoping to get answers to?

8  A.   Yes.

9  Q.   All right.  And when you met with him the second time, did

10 you show him some of the documents that you had obtained as part

11 of the investigation?

12 A.   That was the first time, in November of 2008.

13 Q.   Okay.  What did you show him?

14 A.   In November of 2008, myself and Agent Myers who is another

15 agent with our agency, showed Mr. Wilson the OI-41, which were

16 the -- which was the wage request for Robert Pochmara which was

17 received back in our office, as well as the articles of

18 incorporation, and also a letter that had the signature of Sue

19 Wilson on it.

20 Q.   All right.  So what you are referring to as an OI form 41,

21 is that what's now marked as Exhibit 41A?

22 A.   I believe so.

23 Q.   Excuse me.  I think I misspoke, 24A.

24 A.   I don't have it in front of me so I can't --

25 Q.   All right.  Let's fix that.  I have handed you my copies of

Jury Trial, Vol. IV of V

1   24A, B and C and also 25.  Do you see those?

2   A.   Yes.

3   Q.   What are those?

4   A.   Exhibit 24A is the form OI-41 which is a request for wages,

5   for employment.  It's a two-page form.  Exhibit No. 24B is a

6   letter, a cover letter that was received back with this form when

7   it was completed.  And Exhibit 24C is an annual meeting of

8   shareholders and board of directors of GW & SW, Inc., a document

9   that was received along with 24B.

10  Q.   All right.  So if I understood you correctly, you said the

11  first time you went to see Mr. Wilson, you showed him some

12  documents.

13  A.   Yes.

14  Q.   Which ones were they, the 24 set or the 25 set or both?

15  A.   The 24 set.

16  Q.   Did you have the 25 set yet?

17  A.   No, we did not.

18  Q.   Okay.  So the first time you went to see -- talk to Mr.

19  Wilson about this matter, were you asking him about the

20  information contained on that form?

21  A.   Yes.

22  Q.   Did you ask him about the signature on the form?

23  A.   I did.

24  Q.   What did he say about that signature?

25  A.   I asked Mr. Wilson if the signature on this form was that of

Jury Trial, Vol. IV of V

1  his wife.

2  Q.   And what was his response?

3  A.   He stated yes.

4  Q.   And --

5        MR. PIAZZA:  Your Honor, I will object because that's a

6  statement by a co-defendant, you know, that can't be used against

7  my client under *Bruton vs. United States*.

8        THE COURT:  Do you --

9        MS. PARKER:  Pardon?

10        THE COURT:  Go ahead.  You were responding.

11        MS. PARKER:  Did you wish me to respond?  I'm sorry,

12  that's what I didn't hear.

13        THE COURT:  Yes.  The gentleman was relying on *Bruton*

14  for his objection to the statement.

15        MS. PARKER:  I think at this point, it's 801(d)(2)(e).

16        THE COURT:  I -- I would agree.

17        MR. PIAZZA:  I don't think they've established, you

18  know, under -- the conspiracy of my client's membership at this

19  time.

20        THE COURT:  Respectfully, there are sufficient

21  preliminary proofs at this juncture for the Court to admit the

22  response.

23  BY MS. PARKER:

24  Q.   So at this point, then, did you question Mr. Wilson

25  regarding the information that was on that form?

Jury Trial, Vol. IV of V

523

1  A.   Yes, I did.

2  Q.   And did he confirm that Robert Pochmara worked at the NAPA

3  Auto Parts Store during the time period?

4  A.   Yes, he did.

5  Q.   And did he confirm that for that work, Maxine Pochmara was

6  paid those wages reported on that form?

7  A.   That's correct.

8  Q.   Okay.  So the next step in the investigation -- after that,

9  is that when you received the Exhibit 25 response?

10  A.   That's correct.  We sent out -- I sent out an additional

11  OI-41 and Government's Exhibit 25 was the response to that.

12  Q.   So that came in after your initial interview.

13  A.   That's correct.

14  Q.   And you continued to investigate over the course of

15  basically the next year, 2009.

16  A.   Correct.

17  Q.   And in 2010, January of 2010, I believe you indicated you

18  went back to speak to Mr. Wilson again.

19  A.   That's correct.

20  Q.   At this time, did he in any way change his explanation

21  regarding who was the worker and who was getting paid?

22  A.   No.

23  Q.   I would like to ask you to turn back to Exhibit 42 for a

24  moment, please, the front of the second page of that mortgage.

25       Do you see that?

Jury Trial, Vol. IV of V

524

1  A.   Yes.

2  Q.   Below the signatures of -- purported signatures of Gary

3  Wilson, Sue Wilson, Robert Pochmara, Maxine Pochmara, there is a

4  section that begins, "The foregoing instrument was acknowledged

5  before me"?

6  A.   Yes, I see that.

7  Q.   Can you read that for us?

8  A.       "The foregoing instrument was acknowledged

9        before me this July 22nd, 2004, by Gary Wilson,

10       Sue Wilson, Robert Pochmara and Maxine Pochmara

11       as officers of GW & SW, Inc.  My commission expires

12       January 12, 2006.  Erik Nadolsky, Notary Public,

13       Presque Isle County, Michigan."

14           "This instrument was prepared by and returned

15       to Huron National Bank, 200 East Erie, Rogers City,

16       Michigan, 49779."

17  Q.   And for the court reporter, will you spell Erik Nadolsky's

18  name for us?

19  A.   First name, Erik, E-R-I-K, last name, Nadolsky,

20  N-A-D-O-L-S-K-Y.

21  Q.   And that represents that he is a notary?

22  A.   From what I gather.  That's on the notary public line.

23           MS. PARKER:  Thank you, your Honor.  I will pass the

24  witness.

