UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.                            File No. 12-20607

GARY L. WILSON and SUE A. WILSON,

        Defendants.

_____/

REDACTED TRANSCRIPT

JURY TRIAL

VOLUME II OF V


BEFORE THE HONORABLE THOMAS L. LUDINGTON

United States District Judge

United States Post Office Building

1000 Washington Avenue

Bay City, Michigan 48708

Wednesday, May 22, 2013

Jury Trial, Vol. II of V

147

APPEARANCES:


For the Plaintiff:        JANET L. PARKER (P34931)
                          U.S. Attorney's Office
                          Eastern District of Michigan
                          101 1st Street
                          Suite 200
                          Bay City, Michigan  48708
                          Phone: (989) 895-5712
                          janet.parker2@usdoj.gov


                          ANCA POP (P70032)
                          U.S. Attorney's Office
                          Eastern District of Michigan
                          101 1st Street
                          Suite 200
                          Bay City, Michigan  48708
                          Phone: (989) 895-5712
                          anca.pop@usdoj.gov



For Defendant Gary
      Wilson:            STEVENS J. JACOBS (P37740)
                         Jacobs law Office
                         45 N. Tuscola Road
                         Bay City, Michigan   48708
                         Phone:  (989) 892-8611
                         jacobslawoffice@sbcglobal.net


For Defendant Sue
      Wilson:            JAMES F. PIAZZA (P30172)
                         803 Court Street
                         Saginaw, Michigan   48602
                         Phone:  (989) 791-1813
                         jfpia@aol.com



To Obtain a Certified Transcript:

PEG L. GOODRICH, CSR-0258, RMR
Federal Official Court Reporter
www.transcriptorders.com

Jury Trial, Vol. II of V

148

1                       T A B L E   O F   C O N T E N T S

                                                            PAGE
2
OPENING PRELIMINARY INSTRUCTIONS:
3
        By the Court                                        151
4


5
OPENING STATEMENTS:
6
        By Ms. Pop                                          160
7       By Mr. Jacobs                                       173
        By Mr. Piazza                                       184
8


9
WITNESSES:
10
        DEANNA SMITH (Sworn)                                189
11          Direct Examination by Ms. Parker                189
            Cross-Examination by Mr. Jacobs                 228
12          Cross-Examination by Mr. Piazza                 234
            Redirect Examination by Ms. Parker              236
13
        ELIAS TARATUTA (Sworn)                              237
14          Direct Examination by Ms. Pop                   238
            Cross-Examination by Mr. Jacobs                 257
15          Cross-Examination by Mr. Piazza                 264

16      ALAN PINES (Sworn)                                  264
            Direct Examination by Ms. Parker                265
17          Cross-Examination by Mr. Piazza                 270

18      GERALD SMIGELSKI (Sworn)                            271
            Direct Examination by Ms. Pop                   271
19          Cross-Examination by Mr. Jacobs                 277
            Cross-Examination by Mr. Piazza                 277
20
        STEVEN PETERS (Sworn)                               280
21          Direct Examination by Ms. Pop                   281
            Cross-Examination by Mr. Jacobs                 284
22          Cross-Examination by Mr. Piazza                 285

23      JEFFREY HACKETT (Sworn)                             287
            Direct Examination by Ms. Parker                287
24

25

Jury Trial, Vol. II of V

149

1           T A B L E   O F   C O N T E N T S (Continued)

                                                              PAGE
2

CERTIFICATE OF COURT REPORTER:                                 318
3


4

EXHIBITS:                                    IDENTIFIED RECEIVED
5
   GX  10  - Employee Annuity Form RB-1           193      196
6  GX  11  - Employee Disability Benefits RB-1d   193      196
   GX  12  - Employee & Spouse Annuities RB-9     193      196
7  GX 13A-C - RRB Forms RL-4                       193      196
   GX 20   - Form AA-1d, 6/8/92                    207      208
8  GX 21   - Form AA-1, 6/25/92                    207      208
   GX 22   - Form G-319, 6/15/94                   214      215
9  GX 23   - Form G-254, 8/22/08                   214      215
   GX 24A-C - Form OI-41 w/ supporting documents   291      291
10 GX 25   - Information Request, 12/20/08         291      291
   GX 26   - Monthly annuity payments              221      221
11 GX 27   - FICA earnings, M. Pochmara 1998-2012  222      223
   GX 28   - FICA earnings, R. Pochmara 1998-2012  222      223
12 GX 29   - NAPA checks, M. Pochmara              298      299
   GX 30A-J - GW & SW, Inc., earnings reports      303      305
13 GX 127  - 2005 Federal income tax return        240      241
   GX 128  - 2005 Michigan tax return              240      241
14 GX 129  - 2006 Federal income tax return        240      241
   GX 130  - 2006 Michigan tax return              240      241
15 GX 131  - 2007 Federal income tax return        240      241
   GX 132  - 2007 Michigan tax return              240      241
16 GX 133  - 2008 Federal income tax return        240      241
   GX 134  - 2008 Michigan tax return              240      241
17 GX 135  - 2009 Federal income tax return        240      241
   GX 136  - 2009 Michigan tax return              240      241
18 GX 146  - 2004 Federal income tax return        240      242
   GX 147  - 2005 Federal income tax return        240      242
19 GX 148  - 2005 Michigan tax return              240      242
   GX 149  - 2006 Federal income tax return        240      242
20 GX 150  - 2006 Michigan tax return              240      242
   GX 151  - 2007 Federal income tax return        240      242
21 GX 152  - 2007 Michigan tax return              240      242
   GX 153  - 2008 Federal income tax return        240      242
22 GX 154  - 2008 Michigan tax return              240      242
   GX 155  - 2009 Federal income tax return        240      242
23 GX 156  - 2009 Michigan tax return              240      242

24

25

Jury Trial, Vol. II of V

150

1              Bay City, Michigan

2              Wednesday, May 22, 2013

3              At 8:37 a.m.

4         (Court, counsel and defendants present; out of the

5         presence of the jury)

6         THE COURT:  Good morning.

7         MS. PARKER:  Good morning, your Honor.

8         THE COURT:  Counsel ready to proceed?

9         MS. PARKER:  Government is ready, your Honor.

10        MR. JACOBS:  The only additional matter I would like to

11   place on the record, your Honor, is dealing with objections.  I

12   would like to join in co-counsel's -- co-defense counsel's

13   objections.  That way we can expedite matters and we each won't

14   have to jump up and make separate objections or join in the other

15   party's objections during the course of the trial.

16        MR. PIAZZA:  So agreed, your Honor.

17        THE COURT:  And if there is ever an exception, we will

18   note it.

19        MR. JACOBS:  Thank you, your Honor.

20        THE COURT:  Could we have the jury, please.

21        Miss Pop, one comment the jury made yesterday was that

22   if you could elevate your voice a little bit, it will be easier

23   for them to understand you.  So you might even want to get a

24   little closer to the mic.

25        MS. POP:  Okay.

Jury Trial, Vol. II of V

151

1           (At 8:42 a.m. - jury enters courtroom)

2           THE COURT:  Good morning.

3           THE JURY:  Good morning.

4           THE COURT:  Miss Jacobs, if we could have the jury

5    sworn, please.

6           THE CLERK:  Sorry, I need you to stand and raise your

7    right hand.

8           Do you solemnly swear that you will well and truly try

9    the issues joined in this cause now pending and a true verdict

10   render, according to the law and evidence given to you in open

11   court?

12          THE JURY:  I will.

13          (At 8:43 a.m. - jury panel sworn)

14          THE COURT:  Please be seated.  Ladies and gentlemen, I

15   want to speak to you briefly about the function of the judge in a

16   criminal trial and your function as jurors.  You've been sworn as

17   the jury to try this case.  By your verdict, you will decide the

18   disputed issues of fact that arise between the parties.  I will

19   decide the questions of law that arise during the trial and

20   before you retire to deliberate at the close of the trial, we

21   will instruct you on the law that you are to follow and apply in

22   reaching your verdict.

23          It is my responsibility to conduct the trial of the case

24   in an orderly, fair and efficient manner, to rule upon questions

25   of law that arise during the course of the trial, and to instruct

Jury Trial, Vol. II of V

1   you about the law that applies to the case.

2          You can look upon my function, that is the function of

3   the Court, as that of a referee or umpire.  I have no personal or

4   professional interest in how this case turns out.  My job is to

5   see to it that only legally admissible evidence is received in

6   court and to tell you about the law at the end of the trial as

7   well as to settle any disputes between the attorneys that may

8   arise during the course of the trial concerning the admission of

9   evidence.

10          You will have been provided, and now have on, your

11  badges.  They identify you as a juror which is important to us.

12  It's important to many other people that will be in the vicinity

13  of the courthouse, including the parties.

14          What they do is to inform us of what your role is.  As

15  we will -- as a result, we will not be talking about the case in

16  your presence other than in the courtroom and we will be making a

17  point to maintain our distance from you to respect your role

18  during the course of the case.

19          I tell you that because the parties also have a similar

20  responsibility.  If you arrive at the elevator and they are

21  arriving at the same period of time and they turn around and walk

22  away, they are not doing that because they are mean or ugly

23  people.  They are doing that because it's part of their charge to

24  respect your role and the badges identify you as a juror to both

25  the parties as well as the other employees within the court.

Jury Trial, Vol. II of V

153

1         As you have noticed, probably, the temperature in this

2   building can vary greatly.  It has no relationship whatsoever to

3   the thermostat.  We just live with whatever it delivers.  So you

4   need to be somewhat flexible.  The air conditioning may not be

5   working at one point and then all of a sudden, it will turn the

6   place into a freezer.  We just note that so that you're prepared

7   to adapt to whatever circumstance may arise here in the -- in the

8   room.  We do it daily and we've survived.

9         You will be permitted to take notes during the course of

10  the trial.  You are not obligated to do so.  If you do take

11  notes, it's important that you not be influenced by the notes of

12  another juror.  Your independent memory of what you recall during

13  the course of the trial is the most important thing.  Note taking

14  must also not be allowed to distract you from what happens here

15  in court.

16        Your notes are also not evidence in the case and they

17  are not to take precedence over anyone's independent recollection

18  of what the evidence was during the course of trial.  Notes are

19  only an aid to recollection.  They are not entitled to any

20  greater weight than the actual recollection or your impression as

21  to what actually occurred here in the courtroom.

22        Any notes taken by a juror should not be disclosed to

23  anyone other than a fellow juror.  You will be provided with the

24  notebooks that you may use during the course of the trial.  They

25  must remain in the jury room at the end of each day.  At the

1  conclusion of the trial, the notes will be destroyed and they

2  will not be read by anyone.

3       Let me briefly explain the general order of procedure

4  that we will follow during the trial.  First, the attorneys for

5  the government will be making an opening statement which they

6  will outline -- she will outline the theory of the government's

7  case.

8       The attorneys for the defendants may then make an

9  opening statement or they may reserve their statements until

10  later on during the course of the case.  The opening statements

11  are not evidence.  They are only intended to assist you in

12  understanding the viewpoints and the claims of the parties.

13       After the opening statements, we will begin with the

14  taking of the evidence.  The attorneys for the government will

15  proceed first.  She will call witnesses and will offer exhibits

16  during the course of the witness's testimony, such as documents

17  or physical objects.

18       The attorneys for the defendant will have a right to

19  cross-examine any of the witnesses that are called by the

20  government in order to test the truth and accuracy of their

21  testimony or to otherwise elicit testimony favorable to the

22  defendants.

23       Following the government's presentation, the defendant

24  will have an opportunity to present evidence.  You should clearly

25  understand that a defendant in a criminal case is not obligated

Jury Trial, Vol. II of V

155

1 to produce any evidence whatsoever.  The law does not require a
2 defendant in a criminal case to prove his innocence or to produce
3 any evidence.
4        Similarly, however, the attorney for the government has
5 a right to cross-examine any of the witnesses that may be called
6 by the defendant.
7        After all the defendant -- after all the evidence has
8 been presented, we will provide you preliminary final
9 instructions that will explain the law that applies to the
10 case.
11        After we have done that, the attorneys for both sides
12 will have an opportunity to present closing arguments to you in
13 support of their case.  The statements of the attorneys in
14 closing statements, as in opening statements, are not evidence.
15 They are only intended to assist you in understanding the
16 evidence and the theory of each party.  You must base your
17 decision only on the evidence.
18        Following the closing arguments of the attorneys, I will
19 give you instructions on the manner of your deliberations and
20 then you will retire and deliberate on your verdict.  You will do
21 that by applying the law as I give it to you to the facts as you
22 find them to be.
23        The function of the jury is to determine the facts.  You
24 are the sole and exclusive judges of the facts and you alone
25 determine the weight, the effect and the value of the evidence as

Jury Trial, Vol. II of V

156

1  well as the credibility of the witnesses.  You must consider and

2  weigh the testimony of all witnesses who appear before you and

3  you alone are to determine whether to believe any witnesses and

4  the extent to which any witness should be believed.

5          It is your responsibility to consider any conflicts

6  in testimony which may arise during the course of the trial.

7  Your decision as to any fact in this case is final.  On the

8  other hand, it is your duty to accept the law as I explain it to

9  you.

10         Your determination of the facts must be based only on

11  the evidence which is offered and received in this courtroom.

12  Evidence consists of the sworn testimony of the witnesses.  It

13  may also include exhibits which will be documents or other

14  physical objects.  It may also include some things which the

15  Court simply instructs you to consider as evidence.

16         Your function as the jury is as equally important as the

17  function of the Court and the attorneys.  You should give careful

18  consideration to the testimony of witnesses as it is presented to

19  you for your consideration.  You should keep an open mind and not

20  form or express any opinion about the case until after you have

21  heard all of the evidence, the closing arguments of the attorneys

22  and the instructions that apply to the law.

23         From this point forward, you must not discuss the case

24  with anyone, not even members of your own family or your fellow

25  jurors.  It would be unfair for you to discuss the case among

1  yourselves or with family or friends before you retire to

2  consider your verdict with your fellow jurors.

3          You may tell your family and friends that you've been

4  selected as a juror.  Then you must tell them that you are under

5  instructions from the Court and you are not to discuss the case

6  with them until you are permitted to do so.

7          After the case is submitted to you for deliberations,

8  you must discuss it only when the Court instructs you to do so

9  and only in the jury room and only in the presence of all of your

10  other fellow jurors.

11          When the trial is over, you may discuss the case with

12  anyone you wish.  Until that time, we ask you that you control

13  your natural -- the natural desire to discuss the case both here

14  and at home.

15          You must not visit any scene that is mentioned in the

16  evidence of the trial.  If for any reason it would become

17  necessary to visit a scene or a place, we would normally take you

18  there as a group under the supervision of the Court.

19          You are not to consider as evidence any personal

20  knowledge that you might have of a scene or place that's

21  mentioned in the evidence.

22          You must not make any investigations on your own about

23  the case, the witnesses, the parties or the attorneys.  I know

24  that many of you have smart phones, iPads and the equivalent and

25  that you use them in daily life to research many issues that may

Jury Trial, Vol. II of V

158

1    arise during -- that may arise.  But during the course of this

2    case, it's important that none of those devices be used either to

3    communicate any information about the case to any party or to

4    investigate anything about the case, and by that I mean, the

5    attorneys, the witnesses or anything else related to the

6    proceeding.

7            A trial follows long-established rules of procedure and

8    evidence.  The attorneys are trained in the rules and from time

9    to time, they may make objections and motions.  I will rule on

10   the objections and motions most of the time in your presence.

11   It's important for you to understand that in making those

12   decisions about admitting or excluding evidence, my job is to

13   apply the rules of evidence that govern the admission of those

14   materials into Court.

15           You should not draw any inference from the decisions

16   that I make concerning the admission of evidence, that I have any

17   view about the way the case should be resolved.

18           Please let me know immediately by raising your hands if

19   you cannot hear a witness or see what is being demonstrated

20   during the course of the case.  We will promptly react to any

21   questions that you have.

22           Those are the instructions that I -- further

23   instructions that I organized for the morning.  Any additions or

24   objections?

25           MS. PARKER:  The government requests the direct and

Jury Trial, Vol. II of V

159

1  circumstantial evidence instruction, which at the moment would

2  seem particularly apropos, your Honor.

3          THE COURT:  Indeed, it would.  Do you have it present?

4          MS. PARKER:  I do, your Honor.

5          THE COURT:  I assume there is no objection from the --

6          MR. JACOBS:  None, your Honor.

7          THE COURT:  Thank you.

8          Some of you may have heard the terms direct evidence and

9  circumstantial evidence.  Direct evidence is simply evidence like

10 the testimony of an eyewitness, which if you believe it, directly

11 proves a fact.  If a witness testified that he saw it raining

12 outside and you believed him, that would be direct evidence that

13 it was raining.

14         Circumstantial evidence, by contrast, is simply a chain

15 of circumstances that may indirectly prove a fact.  If someone

16 walked into the courtroom wearing a raincoat, covered with drops

17 of water and carrying a wet umbrella, that would be

18 circumstantial evidence from which you could conclude that it was

19 raining.

20         It is your job to decide how much weight to give the

21 direct and circumstantial evidence.  The law makes no distinction

22 between the weight that you should give to either one or say that

23 one is any better than the other.

24         You should consider all the evidence, both direct and

25 circumstantial, and give it whatever weight you believe that it

Jury Trial, Vol. II of V

160

1   deserves.

2          Any other additions or corrections from the government?

3          MS. PARKER:  Thank you, your Honor, no.

4          THE COURT:  Gentlemen?

5          MR. JACOBS:  No, sir.

6          MR. PIAZZA:  No, your Honor.

7          THE COURT:  We would entertain the opening statement on

8   behalf of the government.

9          MS. POP:  Good morning.  May it please the Court, Ladies

10  and Gentlemen of the Jury, counsel, again my name is Anca Pop and

11  my co-counsel is Janet Parker.  We are both Assistant United

12  States Attorneys in the Bay City office and together, we are

13  representing the United States against the defendants, Gary

14  Wilson and Sue Wilson.

15         This criminal case is about lying to the government.

16  It's about these two defendants, Gary and Sue Wilson, who along

17  with co-conspirators, Robert and Maxine Pochmara, defrauded the

18  United States and made false statements to the IRS and the Social

19  Security Administration.

20         We are here today because the Wilsons are charged with

21  conspiracy to defraud the United States or one of its agencies

22  and providing or causing to provide false information to the

23  Social Security Administration regarding the true identity of a

24  person earning wages.

25         We are here today because over the course of more than

Jury Trial, Vol. II of V

161

1    one decade, the Wilsons, who owned a corporation called GW & SW,

2    that operated a NAPA Auto Parts Store in Rogers City, Michigan,

3    worked with Robert Pochmara on a regular basis but made paychecks

4    for his work payable to Maxine Pochmara and caused their

5    accountant to issue W-2s in Maxine Pochmara's name and Social

6    Security number for work that was done by Robert Pochmara at the

7    Wilson's auto parts store.

8            Gary and Sue Wilson falsely reported to the Social

9    Security Administration and to the IRS that Maxine Pochmara was

10   the one working and earning those wages when in reality, she was

11   not working there and Robert Pochmara was the one performing the

12   work.

13           And at the same time, all this time that he was working

14   for the NAPA Auto Parts Store, Robert Pochmara was receiving full

15   disability benefits from the Railroad Retirement Board in a total

16   amount of $218,000 and had he reported these earnings for work

17   from NAPA, he would have lost these benefits.

18           We are here today because the Wilsons falsely reported

19   to the Social Security Administration and to the IRS that Maxine

20   Pochmara earned an additional $337,929, from NAPA Auto Parts

21   Store, which in addition to her regular income, she had a

22   full-time job at a health care center, earning a full-time salary

23   from there, more than doubled her reported income.

24           We are here today because Gary and Sue Wilson lied to

25   the IRS and to the Social Security Administration.

Jury Trial, Vol. II of V

162

1          The facts are simple.  All you have to do in this case

2    is just follow the paper trail.  Compare what they had in their

3    internal paperwork and bank statements against what they had in

4    their official paperwork reported to the government.  Compare

5    what they did and what was happening in reality against what they

6    reported to the government.

7          The evidence will show that in 1992, Robert Pochmara

8    applied for and later obtained disability benefits from the

9    Railroad Retirement Board for some back problems that he

10   developed while working for the railroads.

11         The Railroad Retirement Board is a federal agency and

12   unlike the rest of us who participate in the Social Security

13   Administration system for disability and pension, people working

14   for the railroad have their own system and that's the Railroad

15   Retirement Board.

16         You will see that Robert Pochmara signed numerous forms,

17   acknowledging that while receiving disability benefits, he had a

18   duty to report any type of work that he might be performing,

19   whether paid or unpaid, and whether working for someone else or

20   self-employed.

21         He was notified in writing that he had this duty because

22   any work that he might be performing may affect his disability

23   payments or may even cause the board to reconsider his disability

24   altogether.

25         He signed these forms acknowledging that he had this

1   duty to report work and that if he made any false statements, he

2   would be committing a crime.

3          Every year thereafter, Robert Pochmara was notified and

4   was sent reminders regarding his continued disability benefits

5   and continued duty to report any type of work.  You will see that

6   he was even notified that he had to report if he ever became a

7   corporate officer or if he owned or operated a corporation,

8   including a corporation owned by a friend or a family member and

9   whether for pay or not.

10          You will learn that all this time, Robert Pochmara lived

11   in Rogers City in the same house with Maxine Pochmara.  And that

12   Maxine Pochmara worked full-time for the Northeast Michigan

13   Community Mental Health Authority earning a full-time salary from

14   there.

15          In 1998, Robert Pochmara and Maxine Pochmara decided to

16   purchase 45 percent of the shares of the company GW & SW that was

17   owned by Gary and Sue Wilson and that operated the NAPA Auto

18   Parts Store in Rogers City, Michigan.

19          We will show you internal documents from this company

20   indicating that on January 5th, 1998, GW & SW, through its

21   president, which was Gary Wilson, and secretary and treasurer,

22   Sue Wilson, sold 45 percent of its shares to both Maxine and

23   Robert Pochmara for $70,000.

24          This document -- at the same time, Gary and Sue Wilson

25   retained the rest of the 55 percent of the company jointly.  This

Jury Trial, Vol. II of V

1   document will also show you that on the same day, the following

2   corporate officers were elected:  President, Gary Wilson; Vice

3   President, Robert Pochmara; and Secretary and Treasurer, Sue

4   Wilson.  And this document was signed by both Gary Wilson and Sue

5   Wilson.

6         However, when the Wilsons officially reported to the

7   government who the corporate officers were, through an affidavit

8   of information of the company, the corporate officers all of a

9   sudden changed.  With the exception of Gary Wilson who was still

10  President, there was no Vice President.  Sue Wilson was only

11  Secretary.  And the Treasurer was Maxine Pochmara.  There was no

12  mention whatsoever of Robert Pochmara in these official documents

13  reported to the government.

14        And this document was signed by Sue Wilson in March of

15  1998.  We will also show you a second document, a similar

16  document, signed by Sue Wilson in 1999 reporting the following

17  corporate officers:  President, Gary Wilson; Vice President,

18  Maxine Pochmara; and Secretary and Treasurer, Sue Wilson.

19        You will see documents and hear testimony indicating

20  that starting in 1998, Robert Pochmara started working for GW &

21  SW at the NAPA Auto Parts Store on a full-time basis and that

22  Maxine Pochmara never worked there.  Gary Wilson and Sue Wilson

23  also worked for this store, Gary Wilson on a full-time basis and

24  Sue Wilson on a part-time basis, taking care of the bookkeeping

25  for the company.

Jury Trial, Vol. II of V

165

1          And aside from witnesses who will testify to you about

2    his -- about their feelings with the NAPA Auto Parts Store and

3    with Robert Pochmara while he was employed, as an employee or

4    manager at the NAPA Auto Parts Store, we will show you documents

5    from the defendants themselves, acknowledging that Robert

6    Pochmara was working for the store.

7          In November of 2008, when the Railroad Retirement Board

8    officer of investigations requested some information from the

9    NAPA Auto Parts Store regarding Robert Pochmara's employment

10   there, Sue Wilson responded in writing, listing Robert Pochmara's

11   earnings from 2003 to 2007 and stating that Gary Wilson and

12   Robert Pochmara were both store managers working equal hours, but

13   the paychecks, payroll checks, were written to Maxine Pochmara,

14   wife of Robert Pochmara.

15         She also stated that -- well, a letter -- in a letter

16   submitted a month later, in December of 2008, she stated that

17   Robert Pochmara never drew earnings from NAPA Auto Parts Store

18   but Maxine Pochmara did and that Robert Pochmara worked on behalf

19   of Maxine Pochmara.

20         Yes, Ladies and Gentlemen of the Jury, you will see that

21   Robert Pochmara was working for the store but the paychecks for

22   his work that were reported to the Social Security Administration

23   were written in Maxine Pochmara's name.