25           THE COURT:  Cross?

Jury Trial, Vol. IV of V

1          MR. JACOBS:  Thank you, your Honor.

2                    CROSS-EXAMINATION

3    BY MR. JACOBS:

4    Q.   How old are you, Special Agent Hackett?

5    A.   I am 44.

6    Q.   Forty-four.  And is that the correct title, are you supposed

7    to be -- you're a special agent?

8    A.   Special agent, correct.

9    Q.   And how long have you been with the Railroad Retirement

10   Board?

11   A.   August, 2002.

12   Q.   And you're an investigator, is that fair to say?

13   A.   That's correct.

14   Q.   Let's talk about this Exhibit 24, the A, B and C.  We know

15   that there is a back stamp on it -- back stamp on it that notes

16   when it came back into the office.  It came back in, I think,

17   November 7th of 2008.  Is that correct?

18   A.   That's correct.

19   Q.   Can you tell when it went out?

20   A.   No, it is not a dated form.

21   Q.   Right.  So we don't know how long somebody had possession of

22   it before they sent it back in.  But we know that you must have

23   sent it out after -- well, of course, the referral from Detroit

24   was in September.  So it had to go out after September, of

25   course.

Jury Trial, Vol. IV of V

1  A.   That's correct.

2  Q.   All right.  You don't have any independent recollection of

3  when it went out?

4  A.   No, sir.

5  Q.   No.  All right.  These -- Mr. Stanley Krajnik or Krajnik,

6  Z-R-A-N-I-K, he is the individual who you interviewed -- he is

7  one of the individuals you interviewed back in January of 2010.

8  Do you recall that?

9  A.   Are referring to Stanley Krajnik?

10  Q.   Krajnik, Krajnik.  I know I'm the one who is slaughtering

11  his name.

12  A.   Yes.

13  Q.   Krajnik.  In fact, it was January 13th of 2010, you

14  interviewed him, is that correct?

15  A.   That's correct.

16  Q.   And at that time, did he tell you that he had gone to the

17  NAPA Store approximately ten to twelve times a week, he would

18  pick up parts at the NAPA Store?

19  A.   I don't have the report or interview in front of me but that

20  sounds about right.

21  Q.   Sounds about right?

22  A.   Sounds about right.

23  Q.   Sir, do you believe during the course of your investigation

24  before, oh, like before 2010, that Maxine and Robert Pochmara

25  were married?

Jury Trial, Vol. IV of V

527

1          MS. PARKER:  Objection.  Relevance.

2          MR. JACOBS:  Well, I think it's very relevant, your

3    Honor, as to how they held themselves out on these various

4    documents.  They held themselves out as husband and wife more

5    than once.  They signed mortgages as husband and wife.

6          MS. PARKER:  Judge, this is a narrative response

7    supplying information that I submit is objectionable.

8          MR. JACOBS:  It goes to their character, your Honor, as

9    far as whether they purported being married.

10         MS. PARKER:  Objection, your Honor.  Character of --

11         THE COURT:  I'm going to sustain the objection.

12   BY MR. JACOBS:

13   Q.   Then I will ask it this way.  During the course of your

14   investigation, did you determine that Robert and Pochmara --

15   Robert and Maxine Pochmara were divorced September 28th of

16   1981?

17         MS. PARKER:  Objection.

18         THE COURT:  Sustained.

19   BY MR. JACOBS:

20   Q.   During the course of your investigation, you obtained

21   many checks, bank records and copies of checks, is that fair to

22   say?

23   A.   Yes, sir.

24   Q.   And with these checks, I believe earlier, you testified you

25   couldn't get copies of checks prior to 2005?

Jury Trial, Vol. IV of V

528

1  A.   I believe that's correct.

2  Q.   Because banks wouldn't necessarily have the actual copies,

3  is that fair to say?

4  A.   Correct.

5  Q.   All right.  During the course of your investigation, did you

6  find checks written or designated as coming from the NAPA Store

7  signed by Maxine Pochmara?

8  A.   I believe there were a few.

9  Q.   There were a few signed by her.

10  A.   Yes.

11  Q.   Exhibit 24 -- now, I will go on to the other railroad type

12  exhibits.  This Exhibit No. 10, and I will just kind of identify

13  it for you, that was the Employee Annuity Booklet, the very big

14  booklet, that booklet went out to employees, is that correct?

15  A.   That's correct.  Those booklets go out to employees.

16  Q.   And they don't necessarily go out to people in the general

17  public, just the employees.

18  A.   Only if you request one for some reason.  No.

19  Q.   The Employee Disability Benefit Notice goes out to

20  employees, is that correct?

21  A.   That's correct.

22  Q.   The employee's spouse -- Exhibit 12, the Employee and Spouse

23  Annuity, Things That Must be Reported, that goes out to the

24  employee.

25  A.   Employee or eligible family member, correct.

Jury Trial, Vol. IV of V

1  Q.   Employee or eligible family member.  So in this case, it

2  would be Robert Pochmara and -- and if they were married, his

3  spouse, Maxine Pochmara.

4  A.   That's correct.

5  Q.   The application actually filled out -- No. 20, filled out by

6  the employee, that's confidential, isn't it?

7  A.   That's correct.

8  Q.   The second application, Exhibit No. 21, the one with the

9  typed -- looked like computer-generated type equipment, is

10  another -- another application or at least it's called an

11  application, that's also confidential, is that correct?

12  A.   That's correct.

13  Q.   The Exhibit 22, the statements regarding family and

14  earnings, that's by Robert Pochmara and that's confidential, is

15  that correct?

16  A.   Correct.

17  Q.   All right.  And lastly, the last exhibit regarding that,

18  Exhibit 23, the Continued Disability Report by Robert Pochmara

19  that you all received on August 22nd of 2008, signed by Robert

20  Pochmara, that's also confidential, is that correct?

21  A.   That's correct.

22  Q.   These loan installment agreements and bank notes, do people

23  sometimes refinance a note that's a couple years old?