24         You will see weekly paychecks signed by either Sue

25   Wilson or Gary Wilson in Maxine Pochmara's name, but you will

Jury Trial, Vol. II of V

166

1  also see that Maxine Pochmara never worked there, that she had

2  her own full-time job with the Northeast Michigan Community

3  Mental Health Authority earning a full-time salary from there.

4  What you will not see is any paychecks written in Robert

5  Pochmara's name.

6          We will also show you some documents showing that every

7  year, GW & SW Company was issuing W-2s in Maxine Pochmara's name

8  and Social Security number, reporting all of Robert Pochmara's

9  work earnings as a salary under her name.  There was no 1099 form

10 or any other kind of dividend or stock disbursement form in

11 Maxine Pochmara's name.  No.  Just salary for work she never

12 performed.

13         There was never, ever, a W-2 issued in Robert Pochmara's

14 name, though, as if he was never even there.  The Wilsons were

15 falsely reporting this to the IRS as Maxine Pochmara's salary and

16 they did the same false reporting to the Social Security

17 Administration.

18         On the other hand, you will see loan applications and

19 mortgage applications on behalf of GW & SW and NAPA Auto Parts

20 Store.  They were co-signed not only by Gary Wilson, Sue Wilson

21 or Maxine Pochmara but also by Robert Pochmara.  You will also

22 see bank statements for a bank account opened on behalf of GW &

23 SW and NAPA Auto Parts Store that had Robert Pochmara as an owner

24 on the account, together with Gary and Sue Wilson and Maxine

25 Pochmara.

1      On the other hand, you will see that every year's tax

2  forms prepared by the Wilsons' company and signed by Gary Wilson

3  and submitted to the IRS, never referred or never mentioned

4  Robert Pochmara and falsely represented that Maxine Pochmara was

5  working there and dedicating a hundred percent of her time to the

6  company all these years, when in fact, that was a lie and the

7  defendants knew that.

8      You will also see other corporate paperwork and earning

9  reports listing Gary Wilson, Sue Wilson and Maxine Pochmara as

10  employees of the corporation together with some other employees

11  that they had, but they never, ever, mentioned Robert Pochmara

12  when in fact, he was the one working and not Maxine Pochmara and

13  he was working on a regular basis with Gary Wilson and sometimes,

14  also, with Sue Wilson.

15      You will also see that the company had many ups and

16  downs when it comes to its taxable income but the checks written

17  to Maxine Pochmara only went up, usually.

18      You will see that Robert Pochmara never reported this

19  income from the NAPA Auto Parts Store to either IRS, Social

20  Security Administration or Railroad Retirement Board and

21  continued to draw disability benefits while Maxine Pochmara

22  reported to the IRS that income as her own.

23      And this conspiracy and fraud went on and on until the

24  beginning of 2009 when this case was initiated.  From 1998 to

25  2009, the Wilsons falsely reported to the IRS and the Social

1 Security Administration that Maxine Pochmara was earning an

2 additional $337,929 from GW & SW NAPA Auto Parts Store, which in

3 addition to her real income, more than doubled her reported

4 income.

5          At the same time, Robert Pochmara received $218,000 in

6 disability benefits from the Railroad Retirement Board while

7 working full-time for NAPA Auto Parts Store.

8           When they were alerted that this investigation had been

9 opened in this case and realizing their crimes had been

10 discovered, Robert and Pochmara quit this arrangement.  Robert

11 Pochmara quit working for NAPA Auto Parts Store and GW & SW

12 purchased their 45 shares back.

13          Like I said before, all you have to do is follow the

14 paper trail.  Look at what they did and look at what they told

15 the government they did.  Look at what they had in their internal

16 paperwork and then look at what they had in their official

17 paperwork reported to the government.

18          In a criminal trial such as this one, in order for the

19 defendants to be found guilty, we must satisfy you beyond a

20 reasonable doubt that the defendants are guilty of conspiracy to

21 defraud the United States and providing false information to the

22 Social Security Administration.  And to do so, we will prove

23 several elements to you.

24          When it comes to conspiracy to defraud the United

25 States, we will show that two or more people knowingly agreed to

1 engage in conduct, that conduct amounted to fraud against the

2 United States or one of its agencies, and then an overt act in

3 furtherance of the agreement has been committed.

4          Now, the judge will instruct you that conspiracy is not

5 some mystical concept.  It simply means an agreement or an

6 understanding between two or more people to do something, whether

7 that agreement is spoken or unspoken.

8          You will also learn that to defraud means to cheat the

9 government out of money or property but also means impairing,

10 obstructing or defeating the loss of a function of any government

11 agency or department by dishonest means.

12          You will also learn that a crime does not have to be

13 committed directly by the defendants but proof that they

14 attempted or they used a third party to commit the crime may be

15 sufficient.

16          Now, when it comes to providing false information to the

17 Social Security Administration, we will show that the defendants

18 knowingly, willfully and with intent to deceive, furnished false

19 information or caused false information to be furnished to the

20 Social Security Administration regarding the true identity of a

21 person earning wages.

22          The government will prove each and every one of these

23 elements to you beyond a reasonable doubt.  And you will see in

24 this trial, both direct and circumstantial evidence, from which

25 you should draw your own conclusions using your common sense and

170

1    reason.  Now, the judge already gave you an instruction

2    regarding direct and circumstantial evidence but I will give you

3    a couple more examples so you become more comfortable with this

4    concept.

5            We all live in Michigan and we are very familiar with

6    the winters here so let's assume that one night in January, you

7    go to bed at ten p.m. and you set your alarm to wake up at five

8    a.m.  You look outside before you go to bed and you see snow --

9    and you see no snow on the ground.  You go to bed and you sleep

10   through the night.  And when you wake up at five a.m., you see

11   snow on the ground.

12           Now, you didn't see it snowing which would have been

13   direct evidence, but you didn't see it because you were sleeping.

14   But using your common sense and reason, you conclude that it

15   must have snowed sometime between five -- or ten p.m. and five

16   a.m.

17           You also look outside in your driveway and you see some

18   foot tracks coming towards your porch and you see your newspaper

19   on your porch.  Now, you didn't see anyone bringing your

20   newspaper but using your common sense and reason, you conclude

21   that it must have been the newspaper boy bringing you the

22   newspaper.  All you have to do is use your common sense and

23   reason.

24           And I should note that much of the evidence and the

25   arguments in this case will revolve around the question of

Jury Trial, Vol. II of V

171

1   whether the defendants had the requisite intent or mental state
2   to commit these crimes.  Did they knowingly agree to defraud the
3   United States?  Did they knowingly, willfully and with intent to
4   deceive, provide false information to the Social Security
5   Administration?
6          The government will present evidence answering these
7   questions affirmatively.  The evidence will show that, yes, the
8   defendants had the requisite intent to commit these crimes.
9          Now, most of the evidence proving their mental state is
10  going to be indirect evidence because we will not have the luxury
11  of the defendants making a clear admission that this is what
12  their intent was and we cannot read their minds and tell what
13  they are thinking, either.
14         But what you can do to discern their intent and mental
15  state is look at all the facts and circumstances in evidence.
16  Use your common sense and reason and draw your own conclusions.
17  What the defendants did, what the defendants said, how the
18  defendants acted and any other fact and circumstance in evidence
19  may show you what the defendants' state of mind was.
20         The government's functions when compared by intentional
21  falsities and misrepresentations, reported or caused to be
22  reported by the defendants, the Wilsons here.  The Wilsons
23  concealed the fact that Robert Pochmara was working and earning
24  wages at the NAPA Auto Parts Store and falsely reported to the
25  Social Security Administration and to the IRS these wages under

Jury Trial, Vol. II of V

172

1    Maxine Pochmara's name and Social Security number.

2          The defendants had a duty to provide accurate

3    information to these government agencies and their duty was not

4    that technical or hard to understand.  They had a duty not to

5    file false tax returns and a duty not to submit false information

6    regarding the true identity of the person earning wages.  We all

7    have to file tax returns and we all report our own wages.  We do

8    not report someone else's wages as our own.

9          Lies, misrepresentations, false statements and half

10   truths for twelve years do not equate to mistakes, accidents or

11   incidental reasons.

12         You will hear from several witnesses in this trial.  You

13   will hear from several individuals who will testify that they had

14   dealings with Gary Wilson and Robert Pochmara when they were

15   employees or managers at the NAPA Auto Parts Store, but they

16   never had to deal with Maxine Pochmara.

17         You will hear from the case agent and from other

18   government employees working for the Railroad Retirement Board or

19   for the IRS.  And you will even hear from the person keeping the

20   accounting records for GW & SW and NAPA Auto Parts Store.

21         And you will see a lot of documents and these witnesses

22   will explain to you where these documents came from, what they

23   mean, and how you can read them.  But really, what it comes down

24   to is a very simple concept, knowing that Robert Pochmara worked

25   at the NAPA Auto Parts Store, the Wilsons falsely reported that

1  Maxine Pochmara was working instead.

2          In a nutshell, this is the evidence that the government

3  will present.  This evidence will prove that the defendants

4  knowingly agreed to defraud the United States and willfully and

5  with intent to deceive, provided or caused to be provided false

6  information to the Social Security Administration.

7          They knew what they were doing and they lied to the

8  Social Security Administration and to the IRS about the true

9  identity of the person working and earning wages at the NAPA Auto

10 Parts Store.

11         I would like to thank you in advance for your service in

12 this matter.  After hearing all the witnesses and looking at all

13 the evidence, you will find that the United States has proved

14 every element of each offense beyond a reasonable doubt.

15         At the end of this trial, my co-counsel Janet Parker

16 will get a chance to talk to you and she will ask you to return

17 verdicts of guilty as to both defendants as to each count, the

18 only verdicts consistent with the evidence and the law in this

19 case.

20         Thank you.

21         THE COURT:  Thank you, ma'am.

22         Mr. Jacobs, do you wish to provide an opening statement

23 on behalf of Mr. Wilson?

24         MR. JACOBS:  Yes, sir.

25         THE COURT:  Your floor.

Jury Trial, Vol. II of V

174

1          MR. JACOBS:  Again, I'm Steve Jacobs.  My client is Gary

2     Wilson.  Opening statement is a preview, an outline of what we

3     think the testimony will be.  I can't guarantee to you what the

4     testimony will be.  We have -- we interview people ahead of time.

5     Some people, we have notes, we have records, we have -- in this

6     case, we even have tape-recordings.  But sometimes, people say

7     something different than what I assert in my opening statement

8     and I'm not misleading you.  My statements aren't evidence.  The

9     evidence comes from the witness stand.  And if there is some

10    inconsistency with what I say or what our opponents say, please

11    go with what the evidence is.

12          We are allowed to comment on the law a little bit.  They

13    commented on the law and, of course, the government has to prove

14    beyond a reasonable doubt that Gary Wilson is guilty of what he

15    is charged with, conspiring to defraud the United States and

16    also, in essence, defrauding or filing false information to the

17    Social Security Administration.

18          The government has the burden in this case.  They have

19    to show each and every element of the offense and they have to

20    prove my client and his wife -- or his wife, excuse me, I will

21    let Mr. Piazza talk about Sue Wilson -- beyond a reasonable

22    doubt.  That Gary Wilson has no obligation to take the stand.

23          You heard the judge tell you the mechanics of the trial.

24    They go first.  They present their evidence.  We get to

25    cross-examine their witnesses.  Then we have an opportunity to

1  put people on the stand.  We don't have to because again, the

2  defendant doesn't have a burden at all in this case.  If we do

3  put people on the stand, then the government, of course, is

4  allowed to cross-examine them.  And in some situations, there is

5  what we call rebuttal evidence.  That doesn't happen very often.

6  And then there is closing statements.  The judge will give you

7  instructions.

8        And then you will all get to sit back -- well, not sit

9  back but go back into that room and do your jobs.  And that is to

10 determine the facts in this case and whether the government has

11 proven beyond a reasonable doubt that Gary Wilson is guilty with

12 what they are asserting.

13       They are asserting he was involved in a criminal

14 agreement, that there was some mutual understanding, either

15 spoken or unspoken, between two or more people, to cooperate with

16 each other to defraud the United States.

17       Well, you were told here earlier that we're here today

18 for many reasons.  And I would assert to you that we're here

19 today because Maxine and Robert Pochmara lied to Gary and Sue

20 Wilson and they lied to others.  We're going to be able to show

21 that pretty easily.  The folks even lied about whether they were

22 married.  They held themselves out to the world as husband and

23 wife, signed documents as husband and wife, lived together, and

24 we're going to show you they were divorced in 1981.

25       That they lied about Bob being on -- or Robert Pochmara

Jury Trial, Vol. II of V

176

1   being on railroad retirement disability.  They said he was on a

2   pension.  You're going to hear a lot of government witnesses say,

3   well, we believed Bob was on a pension.  Why did they believe

4   that?  Because that's what they asserted.

5           Gary Wilson and Sue -- well, Gary Wilson -- again, it's

6   hard for me to not throw in the wife but that's not my job --

7   Gary Wilson did not know that Robert Pochmara was on disability

8   and was subject to any earning restrictions.  But let's talk

9   about what he -- what he knew and what the facts will be in this

10  case.

11          You'll hear that Robert Pochmara -- excuse me, Gary

12  Wilson, is 58 years old -- well, he's going to be 58 in a couple

13  days -- that he is married to Sue Wilson, that they had three

14  children, that they have three more grandchildren, that they live

15  up in the Rogers City area, northeastern Michigan.  That --

16  northeastern lower peninsula.  Gary graduated from a school up

17  there, I think it was Onaway High School.  He was actually born

18  in Millersburg.  And that after high school, got some -- took

19  some trade, what I would call trade school, learned how to weld,

20  learned how to be an automobile mechanic.  In fact, became

21  certified as an automobile mechanic.

22          They worked different odd jobs and you'll hear he worked

23  for a dealership for a period of time, worked for the limestone

24  company up there.  It's changed names, I don't know what it's

25  called now but they've had different names.  That at some point

1   in time, Gary even worked part time for the sheriff's department
2   up there with animal control.
3         That he was injured in -- let's see -- he was injured in
4   1988.  He couldn't work as a mechanic anymore, fallen off a roof,
5   and looked into other options.  Now, you'll hear that there was a
6   NAPA store in Onaway that had closed and there was no NAPA store
7   in Rogers City.  So Gary Wilson then contacted the NAPA people.
8   They needed some sort of feasibility study.  He contacted a
9   certified public accountant that he knew and that they'd used
10  for -- that they had used for twenty, thirty years, a Mr. Jerome
11  Kieliszewski, and you'll hear some testimony that you heard in
12  the government's opening that someone from the accounting firm
13  will testify in this matter.  I believe that may be Mr.
14  Kieliszewski's wife, Dawn, who also works in the office.  That --
15  she works there with a few other people.
16        That they did this feasibility study and the NAPA people
17  said, okay.  That Gary, of course -- well, not -- I shouldn't say
18  of course -- but needed a partner, and he knew a person by the
19  name of Roger Wentzel who had worked at a local garage.  And in
20  May of 1992, they created GW & RW, Inc., and Gary had a building,
21  it was a laundromat that they actually converted it to the NAPA
22  store.
23        Roger contributed some capital, some money.  They both
24  put in many hours in that store.  They both drew a payroll
25  check and they both paid taxes, of course, on their payroll

Jury Trial, Vol. II of V

178

1  check.

2          But after a few years, they were kind of struggling.

3  Roger wanted out.  They really needed more money, needed more

4  money for inventory.  They had some internal problems in the

5  store.  You'll hear about, there was some theft in the store, and

6  that someone was actually prosecuted and convicted.

7          And so Gary got a loan and bought out Roger.  But again,

8  times are tough, looking for another investor.  And Gary Wilson

9  gets approached by Maxine Pochmara.  Now, Gary Wilson and Sue

10  Wilson had known Maxine and Robert Pochmara for many years.  They

11  lived in the same general neighborhood.  I wouldn't -- you know,

12  the houses aren't like they are in the city out there.  They are

13  not next door neighbors but they are still in the same general

14  neighborhood.  In fact, their kids had played together.

15          That Gary believed that Robert, the husband -- see, they

16  lived together.  They always lived together, held themselves out

17  as husband and wife.  Again, we thought they were married, didn't

18  know they were -- well, I can't say nobody knew, they knew -- but

19  other people were not -- it was not public knowledge that they

20  were divorced.

21          That she approached Gary about investing in the business

22  and receiving a return on her investment.  And her investment --

23  and there is no dispute -- that Maxine, and she signed the

24  documents with her husband, Robert Pochmara, invested $70,000

25  into the corporation.

179

1        I guess I should have shared with you, when Roger
2    Wentzel was bought out, Gary and Sue then incorporated their
3    business as GW & SW, Inc., so they changed the names and of
4    course, they went to the local accountant and had the accountant
5    do the paperwork for the incorporation and they would also take
6    their books to the accountant to do their taxes and things like
7    that.
8        And that they had to set up, how does Maxine get her
9    return on her investment and how do we get a payroll check.
10   So -- and we're talking a mom and pop type store up north where
11   you're paid more or less based on how much money is available and
12   what your interest is in the company.
13       And so like I said, Gary is there 60 hours a week.  The
14   only day he took off was on Fridays and he would be there, also,
15   on Sunday.  He drew a payroll check.  His wife, Sue, she had --
16   she acted as the bookkeeper there but she also had many other
17   jobs.  She worked at one point in time for a beauty salon or
18   cosmetic -- I'm saying it the wrong way -- I guess I will call it
19   a beauty salon.  Also, worked out of her house.  Also sold
20   insurance.  And, you know, there will be testimony to that
21   effect.
22       But she did the books.  She wrote the payroll checks,
23   she contacted the accountant, at least had some role with
24   figuring out what the deductions are for the different people
25   involved, actually sending out the checks.  She -- another person

Jury Trial, Vol. II of V

1  with -- with not a great education but she also had the little

2  minute book that they would try to figure out the requirements

3  and how you -- how you file for your minutes and your annual

4  meetings and things like that.

5        Maxine's role was -- now, Maxine had another full-time

6  job.  Maxine's role was, she invested $70,000, no doubt about

7  that.  That she had a key to the building, that she was on these

8  bank accounts, that she wrote checks.  And we will even bring in

9  a check or two to show that Maxine wrote checks that say NAPA

10  store.  That she was involved in these business decisions.

11       And when I talked to the different professionals and

12  accountants about it, I used the word absentee owner and I get

13  corrected.  Well, they said it's not necessarily an absentee

14  owner if someone is still involved in the business and involved

15  in the business decisions as far as their ability to draw a

16  paycheck.

17       Well, see to me, and to most people, an absentee owner

18  is somebody who isn't there eight hours a day, five days a week,

19  but -- and we will let -- we will let the CPAs explain that to

20  you, but someone who is not there 40 hours a week that has an

21  ownership interest in a building can still draw a paycheck.  They

22  have to do something.  And we assert that Sue Wilson did

23  something, that Maxine Pochmara did something.

24       Now, they are saying, whoa, wait a minute, we think

25  Robert Pochmara did something and that you guys consciously

Jury Trial, Vol. II of V

181

1  defrauded the United States by giving Robert's payroll checks to

2  Maxine.  That's what's going on here, folks.  They are saying

3  that they were giving Robert's payroll checks to Maxine

4  Pochmara.

5         You will see that these people met with the

6  professionals, did the paperwork.  They believed they did what

7  they were supposed to do and drew paychecks and paid taxes on

8  that money.  Both the corporation paid taxes, Gary Wilson paid

9  taxes, Sue Wilson paid taxes, Maxine Pochmara paid taxes.

10        Again, we don't know what Maxine Pochmara and Robert

11 Pochmara's motivation is.  Now, we can kind of look back and say,

12 well, they did have some motivation here.  They wanted to invest

13 in a business, get some money back for Robert without saying it's

14 Robert's money.  And so they might have used Gary and Sue Wilson.

15 That's not an issue.  I -- I think that's another thing the

16 government is going to be able to show in this case, that they

17 used Gary and Sue Wilson.

18        They have to prove beyond a reasonable doubt that Gary

19 and Sue Wilson intended to defraud the United States and intended

20 to furnish false information to the Social Security

21 Administration.

22        So what happens in this matter?  What happens is, Gary

23 gets -- Gary Wilson gets a form from the railroad retirement

24 people at work.  And you're going to see a lot of exhibits and

25 this is the Exhibit 24 in that series.  And you heard the

1  government talk about this without saying the exhibit number in

2  their opening.

3          They get this form from the railroad retirement people

4  that says, tell us about the earnings of Robert Pochmara.  He

5  takes it home and he sits down with Sue and they are looking at

6  it and they are drawing the conclusion, well, they must be asking

7  about Maxine's income.

8          So they fill out the form but they attach a couple

9  documents saying this is, in essence, Maxine's income.  This is

10 the payroll checks to Maxine and that Robert Pochmara was there

11 on occasion.  There on occasion?  Well, first it started out on

12 Fridays.  Robert Pochmara would be at the NAPA store and way back

13 when this started in '98.  And then he started coming in all the

14 time.

15         He's there -- and again, Gary and Sue Wilson told the

16 government this.  They were told, you don't have to talk to us,

17 you don't have to agree to a taped statement.  Well, we've got

18 nothing to hide.  We will sit down, we will tell you the

19 situation and how this came down.

20         So after a period of time, Robert Pochmara is there at

21 the store, at the NAPA store.  He is there two to three days a

22 week.  He is there, I think, five to six -- five to six hours a

23 day, two to three days a week.  He even delivered parts.  He

24 drove the little NAPA truck.  He even -- after a period of time,

25 he, like everybody else, his shirts kept getting dirty, they gave

1  him a NAPA shirt.

2          So, yes, he was there.  We're not asserting he wasn't

3  at the store.  They are asserting that Gary and Sue Wilson

4  purposely attempted to defraud the United States and they didn't

5  do that.

6          Now, on November 20th of 2008, Agent Hackett and another

7  special agent with the Railroad Retirement Board come to the NAPA

8  store and ask Gary Wilson some questions.  And in essence, that's

9  when Gary finds out that Robert Pochmara is on some Social

10  Security -- not Social -- railroad retirement disability and he's

11  subject to some sort of earning restrictions.  They were there to

12  see if Bob had a job and he made more money, it would affect the

13  amount of money he got from the railroad disability people.

14          Then the agents caused or another form was sent out from

15  the railroad retirement people asking for some other years of

16  Robert Pochmara's income.  Gary took that back home.  He and Sue

17  went through it.  They filled it out and they said, this is

18  Maxine's income, not Robert Pochmara's income.

19          And then they -- supposedly, they are defrauding the

20  United States and yet, on January 13th of 2010, both Gary Wilson

21  and I think Sue Wilson was on January 14th, might have been the

22  same day, but folks, you're going to hear or I believe you're

23  going to hear the taped interviews of Gary and Sue Wilson by

24  those agents.

25          You're going to hear that they voluntarily and freely

Jury Trial, Vol. II of V

184

1    said in more detail or answered the questions that were asked of

2    them.  You're probably going to hear more detail -- you will hear

3    more detail of this matter in trial.

4          Gary never said Robert wasn't there.  He never attempted

5    to defraud the United States.  You were asked, folks, to use your

6    reason and common sense.  And you were given an example about

7    snow.  But your reason and common sense will tell you it doesn't

8    snow in Michigan in May.  But it did here a couple weeks ago.

9          So, please, use your reason and common sense, listen to

10   all the evidence in this case, listen to the government's

11   witnesses and our cross-examination of those witnesses.  And we

12   would -- and we'll be asking you to return a verdict of not

13   guilty in this case.

14         Thank you, folks.

15         THE COURT:  Thank you.

16         Mr Piazza on behalf of Mrs. Wilson.

17         MR. PIAZZA:  Thank you, your Honor.  Ladies and

18   Gentlemen of the Jury, good morning.

19         Being the third attorney in line, I'm not going to be

20   here for long but I just want to talk about a few things during

21   opening statement.  I represent Sue Wilson over there.

22         Please, during the course of the trial, look at the

23   evidence or lack of evidence.  See who it points to, who it

24   doesn't point to.  As indicated by both prior counsel talking to

25   you, you will be hearing a lot of evidence against Robert and

1 Maxine Pochmara.  They are not on trial here.  Sue Wilson is on

2 trial.  Look at what the government has and doesn't have relating

3 to Sue Wilson.

4         The government has accused Sue Wilson with conspiracy to

5 defraud the United States as well as providing false information

6 to the Social Security Administration.  What the government has

7 to do is prove each element of those charges beyond a doubt based

8 on reason.  And to show conspiracy, they have to show two or more

9 people knowingly agreed to engage in conduct and that Sue Wilson

10 was a member of that conspiracy.  They have to prove that the

11 conduct constituted a fraud, that there is overt acts committed

12 in furtherance of the agreement.

13        You are not going to hear evidence to convince you

14 beyond a reasonable doubt that Sue Wilson made a -- joined a

15 conspiracy or agreed to conspire to defraud the United States.

16        The other count is providing false information to the

17 Social Security Administration.  The government has to show that

18 Sue Wilson knowingly, willfully, and with the intent to deceive

19 -- there are not "ors" in there, they are "ands" -- and to

20 furnish false information in regard to the true identity of a

21 person earning wages.