24       MS. PARKER:  Objection.

25       MR. JACOBS:  Just a general observation by the witness,

Jury Trial, Vol. IV of V
530

1   your Honor, as to what -- whether we can -- I will ask it this

2   way.

3   BY MR. JACOBS:

4   Q.   Can you tell when you look at one of these installment loan

5   agreements that's dated two years after a prior installment loan

6   agreement, whether the individual is just refinancing?  Can you

7   tell?

8            MR. JACOBS:  He can answer that.

9            MS. PARKER:  Objection.  Calls for speculation.

10           THE COURT:  Sustained.

11  BY MR. JACOBS:

12  Q.   Exhibit 160 for Maxine Pochmara actually showed the Social

13  Security monies or FICA monies withdrawn and sent in to Social

14  Security.  No?

15  A.   I don't have it in front of me, counselor.

16           MS. PARKER:  You should still have it there.

17           THE WITNESS:  One sixty?  Oh, I'm sorry, counselor, I do

18  have it.  I'm sorry.

19  BY MR. JACOBS:

20  Q.   Oh.  Exhibit 160A actually shows Social Security monies

21  actually paid in by Maxine Pochmara, is that correct?  It has a

22  breakdown on FICA and all those monies she actually paid in

23  toward Social Security --

24  A.   FICA, correct.

25  Q.   -- is that fair to say?  And 160B is a different format.

Jury Trial, Vol. IV of V

1  From January 13th, 2000 on, it quit showing the actual

2  withdrawals, is that correct?

3         MS. PARKER:  Objection.  Relevance.

4         MR. JACOBS:  I think it is relevant as far as they are

5  saying the monies paid in to Social Security, your Honor.  If she

6  didn't pay money in to Social Security, or they can't show that,

7  I think it would be relevant as to Count 3.

8         MS. PARKER:  No.

9         MR. PIAZZA:  Not only that, your Honor, but --

10        MS. PARKER:  It's a different --

11        MR. JACOBS:  Not just earnings reported but monies paid

12 in.

13        MS. PARKER:  From GW & SW.

14        MR. JACOBS:  By Maxine Pochmara.

15        MS. PARKER:  No, by GW & SW.

16        THE COURT:  The objection is sustained.

17        MR. PIAZZA:  For the record, I would ask that the Court

18 overrule the objection because it's a document that was

19 introduced by the government and defense counsel is now inquiring

20 about it.

21        MR. JACOBS:  All I have to go by is the document, your

22 Honor.

23        THE COURT:  If we can stop for just a moment.  I didn't

24 quite understand the objection.

25        MR. PIAZZA:  It's my understanding the question is

Jury Trial, Vol. IV of V

532

1  referring to a document that has been introduced and admitted

2  into evidence.  So I believe the whole document can be, you know,

3  questioned about.  And I believe that's where Mr. Jacobs is

4  going.  Unless I'm misunderstanding.

5          MR. JACOBS:  That's correct, your Honor.

6          THE COURT:  I think -- I think you misunderstood the

7  objection.  And I'm going to sustain the objection.  If you wish

8  to reask the question, you may.

9          MR. JACOBS:  I will move on and let Mr. Piazza go into

10  that if he wants.

11          THE COURT:  Okay.

12  BY MR. JACOBS:

13  Q.    That Exhibit 1, the summary, it's money reported or earnings

14  reported.  It's not actually the monies that were paid in, is

15  that correct?

16  A.    That's correct.  It's a summary of earnings as reported.

17  Q.    When you say that the monies paid to Maxine Pochmara would

18  exceed a regular retirement limitation, for who, for somebody

19  retiring from General Motors?

20  A.    Someone retiring as a former railroad worker.

21  Q.    So the monies paid or monies received by Maxine Pochmara

22  would be -- would exceed the limit requirements even for someone

23  who retired from the railroad, is that what you're saying?

24  A.    Can you state that one more time?

25  Q.    Monies, weekly or monthly, paid in for Maxine Pochmara would

Jury Trial, Vol. IV of V

1  exceed the limit requirement for a retiree from the railroad.

2  A.   That's correct.

3  Q.   Is that common knowledge?  From -- you know from working at

4  the railroad, is that fair to say?

5  A.   I --

6  Q.   Sure it is.

7  A.   Yeah.

8  Q.   Now, these interviews you had with my client, that first

9  interview in January of 2010, now, that was at my client's store,

10  at the NAPA Store, wasn't it?

11  A.   The first interview was January of 2008.

12  Q.   I'm sorry, the first interview in January of 2008, it was at

13  the NAPA Store.

14  A.   Correct.

15  Q.   He was working, is that correct?

16  A.   Correct.

17  Q.   And you were asking him questions and during working hours,

18  is that fair to say?

19  A.   That's correct.

20  Q.   Store was still open, is that fair to say?

21  A.   Yes, sir.

22  Q.   We didn't tape-record that interview, did we?

23  A.   No.

24  Q.   We didn't write down or have him give a written statement,

25  did we?  In November of 2008?

Jury Trial, Vol. IV of V

1    A.    Not from memory, no.

2    Q.    All right.  Isn't it in January of 2010, where you

3    tape-record the statement?

4    A.    It was tape-recorded.

5    Q.    All right.  And in January of 2010, is where you would write

6    out your understanding of what he said and have Mr. Wilson sign

7    that document, is that correct?

8    A.    That's correct.  It's written out and then read back by Mr.

9    Wilson.

10   Q.    It's written out by you.

11   A.    It's written out by me.

12   Q.    Yeah.  All right.  Now, Robert Pochmara always told you

13   that -- excuse me -- Gary Wilson always told you that Maxine

14   Pochmara was an investor in their business?

15   A.    It wasn't exactly in those words.

16   Q.    That she bought in?

17         MS. PARKER:  Objection.

18         MR. JACOBS:  Well, it is very relevant, your Honor.

19         MS. PARKER:  It's 801.  *McDaniel, United States vs.*

20   *McDaniel.*

21         THE COURT:  Sustained.

22   BY MR. JACOBS:

23   Q.    During the course of your investigation, were you able to

24   determine that anyone bought into the business?