22        You will hear at the conclusion of the trial jury

23 instructions relating to some of the general concepts and I ask

24 you to listen to those instructions but apply them during the

25 course of the trial.  First and foremost, Sue Wilson as she sits

1  there right now, is presumed to be innocent.  You've heard

2  opening statements.  But that's it, opening statements.  It's not

3  evidence.

4        Sue Wilson is presumed to be innocent and the burden

5  stays right here with the government.  They must prove each case

6  beyond a doubt based on reason.  True, co-counsel indicated that

7  Gary and Sue Wilson are from Rogers City, own a small business up

8  north, the NAPA Auto Store, started out around 1992.

9        About 1998, they were approached and Gary Wilson was

10  approached by Maxine Pochmara to invest in it.  And as Mr. Jacobs

11  indicated, both Gary and Sue Wilson believed that they were

12  husband and wife.  They had no knowledge that Robert Pochmara was

13  on disability.

14        The government indicated in their opening statement,

15  that Robert Pochmara had a duty to disclose any income to the

16  railroad board of directors of any investment.  Didn't say that

17  Sue Wilson had to tell the railroad company anything.  Because

18  she didn't know he was on disability.  It appeared that it was

19  Maxine Pochmara making the investment.

20        At the store, Gary Wilson was running it.  He was the

21  manager.  He owned -- between himself and Sue Wilson, owned 55

22  percent.  Robert Pochmara ran some errands, delivered some parts

23  but he was not an employee.  Maxine Pochmara got paid for her

24  investment.  Loose terms, absentee owner, whatever, she made an

25  investment and was getting paid.  There was nothing illegal about

1    that.

2           And the government is accusing Sue Wilson of being

3    involved in this conspiracy to defraud the United States when in

4    reality, Sue Wilson wasn't at the store, didn't really work at

5    the store.  Gary Wilson brought home the documents and Sue Wilson

6    wrote checks out from her house.  You know, paid bills -- she

7    paid, you know, wages, you know, whatever it was that she was

8    told to do by Gary Wilson, she did.  Questions were asked by Gary

9    Wilson or by the accountant.

10          You will not hear that Sue Wilson has a degree in

11   accounting, that she is sophisticated in tax laws or anything

12   else.  What you will hear is that she is simply the wife of Gary

13   Wilson, and just wrote out the checks as she was told.

14          Late 2008, early 2009, the government comes in and

15   starts an investigation on Robert and Maxine Pochmara.  They talk

16   to Sue Wilson.  Sue Wilson says here, here are some documents.

17   We've got nothing to hide.  Here is what we did.  For Sue Wilson

18   had nothing to hide.  She did not enter into a conspiracy to

19   defraud the United States.  She didn't willfully, knowingly and

20   with the intent to defraud or give false information to anybody.

21   She simply signed the checks, signed the reports.

22          The government makes big things out of who is on the

23   board of directors.  It's a small corporation.  And Sue and Gary

24   Wilson believed that Robert Pochmara was Maxine's husband.  Which

25   was a lie.  But that's what they believed.  It's not like we are

1  talking about GM where people are voted in.

2          During the course of the next few days, we ask you to

3  look at the evidence and look at the lack of evidence.  I'm sure

4  the government is going to say they don't have to prove, you

5  know, who profited, who benefited.  But look at the acts or the

6  lack of acts.

7          Sue Wilson did not benefit from what the government is

8  alleging she did.  She did not benefit or -- or profit.  She did

9  not gain anything.  All she did was simply write out the checks

10  like she was told and did not intend to defraud anybody.

11          She did not willfully defraud, she did not knowingly

12  defraud.  She did not agree to defraud.  And the government

13  cannot present any evidence to show you beyond a reasonable doubt

14  that she did.

15          But you will not hear from the government and their

16  proofs, you will not hear that Sue Wilson knew that Robert

17  Pochmara was on disability during the time frame.  You will

18  hear -- you will not hear from the government that she knew that

19  Robert Pochmara could not collect any money.  You will not hear

20  that she knowingly gave false information to the Social

21  Security.

22          She gave information of what she believed was true.  You

23  will not hear from the government that she agreed to commit

24  fraud.  You will not hear from the government by proof beyond a

25  reasonable doubt that Sue Wilson intended to commit any fraud or

Jury Trial, Vol. II of V

189

1   to commit any crime whatsoever.

2          You have a small town business with the wife of the guy

3   who ran it simply signing the checks and signing documents as she

4   was told.  There is no intent to defraud, no conspiracy.  At the

5   conclusion of the case, simply saying the government hasn't

6   proven their case, that it hasn't been proven, and will ask you

7   to bring in a verdict of not guilty.

8          Thank you.

9          THE COURT:  Your first witness, please.

10         MS. PARKER:  Thank you, your Honor.  The government

11  calls Deanna Smith.

12         Your Honor, could we have the podium moved?

13         THE COURT:  Yes.

14         Good morning.  Please raise your right hand.

15         Do you solemnly swear that the testimony you are about

16  to provide will be the truth, the whole truth and nothing but the

17  truth so help you God?

18         THE WITNESS:  I do.

19         THE COURT:  The witness stand is over on that side of

20  the courtroom, if you will have a seat there, please, ma'am.

21                         DEANNA SMITH

22  Having first been duly sworn at 9:46 a.m., testified as follows:

23                       DIRECT EXAMINATION

24  BY MS. PARKER:

25  Q.   Good morning.

Jury Trial, Vol. II of V

190

1   A.    Good morning.

2   Q.    Will you state your full name and spell it for us, please?

3   A.    Deanna Smith, D-E-A-N-N-A --

4   Q.    All right.  Can you pull the microphone just a little bit

5   closer.

6   A.    Deanna Smith, D-E-A-N-N-A, Smith, S-M-I-T-H.

7   Q.    All right.  How are you employed?

8   A.    I didn't hear you.

9   Q.    How are you employed?

10  A.    I am employed with the federal government at the Railroad

11  Retirement Board.

12  Q.    What are -- what's your position?

13  A.    I am the district manager of a field office.

14  Q.    And where is that field office located?

15  A.    In Detroit, Michigan.

16  Q.    And you said the Railroad Retirement Board is a federal

17  agency?

18  A.    Yes.

19  Q.    Tell us what the job of that particular federal agency is,

20  please.

21  A.    Well, the field that I work in, particularly, is a field

22  where we take retirement applications, survivor applications,

23  unemployment and sickness applications.  We basically administer

24  the RRA, meaning Railroad Retirement Act and the Railroad

25  Unemployment Insurance Act to railroad employees and their

1  families.

2  Q.   Are you familiar with Social Security?

3  A.   Very much, yes.

4  Q.   How does Social Security and the Railroad Retirement Board

5  relate or compare?

6  A.   Well, they are very similar in a lot of ways.  When a --

7  when a person is in normal employment, other than railroad

8  employment, they usually would file under Social Security

9  Administration for retirement benefits.

10        The Railroad Retirement Board, basically, administers

11  the retirement benefits for railroad employees and their families

12  only, if they qualify for the benefit.  We pay two components for

13  the retirement benefit and one of the components is very similar

14  to Social Security.

15  Q.   All right.  Before we get into maybe some of those

16  specifics, how long have you been with the Railroad Retirement

17  Board?

18  A.   It's 23 years.

19  Q.   And have you received specialized training regarding the

20  programs that are available to railroad employees through the

21  Railroad Retirement Board?

22  A.   Yes.

23  Q.   And you said your office is in Detroit?

24  A.   Yes.

25  Q.   And does that Detroit office basically cover all of

Jury Trial, Vol. II of V

192

1  Michigan?

2  A.   Yes.

3  Q.   All right.  Now, going back a little bit to the function of

4  the Railroad Retirement Board, is it a fair statement that

5  basically, people who participate in the Railroad Retirement

6  Board programs can either, depending on their circumstances,

7  ultimately receive railroad retirement or if something happens,

8  that causes them to be unable to perform their job, disability?

9  A.   Yes.

10  Q.   And you're involved with administering those two types of

11  programs?

12  A.   Yes.

13  Q.   And can you explain to me briefly what you do in that

14  regard?

15  A.   Basically, pre-retirement counseling is -- is done by myself

16  and my staff.  We also do retirement counseling.  We take the

17  applications.  We gather the information for the applications and

18  that -- and that is also in regard to disabilities as well.

19  Q.   Now, you indicated you were involved in pre-retirement

20  counseling.  Are you familiar with written materials that are

21  given to railroad employees regarding their potential benefits

22  under the railroad retirement system?

23  A.   Yes.

24       MS. PARKER:  Your Honor, may I approach the witness?

25       THE COURT:  You may.

Jury Trial, Vol. II of V
193

1       MS. PARKER:  Thank you.

2  Q.   I'm going to show you several documents here.  One is a

3  booklet entitled Employee Annuity marked as Government's Proposed

4  Exhibit 10.  Next one is Employee Disability Benefits marked as

5  Government's Proposed Exhibit 11.  Next one is marked as

6  Government's Proposed Exhibit 12 and it's entitled, Employee and

7  Spouse Annuities, Events That Must Be Reported.  And then three

8  documents, 13A, B, and C that are marked as Form RL-4.

9       Do you see all those?

10 A.   Yes, I do.

11 Q.   Are you familiar with all of those?

12 A.   Yes, I am.

13 Q.   Are those documents that you have used in the course of your

14 employment over this twenty-some years?

15 A.   Yes.

16 Q.   And are these documents that are provided in the ordinary

17 course of business to railroad employees?

18 A.   Yes.

19      MS. PARKER:  Your Honor, I offer Government's Proposed

20 Exhibits 10, 11, 12, 13A, B and C.

21      MR. JACOBS:  No objection.

22      MR. PIAZZA:  Your Honor, I'm not sure but, you know,

23 there is no indication that Robert Pochmara received these

24 documents so I'm not sure they would be admissible at this

25 particular time or relevant, you know, unless the government can

Jury Trial, Vol. II of V

194

1   show that Robert Pochmara actually received them or --

2          THE COURT:  I'm struggling with relevance.

3          MS. PARKER:  Your Honor, I think the relevance is that

4   we need to establish the program, how it works and how it would

5   relate to motivations for the conduct by other indicted members

6   of the conspiracy.

7          THE COURT:  Can we have a brief discussion?

8          (Whereupon sidebar conference held on the record as

9          follows)

10         THE COURT:  I'm presuming that the fact that Mr.

11  Pochmara may have been ineligible and may have not reported to

12  the disability board goes in by stipulation.

13         MS. PARKER:  I have not had any stipulations whatsoever.

14         MR. PIAZZA:  No, I won't stipulate.  They have to show

15  that Robert Pochmara knew of the -- the government has to show

16  that Robert Pochmara knew of the ineligibility to show any type

17  of conspiracy.

18         THE COURT:  I'm not disputing that, if -- I mean,

19  you're the one, as I understand it, who is making a relevance

20  objection.

21         MR. PIAZZA:  Right, yeah, at this point in time because

22  it's irrelevant, you know, unless they can tie it to Robert

23  Pochmara.

24         THE COURT:  I appreciate that.  I mean, that's the only

25  thing they are missing.  I mean, if we contingently introduce the

Jury Trial, Vol. II of V

1    evidence at this juncture, but they are going to provide

2    Pochmara -- they are going to be able to do it on an annual

3    questioning.  I mean, I'm looking, it is a tangential

4    significance to your defense at this point which is whatever

5    Pochmara knew and did, wasn't shared with your client.  So, I

6    mean, do you want this testimony?

7           MR. PIAZZA:  I'm sorry?

8           THE COURT:  Do you want this testimony?

9           MR. PIAZZA:  Well, I don't see how they can introduce

10   this unless they can show other documents to show that --

11          THE COURT:  I agree that they will have to do that, to

12   connect the relevance.

13          MS. PARKER:  Judge, I will proffer that there is a

14   document that we will get to that's -- where Mr. Pochmara

15   certifies receipt of these forms.  I have to do it in some

16   sequence.

17          THE COURT:  I agree.  But the only -- I agree.  The

18   only question I'm asking is, if you want that presentation.

19          MS. PARKER:  They don't -- if Mr. Piazza doesn't want to

20   stipulate, I've got to prove it.

21          MR. PIAZZA:  Yes.

22          THE COURT:  I will overrule the objection.

23          (Whereupon sidebar concluded)

24          THE COURT:  You may continue.

25          MR. PIAZZA:  Your Honor, my objection is overruled at

Jury Trial, Vol. II of V

196

 1  this time?

 2          THE COURT:  Yes.

 3          MS. PARKER:  So the exhibits are received, your Honor?

 4          THE COURT:  Without --

 5          MR. PIAZZA:  I'm sorry.

 6          THE COURT:  They are received contingent upon the

 7  introduction of the additional testimony that we've talked about.

 8          You may continue.

 9          MS. PARKER:  May I ask that they be displayed?

10          THE COURT:  You may.

11          MS. PARKER:  All right.  I believe the Court needs to --

12          THE COURT:  It should be on.

13          MS. PARKER:  While that is being -- there they go.

14  BY MS. PARKER:

15  Q.   All right.  Can you see on Exhibit 10 in front of you?

16  A.   Yes.

17  Q.   All right.  And you indicated that is the type of document

18  that was routinely provided to retirees?

19  A.   Yes.

20  Q.   Or employees, excuse me.

21  A.   Applicants, yes.

22          THE COURT:  Miss Parker, if I could have just a moment.

23  If the folks that are in the front row could just gently lift the

24  display, it makes it's much easier for the folks in the back to

25  be able to see at the same time.

Jury Trial, Vol. II of V

197

1          You may continue, ma'am.

2   BY MS. PARKER:

3   Q.   All right.  I would like to direct your attention, excuse

4   me, to Page 13 of Exhibit 10.  You have it there?

5   A.   Yes.  Yes.

6   Q.   Okay.  Open to Page 13 of Exhibit 10.  What's the caption

7   there?

8   A.   How Earnings Affect Your Annuity.

9   Q.   Let me ask you this before we get too involved in this.

10  What's an annuity?

11  A.   An annuity is basically a retirement benefit that is

12  composed of two components, a Tier I component and a Tier II

13  component.

14  Q.   All right.  It's basically what you can get upon retirement,

15  whether you're on disability or having completed enough years of

16  service.

17  A.   That's correct.

18  Q.   Do employees have to pay into this system to become eligible

19  for an annuity?

20  A.   Yes.

21  Q.   How are those payments made?

22  A.   Through their earnings.  They -- while working, they

23  contribute to a Tier I and Tier II tax, while working for the

24  railroad, and if they have any outside railroad earnings, meaning

25  non-railroad employment, they are still contributing towards

1  Social Security benefits.

2  Q.    So how does the Railroad Retirement Board keep track of

3  those payments made by the employees?

4  A.    We receive yearly reports from the Social Security

5  Administration.

6  Q.    And are Social Security numbers used to keep track of those

7  payments?

8  A.    Yes.

9  Q.    And the person's name?

10  A.    Yes.

11  Q.    And is that information then that is shared between the

12  Railroad Retirement Board and the Social Security Administration

13  and the IRS?

14  A.    Yes.

15  Q.    And would you then receive -- that is, you being the

16  Railroad Retirement Board, receive any reports of non-railroad

17  earnings reported under a person's name and Social Security

18  number?

19  A.    Yes, that is also included.

20  Q.    All right.  Now, again, referring to Page 13 of Chapter

21  10, in this section here, are you referring to retirement in

22  general?

23  A.    I don't think I understand your question.

24  Q.    All right.  Would this -- this Chapter 10, How Earnings

25  Affect Your Annuity, would that apply both to people who

Jury Trial, Vol. II of V
                                                                              199

1   retire on disability and people who retire at the end of their

2   service?

3   A.   This would -- this paragraph or this statement, is referring

4   to regularly retired people.

5   Q.   Okay.  Are there special rules that apply to people who

6   retire on disability?

7   A.   Yes.

8   Q.   All right.  I would like to ask you to refer to Exhibit 11,

9   Page 7.  Do you see that?

10  A.   Yes.

11  Q.   Now, on that particular page -- again, what was the title of

12  that booklet that's Exhibit 11?

13  A.   That's Employee Disability Benefit Booklet.

14  Q.   All right.  And on Page 7 of that booklet, does that address

15  how work or other income can affect disability retirement

16  payments?

17  A.   Yes.  It is specific to that.

18  Q.   Now, again, going back to your duties, have you actually

19  personally been involved in counseling a person who is applying

20  for disability retirement?

21  A.   Yes.

22  Q.   And would this be something that you would discuss with

23  them?

24  A.   Yes.

25  Q.   Now, in this page of this booklet, is that something that

Jury Trial, Vol. II of V

200

1  you would address?

2  A.   Yes.

3  Q.   Why?

4  A.   It is pertinent for them to know this information.  It is

5  detrimental towards receiving and continuing to receive the

6  benefit without any type of overpayments involved or just

7  continuance of the benefit.

8  Q.   And during this -- in this booklet, it points out that there

9  is an earnings restriction.  Do you see that?

10  A.   Yes.

11  Q.   What was the earning restriction?

12  A.   It was four hundred a month for disability annuitants.

13  Q.   When you say it was, did that change?

14  A.   It did.  It changed recently.  I'm not quite sure of the

15  year but it did increase on a monthly basis.

16  Q.   Do you recall what it is even today?

17  A.   Today, it is $810 a month for 2013.

18  Q.   Okay.  So going -- looking again, if you will, at the first

19  page of Exhibit 11, do you see a date there for that booklet?

20  A.   Okay.  It is September of '89.

21  Q.   Okay.  Can you go back to the first page, please.  Can you

22  explain where you see that?

23  A.   On the front of the booklet?

24  Q.   Correct.

25  A.   At the bottom right-hand corner.

Jury Trial, Vol. II of V

201

1  Q.   All right.  That's the top.  I'm sorry.  Below the exhibit

2  sticker?

3  A.   Yes.

4  Q.   Okay.  So it says Form RB-1d.  What does that mean to you?

5  A.   That is the government's form number assigned to the booklet

6  for employee disability benefits.

7  Q.   All right.  And the D indicates disability.

8  A.   Yes.

9  Q.   All right.  And in parentheses, 9-89?

10 A.   That is the revision date.

11 Q.   Okay.  And so that would have been in effect up until the

12 time of the next revision.

13 A.   Yes.

14 Q.   And did it remain $400 for quite some time?

15 A.   Yes.

16 Q.   And that $400 limit applied to a month?

17 A.   Per month, yes.

18 Q.   Not week but month.

19 A.   Per month.

20 Q.   And what are the potential consequences to earning more than

21 $400 a month for work?

22 A.   Once -- once it's discovered or reported to us, it would

23 immediately stop the benefit.

24 Q.   All right.  I would like to ask you if there is a

25 requirement to report activities that are not resulting in a

Jury Trial, Vol. II of V

1   paycheck.

2   A.   Yes.

3   Q.   And how is that?

4   A.   We -- we require that any work is reported.  And the reason

5   why is because when a person is disabled, the type of work that

6   they are performing could be in conflict with the type of

7   disability that they were approved for.

8   Q.   So if they are doing volunteer work for Habitat for

9   Humanity, putting roofs on houses, even if they are not getting

10  paid, that might be inconsistent with their disability?

11  A.   It could definitely affect their disability payments due to

12  the conflict, depending on what their disability is.

13  Q.   I would like to ask you to go on to Exhibit 12.  Again, are

14  you familiar with that document?

15  A.   Yes.

16  Q.   And what's the title of that document?

17  A.   Employee and Spouse Annuities, Events That Must be Reported.

18  Q.   All right.  And can you look at Page 10 of that document?

19  Again, there is an explanation there regarding earnings and

20  disabilities?

21  A.   Yes.

22  Q.   And again, you still see the same $400 limit?

23  A.   Yes.

24  Q.   And what's the form number on this form?

25  A.   That is a RB-9.

Jury Trial, Vol. II of V

203

1   Q.   And the date on this version that you have?

2   A.   January, '94.

3   Q.   Okay.  And at the top, it has the notation, revised.

4   A.   Ah, 11 of '99.

5   Q.   All right.  So that would have been at least through '99,

6   the operative amounts?

7   A.   Yes.

8   Q.   And again, would you, in the course of preparing someone to

9   retire on disability, explain these items to the person?

10  A.   Yes.

11  Q.   Once the person is on disability, do they receive any

12  reminders regarding the need to report work activities or

13  income?

14  A.   Yes, yearly reminders.

15  Q.   I would like to ask you to look at Exhibit 13A.  Do you have

16  the actual exhibit in front of you?

17  A.   Yes.

18  Q.   Can you hold that up for us?  So that's a document that's

19  kind of almost the size of a legal envelope?

20  A.   Yes.

21  Q.   And how would that be used to notify a person on disability

22  retirement of the obligations?

23  A.   It's very specific and brief.  However, the specifics of

24  it definitely says that any work, anyone going over the limit

25  would --

Jury Trial, Vol. II of V

204

1   Q.   Okay.  Let me ask you this way.  Is this something that
2   would be mailed out to the person?
3   A.   Yes, definitely.
4   Q.   And the form number on this is, again, on 13A?
5   A.   RL-4.
6   Q.   And the particular revision date on 13A is?
7   A.   August of '94.
8   Q.   Okay.  And on the back of it, do you see where it says:
9   "You must notify the Railroad Retirement Board"?
10  A.   Yes.
11  Q.   All right.  What is the first point after that?
12  A.   "If you perform any work," and "any" is in all caps.
13  Q.   And is there a parenthesis?
14  A.   "Including self-employment," is in parentheses.
15  Q.   And then below that, there is another section that goes:
16  "You must return your annuity payment for any month," and then
17  the second bullet there?
18  A.       "Your earnings exceed $400 after deduction of
19          disability-related work expenses, regardless of your
20          employer."
21  Q.   Let's go on to Exhibit 13B.  Is this kind of like 13A, same
22  size?
23  A.   Yes.
24  Q.   Two-sided mailing?
25  A.   Yes.

Jury Trial, Vol. II of V

205

1   Q.   And then on -- this is the revision that was done when?

2   A.   This one is August, 2001.

3   Q.   All right.  So let's look at the back of that one.  Again,

4   at the top, it says:  "You must notify the Railroad Retirement

5   Board."  What's the first bullet point there?

6   A.   "If you perform any work (including self-employment)," in

7   parentheses.

8   Q.   And then below that:  "You must return your annuity payment

9   for any month," and what's the second bullet point there?

10  A.       "Your earnings exceed $400 after deduction of

11          disability-related work expenses, regardless of your

12          employer."

13  Q.   All right.  And then going to Exhibit 13C, is that still a

14  RL-4?

15  A.   Yes.

16  Q.   But it's a slightly different format.

17  A.   Yes.

18  Q.   It's a full sheet of paper.

19  A.   Yes.

20  Q.   And again, the date of this revision?

21  A.   March, 2007.

22  Q.   Okay.  And it says at the top:  "You must notify the

23  Railroad Retirement Board."  What's the first bullet point?

24  A.       "If you perform work, including self-employment

25          for a family-owned, controlled or managed business,

Jury Trial, Vol. II of V

206

1        including a business, operated, managed or owned by

2        you, a family member, friend or close associate, whether

3        for pay or not, without regard to how the business is

4        organized."

5    Q.   And then there is a parenthesis?

6    A.      "For example, sole proprietorship, partnership,

7        corporation, LLC, et cetera."

8    Q.   All right.  And the third bullet point?

9    A.      "If you become a corporate officer of, own or

10       operate a corporation (including a corporation owned

11       by a family member or friend) whether for pay or not."

12   Q.   And even the next one below that.

13   A.      "If you receive anything of value in lieu of

14       salary or wages for any work that you perform."

15   Q.   All right.  Going down near to the bottom of the page, it

16   says:  "You must return your annuity for any month that you work

17   for --" do you see that part?

18   A.   Yes.

19   Q.   Would you continue reading that for us?

20   A.      "That you work for a railroad employer and you

21       must return your annuity if your earnings exceed $700

22       after deduction of disability work expenses, regardless

23       of your employer."

24   Q.   And just for the sake of the record here, the first exhibit,

25   Exhibit 10, what is the form number on that?

Jury Trial, Vol. II of V

207

1  A.   Exhibit 10 is RB-1 form.

2  Q.   Okay.

3       MS. PARKER:  May I approach the witness, your Honor?

4       THE COURT:  You may.

5  BY MS. PARKER:

6  Q.   I would like to show you two more Government's Proposed

7  Exhibits, Exhibit 20 and 21.  Do you recognize those?

8  A.   Yes.

9  Q.   What are those?  Let me ask you this way.  What is

10 Government's Proposed Exhibit 21?

11 A.   Twenty-one is a form for Application for Employee Annuity.

12 Q.   Okay.  And what is Exhibit 20?

13 A.   Exhibit 20 is Application for Determination of Employee

14 Disability.

15 Q.   Are these forms that you're familiar with?

16 A.   Yes.

17 Q.   Are these the type of forms that you use in the ordinary

18 course of your employment?