25         MS. PARKER:  Objection.  Relevance.

Jury Trial, Vol. IV of V

535

1      MR. JACOBS:  It's relevant.  It's regarding exhibits

2  that's already been accepted into evidence, Exhibit, I think it's

3  202.

4      THE COURT:  But the question, I think, that she is

5  raising is the relevance of the investment to the issues that are

6  related to the case.

7      MR. JACOBS:  I'm not trying to get into the relevance of

8  the investment.  I'm trying to get to the fact that my client

9  said the same thing the first time that he said the second time,

10  your Honor, because they're trying to assert to this jury that we

11  somehow concocted something for the second interview.

12      THE COURT:  I don't believe so and I agree with the

13  government on this point.

14      MR. JACOBS:  Well, that's not -- I misunderstood that

15  then, your Honor.

16  BY MR. JACOBS:

17  Q.   So Mr. Wilson has been consistent in his answers to you?

18  A.   That's correct.

19      MR. JACOBS:  Nothing further, your Honor.

20      THE COURT:  Sir?

21      MR. PIAZZA:  Thank you, your Honor.

22                    CROSS-EXAMINATION

23  BY MR. PIAZZA:

24  Q.   Good morning, sir.

25  A.   Good morning.

Jury Trial, Vol. IV of V

536

1  Q.   Just a few questions.  You've interviewed a lot of people,

2  apparently.  You've, you know, talked about some.  You also

3  interviewed Gary Wilson, is that correct?

4  A.   That's correct.

5  Q.   Also, back in the fall of 2008, you also talked with Sue

6  Wilson, is that correct?

7  A.   No, that's not correct.

8  Q.   She talked with you at least in January of 2010?

9  A.   January, 2010, correct.

10  Q.   And you asked her to talk with you, is that correct?

11  A.   That is correct.

12  Q.   And she came -- and she did talk to you, is that correct?

13  A.   Yes, she did.

14  Q.   She answered your questions, is that correct?

15  A.   Yes, she did.

16  Q.   And in fact, you asked for some documents from either Sue or

17  Gary Wilson at various times and they provided documents to you,

18  is that correct?

19  A.   That is correct.

20  Q.   The relationship with, I believe, 24 that you have before

21  you -- you have 24A and that's the request for information

22  relating to employee, is that correct?

23  A.   Correct.

24  Q.   And it also includes a breakdown of wages with a notation --

25  this is Page 2 on Exhibit 24 -- "See the cover letter, as well as

Jury Trial, Vol. IV of V

537

1  the annual meetings."

2  A.   That's correct.

3  Q.   And we have 24B, is the cover letter itself, is that

4  correct?

5  A.   That's correct.

6  Q.   And this is given out November 3rd, 2008, is that correct?

7  A.   It's dated November 3rd, 2008, correct.

8  Q.   Now, during direct examination the other day, the

9  prosecution asked you to read Paragraph 3 of that letter

10 regarding who worked in the store, is that correct?

11 A.   That's correct.

12 Q.   But they didn't ask you to read Paragraph 4.  Could you read

13 Paragraph 4?

14 A.   Paragraph 4:

15         "Payroll checks are issued to Maxine Pochmara,

16      (wife of Robert Pochmara) based on 45 shares owned

17      in W & W Auto Parts."

18 Q.   And that's purportedly signed by Miss Wilson, is that

19 correct?

20 A.   There is a signature, Sue Wilson with Sec/Treas under it,

21 correct.

22 Q.   All right.

23         MR. PIAZZA:  Could I have a moment here, your Honor?

24         (Whereupon defense counsel confer off the record)

25         MR. PIAZZA:  Thank you.  Nothing further.

Jury Trial, Vol. IV of V

538

1          THE COURT:  Redirect?

2          MS. PARKER:  No redirect, your Honor.  Thank you.

3          THE COURT:  Thank you, sir.

4          THE WITNESS:  Thank you, your Honor.

5          (At 10:04 a.m. - witness excused)

6          THE COURT:  Does the government have any additional

7   witnesses?

8          MS. PARKER:  The government does not.

9          THE COURT:  Government rests?

10          MS. PARKER:  I believe we could go over our exhibits at

11   a later time.  I think I have an understanding of a few that are

12   not in and the rest, I believe, are received.

13          I think it would be 31, 31A, 90 and 91 that are not in

14   evidence.  I believe the rest are.  Subject to the concurrence on

15   that, the government does indeed rest.

16          THE COURT:  There are some things I would like to take

17   up with the parties outside of your presence.  So we are going to

18   give you a break.  Mr. Crowder should be on his way here in a

19   moment.

20          Please rise for the jury.

21          (At 10:05 a.m. - jury leaves courtroom)

22          THE COURT:  Please be seated.

23          Counsel, I want to review a couple of things with you

24   concerning the defendants' case.  Can you tell me about the

25   defendants' intentions concerning providing testimony and the

Jury Trial, Vol. IV of V

539

1  extent to which you have reviewed their entitlement to not

2  testify.

3        Mr. Jacobs?

4        MR. JACOBS:  Your Honor, of course, we would like to

5  reserve our right to argue at some point Rule 29 motions.

6        Secondly, in response to the Court's inquiries, after a

7  lot of discussions with my client and myself, we have elected not

8  to call any witnesses and my client will not be testifying.

9        THE COURT:  Is that true for Mrs. Wilson as well?

10        MR. PIAZZA:  Yes.  James Piazza on behalf of Sue Wilson.

11  We will not be presenting any witnesses nor is my client going to

12  be called to the stand.