19 A.   Yes.

20 Q.   Day in and day out.

21 A.   Yes.

22 Q.   And are these particular forms relating to Robert Pochmara?

23 A.   Yes.

24 Q.   All right.

25       MS. PARKER:  Your Honor, I offer Government's Proposed

Jury Trial, Vol. II of V

208

1   Exhibits 20 and 21.

2          THE COURT:  Any objections?

3          MR. PIAZZA:  Well, your Honor, I would object to both of

4   these.  It appears to be a signature by somebody but there is no

5   one authenticating the signature of Robert Pochmara in either one

6   of these exhibits.

7          THE COURT:  Perhaps as to the signature but she can

8   furnish her testimony with respect to the authentication, which I

9   believe she has.  So while the signature is inadmissible at this

10  juncture, the balance of the exhibits is.

11  BY MS. PARKER:

12  Q.   All right.  I would like to ask you then to look at Exhibit

13  21 and have that displayed, please.  Okay.  Again, you indicated

14  this is an application form for Robert Pochmara.

15  A.   Yes.

16  Q.   And is that the original application form?

17  A.   Yes.

18  Q.   All right.  When was that officially filed?

19  A.   June 18th, 1992.

20  Q.   Okay.  And I notice on Line 1, it says:  "My RRB claim

21  number is Axxx-xx-6475."  And then below that:  "My Social

22  Security number is xxx-xx-6475."  Are those pretty much identical

23  numbers?

24  A.   Yes.  The difference is that the Railroad Retirement Board

25  assigns a claim number which is normally the railroad employee's

Jury Trial, Vol. II of V

209

1   Social Security number preceded by the letter A.

2   Q.   So the Social Security number again is used to track the

3   disability claimant and the person receiving payments.

4   A.   Yes.

5   Q.   Can you explain to the jury how this form is used in the

6   process of a person -- how Robert Pochmara would have used this

7   in the process of applying for disability insurance from the

8   railroad?

9   A.   Whenever a railroad employee files for retirement benefits,

10  we use an application for an employee annuity.  We ask

11  identifying information about themselves, their marriage, their

12  railroad employment, their non-railroad employment, any other

13  benefits that are being paid such as public service or

14  non-covered service pensions.  We even ask about Social Security

15  benefits.

16         If we -- we ask if they are receiving any supplemental

17  benefits from the railroad employer.  Generally, we also use this

18  application as their Medicare application, to have them apply for

19  it when they retire, even though they are not age-qualified at

20  the time.  And we have them sign a certification to the

21  information that they provided to us.

22  Q.   All right.  And let me just make sure we clarify one thing.

23  Exhibit 21 would be used to apply for railroad retirement of any

24  kind, whether it's old-age retirement or disability?

25  A.   Yes.

Jury Trial, Vol. II of V

1  Q.   All right.  But this would be, like, step one of the

2  process.

3  A.   Yes.

4  Q.   And you rely on the information that is provided in this

5  form.

6  A.   Yes.

7  Q.   Okay.  I would like to ask you to turn to the next to the

8  last page of this document.  Do you see certain information

9  contained there that would -- would that information have been

10 discussed with the person who is applying for retirement?

11 A.   Yes.

12 Q.   Okay.  And on this document, was there an agreement

13 being made by the applicant, Robert Pochmara, to provide

14 notification?

15 A.   Yes.

16 Q.   And that would include notification of work.

17 A.   Yes.

18 Q.   All right.  And then going to the last page, can you read

19 for us what is there over the certification?

20 A.        "Also, if I am covered by the earnings restriction

21         provisions of the Railroad Retirement Act, I agree to

22         immediately notify the RRB if I earn more than the

23         annual earnings exempt amount.  Failure to report my

24         earnings on a timely basis may result in a penalty

25         deduction from my annuity."

1  Q.   Now, below that, there is the word Certification.  Do you
2  see that?
3  A.   Yes.
4  Q.   And what purports to be the signature of Robert Pochmara.
5  A.   Yes.
6        MR. PIAZZA:  Well, I'm going to object to that, your
7  Honor.  There is no authenticity of that, that it is actually
8  Robert Pochmara's signature there, unless this witness observed
9  him signing it in front of her.  That's the only way she can
10 testify to that.
11       MS. PARKER:  Your Honor, I asked the question, I think,
12 in an appropriate manner in light of that objection.
13       THE COURT:  Overruled.
14 BY MS. PARKER:
15 Q.   Would there be reason to believe that that is in fact the
16 signature of Robert Pochmara?
17 A.   Can you repeat that?
18 Q.   Would there be reason, based on the application and the
19 process that you're familiar with, to believe that that is a
20 document that was signed by Robert Pochmara?
21 A.   Yes.
22 Q.   Explain that to us, please.
23 A.   In a case of a disability, we, at one point, at the Railroad
24 Retirement Board, were required to do a personal observation for
25 disability applicants.  So the application would have been signed

1  in front of a rep because of the fact that they were filing for

2  disability.

3  Q.   And that's the day-to-day practice of the Railroad

4  Retirement Board.

5  A.   Yes.

6  Q.   And was -- you reviewed the claimant's file for this -- for

7  Mr. Pochmara's file?

8  A.   Yes.

9  Q.   And did you find the record relating to the personal meeting

10  between the claimant and the person from the Railroad Retirement

11  Board processing the claim?

12  A.   Yes.

13  Q.   Thank you.  Now, let's go on to Exhibit 20.  How does

14  Exhibit 20 differ from Exhibit 21?

15  A.   Well, the Exhibit 20 is where the railroad employee has an

16  opportunity to provide us with the information regarding his

17  disability.  It -- it has various things, ranging from the

18  diagnosis of the disability, the medications that have been

19  prescribed, when it began to affect his ability to work, the

20  doctors and hospitals he's been to.  It -- it also asks about

21  education but also, work, any other work that was performed.

22  Q.   All right.  And would this Exhibit 20 be completed by

23  somebody who was just retiring based on age?

24  A.   No, it would not be necessary.

25  Q.   All right.  This is just for disability retirement.

Jury Trial, Vol. II of V

213

1  A.   This is for disability.

2  Q.   And again, the date on this document?  When was it filed?

3  A.   It was filed June 18th, 1992.

4  Q.   Same date as Exhibit 21.

5  A.   Yes.

6  Q.   All right.  I would like to ask you to again turn to the

7  certification at the -- inside the last page.  Do you see that?

8  A.   Yes.

9  Q.   And again, is there a signature of Robert J. Pochmara

10 there?

11        MR. PIAZZA:  Again, your Honor, objection.  We don't

12 know the authenticity as to whether it's Robert Pochmara's actual

13 signature or not.

14        THE COURT:  That wasn't the question.  That wasn't the

15 question.

16        MR. PIAZZA:  Okay.

17        THE COURT:  Overruled.

18 BY MS. PARKER:

19 Q.   I would like to ask you to start reading where there is a

20 little 64.  Do you see where I'm talking about?

21 A.   Yes.

22 Q.   All right.  "I know --"

23 A.       "I know that if I make a false or fraudulent

24       statement in order to receive benefits from the RRB,

25       I am committing a crime which is punishable under

Jury Trial, Vol. II of V

214

1        federal law."

2            "I have received the appropriate application

3        booklet, Employee Disability Benefits, RB-1d.  I also

4        understand that I am responsible for reporting any

5        events that would affect my annuity as explained in

6        that booklet."

7            "I certify that the information I gave the RRB

8        on this application is true to the best of my

9        knowledge.  I agree to immediately notify the RRB

10       if I perform any work (including self-employment)."

11           "If my condition improves --"

12   Q.   All right.  I think we can stop there for now.  And just for

13   clarification, RRB stands for Railroad Retirement Board?

14   A.   RRB stands for Railroad Retirement Board, yes.

15   Q.   And the Employee Disability Benefits, RB-1d, that's Exhibit

16   11?

17   A.   Yes.

18   Q.   All right.  And this has the signature date of what?

19   A.   June 7th, 1992.

20   Q.   Next, I would like to show you Government's Proposed

21   Exhibits 22 and 23.  Exhibit 22 is a document entitled,

22   Statement Regarding Family and Earnings for Special Guarantee

23   Computation, is that correct?

24   A.   Yes.

25   Q.   And is that for Robert Pochmara?

Jury Trial, Vol. II of V

215

1   A.   Yes.

2   Q.   And Exhibit 23 is a Continuing Disability Report, also for

3   Robert Pochmara?

4   A.   Yes.

5   Q.   Are these from the files of the Railroad Retirement Board?

6   A.   Yes.

7   Q.   Are these forms that you use in the day-to-day processing

8   and making of payments to railroad disability retirees?

9   A.   Yes.

10         MS. PARKER:  Your Honor, I offer Government's Proposed

11   Exhibits 22 and 23.

12         THE COURT:  Any opposition?

13         MR. JACOBS:  I don't have any objection, your Honor.

14         MR. PIAZZA:  I have an objection relating to it's

15   purportedly signed by an individual and, of course, that's not

16   been authenticated so --

17         THE COURT:  We will overrule the objection.  We will

18   receive the -- we will receive the exhibits.

19         MS. PARKER:  All right.

20         MR. PIAZZA:  Your Honor, I hate to interrupt.  May

21   I have a continuing objection regarding these documents

22   regarding any purported signatures purportedly to be of Robert

23   Pochmara?

24         THE COURT:  The witness has not been asked to testify

25   that the signature was in fact of Robert Pochmara.  She has

Jury Trial, Vol. II of V

216

 1  testified concerning the circumstances of the administration of

 2  her records related to the claim made by a Robert Pochmara.

 3          You may continue, ma'am.

 4          MS. PARKER:  Thank you.

 5  BY MS. PARKER:

 6  Q.  All right.  I would ask you to turn to Exhibit 22, and

 7  going to the last page, just above the signature, do you see a

 8  box 47?

 9  A.  Yes.

10  Q.  And just -- after the bullet points, can you see, "Also, I

11  agree"?

12  A.  Yes.

13  Q.  What does that say?

14  A.      "Also, I agree to immediately notify the RRB

15      if I earn, or a family member included in the annuity

16      computation earns, more than the annual earnings exempt

17      amount.  Failure to report these earnings on a timely

18      basis may result in penalty deductions from the

19      annuity."

20  Q.  And again, does it have various promises to report events

21  that would affect the annuity?

22  A.  Yes.

23  Q.  And what was the date on this form?

24  A.  It -- the signature date?

25  Q.  Yes.

Jury Trial, Vol. II of V

217

1   A.   June 4th, 1994.

2   Q.   And would this have been used and relied on by the Railroad

3   Retirement Board in processing Robert Pochmara's application for

4   disability benefits?

5   A.   It -- yes.

6   Q.   All right.  And this -- this relates more to what other

7   people might be able to claim under his disability?

8   A.   Yes.

9   Q.   But it reiterates the requirement of notifying about

10  events.

11  A.   Yes.

12  Q.   All right.  Let's go on to Exhibit 23.  Are you familiar

13  with the use of this document?

14  A.   Yes.

15  Q.   And can you -- give us the title of this document.

16  A.   Continuing Disability Report.

17  Q.   And how is this document used by the Railroad Retirement

18  Board?

19  A.   It is used to, in some -- it is used to monitor and review a

20  person's disability status.

21  Q.   And are -- are there different kinds of things that would

22  trigger sending out this form?

23  A.   Yes.  If you have earnings that have been reported to us,

24  whether it be railroad earnings or non-railroad earnings, or if

25  we receive a report of earnings from the actual disability

Jury Trial, Vol. II of V

218

1  annuitant.

2  Q.   All right.   In this case, did you ever receive a report of

3  earnings from the annuitant -- you being the Railroad Retirement

4  Board, not you personally, I'm sorry -- of the annuitant Robert

5  Pochmara receiving earnings?

6  A.   No, not from Robert Pochmara.

7  Q.   Did you receive some information that he might be receiving

8  earnings, however?

9  A.   Yes.

10  Q.   And what was the nature of that information?

11  A.   That he was possibly -- well, that he was actually working,

12  that they witnessed that they actually saw him working.

13  Q.   All right.

14  A.   And this was a statement from an anonymous person.

15  Q.   So an anonymous person notified the Railroad Retirement

16  Board and said that they saw Robert Pochmara working.

17  A.   Yes.

18  Q.   And that caused the Railroad Retirement Board to send out

19  Exhibit 23?

20  A.   Yes.

21  Q.   All right.   And just -- again, what's the form number on

22  this document?

23  A.   This is a G-254.

24  Q.   And this was sent to Robert Pochmara.

25  A.   Yes.

1  Q.   And it's a multi-paged document but can you tell us the type

2  of information you were seeking?

3  A.   We asked about work of any kind and earnings.  We also asked

4  about whether or not their disability has gotten worse or if it

5  has improved.

6  Q.   And on this document, was any work or earnings reported?

7  A.   The first question required to be answered is:

8            "Have you worked for an employer, railroad or

9       non-railroad, during the period shown in Section 1

10      above?"

11           And that period is May 20, 1991, to present.  The answer

12  was no.  And there is no other information completed in regard to

13  working or earnings.  As a matter of fact, the applicant skips to

14  the next section which is Section 4, without completing anything

15  else that's required.

16  Q.   And Section 4 deals with the physical complaints.

17  A.   No, actually Section 4 is about self-employment but it is

18  also blank because it is not required if you are not

19  self-employed -- if you are reporting that you're not

20  self-employed.  The next section is where you get the physical --

21  you know, the information about the disability.

22  Q.   All right.  So from the first page where it says no

23  employment, no information is provided until you get to Section 5

24  which is regarding the physical condition.

25  A.   Yes.

Jury Trial, Vol. II of V
220

1  Q.   All right.  I would like to ask you to turn to Section 7
2  which is the authorization and certification.  Do you see
3  Paragraph 37?
4  A.   Yes.
5  Q.   That first paragraph, can you read that for us?
6  A.      "I understand that civil and criminal penalties
7       may be imposed upon me for false or fraudulent
8       statements or for withholding information to
9       misrepresent a fact or facts material to
10      determining a right to benefits under the Railroad
11      Retirement Act.  I affirm that to the best of my
12      knowledge, the information I have provided on this
13      form is true, complete, and correct."
14  Q.   And then the next paragraph, please?
15  A.      "I have received the appropriate application
16      booklets, RB-1d, Employee Disability Benefits, and
17      RB-9, Employee and Spouse Events That Must be
18      Reported.  I understand that I am responsible for
19      reporting any events that would affect my annuity as
20      explained in these booklets."
21  Q.   All right.  And finally, the last paragraph above the
22  purported signature.
23  A.      "I authorize the Railroad Retirement Board to
24      secure any information from the Social Security
25      Administration which is required to determine my

Jury Trial, Vol. II of V

221

1      continuing entitlement to benefits under the Railroad

2      Retirement Act."

3   Q.   And does the Social Security -- excuse me -- does the

4   Railroad Retirement Board keep track of payments that would be

5   made to each person receiving payments under the Railroad

6   Retirement Board?

7   A.   Yes.

8            MS. PARKER:  Your Honor, may I approach the witness?

9            THE COURT:  You may.  So I will note we will be trying

10  to locate a time to take a break here shortly.

11           MS. PARKER:  Yeah, I'm almost done.  I have a couple

12  more exhibits.  It should be fairly quick.

13           THE COURT:  Good.

14  BY MS. PARKER:

15  Q.   I show you Government's Proposed Exhibit 26.  Is that a

16  document that reflects the various monthly payments made to

17  Robert Pochmara from January of 1998 through April of 2013?

18  A.   Yes.

19  Q.   And is that the type of data that is ordinarily kept by the

20  Railroad Retirement Board?

21  A.   Yes.

22           MS. PARKER:  Your Honor, I offer Government's Proposed

23  Exhibit 26.

24           THE COURT:  Any opposition to 26?  Gentlemen?

25           MR. PIAZZA:  Yes.  I have no comment, your Honor.

Jury Trial, Vol. II of V

222

1        MR. JACOBS:  No objection, your Honor.

2        THE COURT:  Exhibit 26 is received.

3   BY MS. PARKER:

4   Q.   And next, I would like to show you Government's Proposed

5   Exhibits 27 and 28.  Do you recognize what those documents are?

6   A.   Yes.

7   Q.   Do you have a name that you call them in the Railroad

8   Retirement Board?

9   A.   Yes, it's -- it's an acronym, we call DEQY.

10  Q.   And what really is a DEQY, in common language for the rest

11  of us?

12  A.   Detailed Covered FICA Earnings and Employer.

13  Q.   And Exhibit 27 is for a M. Pochmara?

14  A.   Yes.

15  Q.   And Exhibit 28 is for?

16  A.   R.J. Pochmara.

17       MS. PARKER:  Your Honor, I will offer Government's

18  Proposed Exhibits 27 and 28.

19       THE COURT:  Gentlemen?

20       MR. PIAZZA:  I'm not sure the prosecution has indicated

21  this is kept in the ordinary course of this witness's business.

22  It appears to be from another agency so --

23       MR. JACOBS:  I just have a brief voir dire, your Honor.

24       THE COURT:  Sir.

25       MR. JACOBS:  Thank you, your Honor.

Jury Trial, Vol. II of V

223

1  BY MR. JACOBS:

2  Q.   Ma'am, if I'm reading this right, it shows, is it gross

3  earnings?  Like we are looking at Exhibit 27.  Is that Maxine

4  Pochmara's gross earnings for a particular year, the $16,953?

5  A.   Yes.

6  Q.   All right.  And then the wage total is the same number so

7  that's her gross earnings, is that correct?

8  A.   Yes.

9  Q.   And what does the employer total mean?  That was what was

10 reported by her employer?  Is that what that means?  I'm just

11 trying to figure out what -- so the next number, which is the

12 same as the last two, says $16,953.38, and it says in front of

13 that, employer total.  Is that a number that came from the

14 employer?

15 A.   Yes.

16 Q.   All right.  These are just gross earnings.  Does it show any

17 deductions as far as Social Security taken out or -- or any

18 deductions by the employer, like FICA and things like that?

19 It's just gross earnings?

20 A.   Yes.

21       MR. JACOBS:  Nothing further, your Honor.  I don't have

22 any objection to it.

23       THE COURT:  Received.

24 BY MS. PARKER:

25 Q.   All right.  I think Mr. Jacobs used a term FICA or F-I-C-A.

Jury Trial, Vol. II of V

224

1  What does that mean to you?

2  A.   It's another acronym but it just shows that Social Security

3  taxes were withheld from earnings.

4  Q.   Would you first refer to Exhibit 28?  You indicated that was

5  a DEQY report for Mr. Pochmara?

6  A.   Yes.

7  Q.   And again, that was the type of form that you have access

8  to, you get this information through Social Security.

9  A.   Yes.

10  Q.   And for Mr. Pochmara, what time period does this report

11  cover?

12  A.   From 1998 through 2013.

13  Q.   And how do you know that?

14  A.   It actually states it on the -- on the print-out.

15  Q.   Like the second line from the top?

16  A.   Yes.  Years requested is where it says it.

17  Q.   All right.  So it was for 1998 to 2012.

18  A.   2013.

19  Q.   Excuse me, 2013, I misspoke.  And below there, what

20  purported earnings were listed under Mr. Pochmara's Social

21  Security number?

22  A.   It says no covered FICA earnings posted for years

23  requested and it also says no non-covered earnings for years

24  requested.

25  Q.   So for those years, no reported earnings for Robert

1  Pochmara.

2  A.   Yes, that's correct.

3  Q.   Okay.  Let's go to Exhibit 27.  This one is for M.C.

4  Pochmara.   Correct?

5  A.   Yes, that's correct.

6  Q.   And what is the time frame covered by this request?

7  A.   The years requested is 1998 through 2012.

8  Q.   And the time frame -- excuse me.  On the first page, do you

9  see what time frame is covered by that first page?

10  A.   Yes.

11  Q.   And what do you see there?

12  A.   1998.

13  Q.   And where do you see that?

14  A.   Under -- it's another acronym, RPYR, report year.

15  Q.   So if you were describing where it is on the page, is it on

16  the left side?

17  A.   It is on the left side.

18  Q.   About halfway down?

19  A.   About halfway down.

20  Q.   And RPYR would be right over that?

21  A.   Yes.

22  Q.   Reporting year?

23  A.   Yes.

24  Q.   So that would be for 1998.

25  A.   Yes.

Jury Trial, Vol. II of V
226

1  Q.   And on this page, how many sources of income are listed for
2  M. Pochmara?
3  A.   On this page, it is two different sources of income, two
4  different employers.
5  Q.   And what are those?
6  A.   The first one is Northeast Michigan Community Mental Health
7  Board.  And the second one is GW & SW, Incorporated, W.W. Auto
8  Parts.
9  Q.   And where is that located?
10 A.   The second one?
11 Q.   Yes.
12 A.   It's Rogers City, Michigan.
13 Q.   And then each successive page would be a different year?
14 A.   Yes.
15      MS. PARKER:  Your Honor, apparently, I neglected to
16 explain Government's Proposed Exhibit 26.  I would like to do
17 that briefly before passing the witness.
18 Q.   And again, that is an earnings report through last month,
19 basically.  Is that correct?
20 A.   Can you say that again?
21 Q.   Exhibit 26 covers payments made to Mr. Pochmara up to April
22 of this year.
23 A.   Yes, that's correct.
24      MS. PARKER:  Thank you, your Honor.  I'll pass the
25 witness.

1       THE COURT:  Let's take a brief recess, about ten

2   minutes.  The gentleman should be here in just a couple of

3   minutes.

4           Please rise for the jury.

5           (At 10:50 a.m. - jury leaves courtroom)

6       THE COURT:  We are outside the presence of the jury.

7           I just want to raise an issue.  I mean, we essentially

8   anticipated about three days of proofs with respect to -- for the

9   government.  This -- the last hour and a half is largely

10  unrelated to these defendants but is admissible to the extent

11  that it explains the motive for Mr. Pochmara's practice.

12          How long do you anticipate cross-examination?

13      MR. JACOBS:  Mine, less than ten minutes.

14      THE COURT:  Okay.  Will we have any other proofs from

15  the Railroad Retirement Benefit Board that relate to Mr. Pochmara

16  alone?  Or are we essentially done at this point?

17      MS. PARKER:  We have -- yes, the forms that I believe

18  the Court is familiar with that were sent out by the OIG at the

19  initiation of the investigation.  We are done with the forms from

20  Miss Smith, from the claim file.  We are into the next phase

21  after this witness.

22      THE COURT:  Which was the investigation.

23      MS. PARKER:  Correct.

24      THE COURT:  And which, at least at that juncture, does

25  involve the defendants.

Jury Trial, Vol. II of V

228

1        MS. PARKER:  Absolutely.  As you know, there are

2   documents signed by Mrs. Wilson.

3        THE COURT:  All right.  We will see you in about ten

4   minutes.

5            (At 10:52 a.m. - proceedings recessed)

6            (At 11:13 a.m. - proceedings resumed; out of the

7            presence of the jury)

8        THE COURT:  Could we have the jury, please.  Ma'am, if

9   you would like to rejoin us, please.  We have a special place for

10  you.

11           (At 11:15 a.m. - jury enters courtroom)

12       THE COURT:  Please be seated.  Cross-examination.

13                       CROSS-EXAMINATION

14  BY MR. JACOBS:

15  Q.   Ma'am, my name is Steve Jacobs.  I represent Gary Wilson.

16  As far as you know, Gary Wilson was never a railroad employee,

17  was he?

18  A.   Not as far as I know.

19  Q.   And when we talk about these various exhibits, like Exhibit

20  No. 10, the employee annuity form, the very first exhibit you

21  talked about, that goes to the railroad employee, is that

22  correct?

23  A.   Yes.

24  Q.   Doesn't go to third parties, correct?

25  A.   Goes to the applicant.

Jury Trial, Vol. II of V

1   Q.   Goes to the applicant.  The other documents -- well, let's

2   talk specifically about 20 and 21, the Application for

3   Determination of Employee Disability, that is filled out by the

4   employee and -- the prior employee.  Is that confidential between

5   the railroad employee and the railroad retirement people?  Can I,

6   as a third party, get a hold of that?

7   A.   No, not to my knowledge.

8   Q.   Right.  That's -- that doesn't go out to third parties.  It

9   just goes from the applicant in to you all, is that correct?

10  A.   Yes.

11  Q.   You're not aware of any notice requirement being sent out to

12  NAPA Auto Parts or Gary Wilson informing him that he had any

13  requirement to report any earnings of Robert Pochmara, are you?

14  A.   No.

15  Q.   Specifically, on Exhibit No. 21, that's this application,

16  kind of a print-out, does -- does it say on there, am I reading

17  that correctly, that:  "My marriage to this spouse ended December

18  31st, 1984"?  Is that what's on the form?

19  A.   Yes.

20  Q.   And that information was provided by Mr. Pochmara.

21  A.   Yes.

22  Q.   Now, we don't do any independent examination or confirmation

23  of when somebody got married or when somebody got divorced or

24  anything like that, do we?