13        THE COURT:  Let's take up your Rule 29 motion.

14        MS. PARKER:  Your Honor, I would ask the Court to

15  inquiry of the defendants that that is indeed their decision.

16        THE COURT:  That's fair.

17        MS. PARKER:  Thank you.

18        THE COURT:  Mr. Wilson, we have spent some time with a

19  number of issues.  We actually issued an opinion about a week and

20  a half ago addressing one question which was the circumstances

21  under which your accountant could testify.

22        You've had a chance to review that with Mr. Jacobs?

23        DEFENDANT GARY WILSON:  Yes, I have, your Honor.

24        THE COURT:  You've also had a chance to talk with him

25  about the decision as to whether or not you would furnish

Jury Trial, Vol. IV of V

540

1    testimony yourself?

2            DEFENDANT GARY WILSON:  Yes, I have, your Honor.

3            THE COURT:  And indeed, it is your decision that you

4    choose not to provide testimony and simply to rely on the

5    question of whether or not the government has met their burden of

6    proof.

7            DEFENDANT GARY WILSON:  Yes, I do, your Honor.

8            THE COURT:  Thank you.

9            MR. PIAZZA:  And your Honor, if I may inquire of my

10   client.

11           THE COURT:  Certainly.

12           MR. PIAZZA:  Miss Wilson, we've discussed the matter

13   about whether or not you should testify or not, is that correct?

14           DEFENDANT SUE WILSON:  That's correct.

15           MR. PIAZZA:  And in discussing that matter, I have

16   informed you that you have a right to testify, is that correct?

17           DEFENDANT SUE WILSON:  That's correct.

18           MR. PIAZZA:  And that if you decide to testify, that the

19   prosecution gets to cross-examine you.  Do you understand that?

20           DEFENDANT SUE WILSON:  Yes.

21           MR. PIAZZA:  You also understand that you have a right

22   not to testify?

23           DEFENDANT SUE WILSON:  Yes.

24           MR. PIAZZA:  And you understand that the Court can

25   instruct the jury that they are not to use that against you in

1  any way.  Do you understand that?

2        DEFENDANT SUE WILSON:  Yes.

3        MR. PIAZZA:  And we've had several discussions relating

4  to this, is that correct?

5        DEFENDANT SUE WILSON:  That is correct.

6        MR. PIAZZA:  And is it your decision not to testify at

7  this time?

8        DEFENDANT SUE WILSON:  It is.

9        THE COURT:  Thank you.  I'm assuming that he is

10 preparing to argue his motion.

11       MR. JACOBS:  Yes.  Yes, your Honor.  I was looking for

12 the indictment.

13       Your Honor, we would assert that pursuant to Rule 29,

14 even looking at the evidence most favorable to the government,

15 that they haven't reached the threshold necessary to take this

16 case to the jury.

17       The Court is well aware and we've talked about proposed

18 jury instructions, as to Count 1, we need a conspiracy and

19 agreement to defraud.  As to Count 3, we have to furnish false

20 information or -- or fail to furnish information to the Social

21 Security Administration regarding the true identity of a person

22 earning wages.

23       We assert -- or I assert that the government has sure

24 shown that Robert Pochmara had a duty to report his -- any income

25 he received to the Railroad Retirement Board.  That duty, though,

1  does not apply to my client, is not even a factor regarding the

2  elements of both Count 1 and Count 3.

3        That Mr. Pochmara or Mrs. Pochmara, whether we --

4  whether they are married or not married, and I believe the Court

5  decided that wasn't an issue, and yet the spouse had certain

6  earning limits.  The spouse had certain designations such as

7  being an officer.  And if the spouse was an officer, Mr. Pochmara

8  was supposed to have reported that to the Railroad Retirement

9  Board.

10       But I assert that again is not a factor regarding

11 whether my client is guilty of Count 1 or Count 3, and even if we

12 look at the evidence as most favorable to the government, that

13 the Court should not send this matter to the jury.

14       That's all, your Honor.

15       THE COURT:  Sir?

16       MR. PIAZZA:  I will concur and request the Court to

17 enter a directed verdict of acquittal pursuant to Rule 29 and

18 adopt brother counsel's argument.

19       THE COURT:  Miss Parker?

20       MS. PARKER:  Thank you, your Honor.

21       I agree with Mr. Jacobs with the standard that is that

22 the Court should view the evidence in the light most favorable to

23 the government.

24       I think this is a fairly simple case.  Did the

25 defendants conspire with others, in this case, the Pochmaras, or

543

1   each other, or a combination thereof, to defraud the United

2   States by providing false information to the IRS and Social

3   Security regarding the wages that they were paying, the identity

4   of the person who was receiving those wages.

5          Likewise, Count 3, with intent to defraud, did they

6   provide false information.  I think these are basically a case

7   that boils down to a simple set of facts and a simple issue

8   which is a jury issue.

9          Can a jury infer the requisite intent to defraud and

10  deceive from the evidence before them in this case?  I submit

11  that they can.

12         Over a period of more than ten years, these defendants

13  prepared documents, made payments to Maxine Pochmara, not based

14  on her work but based on Robert Pochmara's employment and then

15  they filed their quarterly tax returns and annual tax returns for

16  their corporation totally mischaracterizing and providing W-2s

17  saying Maxine Pochmara was the person who earned the wages,

18  totally leaving Robert Pochmara out of the picture.

19         I think that is sufficient to prove the case.

20         THE COURT:  And would you agree, that it would be

21  sufficient, even if the Wilsons were unfamiliar with Mr.

22  Pochmaras' reason for wanting the arrangement that was

23  ultimately made, that the earnings would be reported in Maxine's

24  name?

25         MS. PARKER:  Absolutely.  I think it's a reasonably

1  understood expectation that if you report earnings in the name

2  and Social Security number of one person, that are in fact the

3  wages of another person, that is false and fraudulent or

4  deceptive.