25  A.   At the Railroad Retirement Board, yes.

230

1  Q.   Oh, they do.

2  A.   Yes.

3  Q.   So you're telling me that they confirmed that his marriage

4  ended December 31st, 1984.  Somebody.

5  A.   For -- we request a marriage certificate and in certain

6  cases, we also request a divorce decree.

7  Q.   And do we know if we requested a divorce decree?

8  A.   The only way that we would have is if he had a property

9  settlement and as far as I can tell on this application, it says

10  that he is not under current -- or under a court order to pay a

11  property settlement.

12  Q.   So child support, something like that?

13  A.   Right.

14  Q.   So my question to you is, do you believe that the railroad

15  retirement people confirmed that he was divorced on December

16  31st, 1984?

17  A.   We probably went by his statement.

18  Q.   Sure.  If he put down the wrong date and he was really

19  divorced in '81, we would put down whatever date he told us.

20  A.   Yes.

21  Q.   Is that fair to say?

22  A.   Yes.

23  Q.   These earning restrictions and earning requirements, I

24  believe it's Exhibit 27 we talked about -- whoops, I might be

25  saying the wrong number.  I am.

Jury Trial, Vol. II of V

231

1       Exhibit 22, you pointed out that right before his
2  signature, it says:
3       "I agree to notify the RRB, Railroad Retirement
4       Board, if I earn, or a family member included in my
5       annuity computation, earns more than the annual
6       earnings exempt amount."
7       Is that correct?
8  A.   Yes.
9  Q.   All right.  So if Mr. Pochmara's wife earned money, he was
10  supposed to report that, is that correct?
11  A.   Yes.
12  Q.   All right.  When -- when, annually, a notice goes out, a
13  form goes out and is referred to as a 1099 by the tax people, a
14  1099 form goes out to the recipient regarding railroad -- United
15  States Railroad Retirement Board, and it notes the total gross
16  paid, is that correct?
17       MS. PARKER:  Your Honor, I'm going to object.  I think
18  this is beyond the scope of direct.
19       MR. JACOBS:  It is beyond the scope of direct but it is
20  a 1099 that was issued by the Railroad Retirement Board.  She is
21  their representative.  It is my understanding that other than the
22  agent, she is going to be the witness for them.
23       May I approach and show it to her?
24       THE COURT:  I'm sorry.  I'm not exactly sure what you're
25  asking the witness.  Could you explain it one more time?

1      MR. JACOBS:  I would like her to explain the 1099 and I

2   would like her to point out that the 1099 that is received by

3   the participant, by the -- by the people receiving the benefits

4   or monies, that it doesn't distinguish whether it's between

5   disability monies or pension monies.  That's what I will be

6   asking her, your Honor.

7      THE COURT:  And the relevance?

8      MR. JACOBS:  Relevance as to third party's notice, such

9   as a CPA or an accountant doing somebody's taxes, which will

10   become an issue on a later day here, your Honor.

11      THE COURT:  Overruled.

12      MR. JACOBS:  Thank you, your Honor.

13   BY MR. JACOBS:

14   Q.   Ma'am, I got a 1099 that's attached to Government's Proposed

15   Exhibit 146.

16      MS. PARKER:  Judge, I will stipulate to the exhibit and

17   the information contained in it.

18      MR. JACOBS:  All right.  I appreciate that stipulation

19   from the government.  I would just like the witness to

20   acknowledge that there is no distinction on the form between

21   whether it's disability monies or pension monies.

22      MS. PARKER:  I will stipulate to that, too, judge.  I

23   don't think that's a disputed issue.

24      MR. JACOBS:  I didn't know it would be a stipulation.

25   That's why I'm asking the witness, your Honor.  But I guess we

Jury Trial, Vol. II of V

233

1  can do it in the form of the stipulation.  I don't have a problem

2  with that.

3            THE COURT:  You can ask the question.

4            MR. JACOBS:  Thank you.

5  BY MR. JACOBS:

6  Q.   Ma'am, is there a distinction?

7  A.   None that I'm aware of.

8  Q.   Exhibit 27, that was the one that showed income coming in

9  from different sources.  It showed GW & SW and also income coming

10 in from, I think it was the mental health place.  Was that the

11 form -- do you have that in front of you, ma'am?

12 A.   Yes.

13 Q.   That particular form does not note monies deducted from the

14 gross income sent in to either the government or the Social

15 Security -- Social Security monies, is that correct?  It just

16 shows gross income.

17 A.   Could you -- could you repeat that?  I don't know if I

18 understood what you were saying.

19 Q.   All right.  That's probably the way I'm asking the

20 question.

21           Ma'am, a lot of paychecks have a pay stub that notes

22 what your gross income is, how much goes out for Social Security,

23 how much goes out for state withholdings, how much goes out for

24 federal withholdings.  That form doesn't make that distinction,

25 does it?

Jury Trial, Vol. II of V

234

1  A.   No.

2  Q.   So you can't tell from that form whether monies were

3  withdrawn and paid out to the different agencies or different

4  branches of government.

5  A.   No.

6           MR. JACOBS:  Nothing further, your Honor.

7           THE COURT:  Mr. Piazza, any questions of the witness?

8           MR. PIAZZA:  Just a couple, your Honor.

9                     CROSS-EXAMINATION

10  BY MR. PIAZZA:

11  Q.   Good morning, ma'am.

12  A.   Good morning.

13  Q.   In the literature that's provided to a railroad employee

14  that goes on disability, they have to report wages, work, whether

15  paid or not, is that correct?

16  A.   Yes.

17  Q.   So if somebody did some work pro bono, for free, helping

18  out, they would have to report that to the railroad board, is

19  that correct?

20  A.   Yes.

21  Q.   So by not getting paid, it doesn't matter.  They would still

22  have to report to the railroad board.

23  A.   That's correct.

24  Q.   And that's sent out in the retirement notices and everything

25  else, is that correct?

Jury Trial, Vol. II of V

235

1  A.   Yes, yes.

2  Q.   In addition to that, they have to report any income that a

3  family member collects, is that correct?

4  A.   Yes.

5  Q.   All right.  And if a person is a corporate officer, whether

6  paid or not, or doing any type of work for a corporation, whether

7  it's family-owned, spouse-owned or -- in part, or a close friend,

8  that the railroad employee is required to report that.

9  A.   Yes.

10 Q.   There is no obligation whatsoever by the corporation,

11 correct, to make any type of reporting?  That's correct?

12 A.   Yes.

13 Q.   Okay.  No obligation by any manager, head of a business or

14 anything else to report any income given to a railroad employee.

15 It's up to the employee to -- up to the railroad employee to tell

16 you, correct?  Let me rephrase that.

17 A.   You --

18 Q.   Yeah, the obligation under all these notices is to the

19 person on disability or pension to report it.

20 A.   I just want to make sure that this is clarified.  If we send

21 out a notice and sometimes, we do.

22 Q.   Okay.

23 A.   If we obtain the information from the fact that an applicant

24 or an annuitant that is receiving benefits is working for an

25 employer, and we have the name and address for that employer, we

Jury Trial, Vol. II of V

236

1  will send a notice to that employer --

2  Q.   Okay.

3  A.   -- and request those earnings from that employer.

4  Q.   Oh, yes.

5  A.   And we are obligated to do that.

6  Q.   Yeah, after the fact.  If --

7  A.   Okay, okay, yes,

8  Q.   But generally speaking, you know, if somebody is on

9  disability and goes out and gets a job, doesn't tell his

10 employer, it's up to the railroad employee to come in and tell

11 you.

12 A.   Yes.

13 Q.   Okay.  You can -- in reviewing your file itself, you did not

14 sit down with Robert Pochmara yourself, if you can remember.

15 A.   No.  I might have still been in high school.

16 Q.   Oh, okay.  And even if somebody is on disability, they could

17 earn a limited amount of monies anyways, up to a certain amount,

18 per month, is that correct?

19 A.   Yes.

20 Q.   All right.

21       MR. PIAZZA:  May I have a brief moment, your Honor?

22       (Whereupon defense counsel confer off the record)

23       MR. PIAZZA:  Nothing further, your Honor.

24       THE COURT:  Any redirect for the government?

25                   REDIRECT EXAMINATION

Jury Trial, Vol. II of V

237

1  BY MS. PARKER:

2  Q.   Miss Smith, if there are any earnings or any work, it has to

3  be reported, right?

4  A.   Yes.

5  Q.   Even if it's below the threshold.

6  A.   Yes.

7  Q.   And you said that if you have information from any source

8  indicating that a person who is on railroad disability is

9  actually working, and you have information regarding who that

10 person is working for, you can inquire of that person.

11 A.   Yes.

12 Q.   And would you expect to get a truthful response regarding

13 someone working there or not?

14 A.   Yes.

15       MS. PARKER:  Nothing further, your Honor.  Thank you.

16       THE COURT:  Any concluding recross?

17       MR. JACOBS:  No, sir.

18       MR. PIAZZA:  No, your Honor.

19       THE COURT:  Thank you very much, ma'am.

20       (At 11:30 a.m. - witness excused)

21       THE COURT:  Government's next witness, please.

22       MS. POP:  The government calls Elias Taratuta.

23       THE COURT:  Good morning.

24       THE WITNESS:  Good morning.

25       THE COURT:  If you could raise your right hand.

Jury Trial, Vol. II of V

238

```
 1          Do you solemnly swear that the testimony you are about
 2   to provide will be the truth, the whole truth and nothing but the
 3   truth so help you God?
 4          THE WITNESS:  I do.
 5          THE COURT:  Please have a seat over in the witness stand
 6   to your far left.
 7                         ELIAS TARATUTA
 8   Having first been duly sworn at 11:30 a.m., testified as follows:
 9                      DIRECT EXAMINATION
10   BY MS. POP:
11   Q.   Good morning.  Could you please introduce yourself and spell
12   your name for the record?
13   A.   I'm Elias Taratuta.  That's E-L-I-A-S, T-A-R-A-T-U-T-A.
14   Q.   And what is your occupation?
15   A.   I'm a builder by trade and then in the wintertime for three
16   months, I prepare income taxes.
17   Q.   And where do you work when you do these tax preparations?
18   A.   My office in my house.
19   Q.   Where is that located?
20   A.   It's 7905 441 Road, Hawks, Michigan.
21   Q.   And how far is that from Rogers City?
22   A.   About ten, ten and a half miles.
23   Q.   So how far did you go to school?
24   A.   Pardon?
25   Q.   How far did you go to school?
```

Jury Trial, Vol. II of V

239

1   A.   Twelfth grade.

2   Q.   And did you get any kind of training to prepare taxes?

3   A.   No.

4   Q.   How did you learn how to do that?

5   A.   Well, I get the professional guide every year.

6   Q.   So did you self-train yourself?

7   A.   Yes, yes.

8   Q.   And what kind of areas do you work for, like --

9   A.   What area?

10  Q.   Yeah.

11  A.   Northeastern lower Michigan.  Primarily Presque Isle County,

12  Alpena County, Montmorency County.  Basically those three

13  counties.

14  Q.   And how long have you been doing this for, tax preparation?

15  A.   Forty-eight years.

16  Q.   Forty-eight years.  And approximately how many returns do

17  you prepare every year?

18  A.   Right about three hundred.

19  Q.   What kind of tax returns do you prepare?

20  A.   Individual, some business, a few businesses, less than 25,

21  and then a few farms, probably half a dozen farm returns.

22  Q.   Okay.  And do you know Robert and Maxine Pochmara?

23  A.   Yes, I do.

24  Q.   How do you know them?

25  A.   Well, I've known them for probably 25 years or longer.  I

Jury Trial, Vol. II of V

1  used to do Robert's parents income taxes and they live in the

2  general area so everybody knows everybody there.

3  Q.   And have you prepared tax returns for Maxine and Robert

4  Pochmara?

5  A.   Yes, I did.

6  Q.   Both federal and state?

7  A.   Yes.

8  Q.   And how long have you been doing this for?

9  A.   For them?

10  Q.   Yes.

11  A.   Probably 25 years.

12  Q.   I will hand you some exhibits, Government's Exhibits 127

13  through 136 and 146 through 156.

14        MS. POP:  May I approach, your Honor?

15        THE COURT:  You may.

16  BY MS. POP:

17  Q.   Let's take a look at the first document, Exhibits 127

18  through 136.  Do you recognize those?

19  A.   Yes.

20  Q.   And what are they?

21  A.   Those are federal income tax returns for Maxine Pochmara and

22  I also see there is Michigan income tax returns for the same

23  individual.

24  Q.   What years are they for?

25  A.   Pardon?

Jury Trial, Vol. II of V

241

1   Q.   What years are they for?

2   A.   This is 2005, 2006, all the way to 2007, 2008, and 2009.

3   Q.   And how do you recognize them?

4   A.   Well, I would have -- by the signature on them.

5   Q.   Did you prepare those tax returns?

6   A.   Yes, I did.

7   Q.   Could you speak closer to the microphone, please.

8   A.   Okay.

9   Q.   Did you prepare those tax returns?

10  A.   Yes, I did.

11  Q.   Is it a fair and accurate depiction of the state and federal

12  tax returns that you prepared for Maxine Pochmara from 2005

13  through 2009?

14  A.   Correct.

15       MS. POP:  Your Honor, the government moves to admit

16  those exhibits into evidence.

17       THE COURT:  Any opposition?

18       MR. JACOBS:  No objection, your Honor.

19       MR. PIAZZA:  No comment.

20       THE COURT:  Received.

21  BY MS. POP:

22  Q.   Now, if you could take a look at the other stack of

23  exhibits, 146 through 156.  Do you recognize those exhibits?

24  A.   Yes.

25  Q.   What are they?

Jury Trial, Vol. II of V

242

1  A.    Federal and Michigan income tax returns for Robert J.

2  Pochmara.

3  Q.    And what years are they for?

4  A.    This one starts at 2004 and all the way to 2009.

5  Q.    And did you prepare those tax returns?

6  A.    Yes, I did.

7  Q.    Did you sign them?

8  A.    Yes, I did.

9  Q.    And are they a fair and accurate depiction of the state and

10  federal tax returns you prepared for Robert Pochmara from 2004 to

11  2009?

12  A.    Yes.

13        MS. POP:  The government moves to admit into evidence

14  these exhibits, your Honor.

15        MR. JACOBS:  Repeat the exhibit numbers, please.

16        MS. POP:  They are 146 to 156.

17        THE COURT:  Any objections, gentlemen?

18        MR. JACOBS:  I have none, your Honor.

19        MR. PIAZZA:  No, your Honor.

20        THE COURT:  They are received.

21  BY MS. POP:

22  Q.    And do you have records older than 2005 when it comes to

23  their tax returns?

24  A.    Yes, I do.  Some would be electronic.  The more previous

25  ones are electronically stored.

Jury Trial, Vol. II of V

243

1   Q.   And do you keep all of their tax returns --

2   A.   I don't for the paper ones.

3   Q.   -- for the last 25 years?

4   A.   Not the paper ones, no.

5   Q.   Some of them have been destroyed due to their age?

6   A.   Pardon?

7   Q.   Some of them have been destroyed?

8   A.   Yes, I shred them.

9   Q.   And if you can take a look at those exhibits on the front

10  page, can you tell us how they listed themselves when it comes to

11  their filing status?

12  A.   They filed single.

13  Q.   Let's take a look at Exhibit 127, if we can pull that out.

14  A.   One twenty-seven?

15  Q.   Yes.  And if you can show us where the filing status line

16  is?

17  A.   Filing status line is 6A.

18  Q.   And that reads?

19  A.   Single.

20  Q.   Single.

21  A.   It says yourself.  Filing status is Line 1, which is single,

22  yeah.

23  Q.   Okay.  And what is the address listed on the tax return?

24  A.   What is the address?

25  Q.   Yes.

Jury Trial, Vol. II of V

244

1   A.   1537 Klee Road, Rogers City, Michigan, 49779.

2   Q.   Okay.  And if we can take a look at Exhibit 146.

3   A.   Yes.

4   Q.   What is -- one second.  We will pull that up.  What's the

5   name on this tax return?

6   A.   Pardon?

7   Q.   What is the name on the tax return?

8   A.   Robert J. Pochmara.

9   Q.   And what is the status listed there?

10  A.   Filing status is single.

11  Q.   And what is the address?

12  A.   The address is 1537 Klee Road, Rogers City, Michigan, 49779.

13  Q.   Do you know Gary Wilson?

14  A.   Yes, I do.

15  Q.   Do you see him in the courtroom today?

16  A.   Yes, I do.

17  Q.   Can you point him out and describe where he is sitting and

18  what he's wearing?

19  A.   He is sitting right on the left of that table with a blue

20  shirt.

21       MS. POP:  Your Honor, may the record reflect the witness

22  has identified the defendant Gary Wilson?

23       THE COURT:  The witness has identified the defendant.

24  BY MS. POP:

25  Q.   How long have you known Gary Wilson for?

Jury Trial, Vol. II of V

1  A.   Since I've been going to the NAPA Auto Parts Store, which is

2  probably 15 years.

3  Q.   And how do you know him?

4  A.   By going to the store.  Yes.

5  Q.   Did you see him at the store?

6  A.   Yes.

7  Q.   And do you know Sue Wilson?

8  A.   I do not know Sue Wilson.

9  Q.   And how long have you been going to the NAPA Auto Parts

10  Store?

11  A.   At least 15 years.

12  Q.   And when you went to the NAPA Auto Parts Store and Mr. Gary

13  Wilson was there, what was he doing there?

14  A.   He was manning the counter.

15  Q.   Would he wait on you?

16  A.   Yes, he would.

17  Q.   And how often would he be there at the NAPA Auto Parts

18  Store?

19  A.   Sometimes only once or twice a year.  Maximum, would be four

20  times, but --

21  Q.   And every time you went there, you saw Gary Wilson there as

22  well?

23  A.   Pretty well, yes.

24  Q.   And have you also seen Robert Pochmara in the store when you

25  went there?

Jury Trial, Vol. II of V

246

1    A.    Yes, I have.

2    Q.    How often did you see Robert Pochmara there?

3    A.    He was there about every time that I was at the store.

4    Q.    And for how long have you seen Robert Pochmara at the NAPA

5    Auto Parts Store?

6    A.    Probably for a span of about ten years.

7    Q.    And what would Mr. Pochmara do there at the NAPA Auto Parts

8    Store?

9    A.    He would man the counter, also.

10   Q.    And would he wait on you?

11   A.    Yes, he would.

12   Q.    And if you needed any parts, he would be helping you with

13   that?

14   A.    Yes.  He would look it up on the computer, on the screen,

15   and would go in the back room and get the parts.

16   Q.    Okay.  And have you ever seen Maxine Pochmara working at the

17   NAPA Auto Parts Store?

18   A.    Never.

19   Q.    Now, when you prepared the tax returns that I just showed

20   you, was that based on information that Maxine and Robert

21   Pochmara provided to you?

22   A.    Yes.

23   Q.    And what kind of information did Maxine Pochmara provide to

24   you to prepare those taxes?

25   A.    Maxine provided W-2 forms.

Jury Trial, Vol. II of V

1  Q.   How many every year?

2  A.   Two.

3  Q.   And where were they from?

4  A.   One was from Northeastern Michigan Health and the other one

5  was from GW SW Auto Parts or whatever, yeah.

6  Q.   How about Mr. Robert Pochmara?  What did he provide to you

7  so you could prepare his tax returns?

8  A.   He had a railroad retirement so he was a 1099-R.

9  Q.   And did he ever give you any kind of W-2s for work performed

10  the years 1998 to 2009?

11  A.   No.

12  Q.   Did Maxine Pochmara ever give you a 1099?

13  A.   No.

14  Q.   And are you familiar with 1099s and W-2s?

15  A.   Yes.

16  Q.   And what is your understanding of the difference between

17  W-2s and 1099s?

18  A.   Well, if an individual works for a company or another

19  individual, they are required to give you a W-2 form.  A 1099

20  form is issued to self-employed people that offer work or

21  services for others and if it's in excess of $600 for that year,

22  they are obligated to give you a 1099 form.

23  Q.   And have you filed some of these tax returns for them

24  electronically?

25  A.   Yes.

Jury Trial, Vol. II of V

1  Q.    How recent have you been requested or required to do so?

2  A.    I would say about five years ago.

3  Q.    Now, let's take a look at Exhibit No. 127.

4  A.    Yes.

5  Q.    And let's turn to Page 2 of that.  Well, first of all, could

6  you tell us what 127 is?

7  A.    It's the federal income tax return for 2005.

8  Q.    For whom?

9  A.    For Maxine C. Pochmara.

10 Q.    Okay.  And if you can turn to the second page?

11 A.    Yes.

12 Q.    At the bottom of the page --

13 A.    Yes.

14 Q.    -- is that your signature there?

15 A.    Yes, it is.

16 Q.    And above that, there is a place where Maxine Pochmara

17 should have signed but there is no signature there.

18 A.    The copy that's mailed in copies, I always make them sign

19 those copies.

20 Q.    Okay.

21 A.    But electronically, then they sign an E file authorization

22 form that gives me the authority to use their last five digits of

23 their Social Security number as their electronic signature.

24 Q.    So when you prepare these tax returns for Maxine Pochmara,

25 you would ask Maxine to verify all of that information that you

1  filled in?

2  A.    Yes.

3  Q.    And then you would have her sign the form that you returned

4  or mailed to the IRS?

5  A.    Yes.

6  Q.    And when you prepared them and filed them electronically,

7  you would still have them verify the accuracy of the information

8  that's contained in them?

9  A.    Yes.

10  Q.    And she would sign an E file certification certifying that

11  was the truth in allowing you to file that?

12  A.    Yes, yes.

13  Q.    Now, let's take a look -- and would you do the same thing

14  for Robert Pochmara?

15  A.    Yes, I would.

16  Q.    Let's take a look at Exhibit 128.  And let's go all the way

17  to the Schedule W, the Michigan tax return, 2005, withholding tax

18  schedule.

19  A.    Yes.

20  Q.    Now, towards the center of that page, there is a table,

21  Table 1.  Could you tell us what that is?

22  A.    That is where they had Michigan taxes withheld from W-2

23  forms.

24  Q.    And what is listed in that box?

25  A.    Northeast Michigan Community Mental Health and GW & SW,

Jury Trial, Vol. II of V

250

1   Incorporated.

2   Q.   Now, if you go into the first column there in Table 1, there

3   is a box X'd.

4   A.   Yes.

5   Q.   What is that indicating?

6   A.   That indicates whose W-2 is it.  Is it for an individual or

7   for a spouse.  In this case, it's -- it's for her because it's a

8   single return.

9   Q.   And she -- and that box is marked for both jobs --

10   A.   Yes.

11   Q.   -- both the Northeast Michigan Community Mental Health and

12   GW & SW.

13   A.   Yes.

14   Q.   And then you have the income reported on that W-2 from both

15   locations, is that right?

16   A.   Yes.

17   Q.   And what was the income from each one?  What was the income

18   from each one?

19   A.   Yes.

20   Q.   Can you read it, please?  Can you read what the income was

21   from each company.

22   A.   Now, which --

23   Q.   On Table 1.

24   A.   Northeast Michigan Community Mental Health was $19,168.

25   GW & SW, Incorporated was $31,720.

Jury Trial, Vol. II of V

251

1   Q.   And that was back in 2005, correct?

2   A.   Right.

3   Q.   And that information -- where did that information come

4   from?

5   A.   Directly from the W-2 forms.

6   Q.   And that was provided to you by Maxine, correct?

7   A.   Yes.

8   Q.   Okay.  Let's take a look at Exhibit 130.  And let's move on

9   to the same W schedule and the Table 1.

10  A.   Yes.

11  Q.   Is this the 2006?

12  A.   It's 2006, yes.

13  Q.   Okay.  And what is listed in that box?

14  A.   Northeast Michigan Community Mental Health, wages were

15  $20,514 and Michigan tax withheld was $800.  And GW & SW,

16  Incorporated, the wages were $33,220 and Michigan tax withheld

17  was $2,070.

18  Q.   And again, this information came from W-2s provided by her

19  to you?

20  A.   Yes.

21  Q.   And she verified the accuracy of this information?

22  A.   Yes.

23  Q.   Let's move on to Exhibit 132.  And go to the same Schedule W

24  in Table 1.

25  A.   Did you say 133?

Jury Trial, Vol. II of V

252

1   Q.   One thirty-two.

2   A.   One thirty-two, okay.

3   Q.   What's listed in that table?  What's listed in that table

4   there?

5   A.   Northeast Michigan Community Mental Health for $19,261 in

6   wages, $761 withheld for Michigan tax.  GW & SW, Incorporated,

7   $34,980 in wages and $2,947 held in Michigan tax.

8   Q.   And this is the 2007 Michigan withholding tax schedule, is

9   that what it is?

10  A.   Yes.

11  Q.   And this is from W-2s provided to you by her, correct?

12  A.   Correct.

13  Q.   Now, if we go to Exhibit 131, and we look at her reported

14  earnings, can you tell me what that total amount was?