5       Whether you knew the motivations behind the request that

6  you enter into this arrangement is something that does not have

7  to be shown.  And their knowledge or lack of knowledge on that

8  issue is not part of what's required to prove the case.

9       THE COURT:  Now, I asked that question for a reason

10  because that was at least part of the argument that you advanced,

11  Mr. Jacobs.

12       Do you agree with Miss Parker or do you disagree?

13       MR. JACOBS:  I believe the Court and Miss Parker have

14  correctly stated the law.

15       THE COURT:  And I would respectfully agree with the

16  government, that the evidence that's been submitted demonstrates

17  a jury submissible question and would respectfully deny the Rule

18  29 motion.

19       That will have us needing, I think, at this juncture to

20  be sure that we are in agreement on the instructions.

21       Have you furnished a copy of the editing that you had

22  done, Miss Parker, to the defendants?

23       MS. PARKER:  The e-mail was copied to defense counsel,

24  yes, the same one I sent you.

25       THE COURT:  Okay.  And I was actually looking at some

Jury Trial, Vol. IV of V

545

1  materials this morning with some physical edits on those

2  materials.  And those have been furnished to the defendants.

3          MS. PARKER:  Right.  I'm sorry, your Honor.  In the

4  interest of speed, since I have sometimes technical challenges in

5  terms of making all these modifications in writing and then

6  making them so you can understand what I'm changing, I just

7  hand-wrote them, had them scanned and attached to an e-mail, sent

8  to your law clerk and your court deputy and also Mr. Jacobs and

9  Mr. Piazza.

10          THE COURT:  I understand.

11          MS. PARKER:  So we all should be on the same page.

12          THE COURT:  Have you had a chance to look at those

13  edits?

14          MR. JACOBS:  Yes, I did, your Honor.  I -- I likewise

15  made some notes on the document I received from Miss Parker and I

16  tendered that to your clerk this morning.

17          THE COURT:  I think perhaps the best thing to do at this

18  stage is just to walk our way through that document in chambers

19  and --

20          MR. JACOBS:  I believe so.  I think we will -- we will

21  spend more than a few minutes going through these jury

22  instructions, your Honor.

23          THE COURT:  We will close the record and we will see you

24  in chambers.

25          MR. PIAZZA:  May we have two minutes before --

Jury Trial, Vol. IV of V

546

1          MR. JACOBS:  Five minutes for the restroom?

2          THE COURT:  Yes.

3          MR. JACOBS:  Thank you, your Honor.

4          (At 10:16 a.m. – proceedings recessed)

5          (At 1:16 p.m. – proceedings resumed; out of the presence

6          of the jury)

7          THE COURT:  Good afternoon.  Please be seated.  The

8    record will reflect the fact it's about quarter after one on

9    Friday afternoon.  We had an opportunity to meet with counsel in

10   chambers about an hour ago.  We spent about an hour reviewing

11   jury instructions in the case.  I think each of the amendments

12   that we had arrived at has been made.

13         Not all of the amendments that may have been sought by

14   each of the parties was completed and I wanted you an opportunity

15   to develop the record on any issues concerning the instructions

16   that are not satisfactory to any one of you.

17         Miss Parker, any issues from the government's

18   perspective?

19         MS. PARKER:  Yes, there are some, a couple minor ones,

20   one on Page 6.  It says, "Weighing conflicting evidence, number

21   of witnesses."  I ask that it just be "number of witnesses."

22   There really isn't a conflict in evidence in that regard,

23   particularly in this case.

24         THE COURT:  Yes, agreed.

25         MS. PARKER:  Down below that, on the first paragraph,

Jury Trial, Vol. IV of V

547

1  "Separate consideration," I believe Miss Pop provided the name of

2  the person.  I just -- I don't have -- I think that's already

3  been provided but I propose changing the end of the sentence to,

4  "Remarks made by Gary Wilson concerning their testimony."  There

5  really wasn't a decision by those individuals to be witnesses.

6  They had sort of an invitation that they couldn't refuse.

7          THE COURT:  Subpoena.

8          MS. PARKER:  Correct.

9          THE COURT:  I think that's a good point.

10          MR. JACOBS:  Change it to "concerning their testimony,"

11  your Honor, is that what you're saying?

12          THE COURT:  Yes.  Correct.

13          MS. PARKER:  Yes.

14          THE COURT:  Continuing.

15          MS. PARKER:  I would propose moving the overt acts to

16  Page 11 (C) Paragraph 2, it says, "Indictment lists overt acts."

17  I would insert them there.  I think the current placement is

18  problematic because immediately after the overt acts where they

19  are now, the instructions say on Page 10, "You must be convinced

20  the government has proved all of these elements beyond a

21  reasonable doubt," and I think that might be perceived as all of

22  those overt acts.  Whereas the instruction on overt acts directly

23  states that an overt act need to be proved.

24          THE COURT:  That would remove some confusion, I think.

25          MR. JACOBS:  I think it's appropriate, your Honor.  We

Jury Trial, Vol. IV of V

548

1    would be moving from Page 9, Paragraph C, the last sentence and

2    then the actual overt acts that go through small (vii), we would

3    be moving that to Page 11, following Paragraph 2?

4         Do I have that correct, Miss Parker?

5         MS. PARKER:  Well, I would just insert it into the

6    paragraph:  "The indictment lists overt acts," or just change it

7    to:  "The indictment lists the following overt acts," and then

8    (i), (ii), (iii), (iv), (v) through (vii), and then:  "The

9    government does not have to prove that all these acts committed,

10   only that these acts -- or that any of these acts themselves were

11   illegal."