15  A.   Now, you're talking about the federal schedule?

16  Q.   Yes.

17  A.   The total wages on Line 7 were $56,394.

18  Q.   And this is her federal tax return in 2007, right?

19  A.   Yes.

20  Q.   And would that amount -- what is that amount -- where is

21  that coming from?

22  A.   It's coming from the W-2 forms.

23  Q.   So if you add the two W-2 incomes together, then we get this

24  number, $56,394?

25  A.   Yes, yes.

Jury Trial, Vol. II of V

253

1  Q.   Okay.  Let's move on to Exhibit 134.  And if we can again,
2  look at Table 1 in the Michigan withholding tax schedule.
3  A.   Yes.
4  Q.   And what year is that for?
5  A.   This is for 2008.
6  Q.   Okay.  And what is listed there?
7  A.   We show income from Northeast Michigan Community Mental
8  Health for $22,899 and $996 withheld for income tax, Michigan
9  tax.  GW & SW, Incorporated, income of $34,370 and Michigan tax
10 withheld, $3,153.
11 Q.   Okay.  And if you take a look at Exhibit 133, Line 7.  What
12 is that document?
13 A.   This is a federal income tax return for 2008.
14 Q.   For Maxine Pochmara?
15 A.   Pardon?
16 Q.   For Maxine Pochmara?
17 A.   Yes.
18 Q.   And on Line 7, what is that number?
19 A.   That is the total of all of the income off the W-2 forms
20 which is $57,269.
21 Q.   So the numbers we just saw on Table 1, if you add those
22 together, they would come to this amount?
23 A.   I'm sure.  That's correct.
24 Q.   Okay, let's move on to Exhibit 136.  And if we move on to
25 the Michigan withholding tax schedule, on Table 1, can you tell

1  me what year that is for?

2  A.    This is for year 2009.

3  Q.    Okay.  And what do we have there in Table 1?

4  A.    We have income from Northeast Michigan Community Mental

5  Health for $23,145 and Michigan income tax withheld, $1,007.  We

6  also have income from GW & SW, Incorporated, in the amount of

7  $5,526 and Michigan income tax withheld of $497.

8  Q.    And if you take a look at Exhibit 135, you can tell us what

9  that is.

10  A.    That is a 2009 federal income tax schedule, 1040.

11  Q.    And if you go to Line 7.

12  A.    Line 7 indicates income from W-2 forms in the amount of

13  $28,671.

14  Q.    And again, you arrived at that number by adding the amounts

15  on the two W-2s, is that right?

16  A.    Yes.

17  Q.    Okay.  Did Maxine Pochmara ever claim any kind of dividends

18  or stock or investment return income?

19  A.    I didn't understand the question.

20  Q.    Did Maxine Pochmara ever give you any kind of forms claiming

21  any kind of dividend, stock or investment return income?

22  A.    Nothing that amounted to much, maybe a few dollars in

23  savings interest and that's about it.

24  Q.    And was that coming from her savings accounts?

25  A.    I'm not sure.  It's just a form they get from their credit

Jury Trial, Vol. II of V
                                                                            255

1    union.

2    Q.    I see.  I see that Maxine Pochmara, if we take a look at

3    Schedule A, let's say, on Exhibit 127, she is also listing her

4    real estate taxes, mortgage interest, and things of that nature,

5    is that right?

6    A.    Yes.

7    Q.    And did Robert Pochmara have one like that?  Did he claim

8    any real estate taxes or mortgage interest?

9    A.    He did not.

10   Q.    Did he only have the standard deductions?

11   A.    I just took the standard deduction.

12   Q.    Now, let's take a look at Exhibit 135.

13   A.    Okay.

14   Q.    Can you tell us what you're looking at?  What is that?

15   A.    This is federal income tax return for the year 2009.

16   Q.    For whom?

17   A.    Pardon?

18   Q.    For whom?

19   A.    This is for Maxine C. Pochmara.

20   Q.    And let's take a look at Line 13.

21   A.    Yes.

22   Q.    Can you tell me what's listed in that line?

23   A.    That is a capital gains that she reported on the sale of her

24   share of the auto parts store.

25   Q.    And what is the capital gain?

Jury Trial, Vol. II of V

256

1   A.   It was $20,000.

2   Q.   And let's look through this exhibit, all the way to Schedule

3   D.

4   A.   Yes.

5   Q.   And Part 2, Paragraph 8.

6   A.   Yes.  It says NAPA Auto Parts.

7   Q.   Can you -- Schedule D, Part 2.

8   A.   Part C, 3/24 of '09.

9   Q.   One second, so we can pull this up.  It's 135.  And if we go

10  to Part 2, Paragraph 8.  Okay.  So we have an explanation there

11  for this capital gain.  Can you tell us what that is?

12  A.   That's the auto parts store, that she sold her portion of

13  it.

14  Q.   And can you tell us the details about that transaction that

15  are reported there?

16  A.   Well, she acquired it the 5th of January, 1999, and date

17  sold was 3/24 of '09.  Sale price was $90,000.  Cost or other

18  basis was $70,000.  So the capital gain was twenty thousand.

19  Q.   So does that mean she purchased that for $70,000 and sold it

20  for $90,000?

21  A.   Yes.

22  Q.   And made a profit of $20,000.

23  A.   Correct.

24  Q.   Okay.  And if we look to Form 2106, it looks like she also

25  reported some vehicle expenses.  Do you know what those were

Jury Trial, Vol. II of V

257

1   about?

2   A.    That would be her expenses in the in-home health care.  I

3   believe she went to visit clients at their homes.

4   Q.    So she was claiming mileage --

5   A.    Yes.

6   Q.    -- for visiting patients?

7   A.    Yes.

8   Q.    Let's go back to NAPA.  When you would go there and Robert

9   Pochmara would wait on you and you would purchase parts from

10  there --

11  A.    Yes.

12  Q.    -- would he also take the money for those parts from you

13  and --

14  A.    Yes, he would.  Yes.

15  Q.    Okay.

16          MS. POP:  Thank you.  No further questions.

17          THE COURT:  Cross-examination?

18          MR. PIAZZA:  Just a brief moment, your Honor.

19          (Whereupon defense counsel confer off the record)

20                        CROSS-EXAMINATION

21  BY MR. JACOBS:

22  Q.    Sir, I'm Steve Jacobs.  I represent Gary Wilson.  I think --

23  well, let's just clarify.  In the 1990s, all of -- or say around

24  the early 2000s, how often would you go to the NAPA store?

25  A.    Twice a year, maximum four times a year.

Jury Trial, Vol. II of V

258

1   Q.   Okay.  Twice to four times a year.  Now, if I understand
2   correctly, you're a farmer who does -- also does taxes.
3   A.   Yes.
4   Q.   And you've got a twelfth grade education.  Did you take any
5   sort of classes through H & R Block or anything like that, to --
6   to get some expertise in doing taxes?
7   A.   No.  Each year, I purchase a professional income tax guide
8   from JK Lasser, and the guide costs about eighty -- eighty to
9   ninety dollars.  It's a thick book about three inches thick and
10  it's got all the tax laws and the changes each year.
11  Q.   Is that -- do you also order a program, like Turbo Tax or
12  something like that --
13  A.   Yes, I do.
14  Q.   -- to help you do the returns?
15  A.   Yes.  I have a program from Intuit.
16  Q.   Intuit.
17  A.   Yes.
18  Q.   Quickbooks.
19  A.   Mm-hmm.
20  Q.   All right.  You use Quickbooks programs to do the taxes.
21  And other than being self-taught, reading this booklet and using
22  Quickbooks, that's the extent of your further education regarding
23  taxes, is that correct?
24  A.   That's correct.
25  Q.   All right.  Do you also do things like incorporate

Jury Trial, Vol. II of V

259

1  businesses for people and get those corporation books and do the
2  articles of incorporation --
3  A.   No.
4  Q.   -- and minutes and things like that?
5  A.   No.
6  Q.   So you don't do that.
7  A.   I do not.
8  Q.   But in the tax field, though -- because you said you had a
9  few -- a couple businesses?
10  A.   Yeah, small businesses.  Very small individually-owned
11  businesses.
12  Q.   All right.  Well, with those individually-owned businesses,
13  would you do the 940s and 941 forms, if you're familiar with
14  those?
15  A.   Most of them don't have employees.
16  Q.   All right.  So, yes, you're familiar with those forms.
17  A.   Oh, yes, yes.
18  Q.   Those forms have to do with employees.
19  A.   Yes.
20  Q.   And so that's -- quit laughing, Mrs. Parker.  And so you
21  don't particularly use those forms --
22  A.   No.
23  Q.   -- is that what you're saying?
24  A.   No.
25  Q.   Okay.  All right.  When we look at the forms that you did

Jury Trial, Vol. II of V

260

1  fill out for Robert and Maxine Pochmara, it appears to me on

2  Maxine's, that you listed her as a laborer, is that correct?

3  A.   Well, that's -- she is a laborer for Northeast Michigan

4  Health.

5  Q.   All right.  Did you come up with the word laborer, or did

6  she, if you recall?

7  A.   Somebody that provides work for another individual or a

8  company.

9  Q.   Okay.  Who came up with that word?  Did she say I'm a

10  laborer versus a secretary, versus clerical, or did you come up

11  with the word laborer?

12  A.   No.  I just asked, what's your job or occupation, and she

13  said laborer or whatever.

14  Q.   And same thing with Robert Pochmara, you have down there

15  retired.

16  A.   Yes.

17  Q.   How did you come up with that?

18  A.   He has a retirement form.  That's the only thing he had

19  so --

20  Q.   Did you actually talk to him about it, are you retired?

21  A.   Yes.  He said he's on disability, he is retired.

22  Q.   He is on disability, he is retired.

23  A.   Yes.

24  Q.   There is no difference between receiving disability and

25  being retired?

Jury Trial, Vol. II of V

261

1          MS. PARKER:  Objection.  Beyond the scope of direct and
2      expertise.
3          THE COURT:  May and may not.  I will overrule it and
4      take the gentleman's response.
5      BY MR. JACOBS:
6      Q.   If you know, sir, is there a difference between being on a
7      pension and being retired?
8      A.   You still get a 1099 form either way.
9      Q.   So what's your answer, that there is no difference or there
10     is a difference?  Or you don't know?
11     A.   I don't know.
12     Q.   Fair.
13     A.   Okay.
14     Q.   But it is fair, and you correctly pointed out, you still get
15     a 1099 form if you're on retirement or if you're on disability,
16     is that correct?
17     A.   Correct.
18     Q.   And in fact, that's attached to one of your -- one of the
19     tax returns you did, I think it's tax return No. 146.  And it has
20     a copy of a 1099 that Mr. Pochmara received and it notes -- it
21     just notes it's from the United States railroad retirement
22     people, but doesn't make a distinction between pension or
23     disability.
24     A.   Any time you see a R behind a 1099, that's retirement.
25     Q.   All right.  So R is retirement.

Jury Trial, Vol. II of V

262

1  A.   Yes.

2  Q.   Okay.  And that's your understanding.  On these 1040 forms

3  for an individual who is working for an employer and Social

4  Security monies are taken out, FICA, F-I-C-A --

5  A.   Yes.

6  Q.   -- is that noted on the actual tax return, how much Social

7  Security monies are taken out?

8  A.   It's noted on the W-2 form and that -- Social Security

9  wouldn't show up on the federal form.  Now, Michigan, it would be

10 just a withholding tax.  Actually, Social Security would not --

11 withholding wouldn't show up.

12 Q.   Right.  So -- so on those 1040s, first, we will talk the

13 1040 federal form.

14 A.   Right.

15 Q.   If Social Security monies were taken out by the employer,

16 that's not noted on the form.  You have to actually look at the

17 W-2.

18 A.   No.

19 Q.   Is that correct?

20 A.   It's not noted on the 1040 form.

21 Q.   Right.  And with the State of Michigan's 1040 form, if

22 Social Security monies are taken out, that's also not noted and

23 you pointed out, they do note Michigan withholding on there.

24 A.   Right.

25 Q.   But it doesn't denote Social Security withholdings, is that

1  correct?

2  A.   Right.

3  Q.   Are you saying you also did the taxes for the Pochmaras

4  before 2005 and you just don't have the returns?

5  A.   I don't have any of those old ones anymore.

6  Q.   But I'm asking you, do you recall if you did their returns

7  prior to 2005?

8  A.   Oh, yes.

9  Q.   Oh, yes?  And do you recall how many years prior to that

10 that you did their returns?

11 A.   Maybe 25 years total.

12 Q.   Okay.  Might have missed a year or two or --

13 A.   I may have but I didn't notice it though, because I do three

14 hundred plus returns, so --

15 Q.   Sure.  Did they -- did they live together?  I think it's

16 noted on the returns, Robert and Maxine Pochmara lived together.

17 A.   Yes.

18 Q.   And you noted on each one of those returns, that they were

19 single, is that correct?

20 A.   Yes.

21 Q.   If you know, did they hold themselves out as being single to

22 other people?

23 A.   They were divorced many years ago so --

24 Q.   They were divorced many years ago?

25 A.   Yes.  They continued to live with each other, yeah.

1  Q.   And continued to live with each other.

2  A.   Right.

3  Q.   And you knew that because you did their taxes.

4  A.   Right.

5  Q.   All right.

6          MR. JACOBS:  Nothing further, your Honor.

7          THE COURT:  Mr. Piazza, any questions for the gentleman?

8          MR. PIAZZA:  Just a quick question, sir.

9                      CROSS-EXAMINATION

10  BY MR. PIAZZA:

11  Q.   You indicated you learned through the book and the computer

12  program.  You're not a CPA, are you?

13  A.   I am not.

14          MR. PIAZZA:  Nothing further.

15          THE COURT:  Any redirect, ma'am?

16          MS. POP:  No, your Honor.

17          THE COURT:  Thank you very much, sir.

18          (At 12:07 p.m. - witness excused)

19          THE COURT:  Government's next witness, your Honor.

20          MS. PARKER:  Al Pines, your Honor.

21          THE COURT:  Good afternoon.

22          THE WITNESS:  Good afternoon.

23          THE COURT:  Please raise your right hand.

24          Do you solemnly swear that the testimony you are about

25  to provide will be the truth, the whole truth and nothing but the

1  truth so help you God?

2        THE WITNESS:  I do.

3        THE COURT:  If you could have a seat on the witness

4  stand over to your far left.

5        THE WITNESS:  Okay.  Thank you.

6                    ALAN PINES

7  Having first been duly sworn at 12:08 p.m., testified as follows:

8                 DIRECT EXAMINATION

9  BY MS. PARKER:

10  Q.   Hi, there.  Would you state your name and spell it for us,

11  please?

12  A.   Alan Pines, A-L-A-N, P-I-N-E-S.

13  Q.   And what community do you live in?

14  A.   Rogers City, Michigan.

15  Q.   And in that capacity -- well, let me -- where do you work?

16  A.   I work at the Calcite Quarry, in Rogers City.

17  Q.   Can you keep your voice up there just a little bit?

18  A.   Oh, I'm sorry.  Calcite Quarry in Rogers City.

19  Q.   Thank you.  And what type of work do you do for the Calcite

20  Quarry in Rogers City?

21  A.   Currently, I'm the quarry manager and the manager of all the

22  mobile equipment.

23  Q.   And in connection with your work regarding the equipment, do

24  you have occasion to buy parts for your equipment?

25  A.   Yes, I do.

Jury Trial, Vol. II of V

266

1   Q.   How many parts stores are there in Rogers City?

2   A.   Two.

3   Q.   How big of a town is it?

4   A.   It's a community of approximately three thousand people.

5   Q.   And you said there are two parts stores.  What are those two

6   parts stores?

7   A.   The NAPA Store and Bob's Auto Parts.

8   Q.   And who, in your experience, has been involved with working

9   at the NAPA Auto Parts Store?

10  A.   I'm sorry.  I didn't hear what you asked, please.

11  Q.   You -- let me put it this way.  Do you do business with the

12  NAPA Store in getting parts for the equipment that you keep

13  working for the quarry?

14  A.   Currently, no, but we have in the past.

15  Q.   All right.  And when was -- what time frame were you doing

16  business with the NAPA Store?

17  A.   The main amount was in 2004 and 2005.

18  Q.   During that time frame, who were the people who were running

19  the store?

20  A.   The people I had dealings with were Gary Wilson, Bob

21  Pochmara, and Justin -- I don't know his last name, I guess.

22  Q.   Okay.  Do you see Gary Wilson present in the courtroom

23  today?

24  A.   I do.

25  Q.   Could you point to him and describe what he is wearing?

Jury Trial, Vol. II of V

1  A.   Mr. Wilson is right there with a suit and blue shirt and a
2  blue tie, if that's sufficient.
3         MS. PARKER:  Your Honor, may the record reflect that the
4  witness has identified the defendant?
5         THE COURT:  There are two gentlemen there with blue
6  shirts.
7         THE WITNESS:  Okay.  Well --
8         MR. JACOBS:  We have no objection to the identification,
9  your Honor.
10         THE COURT:  The witness is identified.
11         MS. PARKER:  I was trying to figure that out from here.
12  Couldn't tell for sure.  Thank you.
13  BY MS. PARKER:
14  Q.   In the course of your working with the NAPA Auto Parts
15  Store, what kind of interaction would you have with them?
16  A.   What would happen is, I would call or the mechanics would
17  call on an as-needed basis and for the most part, they would
18  deliver parts down to our maintenance shop at the plant.
19  Q.   And when you would call the auto parts store, did you ever
20  have Gary Wilson answer the phone?
21  A.   Yes.
22  Q.   Would he take orders?
23  A.   Yes.
24  Q.   How about Robert Pochmara, would he answer the phone?
25  A.   Yes.

Jury Trial, Vol. II of V

268

1   Q.   Would he take orders?

2   A.   Yes.

3   Q.   And you said there was another person named Justin?

4   A.   Yes.

5   Q.   He would take the orders?

6   A.   He would, also, yes.

7   Q.   And then would those -- would the orders generally be

8   delivered to you at the quarry or would you have to go to the

9   store to get them?

10  A.   Um, sometimes we would pick them up, rarely.  Personally,

11  I've only been in the store a few times.  For the most part, it

12  was delivered to the -- right to the maintenance shop by Mr.

13  Pochmara.

14  Q.   So he was the primary delivery person?

15  A.   Correct.

16  Q.   And if you ordered parts over the phone and Mr. Pochmara

17  delivered them to you at the job site, how would payment be

18  handled?

19  A.   What they would do at that particular time is they would

20  bring in a piece of paper and if I recall, I'm pretty sure it was

21  green, I would sign it, they would keep one copy and I would take

22  a copy over to the office for accounts payable.

23  Q.   But you would give a copy back to Mr. Pochmara?

24  A.   Yes.

25  Q.   When he would make deliveries of the parts to the quarry,

Jury Trial, Vol. II of V
269

1   what kind of vehicle would he use?

2   A.   They had the little white truck with the yellow baseball cap

3   that said NAPA.

4   Q.   Do you know Maxine Pochmara?

5   A.   I know who she is.

6   Q.   All right.  Did you ever encounter her at the NAPA Auto

7   Parts Store?

8   A.   No, I did not.

9   Q.   Never -- did you ever have her answer the phone when you

10  called to order parts?

11  A.   No.

12  Q.   And are you familiar with Klee Road?

13  A.   Yes, I am.

14  Q.   To your knowledge, did the Wilsons ever live on Klee Road?

15  A.   Yes, they did.

16  Q.   Can you say approximately what that cross street there would

17  be?

18  A.   Probably be a quarter to a half mile between there and M-68

19  highway.

20        MS. PARKER:  Pass the witness, your Honor.  Thank you.

21        THE COURT:  Cross?  Any questions?

22        MR. JACOBS:  No, sir.

23        THE COURT:  Mr. Piazza?

24        MR. PIAZZA:  Thank you, your Honor.

25                    CROSS-EXAMINATION

Jury Trial, Vol. II of V

270

1  BY MR. PIAZZA:

2  Q.   Good afternoon, sir.

3  A.   Good afternoon.

4  Q.   You say you would order parts on occasion?

5  A.   Yes.

6  Q.   And on occasion, the truck would come out and a male would

7  be driving the truck, is that correct?

8  A.   I didn't quite hear you.

9  Q.   Okay.  Somebody would come out and deliver the parts.

10  A.   Primarily Mr. Pochmara, yes.

11  Q.   And occasionally, you would go to the store itself, is that

12  correct?

13  A.   I stated a couple times, yes.

14  Q.   At no time, when you went to the store did you see Sue

15  Wilson at the store?

16  A.   No, I did not.

17  Q.   You never saw Sue Wilson ever deliver parts to your

18  establishment.

19  A.   That's correct, I did not.

20  Q.   And you had no dealings relating to the business itself of

21  NAPA Auto Parts with Sue Wilson, is that correct?

22  A.   That is correct.

23          MR. PIAZZA:  Nothing further.

24          MS. PARKER:  I have no redirect, your Honor.

25          THE COURT:  Thank you, sir.  You're excused.

1           (At 12:15 p.m. - witness excused)

2           THE COURT:  Government's next witness, please.

3           MS. POP:  The government calls Gerald Smigelski.

4           THE COURT:  Good afternoon.  If you could raise your

5   right hand.

6           Do you solemnly swear that the testimony you are about

7   to provide will be the truth, the whole truth and nothing but the

8   truth so help you God?

9           THE WITNESS:  Yes, I do.

10          THE COURT:  Please have a seat in the witness stand.

11                          GERALD SMIGELSKI

12   Having first been duly sworn at 12:16 p.m., testified as follows:

13                          DIRECT EXAMINATION

14   BY MS. POP:

15   Q.   Could you please state your name and spell it for the

16   record?

17   A.   My name is Gerald Smigelski, S-M-I-G-E-L-S-K-I.

18   Q.   And where do you work?

19   A.   I work for the Presque Isle County Road Commission.

20   Q.   What do you do there?

21   A.   My current position is superintendent manager.

22   Q.   And where is this located?

23   A.   Rogers City, Michigan.

24   Q.   And how long have you been working for the road commission

25   for?

Jury Trial, Vol. II of V

272

1  A.   I began in 1991 as the clerk.

2  Q.   And how long have you been doing that for, before you became

3  a manager?

4  A.   I was the clerk until 2008 and then I assumed that position

5  as superintendent manager.

6  Q.   Could you explain to us what the road commission does?

7  A.   Our main responsibility is to maintain the roads in a safe

8  and reasonable manner for the traveling public within our county,

9  on both the county road system and the state system.

10  Q.   And do you use a variety of vehicles and machinery to do

11  that?

12  A.   Yes, we do.

13  Q.   And what are your duties for the road commission?

14  A.   As superintendent manager, I'm responsible for every aspect

15  that we have there.  I'm responsible for all our employees, all

16  the purchases, anything that has to do with the road commission's

17  function.

18  Q.   And did you ever deal with the NAPA Auto Parts Store in

19  Rogers City?

20  A.   Personally?

21  Q.   Personally, and as a part of your job if you did.

22  A.   Personally, I've purchased items from there over the past

23  several years.  As an employee of the road commission, when I was

24  clerk, it was my responsibility to pay the accounts payables.

25  And then as superintendent manager, I have spoken several times

Jury Trial, Vol. II of V

273

1  with -- with them regarding things.  Our shop foreman, our head
2  mechanic, usually talks to me if he's going to purchase something
3  large or if he's going to be purchasing any type of item that has
4  to deal with having an inventory in our shop.
5  Q.   And who would you communicate with at the NAPA Auto Parts
6  Store?
7  A.   When I was the clerk, typically, how the function went is
8  our shop mechanic, our head foreman, would receive an invoice.
9  He would pass it on to me after he put down what type of accounts
10  or what type of equipment it was used on.  I would pay that
11  invoice.  We got a monthly statement.  If we didn't have a
12  statement that matched up or invoice that matched up with the
13  statement, I would call down to the auto parts store, asking them
14  to fax over a copy of whatever invoice I was missing.
15  Q.   And who would you be talking to?
16  A.   It varied.  I spoke with Bob or Gary or Justin, whoever
17  answered the phone, and they would just fax it to me within a few
18  minutes.
19  Q.   And is Bob, Robert Pochmara?
20  A.   Yes.
21  Q.   And Gary, would that be Gary Wilson?
22  A.   Yes.
23  Q.   So you know Robert Pochmara then.
24  A.   Yes.
25  Q.   And would he also take orders and deliver parts at your

Jury Trial, Vol. II of V
274

1  establishment?

2  A.   That wasn't my position.   I --

3  Q.   And how long have you known Robert Pochmara for?

4  A.   I would say that when I was the clerk, the only time I met

5  him is if I would go into the shop to get the invoices, so

6  whenever he started working.   I really don't know.

7  Q.   Approximately, you don't have any --

8  A.   I started in 1991.   I don't know what year W.W. Auto Parts

9  started and when they started servicing our facility, that would

10 have been my first experience with him.