12        MR. JACOBS:  I have no objection to that change, your

13   Honor.

14        MS. PARKER:  I think the first sentence in (2)(C), on

15   Page 9, needs to stay where it is:  "Third, the government must

16   prove that a member of the conspiracy did at least one of the

17   overt acts described in the indictment," that that stays there.

18        THE COURT:  Yes.

19        MS. PARKER:  All right.  Just so we're --

20        MR. PIAZZA:  I will leave it to the discretion of the

21   Court.

22        THE COURT:  That all makes sense to me.

23        MS. PARKER:  One minor change on Page -- two minor

24   changes on Page 13.  One, under:  "Willfully and knowingly with

25   intent to deceive," (1)(A), "Conduct is not willful if it results

549

1  from negligence," I believe a comma needs to be inserted between

2  that and "inadvertence."  I think some words were taken out in

3  between.

4          MR. JACOBS:  Would you say that again, Miss Parker?

5  Again, I'm sorry, I missed it.

6          MS. PARKER:  Sure, just insert a comma.  And that would

7  be one modification.  The final one on that page, on the third

8  paragraph, just, I think, to make it easier to read and

9  understand, change the second sentence by moving the clause:

10  "The wages for labor performed by Robert Pochmara," insert that

11  after "report."

12         So it would read, "If you are convinced that a defendant

13  deliberately ignored a high probability that it was unlawful to

14  report the wages for labor performed by Robert Pochmara under

15  Maxine Pochmara's name and Social Security number, comma, then

16  you may find --" and continued.  I think the syntax is easier to

17  understand and read.

18         THE COURT:  Yes.  I believe because of the way we

19  structured it, I was going to add the word "however," comma, at

20  the beginning of 3.

21         MS. PARKER:  That is true, I remember you saying that.

22  I forgot that.  Yeah.  "However, no one can avoid

23  responsibility"?

24         THE COURT:  Yeah.

25         THE LAW CLERK:  You do want that?

Jury Trial, Vol. IV of V

550

1          THE COURT:  Pardon me?

2          THE LAW CLERK:  You do want that?

3          THE COURT:  Yes, please.  Have we exhausted you yet, Ms.

4  Parker?

5          MS. PARKER:  I have, your Honor.  Thank you.

6          THE COURT:  Good.  We are exhausted.  That's it.

7          MR. JACOBS:  Your Honor, Page 13, of course the Court

8  did incorporate some of the willfulness instruction that I

9  submitted to the Court pursuant to the *Duncan* case.

10          THE COURT:  Yes, sir.

11          MR. JACOBS:  And I appreciate the Court doing that but

12  we did delete some things, specifically the -- the proposed

13  instruction read:  "Conduct is not willful if it results from

14  negligence, comma, however great, comma, inadvertence or mistake

15  or due to a good faith misunderstanding of the law."  And the

16  Court deleted the language, "however great" and did not put in

17  the rest of that paragraph as far as -- unless I missed it --

18  "Inadvertence, mistake or due to a good faith misunderstanding of

19  the law."

20          The Court, I thought, talked about moving that to a

21  different spot and maybe I missed that but I don't see that

22  anywhere else in here.

23          THE COURT:  I didn't think that the evidence supported

24  it.

25          MR. JACOBS:  Well, I will just place my objection on the

Jury Trial, Vol. IV of V

551

1  record.

2          THE COURT:  Thank you.

3          MR. JACOBS:  Secondly, I object in total to the

4  deliberate ignorance instruction on Page 13, Paragraph 3, under

5  the willful, knowingly and with intent to deceive definitions.

6  The Court has heard no testimony from the defense in this matter.

7  We've heard arguments by the defense in opening statement but I

8  would assert that those arguments do not justify a deliberate

9  ignorance type instruction in this particular case.

10          That's all the objections I have, your Honor.

11          THE COURT:  Thank you, sir.

12          MR. PIAZZA:  Yes, your Honor.  On behalf of Sue Wilson,

13  I concur with Mr. Jacobs that under willfully, knowingly and with

14  intent to deceive, (1)(A) should at least read:  "Conduct is not

15  willful if it results from negligence, comma, however great,

16  comma, inadvertence or mistake."  At least the "however great"

17  should be allowed based on *Duncan* that we previously cited to the

18  Court.

19          In addition, in Paragraph 3 under willfully, knowingly

20  and with intent to deceive, I agree with Mr. Jacobs that we

21  object to that, the deliberate ignorance statement.  I believe it

22  waters down the government's burden of, you know, proving

23  willfully and knowingly and it lowers the burden lower than

24  beyond a reasonable doubt when it adds that to the willfully and

25  knowingly.

1       However, if the Court is going to overrule my objection

2   and include that Paragraph 3, I would ask that paragraph of the

3   draft of the deliberate ignorance, on Page 17 of the Court's

4   draft, and I will read it into the record, quote:

5           "But to find this, you must be convinced beyond a

6           reasonable doubt that the defendant or defendants were

7           aware of a high probability that the arrangement for

8           paying Maxine Pochmara for work done by Robert Pochmara

9           was designed to deceive the United States or of its

10          agencies or departments, and that the defendant

11          deliberately closed his or her eyes to what was

12          obvious.  Carelessness or negligence or foolishness

13          on the defendant's part is not the same as knowledge,

14          and is not enough to convict.  This, of course, is for

15          you to decide."

16          If the Court is going to give Paragraph 3, willfully,

17  knowingly and with intent to deceive, I would ask that that other

18  paragraph be added.

19          THE COURT:  What does that last paragraph add that

20  (1)(A) does not adequately cover?  However great?

21          MR. PIAZZA:  It adds foolishness which is not covered

22  under (1)(A) or (B).