11 Q.   So were you under the impression that Robert Pochmara was

12 working at the NAPA Store?

13 A.   I did see him at both the store and at our facility, yes.

14 Q.   And what would he be doing at the store?

15 A.   The times that I've seen him was when I went in to get

16 something personally, he was behind the counter helping

17 customers.

18 Q.   And did he help you?

19 A.   I believe on occasions, yes.

20 Q.   And did he cash the money you paid for the parts?

21 A.   He put it in the register, yeah.   He took my money, yes.

22 Q.   And you said you also saw him at the road commission.

23 A.   Correct, yes.

24 Q.   What would he be doing there?

25 A.   Usually, he would be talking with Steve, who is our head

Jury Trial, Vol. II of V

1   mechanic.

2   Q.   And when is the last time you saw him or heard of him

3   working for NAPA?

4   A.   I would say it was several years ago.  Since then, Justin is

5   now coming to our shop.

6   Q.   And do you also know Gary Wilson?

7   A.   I know who he is, yes.

8   Q.   Do you see him in the courtroom today?

9   A.   Yes, I do.

10  Q.   Could you point him out and describe what he is wearing?

11  A.   The gentleman right there with the blue -- blue shirt.

12        MS. POP:  May the record reflect the witness has

13  identified the defendant?

14        THE COURT:  He has.

15  BY MS. POP:

16  Q.   And is Mr. Gary Wilson associated with NAPA as well?

17  A.   I believe so, yes.

18  Q.   In what capacity?

19  A.   I believe he is co-owner of the store.

20  Q.   Now, when you would go to the store, would he also be

21  present at the store?

22  A.   Yes, he has been there at times, yes.

23  Q.   And what would he be doing there?

24  A.   Waiting on customers.

25  Q.   And so how often would you say you would go to the store?

Jury Trial, Vol. II of V

276

1   A.   On a personal basis, I would say I may have been in there

2   half a dozen times over the years.  Not often.

3   Q.   And you said you would be calling the store from time to

4   time.

5   A.   I have, yes.  When we get our monthly statement, if it

6   didn't match up with the actual invoices that I had, I would

7   contact the store to get a copy of the invoice.

8   Q.   And then Robert Pochmara or Gary Wilson would help you then,

9   and then Justin as well?

10   A.   Yes.

11   Q.   Have you ever met Maxine Pochmara?

12   A.   Yes.

13   Q.   And did you ever see her at the NAPA Auto Parts Store?

14   A.   No.

15   Q.   Did she ever answer the phone when you called the NAPA Auto

16   Parts Store?

17   A.   No.

18   Q.   And do you know where Robert and Maxine Pochmara live?

19   A.   Yes.

20   Q.   And where is that?

21   A.   On Klee Road.

22   Q.   Can you give us an intersection?

23   A.   I would say it's approximately a mile south of the M-68

24   intersection on the east side of the road.

25        MS. POP:  No further questions, your Honor.

Jury Trial, Vol. II of V

277

1       THE COURT:  Cross-examination of this witness?

2       MR. JACOBS:  Yes.

3                       CROSS-EXAMINATION

4   BY MR. JACOBS:

5   Q.   Sir, did you know if Robert Pochmara and Maxine Pochmara

6   were married?

7   A.   I believe they were, yes.

8   Q.   They held themselves out as husband and wife, lived

9   together?

10  A.   That I do not know.

11  Q.   You don't know if they lived together on Klee Road?

12  A.   When I -- when I was at Klee Road to pick up an item I

13  purchased from Bob, he was there alone.

14  Q.   But you believed they were married.

15  A.   Correct.  They have the same last name.

16      MR. JACOBS:  Nothing further, your Honor.

17      THE COURT:  Mr. Piazza?

18      MR. PIAZZA:  Thank you, your Honor.

19                      CROSS-EXAMINATION

20  BY MR. PIAZZA:

21  Q.   Good afternoon, sir.

22  A.   Good afternoon.

23  Q.   When you went to -- personally to NAPA Auto Stores, you

24  didn't have any dealings with a person by the name of Sue Wilson,

25  did you?

Jury Trial, Vol. II of V

1    A.   No, sir.

2    Q.   You never saw somebody that was identified as Sue Wilson,

3    did you?

4    A.   No, sir.

5    Q.   And when you would call over to NAPA, you never talked with

6    anybody by the name of Sue Wilson, did you?

7    A.   No, sir.

8    Q.   And when you had parts delivered, you never saw somebody by

9    the name of Sue Wilson delivering parts, did you?

10   A.   No, sir.

11          MR. PIAZZA:  Nothing further.

12          THE COURT:  Are we at a completion?

13          MS. POP:  Nothing on redirect, your Honor.  No further

14   questions for the witness.

15          THE COURT:  Thank you, sir.

16          THE WITNESS:  You're welcome.

17          (At 12:25 p.m. - witness excused)

18          MS. POP:  We call Steve Peters.

19          THE COURT:  Could I see counsel for just a moment?

20          (Whereupon sidebar conference held on the record as

21          follows)

22          THE COURT:  Are we done with customers?

23          MS. PARKER:  No.

24          THE COURT:  Why do we need more?

25          MS. PARKER:  Because I think -- well, I'm sorry.

Jury Trial, Vol. II of V

1        MS. POP:  This one in particular will also mention that

2   he also saw Sue Wilson there on one occasion.

3        THE COURT:  So?

4        MS. POP:  Working at the store as well.

5        MR. JACOBS:  Okay.

6        MS. POP:  Well, they are making a point that she is

7   never there and she doesn't -- that she is going to be getting

8   paid despite the fact that she is not in the store.

9        THE COURT:  I don't see it as relevant.

10       MS. PARKER:  Well, your Honor, they made an opening

11  statement that she is never there.

12       MR. PIAZZA:  Well, she did sign checks and did the

13  bookkeeping.

14       THE COURT:  Yeah.

15       MS. PARKER:  Well, I think we should be entitled to

16  present proofs that she is there.

17       THE COURT:  At this point, from my point of view, it's

18  cumulative with respect to all the other information,

19  particularly when you consider the fact that they've already

20  admitted it.  You've admitted it.

21       MR. JACOBS:  Yeah.

22       MS. POP:  Well, in opening, they said that Robert

23  Pochmara has been there often but he was not an employee there.

24       THE COURT:  Robert.

25       MS. POP:  Yes.

Jury Trial, Vol. II of V

1      THE COURT:  Well, we've already established, they've
2  acknowledged that he worked there on equal terms to Gary Wilson.
3      MS. PARKER:  Judge, are you going to tell Mr. Piazza
4  that he cannot argue that Sue was never in the store?
5      THE COURT:  Let's keep it really narrow, then, to just
6  the one point, all right?
7      MS. POP:  Okay.
8      THE COURT:  Because it's getting cumulative.
9      MR. PIAZZA:  Also, judge, I don't think we mentioned it
10  before but at this time, I'm moving to sequester the witnesses.
11  I've seen a couple people coming in and out.  We never made the
12  motion before but I'm making it now to have the witnesses
13  sequestered.
14      MS. PARKER:  They have been.  That's why it's taking so
15  long to get the witnesses in.  He is -- that one is not our
16  witness.
17      MR. PIAZZA:  All right.
18      (Whereupon sidebar concluded)
19      THE COURT:  Sir, could you raise your right hand?
20      Do you solemnly swear that the testimony you are about
21  to provide will be the truth, the whole truth and nothing but the
22  truth so help you God?
23      THE WITNESS:  Yes, sir.
24      THE COURT:  Please have a seat over in the witness
25  stand.

1                         STEVEN PETERS

2    Having first been duly sworn at 12:31 p.m., testified as follows:

3                       DIRECT EXAMINATION

4    BY MS. POP:

5    Q.   Could you please spell your name for the record?

6    A.   S-T-E-V-E-N, P-E-T-E-R-S.

7    Q.   And where do you work?

8    A.   Presque Isle Road Commission, Rogers City.

9    Q.   And what's your occupation there?

10   A.   I am the head mechanic, shop foreman.

11   Q.   And how long have you been doing this for?

12   A.   1991, March 11th.

13   Q.   And can you tell us what you do there for the road

14   commission?

15   A.   I'm in charge of all the heavy maintenance, repairs at the

16   Rogers City Road Commission, including truck repair, loaders,

17   whatever we have, it is my duties.

18   Q.   And have you ever dealt with the NAPA Auto Parts Store in

19   Rogers City?

20   A.   Yes, I have.

21   Q.   What kind of dealings did you have with the store?

22   A.   We have an inventory system with three suppliers there and

23   once a week, NAPA or the other two suppliers come through and

24   basically have an inventory system that they keep on hand for us.

25   And then if I need anything extra, I either call there or if it's

1  just an inventory restock, I will order the part weekly and they

2  will bring it the following week.

3  Q.   So would you purchase parts from the store?

4  A.   I purchased -- I purchased probably 75 percent of the parts

5  and maintenance, yes.  That's my job.

6  Q.   And you said you've been doing that weekly?

7  A.   Yes, I have -- I had NAPA set up weekly.

8  Q.   Since when?

9  A.   They haven't been there weekly for the last few years but

10  probably around the mid-90s through 2000-something, I don't have

11  the exact records, that we had a salesman come from NAPA to our

12  facility.

13  Q.   Okay.  And have you ever seen Robert Pochmara working at

14  NAPA?

15  A.   Yes, I have.

16  Q.   Would he wear an uniform?

17  A.   Just a blue shirt.  Now and then a hat, if he came to the

18  shop.

19  Q.   And did it say NAPA on it?

20  A.   It said NAPA.

21  Q.   And did he drive a NAPA pickup truck?

22  A.   Yes.  It was a small S-10 with one of the yellow caps on it.

23  Q.   And what would he be doing for NAPA?

24  A.   Delivering parts.  He also was the salesman that did the

25  inventory for NAPA at our facility.  So he would go through and

Jury Trial, Vol. II of V
283

1  check our main parts, truck shop, keep inventory on it without
2  having to walk around and reordering parts.
3  Q.   And he would take orders as well?
4  A.   Yes, he would take orders bi-weekly and come back the
5  following week with -- with his invoice.  I would review the
6  invoice, sign it and he would put the parts away.
7  Q.   And did you also see him at the store?
8  A.   Yes.  I had an account at NAPA.  I bought quite a few of my
9  parts at the NAPA Store, yes.
10  Q.   From him?
11  A.   From Bob or Gary, whoever was working behind the counter.
12  Q.   So you also saw Gary Wilson there.
13  A.   Yes.
14  Q.   And do you know what he was doing there?
15  A.   He was working as a businessman, taking care of the
16  customers and took care of me.
17  Q.   And how often would you go to the store yourself?
18  A.   I might average twice a month that I would actually
19  personally go there and pick out parts.
20  Q.   And what days of the week would that be?
21  A.   Normally on a Wednesday.  Our payday is on Wednesday so I
22  would stop in then after the bank, would stop at the NAPA Store.
23  Q.   And what would be -- would there be any other day that you
24  would regularly go there?
25  A.   A Friday.  A Friday was a common day during the winter

1  months, yes.

2  Q.   And have you ever seen Maxine Pochmara at the NAPA Store

3  when you would go there?

4  A.   Not that I know of.

5  Q.   Have you ever seen Sue Wilson there?

6  A.   Not that I know of.

7  Q.   Never?

8  A.   I was in there one time and Mr. Pochmara had mentioned, this

9  is Gary's wife in the back and it was just a say so and it was

10  gone and it's been a long time ago.  I wouldn't even know what

11  the lady looks like today.

12  Q.   And what was that person doing?

13  A.   It looked like she was doing clerical work with invoices in

14  the back, to the left when you walk in the store.  And that was

15  just a short look and that was it.

16  Q.   Okay.  And are you familiar with Rogers City?

17  A.   Fairly familiar.

18  Q.   Do you know approximately how many stoplights there are in

19  Rogers City?

20  A.   We have one stoplight in Rogers City, one stoplight in the

21  county, ma'am.

22         MS. POP:  Thank you.  No further questions.

23                        CROSS-EXAMINATION

24  BY MR. JACOBS:

25  Q.   Good to know how many stoplights you have in Rogers City.

Jury Trial, Vol. II of V

285

1   A.   It's a red light district.

2   Q.   It's a red light district, okay.  Do you actually know

3   Maxine Pochmara?

4   A.   No, I do not, sir.

5   Q.   So you are -- all right.  You don't know her.

6   A.   No, I do not.

7   Q.   Have you ever seen her?

8   A.   I was at Bob's house several years ago.  I picked up some

9   chickens.  There was a lady there and I couldn't even tell you

10  that that's the lady he is with now.

11          MR. JACOBS:  I have nothing further, your Honor.

12          THE COURT:  Mr. Piazza?

13          MR. PIAZZA:  Thank you, your Honor.

14          THE COURT:  Anything related to chickens or stoplights?

15          MR. PIAZZA:  No.

16                      CROSS-EXAMINATION

17  BY MR. PIAZZA:

18  Q.   Sir, you indicated that at one time, it was somebody that

19  mentioned that Gary's wife was in the back doing some clerical

20  work, is that correct?

21  A.   I had walked in to buy some parts and I've known Robert

22  Pochmara since 1970 through school and we would visit now and

23  again if there was a gathering.  And I walked in there one time.

24  I mentioned, who is that?  And he said, well, that's Gary's wife,

25  and there wasn't even no names mentioned.

1   Q.   Okay.

2   A.   And that was it.  And I just kept on going on my business.

3   Q.   She was in the back?

4   A.   She was -- you walked in the store, it was on the left-hand

5   side, there was a small cubicle there.  She was doing some work.

6   A lady was doing some work.

7   Q.   And you couldn't identify that person.

8   A.   No, sir, I could not.

9   Q.   And that was one time out of the --

10   A.   The whole duration of me going in that NAPA Store, yes.

11   Q.   Okay.  And you didn't introduce yourself.

12   A.   No.

13   Q.   Okay.  And she didn't introduce herself?

14   A.   She stayed right where she was at.

15   Q.   So it could have been anybody back there.

16   A.   That is correct, sir.

17         MR. PIAZZA:  Nothing further.

18         THE COURT:  Are we at a conclusion?

19         MS. POP:  Nothing further, your Honor.

20         THE COURT:  Thank you very much, sir.  We appreciate

21   your attendance.

22         (At 12:35 p.m. - witness excused)

23         THE COURT:  Government's next witness, please.

24         MS. PARKER:  Your Honor, next we call Jeffrey Hackett.

25         THE COURT:  Could you raise your right hand.

1          Do you solemnly swear that the testimony you are about

2   to provide will be the truth, the whole truth and nothing but the

3   truth so help you God?

4          THE WITNESS:  Yes, I do.

5          THE COURT:  Please have a seat.

6                        JEFFREY HACKETT

7   Having first been duly sworn at 12:36 p.m., testified as follows:

8                      DIRECT EXAMINATION

9   BY MS. PARKER:

10  Q.   Mr. Hackett, would you state your full name and spell it for

11  us, please?

12  A.   Jeffrey Hackett, J-E-F-F-R-E-Y, H-A-C-K-E-T-T.

13  Q.   How are you employed?

14  A.   I'm a Special Agent with the Office of Inspector General,

15  Office of Investigations, United States Railroad Retirement

16  Board.

17  Q.   What does Office of Special Investigations mean?

18  A.   Office of Inspector General or --

19  Q.   I'm sorry, Office of Inspector General.

20  A.   The Office of Inspector General investigates allegations of

21  fraud, waste and abuse against the Railroad Retirement Board and

22  its programs.

23  Q.   How long have you been so employed?

24  A.   Since August of 2002.

25  Q.   And in that capacity, have you been involved in the

1  investigation involving the individuals charged in this case?

2  A.   Yes, I have.

3  Q.   By the way, where is your office located?

4  A.   Chicago, Illinois.

5  Q.   And what geographic area do you cover out of that Chicago

6  office?

7  A.   Chicago, Illinois, is the national headquarters.  We have no

8  Washington, D.C. connection.  And we cover basically the entire

9  United States.

10  Q.   All right.  And so you do lots of travel.

11  A.   Yes.

12  Q.   Where did you grow up?

13  A.   Saginaw Township.

14  Q.   Where did you go to college?

15  A.   Michigan State University.

16  Q.   Did you get a degree there?

17  A.   I did.

18  Q.   And what was your degree in?

19  A.   Criminal Justice with a minor in History.

20  Q.   How did you become involved in this investigation?

21  A.   We received a referral from the Detroit district office for

22  the U.S. Railroad Retirement Board and we opened an investigation

23  in September of 2008.

24  Q.   And what was the nature of that communication from the

25  Detroit office of the Railroad Retirement Board?

Jury Trial, Vol. II of V

1          MR. PIAZZA:  I will object to that, your Honor, as being

2     hearsay.  You know, he said he received a communique.  Based on

3     that, he did certain acts.  But what the communique was, that's

4     hearsay.

5          MS. PARKER:  I asked for the nature of the report, your

6     Honor, not the specific content.

7          MR. PIAZZA:  But the nature of the report indicates

8     what's in the report.

9          MR. JACOBS:  Yeah.

10          THE COURT:  Not necessarily.  We will take the witness's

11     testimony.  We will take your objection up if you think it's

12     appropriate based on his testimony.

13          THE WITNESS:  The referral we received was that an

14     anonymous complaint in the form of a letter was received at the

15     Detroit district office for the U.S. Railroad Retirement Board

16     indicating that a Robert Pochmara who was receiving a disability

17     from the U.S. Railroad Retirement Board, was seen working at a

18     NAPA Auto Parts located in Rogers City, Michigan.

19     BY MS. PARKER:

20     Q.   And based on that information, did you start to check to see

21     if Mr. Pochmara had reported any working?

22     A.   We did.

23     Q.   And what did you find?

24     A.   We had some indication that --

25          MR. PIAZZA:  Your Honor, I'm going to object to, "We had

 1  this" or "We had that."  He can testify to what he did but not

 2  what other people did.

 3          THE COURT:  He -- he may have observed it.  The only

 4  question is whether he has personal knowledge of the information

 5  and the question is framed in such a manner that that would be

 6  the response the gentleman would have to provide.

 7          I will overrule the objection.

 8          THE WITNESS:  After we received the allegation, I

 9  started my initial investigation into the matter.

10  BY MS. PARKER:

11  Q.   And did you check to see whether Mr. Pochmara had in fact

12  reported any earnings to the Railroad Retirement Board?

13  A.   Yes.

14  Q.   And what did you find when you checked to see if Mr.

15  Pochmara had reported any earnings?

16  A.   That he did not.

17  Q.   But based on the tip, did you take another step in the

18  investigative process?

19  A.   Yes.

20  Q.   And what was the next step that you took to try to

21  investigate this report?

22  A.   I requested that a form, which is an OI-41, be sent out to

23  the NAPA Auto Parts in Rogers City, Michigan, requesting any

24  employment information related to Robert J. Pochmara.

25          MS. PARKER:  Your Honor, may I approach the witness?

Jury Trial, Vol. II of V

1          THE COURT:  You may.

2   BY MS. PARKER:

3   Q.   I've placed before you some exhibits marked Government's

4   Proposed Exhibit 24A, B and C, and also 25.  Do you recognize

5   those documents?

6   A.   Yes, I do.

7   Q.   And would 24A, B and C be a series of documents that were

8   part of your initial inquiry in response to this tip?

9   A.   Yes, they are.

10  Q.   All right.  And then Exhibit 25, would that be a subsequent

11  inquiry made, also, in response to the tip?

12  A.   Yes, it is.

13  Q.   And 24B and C would be part of the response that you

14  received to the initial -- or the first inquiry?

15  A.   Yes, 24B and C were in response to the -- to the exhibit

16  marked as 24A.

17         MS. PARKER:  All right.  Your Honor, I will offer

18  Government's Proposed Exhibits 24A, B and C and 25.

19         MR. JACOBS:  I have no objection, your Honor.

20         MR. PIAZZA:  No voir dire at this time and -- and no

21  comment.

22         THE COURT:  They are received.

23  BY MS. PARKER:

24  Q.   I would like to ask that Exhibit 24A be displayed, please.

25  All right.  Just as a starter, what do you call this form?

Jury Trial, Vol. II of V

292

1  A.   It's an OI-41.  The U.S. Railroad Retirement Board, Office

2  of Investigation uses this to query employers, if we have an

3  allegation that a disability annuitant or other may be

4  employed.

5  Q.   And this particular copy of that form was sent to what

6  address?

7  A.   It was sent to the NAPA Auto Parts located at 1095 West 3rd

8  Street, Rogers City, Michigan, 49779.

9  Q.   And on the upper right-hand side, did it indicate who the

10  inquiry was related to?

11  A.   Yes, it did.

12  Q.   And who is that?

13  A.   Robert Pochmara.

14  Q.   And does it provide a Social Security number for Mr.

15  Pochmara?

16  A.   Yes, it does.

17  Q.   All right.  The opening paragraph of this letter, what does

18  that state?

19  A.   It states:

20        "Our files indicate the individual named above

21        has been employed by you.  This individual receives

22        disability benefits under the Railroad Retirement Act,

23        (RRA, a federal law).  These benefits are subject to a

24        monthly earnings limitation.  Consequently, we need to

25        know the months worked and earnings for those months."

1   Q.   So in this paragraph, does it say retirement benefits or

2   disability benefits?

3   A.   It says disability benefits.

4   Q.   And then it goes on to request various information regarding

5   that employee?

6   A.   That's correct.

7   Q.   All right.  And did you receive a response to that request?

8   A.   I did.

9   Q.   Let's go to the second page of that exhibit, please.  All

10  right.  If you want, we could back up.  On the back of the first

11  page of that exhibit, is there a stamp?

12  A.   There is.

13  Q.   And what's that?

14  A.   That's a stamp that the Office of Investigations for the

15  Office of Inspector General, we utilize that to stamp in things

16  that we receive in investigations.

17  Q.   All right.  And the date that this response was received

18  then was what?

19  A.   It appears to be November 7th of 2008.

20  Q.   Now, going then to the front of the second page of this,

21  what time period was covered by this request for information?

22  A.   Number one, date began employment with you, month January,

23  day 1st, year 2003.

24  Q.   And the ending date was marked as what?

25  A.   Date last employed, month was blank, day was blank, year was

Jury Trial, Vol. II of V

1   blank.  And in parentheses, it says if still working, so state,

2   and that's highlighted and circled.

3   Q.   Was that done by the person who responded to this

4   information?

5   A.   It was not done by me so I can assume.

6   Q.   All right.  And you were involved in sending this out?

7   A.   Yes.

8   Q.   You didn't send it out that way.

9   A.   No.

10  Q.   You got it back that way.

11  A.   Yes.

12  Q.   Okay.  And then below there, there is a chart with every

13  month of the year from 2003 to 2007?

14  A.   That's correct.

15  Q.   And various dollar figures are filled in for those months

16  and years.

17  A.   That's correct.

18  Q.   And then is there a remarks section?

19  A.   Yes, there is.

20  Q.   And in the remarks section, what does it say?

21  A.   It says:

22           "See cover letter and annual meeting of

23       shareholders for GW & SW, Inc."

24       And then 1/1/98.

25  Q.   And also, perhaps, for each of the years that this

Jury Trial, Vol. II of V

295

1   information covered, 2003 to 2007, there is a total for the
2   year?
3   A.   That's correct.
4   Q.   And in 2003, the total was what?
5   A.   $27,825.
6   Q.   And going up to 2007, the total was?
7   A.   For just the year 2007?
8   Q.   Correct.
9   A.   For 2007, $36,305.
10  Q.   And was that form signed?
11  A.   Yes, it was.
12  Q.   And what was the name signed?
13  A.   The signature on the form was Sue Wilson.
14  Q.   And is there anything after the signature?
15  A.   Sec, S-E-C, dash treasurer.
16  Q.   And the date?
17  A.   November 3rd, 2008.
18  Q.   Now, you already read the part about the annual meeting and
19  shareholders and cover letter.
20       Let's go on to 24B.  Is that the cover letter that you
21  received with this response?
22  A.   Yes, I did.
23  Q.   And the date of it?
24  A.   November 3rd, 2008.
25  Q.   And this is from?

Jury Trial, Vol. II of V

296

1   A.   NAPA Auto Parts, d/b/a, W & W Auto Parts, 1095 West 3rd

2   Street, Rogers City, Michigan, 49779.  And then there is a phone

3   number, (989) 734-7363.

4   Q.   What does d/b/a mean to you?

5   A.   Doing Business As.

6   Q.   And the third paragraph of the letter says what?

7   A.   Third paragraph states:

8            "Gary Wilson and Robert Pochmara are store

9        managers working equal hours based on shares owned

10       included in the annual meeting of shareholders and

11       Board of Directors of GW & SW, Inc."

12  Q.   And it's signed?

13  A.   Signed Sue Wilson, sec/treasurer.

14  Q.   Okay.  The next document I would like to ask you to turn

15  your attention to is Exhibit 24C as in Charlie.  Is -- how is

16  that document entitled?