23          MR. JACOBS:  It also gives a further explanation, your

24  Honor, of the -- what's appropriate conduct and what's

25  inappropriate as far as a further explanation of what deliberate

1  ignorance is and I would -- I would join with my counsel's
2  request for that additional paragraph.
3      THE COURT:  Miss Parker, do you wish to comment?
4      MS. PARKER:  The government is satisfied with the
5  instructions as proposed.  I think if -- if it would resolve the
6  matter by saying:  "Conduct is not willful if it results from
7  foolishness, negligence and inadvertence and if that would
8  satisfy this concern," I don't have any objection to that.  If
9  it's the balance of the paragraph, I proposed that paragraph.  I
10 don't object to it per se but I also think the Court has drawn an
11 acceptable line of demarcation between negligence and ignorance
12 which is of the deliberate nature for the calculated purpose of
13 avoiding consciousness of guilt.  And I think that's
14 appropriately the standard to be outlined.
15     THE COURT:  That is the line that we're trying to draw.
16 She made an offer but I don't think it's --
17     MR. JACOBS:  I would like to accept that offer, your
18 Honor.  I would back down on my objection regarding deliberate
19 ignorance.  I don't know if my co-counsel would accept that.
20     MR. PIAZZA:  I would ask that the whole paragraph be in
21 because reading it in total, as indicated, "But to find this, you
22 must be convinced beyond a reasonable doubt that the defendant or
23 defendants were aware of a high probability," I think it reads
24 better given that entire paragraph and since it was drafted by
25 the prosecution --

Jury Trial, Vol. IV of V

554

1          THE COURT:  Respectfully, I think what we will do is to

2     resolve Mr. Jacobs' objection by the addition of the language to

3     (1)(A) and respectfully, Mr. Piazza, I think we -- with that

4     addition, have adequately demarcated the two concepts that we are

5     trying to instruct the jury on.

6          MR. PIAZZA:  Okay.  So for the record, the Court is

7     denying my request to one, not give the deliberate ignorance and

8     if the Court is going to give it, deny my request to add that

9     paragraph in total.

10          THE COURT:  Yes.

11          MR. PIAZZA:  I'm sorry?

12          THE COURT:  Yes, sir.

13          MR. PIAZZA:  Okay.  Also, the Court is denying my

14     request to add under (1)(A), "Conduct is not willful if it

15     results from negligence however great."  Again, those words were

16     originally included in the *Duncan* case, taken out by this Court.

17          Is the Court denying my request to add that in?

18          MS. PARKER:  As I recall, *Duncan*, the facts were the

19     Court declined an instruction on good faith where there was a

20     factual basis for it and declined to give the instruction -- the

21     Sixth Circuit reversed the conviction but that doesn't equate

22     with a verbatim approval of the proposed instruction.  I believe

23     that terminology came from a proposed instruction.

24          THE COURT:  And I'm concerned about the particular

25     language not -- not being precise.  However great in referring to

Jury Trial, Vol. IV of V

 1   negligence, I have a concern, is going to confuse the jury.  What
 2   if we said however modest?
 3          MR. PIAZZA:  That's not what the proposed instruction in
 4   *Duncan* suggested.
 5          MR. JACOBS:  That wasn't what the instruction in *Duncan*
 6   was, your Honor --
 7          THE COURT:  But it highlights --
 8          MR. JACOBS:  -- in reading the actual willful
 9   instruction.
10          THE COURT:  But it does highlight my point.  If we said
11   however modest or however great, we will be getting to bracket
12   something rather than simply saying negligence.
13          So I have eliminated the language for two reasons, one,
14   it was -- as Miss Parker simply pointed out, it's simply a
15   proposed instruction, was rejected in *Duncan*, number one, and
16   number two, I don't like the reference to degrees of negligence
17   either way.  I think we are better off with simply using the
18   single word and leaving the jury to their interpretation and
19   understanding.
20          MR. PIAZZA:  So the Court has denied my request to add
21   those two words.
22          THE COURT:  Correct.
23          MR. PIAZZA:  All right.
24          THE COURT:  However significant or insignificant.
25          MR. PIAZZA:  I have nothing further relating to the jury

Jury Trial, Vol. IV of V

556

1  instructions.

2        THE COURT:  That brings us to a conclusion.  We will

3  make sure that you are e-mailed a copy of the final instructions

4  before the close of business today.  We will see you at 8:30 on

5  Tuesday morning.

6        Any additional business we ought to cover before we

7  break for the week, government?

8        MS. PARKER:  Nothing for the government, your Honor.

9        THE COURT:  Mr. Jacobs?

10        MR. JACOBS:  No, sir.

11        THE COURT:  Mr. Piazza?

12        MR. PIAZZA:  Just a question.  I take it once the jury

13  has it, they will stay here until five o'clock.

14        THE COURT:  Yes.

15        MR. PIAZZA:  Or until they reach a verdict.

16        THE COURT:  Correct.

17        MR. PIAZZA:  Okay.

18        THE COURT:  Have a good weekend.  Appreciate your

19  efforts to be here through the course of the week.

20        (At 1:34 p.m. proceedings recessed)

21                        *****

22

23

24

25

Jury Trial, Vol. IV of V

557

1                    *CERTIFICATE OF COURT REPORTER*

2

3

4           I, PEG L. GOODRICH, Official Court Reporter

5       in and for the United States District Court, Eastern

6       District of Michigan, appointed pursuant to the

7       provisions of Title 28, United States Code, Section

8       753, do hereby certify that the foregoing proceedings

9       held before the HONORABLE THOMAS L. LUDINGTON, District

10      Court Judge, is a true and correct transcript of my

11      stenotype notes in the matter of UNITED STATES OF AMERICA

12      v GARY WILSON and SUE WILSON, File No. 12-20607, held on

13      Friday, May 24, 2013.

14

15

16

17

18                          s/Peg L. Goodrich
19                          Peg L. Goodrich, CSR, RPR, RMR
                            Federal Official Court Reporter
20                          United States District Court
                            Eastern District of Michigan
21

22
        Date:  November 8, 2013
23             Bay City, Michigan

24

25