17  A.   Annual Meeting of Shareholders and Board of Directors of GW

18  & SW, Inc.

19  Q.   And does it indicate when the 1998 annual meeting of

20  shareholders was conducted?

21  A.   It does.

22  Q.   Excuse me.  I'm sorry?

23  A.   Yes, it does.

24  Q.   And what date?

25  A.   January 5th, 1998.

Jury Trial, Vol. II of V

297

1   Q.   And do you see a paragraph -- the first paragraph that
2   begins saying, "Further resolved"?
3   A.   Yes, I do.
4   Q.   All right.  What does that paragraph say?
5   A.        "Further resolved that the sale of a minority
6        share of the corporation was discussed and agreed
7        upon.  To this end, the sale agreement between the
8        corporation and Maxine and Robert Pochmara, husband
9        and wife, dated January 5th, 1998, is hereby annexed
10       to the minutes of this meeting."
11           "And it is --"
12  Q.   All right.  And going down three paragraphs below that,
13  there is another paragraph that begins, "Further resolved."
14  What does that say?
15  A.        "Further resolved that 45 shares of stock,
16       representing 45 percent of the corporation be and
17       the same hereby are issued to Maxine Pochmara and
18       Robert Pochmara, husband and wife, as evidenced on
19       Certificate No. 3."
20           "And it is --"
21  Q.   All right.  Let's go on to the second page of this exhibit,
22  please.  Do you see a listing of corporate officers?
23  A.   Yes, I do.
24  Q.   And who are -- what names are listed for the corporate
25  officers?

Jury Trial, Vol. II of V
298

1  A.   The names listed are Gary L. Wilson as President, Robert

2  Pochmara as Vice President, Sue A. Wilson as Secretary, Sue A.

3  Wilson as Treasurer.

4  Q.   Do you see any reference to a Maxine Pochmara being an

5  officer?

6  A.   I do not.

7  Q.   And what names purport to be signed there?

8  A.   There is a signature above Gary L. Wilson and there is also

9  a signature above Sue A. Wilson.

10  Q.   As your investigation continued, did you obtain and serve

11  various Grand Jury subpoenas to obtain records?

12  A.   I did.

13  Q.   And was one of those Grand Jury subpoenas directed to Huron

14  National Bank?

15  A.   Yes, it was.

16  Q.   And I show you Government's Proposed Exhibit 29.  Do you

17  recognize that?

18  A.   Yes, I do.

19  Q.   That's a fairly thick stack of pages.

20  A.   Yes.

21  Q.   As a group, what are those?

22  A.   These are checks bearing a letterhead of NAPA, W.W. Auto

23  Parts, issued from an account held there, to a Maxine Pochmara.

24       MS. PARKER:  Your Honor, the government offers Exhibit

25  29.

Jury Trial, Vol. II of V
299

1          MR. JACOBS:  No objection.

2          MR. PIAZZA:  No comment, your Honor.

3          THE COURT:  It's received.

4   BY MS. PARKER:

5   Q.    This group of exhibits, what's the earliest date you have?

6   A.    On June 6th of 2005.

7   Q.    And what's the last date?

8   A.    The last date is March 6th of 2009.

9   Q.    Do you have an understanding as to why you don't have checks

10  from before that first date in June, 2005?

11  A.    Yes.  My understanding is the bank doesn't keep them any

12  further back.

13  Q.    All right.  Let's look at some of the checks from this

14  group, please.  Again, you indicated the checks were drawn on the

15  NAPA Auto Parts Store account?

16  A.    Correct.

17  Q.    And this particular one is from June of 2005.  Is that the

18  first one in the set?

19  A.    That's correct.

20  Q.    And it's made payable to whom?

21  A.    Maxine Pochmara.

22  Q.    And in what amount?

23  A.    $460.43.

24  Q.    And have you reviewed this stack of checks?

25  A.    Yes.

Jury Trial, Vol. II of V

300

1  Q.   And is there a recurring basis on which these checks are

2  issued?

3  A.   Yes.

4  Q.   What is that recurring basis or in time interval?

5  A.   They seemed to be issued every week.  Weekly.

6  Q.   And throughout the period from June of 2005 up to when you

7  were unable to obtain further records of such checks.

8  A.   That's correct.

9  Q.   Let's go on to the next one, please.  This is another check

10 from 2005?

11 A.   Correct.

12 Q.   All right.  And again, made payable -- is this a week later?

13 A.   Yes, seven days later, June 3rd, (sic) 2005.

14 Q.   The amount?

15 A.   $460.43.

16 Q.   I'm sorry.  I think I misunderstood you.  I think you said

17 June 3rd.  Was that --

18 A.   June 13th.

19 Q.   Okay.  And the amount?

20 A.   $460.43.

21 Q.   And in your review of these checks, did you notice anything

22 about the amounts?

23 A.   The amounts seemed to stay pretty consistent.

24 Q.   I would like to ask you to flip to the -- near the end of

25 that stack.  And find a Check 3277.

Jury Trial, Vol. II of V

301

1   A.   It's 3277?

2   Q.   Yes.

3   A.   Issued on January 19, 2009?

4   Q.   Correct.

5   A.   Okay.

6   Q.   On that paycheck, again, you said the date was January 19,

7   2009?

8   A.   Correct.

9   Q.   Made payable to Maxine Pochmara?

10  A.   Yes.

11  Q.   What's the amount of that check?

12  A.   $441.60.

13  Q.   And down in the lower corner, do you see a memo?

14  A.   Yes, I do.

15  Q.   What does that memo say?

16  A.   The memo states:  "Pay period, 01/19/2009 -- 01/19/2009."

17  Q.   And are there other checks in this time frame of this

18  collection of checks that have similar memos?

19  A.   Yes.

20  Q.   Next I would like to show you a group of documents marked

21  Government's Proposed Exhibits -- oh, sorry, you're right.  I

22  think I missed one thing.  I'm sorry.

23        I need to go back to Exhibit 25.  Sorry.  You have

24  Exhibit 25 handy?

25  A.   Yes.

Jury Trial, Vol. II of V

302

1   Q.   All right.   That makes some reference earlier to making a

2   follow-up inquiry to the NAPA Auto Parts Store?

3   A.   That's correct.

4   Q.   All right.   And would that be contained in Exhibit 25?

5   A.   Yes.

6   Q.   Could we have it?   Again, that was addressed to whom?

7   A.   Sue Wilson, NAPA Auto Parts, 1095 West 3rd Street, Rogers

8   City, Michigan, 49779.

9   Q.   And it's regarding?

10  A.   Robert Pochmara.

11  Q.   And on this form, you have the same basic information on the

12  first page.

13  A.   Exactly.   It's the same form.

14  Q.   Regarding the request.

15  A.   Same form.

16  Q.   All right.   The second page is somewhat different in its

17  content.   Did you provide any of the handwriting that's on that

18  form?

19  A.   No.

20  Q.   Was that handwriting there when you sent it out?

21  A.   No, it was blank.

22  Q.   And when you got it back, was that when you found that

23  handwriting?

24  A.   Yes.

25  Q.   The first -- there is a box with a check in it and number

Jury Trial, Vol. II of V

303

1  one.  What does that say?

2  A.   Box -- or I'm sorry, No. 1, "Date began employment with you,

3  Jan, day 1, year 1998."

4  Q.   And above that, there is a handwritten, what?

5  A.   Above that is handwritten, "Maxine Pochmara."

6  Q.   And then below the Line 2, there is another handwritten

7  entry which says what?

8  A.   Below Line 2, "Maxine still draws salary."

9  Q.   Below that, in the remarks section, what was written there?

10  A.   In the remarks:

11       "Robert does not, has never, drawn earnings from

12       NAPA/W & W Auto Parts, only Maxine Pochmara does.

13       Robert works on behalf of Maxine Pochmara."

14  Q.   And again, this form is signed with what name?

15  A.   There is a signature in the signature block that states Sue

16  Wilson.

17  Q.   And the date?

18  A.   12/10/08.

19  Q.   All right.  Let's go on to Exhibits 30A through J.  Do you

20  recognize those?

21  A.   Yes, I do.

22  Q.   Are those more documents that you obtained through subpoena?

23  A.   Yes.

24  Q.   And just generically describe those.

25  A.   Generically, these are earnings reports for GW & SW, Inc.

Jury Trial, Vol. II of V

304

1   Q.   And do they cover a certain time period?

2   A.   Yes.

3   Q.   And 30A would be for what time period?

4   A.   Ah, 30A would be for the month ending 12/31 of 2000.

5   Q.   And 30B?

6   A.   Exhibit 30B, the month ending 2/31 of 2001.

7   Q.   And each successive -- each document thereafter would be for

8   another year?

9   A.   Correct.

10  Q.   And on these documents, is there an indication of the

11  earnings paid by GW & SW, Incorporated?

12  A.   Yes.

13       MS. PARKER:  Your Honor, I offer Government's Proposed

14  Exhibit 30A through J.

15       THE COURT:  Any opposition to 30A through J?

16       MR. JACOBS:  I have no objection.

17       MR. PIAZZA:  If I may voir dire.

18  BY MR. PIAZZA:

19  Q.   You don't know who prepared those documents, do you?

20  A.   I -- I do not.

21       MR. PIAZZA:  I would object.  I don't think there is any

22  foundation for this particular document.  He has no idea who even

23  prepared them.

24       THE COURT:  I don't believe that's part of the inquiry

25  at this point.  They were responsive to a subpoena, correct?

Jury Trial, Vol. II of V

305

1        MS. PARKER:  That's correct.

2   BY MS. PARKER:

3   Q.   And you obtained a certificate of authenticity?

4   A.   I did.

5        THE COURT:  Overruled.  We will receive them into

6   evidence.

7   BY MS. PARKER:

8   Q.   All right.  Now, I would like to ask that Exhibit 30A be

9   displayed.  All right.  You indicated this was for the month

10  ending 12/31/00 or 2000.  Is that indicated in the upper

11  left-hand corner?

12  A.   Yes.

13  Q.   And below that, there are set a boxes for different people

14  or sections?

15  A.   Yes, different sections.

16  Q.   The first one is for whom?

17  A.   Wilson, Gary.

18  Q.   And does it list -- oh, excuse me, I should ask -- what type

19  of information does it list for Gary Wilson?

20  A.   The gross pay, gross wages, Social Security withheld,

21  Medicare withheld, federal tax withheld, state tax withheld,

22  advances, and then net pay.

23  Q.   And across from the name Wilson, comma, Gary, do you see a

24  Social Security number?

25  A.   I do.

Jury Trial, Vol. II of V

306

1   Q.   And is there a year-to-date total for net pay?

2   A.   There is.

3   Q.   And in this case, 2000, what was the net total pay?

4   A.   $21,224.82.

5   Q.   The next entry is for whom?

6   A.   Wilson, Sue.

7   Q.   And same type of information?

8   A.   Yes.

9   Q.   Social Security number?

10  A.   Xxx-xx-0127.

11  Q.   You see that on the form across from her name?

12  A.   Yes.

13  Q.   And then a net pay figure for Sue Wilson is what?

14  A.   $5,251.84.

15  Q.   Okay.  Skipping the next name, going to the name below that,

16  what name do you see there?

17  A.   Maxine Poch -- or I'm sorry, Pochmara, Maxine.

18  Q.   Same type of information is entered there?

19  A.   Yes.

20  Q.   Social Security number for her?

21  A.   Yes, her Social Security number is listed as xxx-xx-0934.

22  Q.   And the net pay?

23  A.   Net pay of $19,789.80.

24  Q.   Okay.  Going to the next page of this document, does that

25  appear to have the total for all of the people on the previous

Jury Trial, Vol. II of V

307

1  page?

2  A.   Yes.

3  Q.   Do you see any entries for Robert Pochmara?

4  A.   No.

5  Q.   The next document, 30B, again, this is for the year, what?

6  A.   States at the top left corner, month ending 12/31/01.

7  Q.   And there is the same type of information for Gary Wilson?

8  A.   Yes.

9  Q.   With a net pay of?

10  A.   $21,256.04.

11  Q.   Sue Wilson?

12  A.   $4,848.44.

13  Q.   You see a Maxine Pochmara near the bottom?

14  A.   I do.

15       THE COURT:  Miss Parker, we will be looking for a place

16  to break for the day.

17       MS. PARKER:  Yes, your Honor.

18  BY MS. PARKER:

19  Q.   Net pay there?

20  A.   Net pay for Maxine Pochmara is listed as $19,643.

21  Q.   And if you add in the pay figures for the other names listed

22  on that sheet -- well, I will leave it there.  Never mind.

23       Now, going to the third page, if you add in the figures

24  for the other people on that page and the second page, do you

25  come up with the total net pay that is reflected on the third

1  page of Exhibit 30B?

2  A.   Yes.

3  Q.   All right.  You've gone through these other exhibits, in the

4  30 series?

5  A.   Yes.

6  Q.   They cover each year up to and including 2009?

7  A.   Yes.

8  Q.   For each of those years, is there a similar entry for Maxine

9  Pochmara?

10  A.   Yes.

11  Q.   The amounts may change slightly over time?

12  A.   Yes.

13  Q.   But do you find any entries for Robert Pochmara for any year

14  covered by any of the exhibits in the Exhibit 30 series?

15  A.   I do not.

16        MS. PARKER:  That would be a good place to stop for the

17  moment, your Honor.

18        THE COURT:  Very good.  We appreciate the day that you

19  have invested with us so far.  Anyone have any logistical

20  problems with being here tomorrow morning at 8:30?  The gentleman

21  should be here shortly.

22        Please rise for the jury.

23        (At 1:10 p.m. - jury leaves courtroom)

24        THE COURT:  You're excused from the stand.  Please be

25  seated.

1       We have had a brief discussion at sidebar concerning the

2   scope of the proofs.  We received a fair amount of information

3   related to the transactions between Mr. Pochmara and the, is it

4   Railroad Retirement Pension Board?

5           THE WITNESS:  Railroad Retirement Board, your Honor.

6           THE COURT:  Okay.  Those are proofs that are of

7   relevance to Mr. Pochmara's period of justification for handling

8   the financial affairs that he did in the way that he did.

9       And the discussion that we had at this stage is

10  two-fold, trying to figure out what is relevant and what is not

11  relevant both to the government's case as well as the defense.

12      And I'm also trying to at this stage, as we've talked

13  about, given the time constraints, willing to exercise some

14  authority under FRE 102, to at least eliminate cumulative

15  evidence.  We are now at a point where the Wilsons' involvement

16  with the Railroad Retirement Board investigation has been

17  directly addressed.

18          MS. PARKER:  I'm sorry?  I couldn't --

19          THE COURT:  Has been directly addressed --

20          MS. PARKER:  Okay.  I just couldn't hear you.

21          THE COURT:  -- for the first time.  Can you give me a

22  little bit of an understanding of the way you see the proofs

23  going for the government at this point going forward?

24          MS. PARKER:  Yes, your Honor.  The government would

25  intend to present additional testimony from Mr. Hackett regarding

1  other documents that were obtained through subpoena regarding the

2  Wilsons' business practices versus the reporting to the

3  governmental agencies.

4          We intend to have the -- an employee of the CPA firm for

5  the Wilsons and the business to address some documents that were

6  in their file.

7          There is an IRS person who will explain some of the

8  implications in terms of the reporting to the agency of

9  Maxine's -- earnings by Mr. Pochmara to the agencies involved.

10         There may be, and I will review this in light of the

11 Court's concerns, but a few other local people but I'm not sure

12 until I review it.

13         THE COURT:  Well, how do you view the response -- two

14 responses that I believe Mrs. Wilson was responsible for

15 authoring to the Railroad Retirement Board?  Is it your

16 contention that those documents themselves were fraudulent in

17 terms of the response that they furnished the Railroad Retirement

18 Board?  Or is the tenor of the conspiracy count and reporting

19 count solely limited to the -- your suggested fraud on the Social

20 Security Administration?

21         MS. PARKER:  Well, there is also the IRS component to

22 the conspiracy but --

23         THE COURT:  I understand.

24         MS. PARKER:  -- I think the answer is, there is a

25 fraudulent component to them in and of itself in attempting to

1  characterize the relationship contrary to really what it was.

2      I think there was a suggestion, for example, in opening

3  statements, as I heard it, that somehow in responding to this

4  query, they misunderstood and provided Maxine's information and I

5  think it's -- the document doesn't request anything regarding

6  Maxine.  It requests Robert's earnings and what was attempted to

7  be done in the response was to evade answering the question by

8  trying to rephrase it as, well, this is what we pay Maxine for

9  Robert's work and I think that in itself is fraud and an

10 admission to fraud, essentially.

11     THE COURT:  So they were -- they were correct from your

12 point of view in furnishing a response that reflected Robert's --

13 Robert's salary income but mischaracterized it in the other

14 portions of the response.

15     MS. PARKER:  Well, I think that -- that may be correct.

16 The numbers are correct.  As far as I know, those numbers

17 accurately reflect what they were paying, but they were paying

18 Robert and not Maxine.

19     Furthermore, in November of 2008, they know at that

20 point from reading the letter, that these are disability

21 benefits.  And it continues thereafter.  And their answers change

22 when they become aware of the investigation and try to

23 recharacterize it even somewhat more and I think that's reflected

24 in the second exhibit, Exhibit 25.

25     So am I answering the Court's question?

Jury Trial, Vol. II of V

312

1          THE COURT:  Yes, you are.

2          MS. PARKER:  I wanted to make sure I was doing that.

3          THE COURT:  The additional witnesses that you would

4    anticipate then following the CPA?

5          MS. PARKER:  Well, I still have more to do with Mr.

6    Hackett.

7          THE COURT:  He is not done.

8          MS. PARKER:  No.  I think -- he's not done.  There is

9    the CPA.  There is the accountant -- excuse me, not the

10   accountant.  The IRS revenue agent.  I'm sorry, I don't have my

11   exhibit list -- or I mean witness list handy.

12          As I said before, possibly a couple of the local people

13   but that would pretty much be it, your Honor.

14          THE COURT:  Okay.  I'm trying to understand what is --

15   what facts are contested here?  We've heard a fairly complete

16   outline of the government's proofs.  We've heard a number of the

17   material witnesses.

18          Can you tell me what facts are actually contested here

19   for the jury to resolve in your view?

20          MR. JACOBS:  That we actually had Robert Pochmara

21   working at the NAPA Store and that we -- instead of paying him as

22   an employee, we paid his wife to defraud the government.  That's

23   the dispute, your Honor.  Are we saying -- well, the Court heard

24   my opening.

25          THE COURT:  Let's stop, let's stop.  Because it seems to

Jury Trial, Vol. II of V

313

1  me that the document that you furnished to the Railroad

2  Retirement Board conceded that Mr. Wilson and Mr. Pochmara were

3  essentially laboring for the most part as equal entrepreneurs.

4         What was the language Miss Wilson used in the 2008

5  response?

6         MR. JACOBS:  Co-managers.

7         THE COURT:  Do you have the 2008 document there?

8         MS. PARKER:  Yes, your Honor.

9         THE COURT:  It would be 24 --

10        MS. PARKER:  It's 24A.  I think you actually mean --

11        THE COURT:  B.

12        MS. PARKER:  -- 24B, says:

13        "Gary Wilson and Robert Pochmara are store

14     managers working equal hours based on shares owned,

15        including in the annual meeting of shareholders and

16        board of directors."

17        THE COURT:  Working equal hours.  Now, that's -- that's

18  Mrs. Wilson's language.  So is Mr. Wilson contesting Mrs.

19  Wilson's representations to the Railroad Retirement Board?  Or

20  is the fact that Mr. Pochmara was working equal hours

21  contested?  And on what basis?  I mean, we've had a number of

22  witnesses traipse --

23        MR. JACOBS:  Well, I know what my client's testimony is

24  going to be, your Honor, and I don't feel there is a need for me

25  to answer that right now in front of Miss Parker.  But he does

Jury Trial, Vol. II of V

314

1  have a response to that.

2         THE COURT:  Well, but I need to make determinations

3  about what is relevant and not relevant, what's -- what evidence

4  is admissible and what evidence is becoming cumulative.  I'm

5  trying to figure out where the issues are for the trier of

6  fact.

7         MR. JACOBS:  My client's testimony -- to answer the

8  Court's inquiry, under protest, my client would respond that he

9  received that letter 24 at work, that he came home, that he

10  talked to his wife about it and they thought that they were

11  inquiring regarding Maxine's income and they put down Maxine and

12  that's why the additional documents are attached.  That Maxine

13  was paid based on her 45 percent share of the business and not

14  based on Bob's working X number of hours a week.

15         THE COURT:  Now, the --

16         MR. JACOBS:  I know what the documents say.

17         THE COURT:  Since the '30s, there's been a doctrine as a

18  part of the Internal Revenue Code, the interpretation of a

19  Supreme Court decision referring to the assignment of income

20  doctrine.

21         It rose out of a case where a, as I recall, husband and

22  wife, filed separately.  Wife had a lower income tax bracket than

23  the husband.  So it was assigned, the income, over to the wife

24  and reported it at the lower -- lower bracket.  And the United

25  States Supreme Court said you cannot assign someone else's income

1  as described in the Internal Revenue Code, Section 61.

2          MR. JACOBS:  And, your Honor, even though the law may

3  say that my client cannot do what he asserted he did, it still

4  goes to his willfulness and his mens rea.  It's still an element

5  of the offense.

6          THE COURT:  Well, you made two points.  The point is,

7  apparently, you do contest the fact that Mr. Pochmara labored

8  equally to Mr. Wilson or approximately equally.  Mrs. Wilson's

9  response was inaccurate.

10         MR. JACOBS:  Yes.

11         THE COURT:  And with respect to the second point, the

12 characterization of the income -- any income, to Mr. Pochmara is

13 also inaccurate, that what was disclosed in that document,

14 notwithstanding the first page, was Maxine Pochmara's income.

15         MR. JACOBS:  Yes.  Yes, sir.  And it's the correct

16 numbers that were actually reported for Maxine.

17         THE COURT:  Notwithstanding our discussion about the

18 assignment of income doctrine citation of the Social Security

19 statute as well as Section 61 of the Internal Revenue Code.

20         All right.  That gives me a little bit of guidance, I

21 guess, as we go forward.

22         I have a set of instructions -- you were rising to your

23 feet.  Do you have a point to make?

24         MS. PARKER:  Well, I do, your Honor, and that's where --

25 I understand the Court's concern about cumulative information.

Jury Trial, Vol. II of V

316

1   And we don't wish to waste the Court's time.

2           On the other hand, I could literally call dozens of

3   people -- I have no intent to -- but that would say that Robert

4   Pochmara was there working.  Mrs. Pochmara was not.  And I

5   believe that as long as they are going to contest that, that we

6   should be allowed to offer some of it.  And I know we've offered

7   some but I think that there are other people that we've prepared

8   to do that with.

9           THE COURT:  But there is a difference of opinion between

10  the two defendants.  Mrs. Wilson's position will be, that her --

11  the document that she furnished the Railroad Retirement Board

12  was fair and accurate.  It wasn't fraudulent and that is that

13  Robert Pochmara worked as an equal participant along with Gary

14  Wilson.

15          Mr. Wilson disputes that.  He says she is wrong, she

16  mischaracterized it.  That the information she furnished was

17  inaccurate.

18          So I don't know how -- and I appreciate your point at

19  this stage.  We are not at a point where we can easily contract

20  proofs.

21          MS. PARKER:  Well, that's my thing.  I mean, I don't

22  want to bring people in here, keep them in a hotel overnight so

23  they are ready to be on the stand at 8:30 in the morning only to

24  have the Court say this isn't an issue, but I hear it being an

25  issue.

Jury Trial, Vol. II of V

317

1          THE COURT:  It is an issue.  They've told us it's an

2     issue.  I don't quite understand it but it is an issue and so we

3     do have a jury-submissible question, I guess, on the question and

4     we will continue to entertain witnesses.

5          We will see you in the morning.

6          MR. JACOBS:  Yes, sir.

7          (At 1:40 p.m. - proceedings recessed)

8                              *****

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Trial, Vol. II of V

318

1                  *CERTIFICATE OF COURT REPORTER*

2

3

4            I, PEG L. GOODRICH, Official Court Reporter

5     in and for the United States District Court, Eastern

6     District of Michigan, appointed pursuant to the

7     provisions of Title 28, United States Code, Section

8     753, do hereby certify that the foregoing proceedings

9     held before the HONORABLE THOMAS L. LUDINGTON, District

10    Court Judge, is a true and correct copy of the transcript

11    originally filed with the Clerk of the Court on November 12,

12    2013, and incorporating redactions of personal identifiers

13    requested by the following attorneys of record or parties:

14    Michael Skinner on behalf of Gary and Sue Wilson, in

15    accordance with Judicial Conference policy.  Redacted

16    characters appear as an "x" in the transcript.

17

18

19

20                        s/Peg L. Goodrich
21                        Peg L. Goodrich, CSR, RPR, RMR
                          Federal Official Court Reporter
22                        United States District Court
                          Eastern District of Michigan
23

24

25