Jury Trial, Vol. III of V

319

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


UNITED STATES OF AMERICA,

          Plaintiff,

v.                              File No. 12-20607

GARY L. WILSON and SUE A. WILSON,

          Defendants.

_____/

REDACTED TRANSCRIPT

JURY TRIAL

VOLUME III OF V




BEFORE THE HONORABLE THOMAS L. LUDINGTON

United States District Judge

United States Post Office Building

1000 Washington Avenue

Bay City, Michigan  48708

Thursday, May 23, 2013

Jury Trial, Vol. III of V

320

APPEARANCES:

For the Plaintiff:          JANET L. PARKER (P34931)
                            U.S. Attorney's Office
                            Eastern District of Michigan
                            101 1st Street
                            Suite 200
                            Bay City, Michigan  48708
                            Phone: (989) 895-5712
                            janet.parker2@usdoj.gov


                            ANCA POP (P70032)
                            U.S. Attorney's Office
                            Eastern District of Michigan
                            101 1st Street
                            Suite 200
                            Bay City, Michigan  48708
                            Phone: (989) 895-5712
                            anca.pop@usdoj.gov



For Defendant Gary
        Wilson:            STEVENS J. JACOBS (P37740)
                            Jacobs law Office
                            45 N. Tuscola Road
                            Bay City, Michigan   48708
                            Phone:  (989) 892-8611
                            jacobslawoffice@sbcglobal.net


For Defendant Sue
        Wilson:            JAMES F. PIAZZA (P30172)
                            803 Court Street
                            Saginaw, Michigan  48602
                            Phone:  (989) 791-1813
                            jfpia@aol.com


To Obtain a Certified Transcript:

PEG L. GOODRICH, CSR-0258, RMR
Federal Official Court Reporter
www.transcriptorders.com

Jury Trial, Vol. III of V

1                    T A B L E   O F   C O N T E N T S

                                                              PAGE
2
    WITNESSES:
3
4       DAWN KIELISZEWSKI (Sworn)                             329
            Direct Examination by Ms. Parker                  329
            Cross-Examination by Mr. Jacobs                   394
5           Cross-Examination by Mr. Piazza                   416
            Redirect Examination by Ms. Parker               425
6
        MICHAEL WISNIEWSKI (Sworn)                            430
7           Direct Examination by Ms. Parker                  431
            Cross-Examination by Mr. Jacobs                   449
8           Cross-Examination by Mr. Piazza                   456
            Redirect Examination by Ms. Parker               458
9           Recross-Examination by Mr. Jacobs                 460
            Recross-Examination by Mr. Piazza                 460
10
        STEVE PORTER (Sworn)                                  461
11          Direct Examination by Ms. Pop                     461
            Cross-Examination by Mr. Jacobs                   467
12          Cross-Examination by Mr. Piazza                   468

13      STANLEY KRAJNIK (Sworn)                               469
            Direct Examination by Ms. Parker                  469
14          Cross-Examination by Mr. Jacobs                   473

15      MICHAEL KROLL (Sworn)                                 477
            Direct Examination by Ms. Pop                     477
16          Cross-Examination by Mr. Jacobs                   482

17


18  CERTIFICATE OF COURT REPORTER:                            488

19


20
    EXHIBITS:                                      IDENTIFIED RECEIVED
21
    GX 41B-F - first page bank statements              386        387
22  GX  50   - 1998 corporate return                   378        378
    GX  51   - 1999 corporate return                   378        378
23  GX  52   - 2000 corporate return                   378        378
    GX  53   - 2001 corporate return                   378        378
24  GX  54   - 2002 corporate return                   378        378
    GX  55   - 2003 corporate return                   378        378
25  GX  56   - 2004 corporate return                   378        378

Jury Trial, Vol. III of V

322

1              T A B L E   O F   C O N T E N T S (Continued)

2    <u>EXHIBITS:</u>                                    <u>IDENTIFIED</u> <u>RECEIVED</u>

3    GX 57    - 2005 corporate return                    343        345
     GX 58    - 2005 Michigan SBT return                 343        345
4    GX 59    - 2005 Michigan SBT shareholders           343        345
     GX 60A-B - 2005 W-2s                                343        345
5    GX 61A-D - 2006 Michigan unemployment ins.          343        345
     GX 62    - GW & SW payroll journal                  352        353
6    GX 63    - 2006 corporate return                    354        355
     GX 64    - 2006 Michigan SBT                        354        355
7    GX 65    - 2006 Michigan SBT shareholders           354        355
     GX 66A-D - 2006 quarterly tax returns               354        355
8    GX 67    - GW & SW payroll summary                  363        366
     GX 68A-B - 2006 W-2s                                354        355
9    GX 69    - statement correction Form 941C           354        355
     GX 70    - 2007 corporate return                    368        369
10   GX 71    - 2007 Michigan SBT                        368        369
     GX 72    - 2007 Michigan SBT shareholders           368        369
11   GX 73A-D - 2007 Michigan unemployment ins.          368        369
     GX 74A-B - 2007 W-2s                                368        369
12   GX 80    - client note re: 1Q06                     360        362
     GX 81    - 2008 corporate return                    375        376
13   GX 82A-D - 2008 Michigan unemployment ins.          375        376
     GX 83    - 2008 Michigan SBT                        375        376
14   GX 84A-C - 2008 W-2s                                375        376
     GX 85    - Federated Insurance document             371        374
15   GX 86    - 2009 corporate return                    375        377
     GX 87    - 2009 Michigan SBT shareholders           375        377
16   GX 88A-B - 2009 Michigan unemployment ins.          375        377
     GX 89A-C - 2009 W-2s                                375        377
17   GX 100   - 1998 return information                  435        438
     GX 101   - 1999 return information                  435        438
18   GX 102   - 2000 return information                  435        438
     GX 103   - 2001 return information                  435        438
19   GX 104   - 2002 return information                  435        438
     GX 105   - 2003 return information                  435        438
20   GX 106   - 2004 return information                  435        438
     GX 107   - 2005 federal income tax return           384        384
21   GX 108   - 2006 federal income tax return           384        384
     GX 109   - 2007 federal income tax return           384        384
22   GX 110   - 2008 federal income tax return           384        384
     GX 111   - 2009 federal income tax return           384        384
23   GX 120   - 1998 tax return information              446        446
     GX 120A  - 1998 Federal return                      378        381
24   GX 121   - 1999 tax return information              446        446
     GX 122   - 2000 tax return information              446        446
25

Jury Trial, Vol. III of V

323

1          T A B L E   O F   C O N T E N T S (Continued)

2    EXHIBITS:                                    IDENTIFIED RECEIVED

3    GX 123   - 2001 tax return information          446        446
     GX 124   - 2002 tax return information          446        446
4    GX 125   - 2003 tax return information          446        446
     GX 126   - 2004 tax return information          446        446
5    GX 140   - 1998 tax return information          443        445
     GX 140A  - 1998 Federal return                  378        383
6    GX 141   - 1999 tax return information          443        445
     GX 142   - 2000 tax return information          443        445
7    GX 143   - 2001 tax return information          443        445
     GX 144   - 2002 tax return information          443        445
8    GX 145   - 2003 tax return information          443        445

9

10   DX 202   - 1998 sales agreement                 401        404
     DX 203   - 1998 SBT shareholders                406        405
11   DX 204   - invoice 6/22/99                      407        408
     DX 205   - NAPA W.W. Auto Parts check           410        ---
12   DX 206   - 2009 sale of stock                   413        ---

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Trial, Vol. III of V

324

1          Bay City, Michigan

2          Thursday, May 23, 2013

3          At 8:34 a.m.

4      (Court, counsel and defendants present; out of the

5      presence of the jury)

6      THE COURT:  Good morning.

7      MS. PARKER:  Good morning.

8      MR. JACOBS:  Good morning.

9      THE COURT:  Mr. Crowder indicated you had one matter you

10  wanted to take up, Miss Parker.

11      MS. PARKER:  Yes, your Honor.  Yesterday, when we were

12  preparing witnesses for testimony today, two of the witnesses

13  indicated that after they received their subpoenas, they had

14  contacts with Mr. Wilson that essentially are intimidating or

15  somewhat threatening.

16      One of the witnesses, a Mr. Krajnik --  I'm trying to do

17  it right -- indicated that Mr. Wilson told him that people who

18  testified against him would pay a high price.  And I believe Miss

19  Pop interviewed another witness, Mr. Porter, and the indication

20  was that someone who testified against him would be sued for

21  defamation of character.

22      And I understand that the possibility of pursuing such a

23  suit of that nature is legally not very sound.  However, this

24  witness is aware of the defendant's litigious propensities.  He

25  has a reputation in the community for that and he takes it very

Jury Trial, Vol. III of V

1   seriously and he feels threatened by it because he doesn't want

2   to lose the product of his life's work.  And in interviewing him,

3   the part that I was involved in, it was a repeat question, I

4   can't afford an attorney, how am I going to deal with this, what

5   am I going to do, you know, that kind of thing.

6          And I believe that these are matters that we should be

7   able to bring out on direct examination and that they are

8   indicative of the defendant's consciousness of guilt.

9          I did place a conference call to Mr. Jacobs last night

10  and with Miss Pop to relay to him this information so that we

11  would be in compliance with our obligations but I think I want

12  the Court to be aware of this and with the Court's permission,

13  to inquire into these areas in our examination of these

14  witnesses.

15         THE COURT:  Thank you.

16         MR. JACOBS:  Response, your Honor?

17         THE COURT:  Yes.

18         MR. JACOBS:  I did in fact receive a telephone call

19  from Miss Parker after five o'clock.  Maybe I came to the wrong

20  assertion.  I thought she was going to try to utilize this

21  information to revoke my client's bond.

22         It is true and we would acknowledge that -- or at least

23  my client shared with me recently that at least one of these

24  individuals, there was a conversation, and he did talk about

25  suing people for defamation of character.  That did in fact

1  happen.  It was when he was delivering a part.  That fact in and

2  of itself isn't -- isn't relevant.

3        If we want to get into whether my guy -- my client has a

4  litigious background, I was also told that when he fell off a

5  roof, he sued his father and they were aware of his litigious

6  background.  My client asserts that's not true.  He did not sue

7  his father.  He does not have a litigious background.  And I

8  think it's opening up a can of worms that we don't need to go to,

9  your Honor.

10       THE COURT:  Yeah, we are not at a point where certainly

11  in our proofs right now, where it's immediately relevant.

12       Do you agree?

13       MS. PARKER:  I do agree, your Honor, but I thought it

14  was appropriate to bring this matter to the Court's attention.

15  I -- I would add that I probably -- perhaps the lawsuit was

16  probably against the father's homeowners insurance.  The roof

17  that I'm told about, was his father's roof he fell off and he

18  probably sued the homeowners insurance.  He also had a litigation

19  against a medical doctor.

20       These are things that are known in the community to the

21  witness who was told that he would be sued, too, and I think in

22  that context -- we don't need to litigate all those issues but I

23  think in the context where he took this seriously and is deeply

24  concerned about it, that's relevant, and I think the defendant

25  intended that consequence to the witness.  And we do expect to

Jury Trial, Vol. III of V

327

1    get to those witnesses today.

2            MR. JACOBS:  I would object, your Honor.  I don't think

3    it is in fact relevant and if -- if they are allowed to go into

4    that, then I would have to cross-examine them regarding that,

5    present extrinsic evidence regarding my client not suing his

6    father and --

7            THE COURT:  We won't get as far as the suit with dad.

8    We may provide her some latitude to the extent that it has an

9    impact on the witness's credibility and explanation concerning

10   the immediate communication that he had with your client.  That,

11   I think, is fair and appropriate and you will have a chance to

12   cross-examine on it.

13           MR. JACOBS:  I understand the Court's ruling.

14           THE COURT:  If we could have the jury, please.

15           MS. PARKER:  Your Honor, if there is no objection by the

16   Court and counsel, I would propose to interrupt the testimony of

17   the agent and proceed to take some other witnesses' testimony and

18   then bring the agent back on later.

19           THE COURT:  For the witnesses' schedule?

20           MS. PARKER:  Yes, and -- well, we have another witness

21   who is an IRS officer whose testimony -- the foundation needs to

22   come from -- in part from the person from the accounting office.

23   He is on sequester furlough tomorrow so I've got to get him on

24   today.  So for that sequence of events, I'm trying to structure

25   things.

Jury Trial, Vol. III of V

328

1        THE COURT:  Got it.  I assume there is no objection from

2   the --

3        MR. JACOBS:  Well, your Honor, they -- they've heard

4   about 24A, B, C and D and these other checks that were issued,

5   aren't as -- aren't as -- there isn't a greater need to

6   cross-examine the witness regarding that.

7        But Mr. Piazza and I predicted this last night when we

8   left, that they are going to put Mr. Hackett on, get part of the

9   direct examination on and pull him off and not give us an

10  opportunity to cross-examine him.  And yes, we do object.

11       MS. PARKER:  If they object and want to cross-examine on

12  the matters already covered, that's fine.  We would still recall

13  him at a later time to complete his direct examination and then

14  they can reopen cross, if that's the preference.

15       MR. PIAZZA:  Your Honor, my problem is the fact that,

16  for example, 24A was read in part to the jury as of yesterday.

17  I'm not going to be able to cross-examine this witness relating

18  to the other paragraphs of 24A or B until sometime later.

19       However, it is the Court's discretion, the Court can

20  allow the prosecution to take the witnesses out of order.  I

21  would just as soon do the cross-examination all at one time with

22  all the exhibits.

23       THE COURT:  In that event, I understand your point.  We

24  will proceed to the additional witnesses and then return.

25       (At 8:41 a.m. - jury enters courtroom)

329

1          THE COURT:  Good morning.

2          THE JURY:  Good morning.

3          THE COURT:  Please be seated.  In order to assist a

4    number of witnesses who've got other scheduling issues, the

5    prosecution has asked to take a couple of witnesses out of the

6    original order and begin with them today interrupting the agent's

7    testimony.  The defense has agreed to that approach so the agent

8    will be recalled later and we will be entertaining our new

9    witness.

10          If you could raise your right hand.

11          Do you solemnly swear that the testimony you are about

12   to provide will be the truth, the whole truth and nothing but the

13   truth so help you God?

14          THE WITNESS:  I do.

15          THE COURT:  The witness seat is right over there, if you

16   could have a seat.

17          THE WITNESS:  The hot seat, right?

18          THE COURT:  Yes, ma'am.

19                    DAWN KIELISZEWSKI

20   Having first been duly sworn at 8:42 a.m., testified as follows:

21                    DIRECT EXAMINATION

22   BY MS. PARKER:

23   Q.   Good morning.  Would you state your name and spell it for us

24   all, please?

25   A.   That will be understandable.  Dawn Michelle Kieliszewski,

Jury Trial, Vol. III of V

330

1  K-I-E-L-I-S-Z-E-W-S-K-I.

2  Q.   Where are you from?

3  A.   Originally?  Or where do I live now?

4  Q.   These days.

5  A.   These days, Rogers City, Michigan.

6  Q.   How long have you been there?

7  A.   1997, so 15 years.

8  Q.   And how are you employed?

9  A.   I am employed by J. W. Kieliszewski, CPA.

10  Q.   And what are your duties -- well, let me ask you this first.

11  How long have you been employed in that CPA firm?

12  A.   Full-time, part-time?

13  Q.   In any capacity.

14  A.   Very part-time, from 1995.  Full-time only, part-time most

15  of the year, ever since.

16  Q.   And are you basically married to Jerome -- I'm going to

17  screw it up -- Kieliszewski?

18  A.   Kieliszewski, yes.

19  Q.   And he is basically the CPA in that CPA firm.

20  A.   It's a one-man show, yeah.

21  Q.   All right.  Well, you have other people, including

22  yourselves.

23  A.   Yes.

24  Q.   And what are your duties?

25  A.   I -- they vary during the year.

Jury Trial, Vol. III of V

331

1  Q.   All right.  On a day-to-day basis, when it's not the peak
2  tax crunch time, what are your duties?
3  A.   Filing, typing.  I do do some general ledger work as well.
4  Q.   What does general ledger work mean?
5  A.   That would be for companies to take their -- one of the
6  services our office provides is to provide financial statements
7  so that they can take them to a bank if they wanted to get a loan
8  or something like that.  So we take their bank records or any
9  checks, check stubs, in some cases, depending on the client, what
10 it is, and we will put that into our computers and generate forms
11 so that they can take them to a bank or something.
12 Q.   So, also, during the tax period, are you involved in that
13 sort of activity?
14 A.   Yes.
15 Q.   And what do you do with regards to the taxes?
16 A.   I'm usually, again, taking basic input.  Like if it's a new
17 client, I would put in, like, maybe their Social Security number,
18 their -- I would take a look at the previously-filed tax return
19 and put that information in.  If there is a W-2, I might go to
20 the box in my program that says where do you put this information
21 and put that stuff in.  I will put all -- try to get some
22 information together for my husband so that he can finish the
23 returns.
24 Q.   Okay.  And you said you work with various businesses.  Are
25 you familiar with GW & SW, Incorporated?

Jury Trial, Vol. III of V

332

1   A.   I am.

2   Q.   Is that one of the clients of the firm?

3   A.   It is.

4   Q.   And have you personally done work on behalf of that

5   business?

6   A.   I have.

7   Q.   And other people in your firm?

8   A.   Yes.

9   Q.   At one time, was Sue Wilson employed in the firm?

10   A.   She was.

11   Q.   All right.  Do you see her present in the courtroom today?

12   A.   I do.

13   Q.   Would you point to her and describe what she is wearing?

14   A.   She has on, looks like gray pants and a black sweater and a

15   patterned shirt.

16        MS. PARKER:  Your Honor, may the record reflect that the

17   witness has identified Sue Wilson?

18        THE COURT:  The witness has identified Mrs. Wilson.

19   BY MS. PARKER:

20   Q.   And do you also know Gary Wilson?

21   A.   I do.

22   Q.   And again, do you see him present in the courtroom today?

23   A.   I do.

24   Q.   And would you point to him and describe what he is wearing?

25   A.   I don't know what color you would call it, brown,

Jury Trial, Vol. III of V

1  olive-colored suit and green shirt.

2         MS. PARKER:  Your Honor, again, may the record reflect

3  that the witness has identified Gary Wilson?

4         THE COURT:  She has.

5  BY MS. PARKER:

6  Q.   You described a little bit of what you did in terms of

7  general ledger work.  Did you perform that kind of services for

8  the Wilsons?

9  A.   I have.

10 Q.   And specifically with regards to the Wilsons and GW & SW,

11 Incorporated, what type of work did you do for that entity?

12 A.   I generally receive a packet of information, it's about that

13 thick, of a bunch of print-offs --

14 Q.   Wait a minute, excuse me.  How thick?

15 A.   So, yeah.  (Indicating)

16 Q.   So later on, when we try to figure out how far apart your --

17 A.   Oh, I'm -- I'm a terrible judge so I don't know how big that

18 would be, two inches, three inches?  I really have no idea.

19        MR. PIAZZA:  I will stipulate to about four inches, I

20 think.

21        THE WITNESS:  All right.  I have no clue.

22        MS. PARKER:  That would be consistent with my estimate.

23 Thank you, counsel.

24        THE WITNESS:  Okay.

25 BY MS. PARKER:

Jury Trial, Vol. III of V

334

1  Q.   All right.  About the breadth of your index finger to your

2  thumb, is that a fair estimate?

3  A.   Right, right.

4  Q.   All right.  You would take records stacked about that high.

5  What kind of records?

6  A.   Most of them are print-offs from the computers at the store,

7  like their -- their sales tapes or whatever, those types of

8  records that the computer generates.  There are -- there's

9  usually bank statements that I can reconcile the bank records.

10 There's usually -- she does a spreadsheet of the sales every day

11 so that it totals down so I can make sure that everything is

12 totaling up with what she thinks there is and what there is in

13 the bank and the sales.

14 Q.   And the "she" in your answer is who?

15 A.   Sue Wilson.

16 Q.   All right.  Is she the person who would deliver the records

17 to you?

18 A.   Not usually, no.

19 Q.   Okay.  Who would deliver the records to you?

20 A.   Usually, Gary Wilson.

21 Q.   All right.  And then why in your answer did you refer to

22 "she"?

23 A.   Because -- I guess there was no reason.

24 Q.   Well, let me ask you this.  When we discussed your

25 testimony, you indicated if there was any failure of things to

Jury Trial, Vol. III of V

335

1  match up, you would usually go back and talk to Sue Wilson, is

2  that correct?

3  A.    Sometimes Sue, sometimes Gary.

4  Q.    All right.  And why would you sometimes talk to Sue?

5  A.    Sue was, as near as I can tell, the one who was usually

6  keeping the check register.  So if it was a question on that type

7  of thing, I would ask Sue.  If it was a question on a print-off

8  from a sale at the store or something, I would usually ask Gary.

9  Q.    Okay.  So basically, they were both involved in the books

10  and records of the business.

11  A.    Correct.

12  Q.    And you talked about the checks written for the business.

13  Did you have a sense of who was writing most of the checks?

14          MR. PIAZZA:  Well, objection to that.  You have a sense,

15  that calls for a conclusion.  It would be speculation on the part

16  of this witness.

17          THE COURT:  It could be based on her personal knowledge.

18  BY MS. PARKER:

19  Q.    All right.

20  A.    To the best of my knowledge, Sue was probably writing most

21  of the checks.

22  Q.    You saw some of the checks from the business.

23  A.    I saw stubs but I didn't see checks themselves.

24  Q.    All right.  And why do you think Sue was writing most of the

25  checks?

Jury Trial, Vol. III of V

336

1   A.   Because they were computer -- most of them are

2   computer-generated to the best of my knowledge.  The stubs that I

3   saw were usually computer-generated and since I think she runs

4   that portion of the computer -- again, that's guessing on my

5   part.

6   Q.   All right.

7             MR. PIAZZA:  And I will ask that the last answer be

8   struck.  She is guessing, you know, as to her answer as to who

9   was responsible.  So --

10            THE COURT:  Respectfully, she has provided two

11  foundational facts explaining the fact that it is a conclusion

12  she is drawing but that it is based on those two facts.

13            I will overrule the objection.

14  BY MS. PARKER:

15  Q.   Did you receive daily reports?

16  A.   Daily reports?

17  Q.   Yes.

18  A.   In that stack of papers, there would be reports every day,

19  yes.

20  Q.   Okay.  And you indicated you often didn't see the actual

21  checks, you would see a check register.

22  A.   Correct.

23  Q.   And if there were questions regarding balancing the check,

24  who would you address those questions to?

25  A.   I don't recall there was a question of balancing checks at

1  all.

2  Q.   Or entries.

3  A.   If I had a question about -- I can give an example.  Say

4  it's something on a credit card and some of it was for supplies

5  and some of it was for cost of goods sold or something like that

6  and I didn't know the breakdown, I would ask Sue usually for

7  something like that.

8  Q.   And did you receive -- when you said you received

9  computerized records, would you describe what those were like?

10  A.   They are typical print-offs from a computer.  I mean, you

11  can kind of tell from the print that it's from a computer.  I

12  don't --

13  Q.   Well, what type of information would be on those print-outs?

14  A.   The daily sales, checks that they would have received on

15  accounts for their receivables, how much of the sales were

16  taxable or non-taxable so that we could do the monthly reports to

17  the State of Michigan.

18  Q.   Did you also receive information regarding payroll for the

19  people working at GW & SW, Incorporated?

20  A.   Yes.

21  Q.   Okay.  And can you describe what you would do with that

22  information?

23  A.   Like any other checks, I would input them into the computer.

24  Q.   For what purpose would you input payroll check information?

25  A.   Well, to balance the checkbook, of course, but also so that

Jury Trial, Vol. III of V

338

1  the appropriate taxes could be then sent on to the State of
2  Michigan or to the federal government or whatever payroll taxes
3  were needed for the company.
4  Q.   That was part of the service you provided, was assisting in
5  the preparation of the tax returns and providing tax information
6  regarding withholdings?
7  A.   I suppose.
8  Q.   Why do you say you suppose?
9  A.   I -- that's a big -- to say I prepared the tax returns, I
10 don't know if I prepared tax returns but --
11 Q.   Okay.  Let me back up here.  With regards specifically to
12 payroll, you indicated there was some reporting requirements.
13 A.   Yes.
14 Q.   What was your firm's involvement in that process?
15 A.   We would help the client prepare those returns.
16 Q.   Okay.  And would you help compile the information that was
17 supplied to you by the client, in this case, Gary and Sue Wilson?
18 A.   Yes.
19 Q.   And as part of that, on the payroll information, were you
20 involved in the preparation of W-2s?
21 A.   Yes.
22 Q.   Explain what your firm does with regards to W-2s.
23 A.   Same situation.  We input the checks as they come in
24 throughout the year and at the end of the year, our computer,
25 basically, gives us the reports.  We compare things to make sure

Jury Trial, Vol. III of V

339

1   all of the reports are lining up.  Sometimes, they are a center

2   or two off and you have to do adjustments, you know, those kinds

3   of things.  And then the computer generates the W-2s.  We then

4   follow up and give them to the clients.

5   Q.   All right.  And the W-2s then, are they printed off at your

6   firm?

7   A.   Yes.

8   Q.   All right.  But you give those W-2s back to the Wilsons to

9   use to give to their employees and for their own tax returns?

10   A.   The Wilsons', sometimes, we will keep in our office because

11   we also happen to do their personal tax returns on a regular

12   basis.  The rest of the clients that we don't -- the rest of

13   their employees that we don't do that for on a regular basis,

14   yes, we give those to the client.

15   Q.   And in preparing the W-2s, do you rely on the information

16   that's provided to you by the Wilsons?

17   A.   Yes.

18   Q.   As far as the preparation of tax returns, you indicated you

19   prepared tax returns for the Wilsons.  Did you also prepare tax

20   returns for GW & SW, Incorporated?

21   A.   Our firm does, yes.

22   Q.   Okay.  I'm sorry.  Not you necessarily personally but part

23   of your firm's efforts are in preparing those tax returns.

24   A.   Yes.

25   Q.   All right.  Is there information that is compiled relative

Jury Trial, Vol. III of V

340

1  to the earnings and withholdings for employees that is also
2  submitted to the IRS and the Social Security Administration?
3  A.   Are you referring to the W-2s themselves?
4  Q.   Yes.  Is that information to be transmitted to the IRS and
5  Social Security?
6  A.   Yes.
7  Q.   And separate from giving the W-2s to the Wilsons to give to
8  their employees, how does that information get to the IRS and the
9  Social Security Administration?
10 A.   When the computer generates W-2s, there are several --
11 you've probably seen them when you've had them when you've
12 worked.  There are three or four copies, usually, of a W-2.  One
13 goes -- in the old days, when you mailed everything in, one would
14 go to the federal government, one would go to the state
15 government, that type of thing.
16         And then there is also a copy that's kind of a special
17 kind because it's a pink one instead of the usual black one that
18 we're familiar with, a pink one with a cover sheet showing the
19 totals of all of the employees for the company, gets sent -- are
20 supposed to be sent to the Social Security Administration.
21 Q.   And also, to the IRS?
22 A.   Well, it's -- they are interrelated.  The information goes
23 together.
24 Q.   Okay.  And do you submit those forms directly yourself or do
25 you give those to your customers?

1 A.   We give those to the customers with instructions on how to

2 file them.

3 Q.   What kind of instructions?

4 A.   It's -- we've got a standard form that we use that says,

5 please review these, if everything is okay, sign and date the

6 cover sheet where indicated and mail in this envelope by such and

7 such a date.

8 Q.   So the client ultimately submits that information to the

9 government.

10 A.   Yes.

11 Q.   Are you also involved in preparing the state reports for the

12 business of GW & SW?  And again, you, referring to the firm.

13 A.   By state, I'm assuming you're meaning payroll type of state

14 returns?

15 Q.   There are actually a couple different things.  You have

16 annual income tax returns, correct?

17 A.   Yes, those are -- yes.

18 Q.   And also quarterly information that needs to be provided?

19 A.   For payroll type of purposes, yes.

20 Q.   So what is -- what kind of information is supplied in those

21 quarterly returns?

22 A.   In the quarterly forms, they've changed it fairly recently.

23 Before --

24 Q.   All right.  I'm going to ask you -- I'm sorry to interrupt

25 you here, but we're most concerned about a period of up to 2009

342

1   so --

2   A.   Okay.

3   Q.   -- during that time period.

4   A.   During that time period, there were two forms that were

5   required to be filed for payroll to the State of Michigan.  I

6   know them -- I cannot remember the names of them.  I just

7   remember the numbers of them.  There was a 1017 and a 1020.

8         And one of them would provide, of course, the employer's

9   name and I.D. numbers and all that kind of stuff and it would

10  show the total taxable wages for the quarter and then it would

11  show something called excess wages.  There are some wages that

12  aren't considered part of that -- that aren't taxed -- excuse

13  me -- aren't taxed, or, let's say it's like the first $8,000 or

14  the first $9,000, depending on the year of the wages that are

15  taxable to the State of Michigan.

16        So it will take the part that isn't taxable for that

17  quarter off and give you a net and then there is a percentage

18  which is provided by the State of Michigan on how much -- and

19  each employer is different -- how much their rate is for the year

20  for unemployment.  And then it comes up with a total.

21  Q.   Okay.  All right.  And at some time -- sometime ago, did you

22  and your firm comply with a Grand Jury subpoena for records?

23  A.   I'm assuming, yes.

24  Q.   All right.  Well, let me ask you this.  You remember you and

25  your husband delivered these boxes --

Jury Trial, Vol. III of V

343

1  A.   Yes.

2  Q.   -- to the U.S. Attorney's Office?

3  A.   Yes.

4  Q.   And that was in response --

5  A.   I'm going to assume those were the boxes we brought down,

6  yes.

7  Q.   Well, if there becomes a big question about that, we will

8  give you a closer look.  But you remember dropping off records

9  and you signed a certificate of authenticity.

10  A.   I probably did.

11  Q.   Do you have any doubt about that?

12  A.   I don't remember signing anything but if you say -- I

13  remember Jerry was carrying some things and you were carrying

14  some things.  I believe I was sitting in the car for the most

15  part.  I may have signed the paper while he was carrying

16  something, I don't recall.

17  Q.   All right.  In any case, I've gone through those records and

18  prepared some that I would like to go over with you here.

19  A.   Okay.

20  Q.   I'm going to show you Government's Proposed Exhibits 57, 58,

21  59, 60A, B, 61A, B, C and D.  Those for now, okay?

22  A.   Okay.

23  Q.   I would like to ask you to look at Government's Proposed

24  Exhibit 57.

25  A.   Okay.

Jury Trial, Vol. III of V

344

1   Q.   Is that a corporate tax return for 2005 for GW & SW,

2   Incorporated?

3   A.   It appears to be.

4   Q.   And does it appear to be one that was prepared by your firm?

5   A.   Yes.

6   Q.   Now, 58, would that be a Michigan single business tax annual

7   report for 2005?

8   A.   It appears to be.

9   Q.   For GW & SW, Incorporated?

10  A.   Yes.

11  Q.   Prepared by your firm?

12  A.   Yes, it appears to be.

13  Q.   All right.  2005 Michigan small business tax or SBT schedule

14  of shareholders and officers?

15  A.   Yes.

16  Q.   Again, is that for GW & SW?

17  A.   Yes.

18  Q.   Prepared by your firm?

19  A.   It would be part of the -- yes.

20  Q.   Okay.  And 60A, B, I think that's it.  Is there a 60C?

21  A.   No, there is only 60A and B here.

22  Q.   All right, 60A and B being W-2s for employees at GW & SW,

23  Incorporated, including Maxine Pochmara and Gary Wilson?

24  A.   They appear to be so, yes.

25  Q.   Okay.  And 61A through D, 2005, Michigan unemployment

Jury Trial, Vol. III of V

345

1  insurance reports for GW & SW, Incorporated?

2  A.   They appear to be, yes.

3  Q.   Okay.

4       MS. PARKER:  I would like to offer these exhibits, your

5  Honor.

6       MR. JACOBS:  They are 59 through --

7       MS. PARKER:  Exhibits 57, 58, 59, 60A and B, 61A through

8  D.

9       MR. JACOBS:  I have no objection.

10      MR. PIAZZA:  No comment, your Honor.

11      THE COURT:  They will be received into evidence.

12 BY MS. PARKER:

13 Q.   Let's go to 57.

14 A.   Okay.

15 Q.   Briefly.

16      MS. PARKER:  Your Honor, could we have the display

17 system activated, please?

18 Q.   Looking at the first page of 57, I believe you've already

19 indicated this is a tax return, a federal tax return for GW & SW,

20 Incorporated?

21 A.   It appears to be, yes.

22 Q.   And I would like to direct your attention to the second page

23 of that document.

24 A.   Okay.

25 Q.   Do you see where there is a Schedule E?

Jury Trial, Vol. III of V

346

1  A.   I do.

2  Q.   And in Schedule E, what officers are listed?

3  A.   The listed people are Maxine Pochmara and Gary Wilson.

4  Q.   And in Column 000000C of Schedule E, what percentage of time

5  is reported as devoted to the business?

6  A.   In both cases, it says one hundred percent.

7  Q.   All right.  Let's skip ahead to the next one, 58.

8  A.   Okay.

9  Q.   That's for the same tax year, 2005.

10  A.   Correct.

11  Q.   Michigan single business tax?

12  A.   Yes.

13  Q.   And that would have been correlated to the federal income

14  tax return?

15  A.   Most of the information would be, yes.

16  Q.   Okay.  We will go on to 59, then.  This is the 2005 Michigan

17  SBT or -- does that stand for small business tax?

18  A.   Yes.

19  Q.   Schedule of shareholders and officers?

20  A.   Yes.

21  Q.   And on this form, what names are given for shareholders and

22  officers?

23  A.   Gary Wilson, Sue Wilson, Maxine Pochmara.

24  Q.   And in Column D, the percentage of time?

25  A.   One hundred percent, fifty percent, one hundred percent

Jury Trial, Vol. III of V

347

1  respectively.

2  Q.   Okay.  And then going down below, the Column I, it says

3  salaries, wages or director's fees.  Are there entries there?

4  A.   There are.

5  Q.   And what are the entries for Gary Wilson?

6  A.   Gary Wilson shows $49,784.

7  Q.   How do you know that's for Mr. Wilson?

8  A.   How do I know it's for Mr. Wilson?

9  Q.   Yeah.  I just want to explain to the jury how to read this

10  particular form.

11  A.   Oh, okay.

12  Q.   So how does that number relate to him?

13  A.   If you take the A -- if you look above at the names, where

14  it says Wilson, Gary L., there is an A next to Gary's name.  Then

15  if you follow down the page and find the little A and read

16  across, it would be Gary Wilson's information.

17  Q.   All right.  So the A -- A person is also the A person of

18  that first line going across in the second chart?

19  A.   Correct.

20  Q.   All right.  And for this particular form, the B line, that

21  would be for Sue Wilson?

22  A.   Yes.

23  Q.   C line for Maxine Pochmara?

24  A.   Yes.

25  Q.   And there is a salary or wage entry for both Mr. Wilson and

Jury Trial, Vol. III of V

348

1    Ms. Pochmara.

2    A.    Yes.

3    Q.    But --

4          MR. PIAZZA:  Well, your Honor, I'm going to object to

5    the phrase of the question, salary or wage.  I believe that

6    indicates salary wage and/or director fees.  So it's not quite an

7    accurate question.

8          MS. PARKER:  All right.  I stand corrected.

9    BY MS. PARKER:

10   Q.    But there are entries in there.

11   A.    Yes.

12   Q.    All right.  And next to that J, there is employee insurance

13   plans, pensions, et cetera?

14   A.    Yes.

15   Q.    There is an entry for all three of those?

16   A.    Yes.

17   Q.    Do you happen to recall what type of employee insurance

18   plans, pensions and things were being provided by GW & SW back in

19   2005?

20   A.    I do not.

21   Q.    All right.

22   A.    I was not doing general ledgers until the end of 2005.

23   Q.    Okay.  And then in L, you have share of business income

24   loss, and then figures there for each of the people.

25   A.    Yes.

Jury Trial, Vol. III of V

349

1   Q.   And what was your understanding that related to?

2   A.   My -- all I could do is guess.

3   Q.   Then don't do that.

4   A.   Okay.

5   Q.   We will move on.  On 60A, there is a sticker at the bottom

6   and we just want to display that part.  What is 60A?

7   A.   Exhibit 60A appears to be copies of W-2s.

8   Q.   And the bottom one is?

9   A.   For Maxine Pochmara.

10  Q.   And it's for earnings from where?

11  A.   GW & SW, Incorporated.

12  Q.   And what is indicated as the wages, tips and other

13  compensation?

14  A.   $31,720.

15  Q.   And below, that the Social Security wages?

16  A.   $33,020.

17  Q.   And 60B at the bottom is the W-2 for whom?

18  A.   Gary Wilson?

19  Q.   And again, for income from what entity?

20  A.   GW & SW, Incorporated.

21  Q.   And going on to 61A.

22  A.   Yes.

23  Q.   All right.  What kind of form is this?

24  A.   This is one of those quarterly 1017s that I was talking

25  about earlier, those unemployment forms.

Jury Trial, Vol. III of V

350

1  Q.   Okay.  And this one also, this information also goes to the

2  Michigan as well as the federal government, that type of

3  information?

4  A.   I'm sorry, I didn't hear.

5  Q.   Would the information that this -- this particular form is

6  for the Michigan Department of Labor?

7  A.   Yes.

8  Q.   Is this same information supplied to the federal government?

9  A.   Usually, yes.

10  Q.   Quarterly returns, also.

11  A.   Yes.

12  Q.   All right.  And with regards to this one, is for what time

13  period?

14  A.   It says it's for the quarter ending March 31st of 2005.

15  Q.   So that would be the first quarter of 2005?

16  A.   Yes.

17  Q.   And below there, what names are listed as employees?

18  A.   Gary Wilson, Fred -- I did not know Fred's last name, Justin

19  Schalk and Maxine Pochmara.

20  Q.   Just for the record, then, would you spell Fred's last name

21  for us?

22  A.   G-A-G-N-E.  I have no idea how they say that.

23  Q.   All right.  Well, that's fine.  And Justin Schalk, would you

24  spell Schalk for us?

25  A.   S-C-H-A-L-K.

Jury Trial, Vol. III of V

351

1  Q.   Thank you.  And then 61B would be the same type of work for

2  2005, second quarter, is that correct?

3  A.   It appears to be, yes.

4  Q.   And the names there?

5  A.   Gary Wilson, Fred, the G-A-G-N-E name again, Justin Schalk,

6  Herbert Stock, III, Andrew Prisk and Maxine Pochmara.

7  Q.   And again, the reporting of the gross wages paid in that

8  quarter?

9  A.   Yes.

10  Q.   For each individual?

11  A.   Yes.

12  Q.   And 61C is for the third quarter of 2005?

13  A.   Yes.

14  Q.   And the names there again?

15  A.   Gary Wilson, Justin Schalk, Herbert Stock, Andrew Prisk,

16  Maxine Pochmara.

17  Q.   And again, 61D would be for the last quarter?

18  A.   Yes.

19  Q.   And the names of the people listed there?

20  A.   Gary Wilson, Justin Schalk, Herbert Stock, III, Maxine

21  Pochmara.

22  Q.   Now, these were all part of the records that were maintained

23  by you -- that is by the accounting firm -- as part of the

24  services you provided to GW & SW, Incorporated?

25  A.   We would keep copies of all of those, yes.

Jury Trial, Vol. III of V

1   Q.   And also to the Wilsons?

2   A.   Yes.

3   Q.   I'm going to show you your -- do you recognize this as being

4   your file for GW & SW, Incorporated for 2005?

5   A.   It appears to be, yes.

6   Q.   All right.  And I would like to ask you to just look at this

7   one.  It's an original format here.

8   A.   Okay.

9   Q.   This is Government's Proposed Exhibit 62.  Is this part of

10   your record?

11   A.   Yes.

12   Q.   And what is the document entitled at the top?

13   A.   Payroll Journal.

14   Q.   For?

15   A.   GW & SW, Inc.

16   Q.   And there is a date -- a set of dates over there on the

17   left?

18   A.   It appears to be a one-year period.

19   Q.   Here.

20   A.   Okay.  Thank you.  It appears to be a one-year period of

21   time from 3/20 of '04 to 3/20 of '05.

22   Q.   And below that, there is some handwriting?

23   A.   Yes.

24   Q.   And that's also part of your file?

25   A.   It is.

Jury Trial, Vol. III of V

353

1   Q.   All right.

2        MS. PARKER:  Your Honor, I will offer Government's

3   Proposed Exhibits 62.

4        MR. JACOBS:  We need to identify the handwriting, your

5   Honor, if that's her writing or not.

6        MS. PARKER:  I don't think it has to be her handwriting.

7        MR. PIAZZA:  And I would object, your Honor.  You know,

8   the business record exception are things that are kept in the

9   ordinary course of business.  Not everything in the business file

10  is kept in the ordinary course of business.  If there is an

11  attachment or a handwritten note by somebody or a letter from

12  somebody, it's not necessarily the business exception.

13       I cite *Woods vs. City of Chicago*, 234 F.3d 979; *United*

14  *States vs. Yates*, Y-A-T-E-S, 553 F.2d 518.  There's an exception,

15  you know, if it's kept in the ordinary course of business.  If

16  there are notes and attachments that are not kept in the ordinary

17  course of business, then it's not admissible.

18       THE COURT:  Respectfully, I believe that we have an

19  adequate foundation at this stage, unless you would like to voir

20  dire the witness further concerning the exhibit.

21       MR. JACOBS:  Not as to this particular exhibit but we

22  will want to address that issue on, what I would refer to as

23  post-it note exhibits.

24       THE COURT:  Objection is overruled.  And you may

25  continue.

Jury Trial, Vol. III of V

354

1          MS. PARKER:  Thank you, your Honor.

2          THE WITNESS:  I don't remember the question at this

3  point.  I'm sorry.

4  BY MS. PARKER:

5  Q.   All right.  There wasn't a question.  I offered the

6  exhibit and I now understand that.  I will ask a question now,

7  however.  First of all, can Exhibit 62 be displayed for us?

8          All right.  Can you read the handwriting in the middle

9  of that document?

10  A.   Yes.  "Gary, prez, Bob, V.P., Sue, sec/treas."

11  Q.   Do you happen to know whose handwriting that is?

12  A.   Yes.

13  Q.   Whose is it?

14  A.   Martha Butler.

15  Q.   Is she one of the employees of your business?

16  A.   She was.

17  Q.   Okay.  And that form that that's written on, was that a form

18  that was generated by your business, the firm?

19  A.   Yes.

20  Q.   On behalf of your client.

21  A.   Yes.

22  Q.   Okay.  Thank you.  Next, I would like to show you

23  Government's Proposed Exhibits 63, 64, 65, 66A, B, C and D, and

24  then 68A, B, and 69 and we will come back to this one.  All

25  right?

Jury Trial, Vol. III of V

355

1   A.   Okay.

2   Q.   I will set them up here so they are available for us.

3   A.   Okay.

4   Q.   All right.  Can you look through those and tell me if those

5   are documents that were prepared by the accounting firm that

6   you're employed with for GW & SW?

7   A.   They appear to be, yes.

8           MS. PARKER:  Your Honor, I will offer Government's

9   Proposed Exhibits 63, 64, 65, 66, 67, 68A through B.

10          MR. JACOBS:  I have no objection except for 67, your

11  Honor.  Could we have a sidebar?

12          MS. PARKER:  I'm sorry.  I didn't mean to offer that

13  one.  I didn't give her that one.  I'm sorry.

14          MR. JACOBS:  Oh.

15          THE WITNESS:  I do not have that one here.

16          MS. PARKER:  You're right.  I'm sorry.

17          MR. JACOBS:  Then I have no objection.

18          MS. PARKER:  Sorry.

19          THE COURT:  The exhibits will be received into evidence.

20  BY MS. PARKER:

21  Q.   Going to Exhibit 63 then, could we have that displayed?  And

22  63, that's the 2006 tax return for GW & SW, Incorporated?

23  A.   It appears to be, yes.

24  Q.   All right.  And down at the bottom, it has indications that

25  it was prepared by your firm?

Jury Trial, Vol. III of V

356

1  A.    Yes.

2  Q.    And there is a typed signature of Gary Wilson.  Can you

3  explain why that might be?

4  A.    It was in the computer that he was the president of the firm

5  and it generated that information.

6  Q.    Okay.  So at this point in time, signing of actual returns

7  wasn't done.  There was a different process used to certify by

8  the taxpayer?

9  A.    It could have been that year.  I really don't recall but at

10  a certain point in time, the government started requiring people

11  preparing tax returns on a regular basis to do it electronically.

12  Q.    All right.  And when that's done, you don't sign on the

13  computer screen, you have to do a different process so there

14  isn't an actual written signature on the return.

15  A.    Correct.

16  Q.    All right.  Let's go to the second page of this document.

17  Looking down again at the bottom on Schedule E, do you see the

18  names of corporate officers listed there?

19  A.    Officers, yes.

20  Q.    And what names are there?

21  A.    Maxine Pochmara, Gary L. Wilson, Sue Wilson.

22  Q.    And what percentage of time devoted to the business is

23  indicated for each of those?

24  A.    It shows a hundred percent for all three.

25  Q.    All right.  Going on to 64, that's the Michigan single

Jury Trial, Vol. III of V

1 business tax return for the same year?

2 A.   Yes.

3 Q.   And would the same type of information provided in W --

4 excuse me, on the corporate tax return flow into that?

5 A.   Most of it would, yes.

6 Q.   All right.  Going on to 65, again, you have a 2006 Michigan

7 SBT schedule of shareholders and officers?

8 A.   Yes.

9 Q.   The names of the people who were provided?

10 A.   Gary L. Wilson, Sue Wilson, Maxine Pochmara.

11 Q.   And on this one, the percentage of time is allocated how?

12 A.   One hundred percent, fifty percent, one hundred percent

13 respectively.

14 Q.   And then the next four exhibits, 66A, B, C and D, are those

15 all quarterly tax returns?

16 A.   They appear to be, yes.

17 Q.   All right.  And do you see the name Robert Pochmara listed

18 on any of those?

19 A.   I do not.

20 Q.   Do you see the name Maxine Pochmara listed on each and every

21 one of those?

22 A.   I do.

23 Q.   Going on to 68, is -- going to the top there, it's a W-2 for

24 who?

25 A.   Maxine Pochmara.

Jury Trial, Vol. III of V

358

1   Q.   And again, that would have been from GW & SW.

2   A.   Yes.

3   Q.   And once that was prepared, that would have been prepared by

4   your firm?

5   A.   Yes.

6   Q.   Did you ever give that directly to Maxine Pochmara?

7   A.   I did not, no.

8   Q.   Your practice was to give it to the Wilsons and they would

9   give it to their employees.

10   A.   Correct.

11   Q.   All right.  And 68B at the bottom --

12   A.   Yes.

13   Q.   Excuse me.  Actually, we can do both the bottom and the top

14   on this one.  The top employee listed there is who?

15   A.   Gary Wilson.

16   Q.   And the bottom?

17   A.   Sue Wilson.

18   Q.   And the address?

19   A.   The address of the firm?

20   Q.   Of the Wilsons, I'm sorry.

21   A.   2054 White Birch Lane.

22   Q.   What city?

23   A.   Rogers City.

24   Q.   And the -- again, the firm was GW & SW?

25   A.   Yes.

Jury Trial, Vol. III of V

359

1  Q.   I believe I gave you Exhibit 69.

2  A.   Yes.

3  Q.   And what is Exhibit 69?

4  A.   It appears to be what is called a 941C.

5  Q.   All right.  Let's -- if you know, what's a 941?

6  A.   Okay.  A 941 is a quarterly report done to the federal side

7  on payroll information.  That's where you show how much the

8  employees earn for that quarter to the federal government to

9  report their FICA, their Social Security and their Medicare

10  withholdings and their federal with -- and the regular federal

11  withholdings.

12  Q.   All right.  And the C indicates what?

13  A.   C for correct, is the way I remember it.

14  Q.   Okay.

15  A.   There has been a mistake somehow and we are making a change

16  to the way it was originally filed.

17  Q.   Okay.  And this supporting statement to correct information

18  is for what period?

19  A.   It says June of 2007.

20  Q.   For what -- I'm sorry.  What time period was the correction

21  being made for, what tax quarter?

22  A.   Let me see if I can find it.  Oh, on the second page, it

23  shows first quarter, 2006.

24  Q.   All right.  And the amount of correction?

25  A.   $24.98.

Jury Trial, Vol. III of V

360

1   Q.   And this was a correction form for GW & SW?

2   A.   Yes.

3   Q.   Next I would like to show you Government's Proposed

4   Exhibit -- whoops -- 80.

5           MR. PIAZZA:  I'm sorry, which number?

6           MS. PARKER:  Eighty.  Sorry, counsel, I distracted

7   myself, unintentionally.

8           THE WITNESS:  Okay.

9   BY MS. PARKER:

10  Q.   Do you recognize that?

11  A.   I do not.

12  Q.   Is it a -- appear to be a note from -- the type of note that

13  would be maintained in the files?

14  A.   It would usually be maintained on the computer.

15  Q.   If there is a print-out of that in the file, would it be

16  part of your records?

17  A.   Yes.

18  Q.   Do you recognize the initials that are on that document?

19          MR. PIAZZA:  Well, your Honor, I'm going to object.  If

20  it's not -- she doesn't recognize it, you know, so I don't think

21  there is any foundation for her to, you know, recognize the

22  initials or anything like that.  She doesn't recognize the

23  document.

24          THE COURT:  That's a different question.  I understand

25  she doesn't recognize the document.  She may still recognize the

Jury Trial, Vol. III of V

361

1  writing.

2  BY MS. PARKER:

3  Q.   Do you recognize the initials on that document?

4  A.   GW, SW at the top.  FICA is understandable, MC, Medicare,

5  EI -- EOY, would be end of year.  JWK would be my husband.

6  Q.   So you recognize the type of information that's on that

7  document?

8  A.   Yes.

9  Q.   And does that correspond -- that information on that

10 document, correspond with the information on 69?

11 A.   Yes, I think I can figure out what happened there.

12 Q.   All right.

13      MS. PARKER:  Your Honor, I think a sufficient foundation

14 has been laid for the admission of this exhibit.

15      MR. JACOBS:  Brief voir dire, your Honor?

16      THE COURT:  Is the issue related to authenticity or the

17 issue that you're addressing related to the foundation for the

18 business records exception to the hearsay rule?

19      MR. JACOBS:  Foundation for business records exception.

20 Just asking if these particular type of client notes are normally

21 in the files and whether we have other file notes like that done

22 by the person purported to be JWK.

23      MS. PARKER:  Well, your Honor, I think the witness has

24 already indicated it would normally be kept on the computer.  I

25 think that question has been answered.

Jury Trial, Vol. III of V

362

 1          THE COURT:  I agree.  Any other objection, gentlemen?

 2          MR. PIAZZA:  I would object because I don't think a

 3   proper foundation has been made.  I don't believe it's a business

 4   record, number one, because it's not kept in the ordinary course

 5   of business.  And number two, she didn't prepare it and, you

 6   know, there is other information on there that's not being

 7   referenced to Exhibit 69.

 8          THE COURT:  So is the issue that you're addressing

 9   authenticity?

10          MR. PIAZZA:  Authenticity, as well as business records.

11          THE COURT:  I will overrule the objection.  I believe

12   that each have been addressed with proper foundation.

13          MS. PARKER:  Thank you, your Honor.  I will ask Exhibit

14   80 be displayed.

15   BY MS. PARKER:

16   Q.   Could you read Exhibit 80 for us, ma'am?

17   A.   It says:  "1Q06 --" which would be the first quarter of

18   '06.

19          "-- 941 is wrong by $25 on gross Line 2.  Doesn't

20          affect calculation of FICA and Medicare.  Probably

21          Pochmara, Bob.  Fix EOY.  Per JWK, do nothing."

22   Q.   And you indicated EOY would mean?

23   A.   End of year.

24   Q.   And below that, it says what?

25   A.   It says:  "Per JWK, do nothing."

1  Q.   And that would be the initials of your husband?

2  A.   It would.

3  Q.   All right.  And the amount that is there on -- is $25, is

4  that correct?

5  A.   It is.

6  Q.   If you look at Exhibit 69 --

7  A.   Yes.

8  Q.   -- do you see what the amount of the correction there is?

9  A.   $25.

10  Q.   And that's for the same quarter?

11  A.   Yes.

12  Q.   The same type of information?

13  A.   Yes.

14  Q.   Next, I would like to show you Government's Proposed

15  Exhibits 67.

16  A.   Okay.

17  Q.   Do you recognize that?

18  A.   I do.

19  Q.   All right.  And what is that?

20  A.   That is a payroll tax summary.

21  Q.   And is there a set of handwritten notations on that summary?

22  A.   There are.

23  Q.   And what is -- well, the amount of that correction?

24  A.   $24.98.

25  Q.   Is that the same amount that's on Exhibit 69?

Jury Trial, Vol. III of V

364

1  A.   Yes.

2  Q.   Is it for the same payroll summary?

3  A.   Yes.

4       MS. PARKER:  Your Honor, I offer Government's Proposed

5  Exhibit 67.

6       MR. JACOBS:  Sidebar, your Honor?

7       (Whereupon sidebar conference held on the record as

8       follows)

9       MR. JACOBS:  This is where we're starting to get into

10 with the post-it notes, your Honor, and she hasn't said anything

11 as to this particular note and that post-it and whose handwriting

12 it is or whether she has seen it before.  I would assert that the

13 post-it note portion of that exhibit is not part of any business

14 record exception and not is admissible.

15      MR. PIAZZA:  And I would concur, your Honor.

16      THE COURT:  Would it be different if the color was

17 yellow?

18      MR. JACOBS:  No, no.  I do think we have some that are

19 different colors.

20      THE COURT:  Does it need to be bigger?

21      MR. JACOBS:  No, sir.

22      THE COURT:  Okay.  I think, respectfully, it's going to

23 fall to the extent that these are maintained within the business

24 record and there is a connection between the post-it note and the

25 primary document, that it's all going to qualify for the hearsay

Jury Trial, Vol. III of V

365

1 exception.

2          MR. JACOBS:  She has been able to show a connection

3 between this and the other exhibits in 67 and this particular

4 post-it note.  I don't -- we're going to have the same type issue

5 and I don't know if we're going to be able to show the connection

6 with the other post-it notes, the 31A and the -- I think it's 85.

7          THE COURT:  Yeah.

8          MR. JACOBS:  So I would have the same type issue.

9          MR. PIAZZA:  The problem is with the post-it notes, they

10 are not kept in the ordinary course of business.  It's not a

11 document that's kept in the ordinary course of business.  It

12 might be notes, it might be thoughts, but it doesn't fall within

13 the business exception.

14          MS. PARKER:  That's not true.  It's simply -- if you

15 think every person who has ever made an entry on the records at

16 Dow has to be produced -- to produce Dow's records in Court, I

17 submit that's not the case.  That they have handwritten

18 notations, whether it's on a post-it or directly on the document,

19 it's in their file, it's maintained.

20          MR. PIAZZA:  I don't think -- you may have several

21 things in a file.  In my file, I have several notes but they're

22 not kept in the ordinary course of business.

23          MS. PARKER:  Then why are you keeping it?  It's the

24 ordinary course of business.  It's not the menu for the Chinese

25 restaurant.

Jury Trial, Vol. III of V

366

1          THE COURT:  I respectfully disagree with you to the

2     extent that they can identify a connection between the post-it

3     and the primary document.  Now, what I don't know is where you're

4     going right now with this one.

5          MS. PARKER:  Well, we have this -- this amount

6     corresponds to the 941 and then the correction, the note

7     regarding the correction specifically says Bob -- Bob Pochmara,

8     probably -- this is a Bob Pochmara post-it.

9          THE COURT:  Okay.

10          MR. JACOBS:  She has shown a connection as to that.

11     Again, as to 85 and the other post-it notes, we will still have

12     an objection as to those.

13          MS. PARKER:  We will get there.

14          THE COURT:  Okay.

15          (Whereupon sidebar concluded)

16          THE COURT:  You may continue, ma'am.

17          MS. PARKER:  I will ask you to display it.  For the

18     record, your Honor, is that received?

19          THE COURT:  It is.

20     BY MS. PARKER:

21     Q.   All right.  On this particular document, there is some

22     handwritten notations at the top?

23     A.   Yes.

24     Q.   Can we zoom in?  I can't see them, at least.  There, that's

25     better.  On this document, it says -- in the handwriting that's

Jury Trial, Vol. III of V

367

1  been brought up, can you read what the numbers are?

2  A.   "Off 24.98."

3  Q.   And that is an entry next to what?

4  A.   I'm sorry, what?

5  Q.   What entry is that next to?

6  A.   Where it says, looks like a quarter to date taxable wages,

7  they are circled.

8  Q.   Okay.  Let me ask it this way.  Is that "off 24.98" next to

9  the entry for federal withholdings?

10  A.   It appears to be federal and Michigan withholding.

11  Q.   All right.  And then below that, it says what?

12  A.   "To compare 941."  Is that the part you're referring to?

13  Q.   All right.  And down below, there is -- do you recognize

14  that handwriting, by the way?

15  A.   I do.

16  Q.   And whose is that?

17  A.   Mine.

18  Q.   And down below, there's a post-it note?

19  A.   Yes.

20  Q.   Do you recognize that?

21  A.   I do.

22  Q.   Whose is that?

23  A.   Mine.

24  Q.   And was it your habit to sometimes make entries and records

25  on post-it notes?

Jury Trial, Vol. III of V

368

1   A.   I will sometimes, yeah.  I've got a bad memory so I will

2   sometimes write things down.

3   Q.   They work out pretty handy, don't they?

4   A.   There are times.

5   Q.   All right.  Next, I would like to show you Government's

6   Proposed Exhibits -- and why don't we set those up here, yeah,

7   just in case they want it later for cross-examination.

8   A.   Okay.

9   Q.   Another set.

10  A.   Okay.

11  Q.   They are 70, 71, 72, 73A, B and C -- I think there is D,

12  yes.  And 74A and B.

13  A.   Okay.

14  Q.   All right.  Now, do you recognize those documents?

15  A.   They appear to be the same type of documents that we've been

16  looking at.

17  Q.   All right.  Just for a different tax year, correct?

18  A.   Yes.

19  Q.   The 2007 year.

20  A.   Yes.

21  Q.   So there is the corporate tax return --

22  A.   Yes.

23  Q.   -- in 70.  And 71 is the Michigan single business tax

24  return?

25  A.   Yes.

Jury Trial, Vol. III of V

369

1   Q.   Seventy-two, shareholders and officers?

2   A.   Yes.

3   Q.   And 73A, B, C and D are the quarterly reports?

4   A.   Yes.

5   Q.   Seventy-four, at the bottom, is a W-2 for Maxine Pochmara

6   from GW & SW?

7   A.   Yes.

8   Q.   And 74B are the W-2s for Sue and Gary Wilson for GW & SW?

9   A.   Yes.

10  Q.   All right.

11          MS. PARKER:  Your Honor, I will offer those exhibits.

12          MR. JACOBS:  I have no objection, your Honor.

13          MR. PIAZZA:  No comment.

14          THE COURT:  They will be received into evidence.

15  BY MS. PARKER:

16  Q.   Okay.  Can you direct your attention then to Exhibit 1?

17  A.   Do you mean 70?

18  Q.   I'm sorry.  Yes, I do.

19  A.   Okay.

20  Q.   I'm trying to think of too many things at once.

21  A.   Okay.

22  Q.   And again, that's the corporate return?

23  A.   Yes.

24  Q.   On Schedule E, who are listed as the corporate officers?

25  A.   Okay.

1   Q.   Can you tell us who that is?

2   A.   It says Maxine Pochmara, Gary L. Wilson, Sue Wilson.

3   Q.   Okay.  Looking at the rest of the documents that you have

4   there, do you see any indication of employment by Robert Pochmara

5   at GW & SW in 2007?

6   A.   Let me review everything here.  Just a second.

7   Q.   Sure.

8   A.   It will take a couple minutes.  No.

9   Q.   Next I would like to show you your file for 2007.

10  A.   Yes.

11  Q.   Do you see that?  Do you recognize this as being your file?

12  A.   I do.

13  Q.   All right.  And I would like to direct your attention to

14  this page of the file.

15  A.   Okay.

16  Q.   Is that a document that is part of your file?

17  A.   It appears to be, yes.

18  Q.   For GW & SW.

19  A.   Yes.

20  Q.   And there are -- it's a document for Federated Insurance?

21  A.   That's what it says at the top, yes.

22  Q.   For GW & SW?

23  A.   Yes.

24  Q.   And down at the bottom, it says, "Report completed by," can

25  you read those names?

Jury Trial, Vol. III of V

371

 1   A.   Kim Kreft.

 2   Q.   Can you spell Kreft for us, please?

 3   A.   K-R-E-F-T.

 4   Q.   And do you recognize who that person is?

 5   A.   Yes.

 6   Q.   Who is that person?

 7   A.   She is one of the girls in our office.

 8   Q.   And next to that is a phone number.

 9   A.   Yes.

10   Q.   Is that the phone number of the CPA firm?

11   A.   It is.

12   Q.   And next, is that a date of 9/19/07?

13   A.   Correct.

14   Q.   And there are two post-its on this document, other than the

15   pink one?

16   A.   Other than the pink one, yes.

17   Q.   All right.

18        MS. PARKER:  Your Honor, I'm going to offer Government's

19   Proposed Exhibits 85.

20        MR. JACOBS:  We briefly addressed this before, your

21   Honor.  I need a sidebar on 85, on our post-it note exhibits.

22        THE COURT:  Do you wish to ask any questions of the

23   witness before our sidebar?

24        MR. JACOBS:  Please.

25   BY MR. JACOBS:

Jury Trial, Vol. III of V

1   Q.   Ma'am, the first post-it note or the post-it note on the

2   left side, it starts out with a percentage sign on there?

3   A.   Percentage ownership, yes.

4   Q.   Do you recall seeing that before?

5   A.   Yes.

6   Q.   All right.  You saw that before.

7   A.   Yes.

8   Q.   Did you see it when it was created?

9   A.   Yes.

10  Q.   All right.  Who created it?

11  A.   I created most of it but not the whole thing.

12  Q.   You created most of it but not the whole thing.

13  A.   Correct.

14  Q.   What part of it did you create?

15  A.   I created the percent ownership, "Gary and Sue, 25

16  percent -- 27 and a half percent each, equals 55 percent.

17  Maxine, 45 percent, equals 100 percent."

18  Q.   What about the bottom part?  We don't necessarily have to

19  say what it says, but did you create that?

20  A.   Yes.

21  Q.   You did.

22  A.   Yes.

23  Q.   Okay.  What does it say?

24  A.   It says:  "Bob Pochmara doesn't own, would mess up SSA and

25  pension somehow."

Jury Trial, Vol. III of V

373

1  Q.   Why did you write that?

2  A.   I didn't understand it but it was that he -- the husbands

3  and wives together, was my understanding of the business

4  ownership at the time and that his portion, he didn't own any in

5  his name.  It was owned in Maxine's name.

6         MR. JACOBS:  I have no further voir dire, your Honor.

7         MR. PIAZZA:  I may have a couple voir dire.

8  BY MR. PIAZZA:

9  Q.   This document is a letter, is that correct, from an

10  insurance or some form for the insurance?

11  A.   The actual form?

12  Q.   Yes.

13  A.   Underneath the sticky notes, yes, that appears to be a

14  worker's comp audit.

15  Q.   But that's nothing kept that you made.  Somebody else did,

16  another company, is that correct?  It wasn't your firm.

17  A.   No.

18         MR. PIAZZA:  I still object to authenticity as well as

19  not a business record.

20         MR. JACOBS:  I have no objection.

21         MS. PARKER:  I think there is an ambiguity in that last

22  question and answer.  Does that -- if I may?

23         THE COURT:  You may.

24  BY MS. PARKER:

25  Q.   At the bottom, does it indicate that form was completed by

Jury Trial, Vol. III of V

374

1  an employee at your firm?

2  A.   Yes.

3  Q.   You were completing it on behalf of GW & SW and Gary and Sue

4  Wilson?

5  A.   Yes.

6        MS. PARKER:  Your Honor, I renew my offering of Exhibit

7  85.

8        MR. PIAZZA:  I have stated my objection for the record.

9        THE COURT:  Indeed.  You have each covered it and I

10  would respectfully overrule the objections.

11  BY MS. PARKER:

12  Q.   When you made the notation -- well, first of all, can we

13  have that displayed?  When you made the notation at the bottom of

14  that yellow post-it --

15  A.   Mm-hmm.

16  Q.   -- where did you get that information?

17  A.   I truly don't remember.

18  Q.   You don't remember who gave it to you.

19  A.   I do not.

20  Q.   Okay.  Thank you.  It wasn't something that you had any

21  independent knowledge of.

22  A.   I have to tell you, if I met Bob or Maxine Pochmara, I

23  wouldn't recognize them if they walked into this room.  I don't

24  know them.

25  Q.   All right.  And you said at the time, you didn't really

Jury Trial, Vol. III of V

375

1   understand what it meant.

2   A.   Correct.

3   Q.   I should ask you this.  What did you understand SSA to

4   mean?

5   A.   Social Security Administration.

6   Q.   Next, I would like to show you Exhibits -- Government's

7   Proposed Exhibits, I should say, 81 --

8   A.   Should I put these aside?

9   Q.   Sure.  Thank you, ma'am.  Exhibits 81, 82A through D, 83,

10  84A, B and C, 86, 87, 88A, B, 89A, B, and C.

11  A.   Okay.

12  Q.   Can you go through those and tell me, are those all GW & SW

13  tax returns for the 1988 tax year?

14  A.   The 81 and 82s appear to be for 2008.  And let's see, 86,

15  87 -- the 86, 87 --

16  Q.   I'm sorry, we are not in 87.

17  A.   Exhibits 88 and 89 appear to be part of '09.

18  Q.   I'm sorry, you are correct.  But other than that, they are

19  the same type of documents we've been talking; 81, the corporate

20  tax return, 82A through D, being the Michigan unemployment

21  insurance reports, 83, the Michigan -- or 2008 Michigan

22  business tax schedule of shareholders and officers, 84A through C

23  being W-2s for Maxine Pochmara, Gary Wilson and Sue Wilson for

24  2008?

25  A.   Yes.

Jury Trial, Vol. III of V

376

1  Q.  All right.

2       MS. PARKER:  I will offer those for now.

3       MR. JACOBS:  I have no objection.

4       MR. PIAZZA:  And I'm sorry, which numbers at this time?

5       MS. PARKER:  They are 81, 82A through D, 83, 84A through

6  C.

7       MR. PIAZZA:  No comment.

8       THE COURT:  They will be received into evidence.

9  BY MS. PARKER:

10 Q.   And excuse me.  Can you go through those documents again

11 for 19 -- or for 2008 and tell me if you see any entries for

12 Robert Pochmara on any of the federal or state tax returns?

13 A.   No.

14 Q.   Okay.  Do you see entries for Maxine Pochmara on each of

15 those?

16 A.   On 81, I do.  The 82s, I do.  The 83, I do.  The 84A, I do.

17 And 84B was other employees, and C.

18 Q.   All right.  The W-2s for the Wilsons are for 84B and C,

19 correct?

20 A.   Correct.

21 Q.   All right.  Let's go on then to the 2009 return.  2000 -- or

22 87, excuse me, would be the 2009 -- let me try this, again.

23 Exhibit 86 would be the 2009 corporate return for GW & SW?

24 A.   Yes.

25 Q.   And 87, the 2009 Michigan business tax?

Jury Trial, Vol. III of V

377

1  A.   Let's see if I can find that one.

2  Q.   2009, 87.

3  A.   Eighty-seven is the schedule of shareholders and officers,

4  not the full form.

5  Q.   Okay.  And 88A and B?

6  A.   Exhibit 88A and B are quarters in 2009, yes.

7  Q.   What type of quarters?

8  A.   Appears to be first and second quarter, 2009.

9  Q.   And 89A and C, would be W-2s for Maxine Pochmara, Gary

10  Wilson and Sue Wilson?

11  A.   Yes.

12       MS. PARKER:  Your Honor, I offer those exhibits.

13       MR. JACOBS:  Exhibits 86 through 89A and -- A through C,

14  no objection, your Honor.

15       MR. PIAZZA:  No comment, your Honor.

16       THE COURT:  They are received into evidence.

17  BY MS. PARKER:

18  Q.   And again, I would like you to look through the 2009

19  exhibits that are before you and ask you if you see any

20  references to Robert Pochmara.

21  A.   I'm trying to go fast.  I do not.

22  Q.   And in your review, did you see references to Maxine

23  Pochmara and a W-2 for Maxine Pochmara?

24  A.   I did.

25  Q.   Next, I would like to show you Government's Proposed

Jury Trial, Vol. III of V

378

1  Exhibits 50, 51, 52, 53, 54 --

2  A.    Should I set these aside again?

3  Q.    Yes, ma'am.   Thank you.

4  A.    Okay.

5  Q.    And 55, 56.

6  A.    Okay.

7  Q.    Are those tax returns for GW & SW, Incorporated that were

8  prepared by your firm?

9  A.    Fifty appears to be, 51 appears to be, 52 appears to be, 53

10  appears to be, 54 appears to be, and 55 appears -- oh, there is

11  one more -- 55 appears to be and 56, it looks like, yes,

12  appears to be, also, a portion of one.   Not the entire but a

13  portion.

14  Q.    And those are for the years, 50 is for 1998, 51 for '99,

15  52 for 2000, 53 for 2001, 54 for 2002, 55 for 2003 and 56 for

16  2004?

17  A.    Yes.

18         MS. PARKER:   Your Honor, I will offer Government's

19  Proposed Exhibits 50 through 56.

20         MR. JACOBS:   I have no objection, your Honor.

21         MR. PIAZZA:   No comment, your Honor.

22         THE COURT:   Exhibits 50 through 56 are admitted.

23  BY MS. PARKER:

24  Q.    Likewise, I would like to show you Government's Proposed

25  Exhibits 120A and 140A.

Jury Trial, Vol. III of V

379

1   A.   Okay.

2   Q.   Do those appear to be tax returns that were prepared by your

3   firm?

4   A.   They do.

5   Q.   Pardon?

6   A.   They do.

7   Q.   Is Exhibit 140A a 1998 tax return?  Did I say 120A?

8   A.   You said 120A?

9   Q.   Yes.

10  A.   Is a 1998.  I do see something that we didn't do on this.

11  Q.   All right.  Is it a tax return that was prepared by you,

12  though?

13  A.   Originally, yes, but it has been altered, I see.

14  Q.   Okay.  In what way?

15  A.   Under filing status, it has two listed there.  One was done

16  by a computer, one is manually written.

17  Q.   All right.  Does the balance of it indicate that it was

18  prepared by your office, however?

19  A.   As originally prepared, it would have been prepared by our

20  office, yes, the computer portion.

21  Q.   And for Maxine Pochmara.

22  A.   Yes.

23  Q.   For 1998?

24  A.   Yes.

25       MS. PARKER:  I will offer Government's Proposed Exhibit

Jury Trial, Vol. III of V

380

1  120A.

2          MR. JACOBS:  Brief voir dire, your Honor?

3  BY MR. JACOBS:

4  Q.  I need to understand, what was modified -- she is asking you

5  what was done by your office and you volunteered that something

6  was altered.

7  A.  Yes.

8  Q.  And what appears to be altered in there?

9  A.  Under filing status, there are two X's.  If you look

10  underneath where it says filing status, it says check only one

11  box, if you're single, married, whatever.  Our office has that

12  it's head of household with qualifying person and then there is a

13  qualifying person there.  That box is checked.  Someone has

14  manually put in married, filing separate return.

15  Q.  Does anything else on that document appear to be altered to

16  you, ma'am?

17  A.  Altered?  Not that I can see, no.

18  Q.  And am I understanding correctly, you did not know Robert

19  Pochmara or Maxine Pochmara?

20  A.  Personally, no.

21  Q.  So is that in fact your signature on the -- your husband's

22  signature on the second page as preparer?

23  A.  It appears to be.

24  Q.  Well, you know his signature.  Does it appears to be his

25  signature?

Jury Trial, Vol. III of V

381

1   A.   It appears to be his signature, yes.

2   Q.   But you don't know any other personal information about that

3   particular return, as far as how your husband got the numbers or

4   anything like that.

5   A.   No, I would -- if I did, it was years ago and I wouldn't

6   remember it.

7          MR. JACOBS:  I have no other voir dire, your Honor.  I

8   have no objection.

9          MR. PIAZZA:  No objection.

10          THE COURT:  It will be received.

11  BY MS. PARKER:

12  Q.   All right.  I would ask you to display that document,

13  please.  And let's go to the second page.

14  A.   Okay.

15  Q.   I would like to focus at the bottom.  You've already

16  indicated, ma'am, you recognize your husband's signature.

17  A.   Yes.

18  Q.   And on this form, it indicates that the occupation of the

19  person in question is what?

20  A.   It says secretary.

21  Q.   And the person is Maxine Pochmara?

22  A.   Yes.

23  Q.   Okay.  Let's go on to Exhibit 140A.  Is that also a return

24  for the year 1998?

25  A.   Yes.

Jury Trial, Vol. III of V

382

1  Q.   A federal return for Robert Pochmara?

2  A.   Yes.

3  Q.   And was that prepared by your firm?

4  A.   As originally made, yes.  It looks like it has the same

5  alteration as the other one.

6  Q.   All right.  And do you recognize your husband's signature?

7  A.   Yes.

8       MS. PARKER:  Your Honor, I offer Government's Proposed

9  Exhibits 140A.

10      MR. JACOBS:  I would like the witness to clarify the

11  alteration, your Honor.

12      THE COURT:  Would you like --

13      MR. JACOBS:  Yes.

14      THE COURT:  Would you like to ask her the question?

15      MR. JACOBS:  Yes, sir.

16      THE COURT:  You may.

17  BY MR. JACOBS:

18  Q.   Ma'am, you made another comment about it was altered.  How

19  was that particular proposed exhibit altered?

20  A.   It appears to be that under filing status again, someone

21  has -- well, this one is different.

22  Q.   How is it different?

23  A.   Well, if I look at Maxine's, hers was head of household and

24  then it has a second X there for married filing separate return.

25  If I look at Robert's, I can see where a box was checked as

Jury Trial, Vol. III of V

383

1  single and then I can see where somebody has whited out or

2  somehow changed the document.  And then there is an X under

3  married, filing separate, that's been manually put in.

4  Q.   Any other alterations that you can -- that you see, ma'am?

5  A.   The numbers are cut off on the sides so I can't tell if they

6  are but from what I can see, no.

7       MR. JACOBS:  I have no further voir dire, your Honor,

8  and I have no objection.

9       MR. PIAZZA:  No objection.

10      THE COURT:  The exhibit will be received.

11  BY MS. PARKER:

12  Q.   All right.  May we have that document displayed, please?

13  Again, this is a tax return for Robert Pochmara for the year

14  1998?

15  A.   Yes.

16  Q.   Federal tax return?

17  A.   Yes.

18  Q.   All right.  Going to the second page at the bottom of that

19  form --

20  A.   Yes.

21  Q.   -- what is listed there as the occupation of the taxpayer?

22  A.   It says disabled.

23  Q.   I'm going to show you some more documents.

24  A.   Okay.  Do you want me to put these aside or something?

25  Q.   Yes.

Jury Trial, Vol. III of V

384

1   A.   Okay.

2   Q.   These are Government's Proposed Exhibits 107 through 111.

3   A.   Okay.

4   Q.   All right.  Can you look through those and then verify that

5   Government's Proposed Exhibits 107 through 111 are tax returns

6   for Gary and Sue Wilson prepared by your firm for the years 2005

7   through 2009.

8   A.   Exhibit 107 appears to be.  Again, 108 appears to be 2006.

9   And 109 appears to be 2007.  And 110 appears to be 2008.  And 111

10  appears to be 2009.

11  Q.   All right.

12       MS. PARKER:  Your Honor, I offer Government's Proposed

13  Exhibits 107 through 111 which would be tax returns -- federal

14  income tax returns for the Wilsons for the years 2005 to 2009.

15       MR. JACOBS:  I have no objection, your Honor.

16       MR. PIAZZA:  No comment.

17       THE COURT:  They are received.

18  BY MS. PARKER:

19  Q.   And just take a quick look at the first one, 107.

20  A.   Yes.

21  Q.   This is a return that covers both Gary and Sue Wilson?

22  A.   Yes.

23  Q.   And it lists their address as where?

24  A.   2054 West -- or White Birch Lane, Rogers City.

25  Q.   And this again is in the days when the tax return is not

Jury Trial, Vol. III of V

385

1   actually signed.

2   A.   I would assume that that is the case.  I really don't

3   remember when that rule turned over but I will say that this

4   doesn't look like the printing from our computer so I don't know

5   if this is another -- a copy of something but it doesn't look

6   like the printing from our computers.  In fact, none of these

7   really do.  It looks like a different print somehow, a different

8   font.

9   Q.   Do you want to go back and try to go through these files and

10  find them again?

11  A.   No, I'll -- I'll -- the documentation appears to be in

12  order.  I'm just saying that the font doesn't look right for some

13  reason.

14  Q.   Have you changed your computers somewhat over the years,

15  however?

16  A.   And that's probably what's happened.  They've changed the

17  software program and I just can't remember what it looked like

18  eight, nine years ago.  That's very possible.

19  Q.   All right.  Now, you indicated sometime ago in your

20  testimony that you would be involved in doing general ledger

21  work?

22  A.   Some, yes.

23  Q.   And as part of the work that you did for GW & SW,

24  Incorporated, did you go through their bank statements?

25  A.   Yes.

Jury Trial, Vol. III of V

386

1  Q.   And why would you do that?

2  A.   In order to reconcile the bank statement for the monthly

3  books to make sure that they were balancing and they had enough

4  money in the bank and all those kinds of things that we have to

5  do.

6  Q.   I would like to show you Government's Proposed Exhibits 41

7  B, C, D, E and F.

8  A.   Do you want me to put these aside now?

9  Q.   Yes, please.

10  A.   Okay.  We are getting a very nice stack there.

11  Q.   We are.  We are getting it all in.  Do you recognize those

12  documents 41B through F?

13  A.   Yes.

14  Q.   And are those bank statements?

15  A.   Yes.

16  Q.   Are they for the account for GW & SW?

17  A.   Yes.

18  Q.   Is there, like the first page of each statement?

19  A.   They appear to be, yes.

20  Q.   And do those have one first page statement for each year,

21  2005 to 2009?

22  A.   Yes.

23       MS. PARKER:  Your Honor, I will offer Government's

24  Proposed Exhibits 41B through F.

25       MR. JACOBS:  Not A?  Not 41A?

Jury Trial, Vol. III of V

387

1        MS. PARKER:  No.  If you want it in, I will.

2        MR. JACOBS:  No.  You're saying 41B through F, no

3  objection.

4        MR. PIAZZA:  If I may voir dire for a brief moment, your

5  Honor.

6  BY MR. PIAZZA:

7  Q.   Ma'am, look at 41F.

8  A.   F.

9  Q.   There is all sorts of handwritten X's and circles and things

10  of that nature, is that correct?

11  A.   Yes.

12  Q.   Is that done by yourself or someone at your office?

13  A.   Some of them are done by me.  Some of them, it looks like

14  might have been done by someone else.

15  Q.   Okay.  Out of your office, probably?

16  A.   Some by --

17  Q.   I don't want you to guess.

18  A.   Then I would say I don't know.

19  Q.   You don't.  All right.

20        MR. PIAZZA:  Thank you.  No further questions.  No

21  comment.

22        THE COURT:  The exhibits will be admitted.

23  BY MS. PARKER:

24  Q.   Do you recognize the handwriting of other people from your

25  office?

Jury Trial, Vol. III of V

388

1  A.   Usually, yes.  Sometimes, some of the writing gets mixed up

2  because some of us write pretty similar.

3  Q.   On 41B, can you display that for us.  These were bank

4  statements from what bank, ma'am?

5  A.   Huron National Bank.

6  Q.   And the account of what entity?

7  A.   GW & SW, Inc.

8  Q.   And in the upper left-hand corner, how is this bank

9  statement addressed?

10  A.   It says Gary or Sue Wilson or Robert or Maxine Pochmara,

11  1095 West 3rd, Rogers City, Michigan, 49779.

12  Q.   At the very top, does it say GW & SW, Incorporated, and then

13  in parentheses NAPA W & W Auto Parts?

14  A.   It does.

15  Q.   And do you recognize that address as being the location of

16  the store?

17  A.   Yes.

18  Q.   And it lists the four names, Gary or Sue Wilson or Robert or

19  Maxine Pochmara?

20  A.   Yes.

21  Q.   And the handwritten notations would have been made for what

22  purpose on documents like this?

23  A.    In this particular case, they are to combine various

24  deposits so that we could tie it with a monthly -- or that

25  monthly spreadsheet in all of the documents that I've talked

Jury Trial, Vol. III of V

1   about previously to make sure I could figure out which day goes

2   with what to make sure we can account for all the money.

3   Q.   Okay.  So for purposes of providing your accounting

4   services.

5   A.   Yes.

6   Q.   Okay.  Let's go on to 41C.  Again, a Huron National Bank,

7   bank statement.

8   A.   Yes.

9   Q.   And at the top, is it -- is it -- how is that addressed, I

10  should ask.  Sorry.

11  A.   The same way as the last one.

12  Q.   Look closely at it.

13  A.   Oh, it changed.  The address changed.

14  Q.   All right.  In what way?

15  A.   It changed to 2054 White Birch Lane.

16  Q.   In Rogers City?

17  A.   Yes.

18  Q.   And do you recognize that to be the address of anybody that

19  you know?

20  A.   I do.

21  Q.   And who is that?

22  A.   Gary and Sue Wilson.

23  Q.   So at that point, this bank statement would have been mailed

24  presumably to the home.

25  A.   Correct.

Jury Trial, Vol. III of V

1   Q.   And it would have listed the names of Gary or Sue Wilson or

2   Robert or Maxine Pochmara.

3   A.   Correct.

4   Q.   All right.  And let's go on to the next one, 41D.  This is

5   for bank statement in 2007?

6   A.   Yes.

7   Q.   I should have asked you, I'm sorry, the 31 -- excuse me, 41B

8   was for what time period?

9   A.   B as in boy?

10  Q.   Yes, ma'am.

11  A.   11/30/05.

12  Q.   Okay.  And 41C?

13  A.   11/30/06.

14  Q.   And 41D?

15  A.   D is 12/31/07.

16  Q.   And this one is addressed as the previous one, with the same

17  four people, at the 2054 White Birch Lane address?

18  A.   Yes.

19  Q.   Now, 41E, for what time period is this bank statement?

20  A.   7/31/08.

21  Q.   And how is that one addressed?

22  A.   Appears to be addressed the same as the others.

23  Q.   The White Birch Lane address?

24  A.   The White Birch Lane address.

25  Q.   Okay, 41F.

Jury Trial, Vol. III of V

391

1   A.   Yes.

2   Q.   All right.  And that's what time period?

3   A.   4/30/09.

4   Q.   And how is this one addressed?

5   A.   It appears to be the same.

6   Q.   The same and -- the same four people's names on this?

7   A.   Yes.

8   Q.   And the White Birch Lane address.

9   A.   Yes.

10  Q.   Next, I would like to show you Government's Proposed Exhibit

11  31.

12  A.   Are we done with these?

13  Q.   Yes, ma'am.

14  A.   Okay.

15  Q.   What type of record is that?

16  A.   It appears to be some type of a payroll record.

17  Q.   For what -- what person or entity?

18  A.   It doesn't say.

19  Q.   Well, do you recognize that?

20  A.   I saw it yesterday in your office but other than that, I

21  don't remember it.

22       MS. PARKER:  Your Honor, I think I need a few moments to

23  locate the original copy of this.  If it would be a good time to

24  take a break, I can do that over the break.

25       THE COURT:  Good point.  It will be about a ten-minute

Jury Trial, Vol. III of V

392

```
 1   recess.  Mr. Crowder should be on his way.
 2            (At 10:24 a.m. - jury leaves courtroom)
 3            THE COURT:  You may step down.
 4            THE WITNESS:  Okay.
 5            THE COURT:  Record is closed.
 6            (At 10:25 a.m. - proceedings recessed)
 7            (At 10:50 a.m. - proceedings resumed; out of the
 8            presence of the jury)
 9            THE COURT:  May we have the jury, please.
10            (At 10:52 a.m. - jury enters courtroom)
11            THE COURT:  Please be seated.  Miss Parker, if you would
12   like to continue examining the witness.
13            MS. PARKER:  All right.  You can sit back down.
14   BY MS. PARKER:
15   Q.   I know you're cold, I think we saw your discomfort here
16   somewhat, but you understand you are still under oath?
17   A.   Yes.
18   Q.   All right.  In the course of providing accounting services
19   for GW & SW, did you sometimes have to deal with changes in pay
20   dates?
21   A.   Yes.
22   Q.   And when you had an issue regarding a pay date being
23   changed, who would you contact to resolve the question?
24   A.   I don't remember it being a question.
25   Q.   All right.  Well, what kind of problems or issues might --
```

Jury Trial, Vol. III of V

393

1  not necessarily problems but issues might arise relative to the

2  pay dates for the people at GW & SW, Incorporated?

3  A.   The only things that I can think of is if it was like at the

4  end of a month and if it was going to be for -- say, if it was --

5  the pay date was supposed to be on Fridays but it's a holiday or

6  Monday, you know, that type of thing, then that might be an

7  issue.  But that's the only thing I can think of where a change

8  in the date would make a difference.

9  Q.   Okay.  Did you have any occasion then to talk to someone,

10 say, to find out if the pay date was going to be on -- what was

11 their pay date at GW & SW, if you recall?

12 A.   I believe the regular employees are Fridays -- or is it

13 Wednesdays?  One of them is Wednesdays and one of them is

14 Fridays, I believe.

15 Q.   All right.  And just for example, if one of those pay

16 days was going to be the 4th of July so it's going to be a

17 holiday --

18 A.   Then they would change it to a different date.

19 Q.   And who would you contact to discuss what date was going to

20 be the day?

21 A.   I wouldn't.  I would look at the stub of the check and put

22 it in for that.

23 Q.   All right.  So you rely on the records from them.

24 A.   Correct.

25 Q.   All right.  Keep track of things that way.

Jury Trial, Vol. III of V

394

1   A.   Yes.

2   Q.   Okay.

3        MS. PARKER:  Thank you, your Honor.  I'll pass the

4   witness.

5        THE COURT:  Cross-examination?

6        MR. JACOBS:  Thank you, your Honor.

7                      CROSS-EXAMINATION

8   BY MR. JACOBS:

9   Q.   Ma'am, I'm Steve Jacobs and I represent Gary Wilson.

10       When you talked about receiving packages of information

11  monthly, and you held up your hand to show three to four inches,

12  would you receive documents about the size of what I have in my

13  hand, a few inches, three to four inches?

14  A.   That looks about normal.

15  Q.   That's about normal, what you get monthly, is that correct?

16  A.   Yes.

17  Q.   All right.  Now, back in 1998 when your husband is a CPA --

18  A.   Yes.

19  Q.   -- and I know this might be difficult, you might have to

20  give us an estimation, but did he have other -- in 1998, did he

21  have other full-time employees?

22  A.   Yes.

23  Q.   All right.  And just a number, how many full-time employees

24  and --

25  A.   Full-time, I would say probably -- including Jerry or

395

1  excluding him?

2  Q.   Well, we will note Jerry and --

3  A.   Jerry, I would say, in '98, four to five.

4  Q.   Four to five other full-time employees.

5  A.   Yes.

6  Q.   And did that change at all in the 2000s, calendar years?

7  A.   Yes.

8  Q.   All right.  And how did it change?

9  A.   The number went down.

10  Q.   The number went down.  And so in 2004, 2005, how many

11  full-time employees do we have?

12  A.   Oh, golly.  We're down probably two, maybe three.  I don't

13  remember when people left and came and things.

14  Q.   Sure.

15  A.   I know one girl passed away.  I know --

16  Q.   One of your full-time people passed away.

17  A.   One of them did, yes.

18  Q.   And of course, you're a full-time person, is that fair to

19  say?

20  A.   No.

21  Q.   No?  Then correct me.

22  A.   I'm part-time.

23  Q.   Part-time.  Twenty hours a week?

24  A.   It varies depending on the time of year.

25  Q.   Sure.  During tax time, you're --

Jury Trial, Vol. III of V

396

1  A.   I'm there twelve hours a day, fifteen hours a day.

2  Q.   All right.  And during tax time, does your husband also pick

3  up part-time people?

4  A.   Yes.

5  Q.   All right.

6  A.   Some paid, some not.

7  Q.   All right.  You don't personally know Maxine and Robert

8  Pochmara, is that fair to say?

9  A.   Yes.

10  Q.   Yes, you don't know them?

11  A.   Yes, I don't know them.

12  Q.   All right.  These different tax forms that you've testified

13  regarding and that have been admitted into evidence, they were

14  prepared at your husband's office, is that fair to say?

15  A.   Yes.

16  Q.   Back in 1998, approximately how many clients did your

17  husband have, did Jerry's office have, did Jerome Kieliszewski

18  have?

19  A.   Eight hundred.

20  Q.   Eight hundred?  Did that number change in the 2000s?

21  A.   Well, some left, others come in.

22  Q.   Sure.

23  A.   I -- I really don't know if the number went up or down.

24  Q.   But it was in the hundreds, for sure.

25  A.   Oh, yes.

Jury Trial, Vol. III of V

1   Q.   And you're saying over five hundred, you think.

2   A.   Yes.

3   Q.   And that was both doing businesses and also doing personal

4   taxes for people --

5   A.   Right.

6   Q.   -- is that fair to say?

7   A.   Yes.

8   Q.   Ma'am, would you peek and go through there and see if you

9   can find 60A?  And if you can't, I will run up there and help you

10  find it.

11  A.   Sixty A.  Yes, I see those.  Very bottom of the stack,

12  okay.

13        MS. PARKER:  Of course.

14        THE WITNESS:  Of course.

15  BY MR. JACOBS:

16  Q.   And what is that, ma'am, 60A, again?

17  A.   Ah, 60A, is a page of W-2s.

18  Q.   All right.  Those are W-2s for?

19  A.   2005, for Fred -- and I can't say his last name -- and

20  Maxine Pochmara.

21  Q.   It says Fred?

22  A.   The one at the top says Fred.

23  Q.   Oh, I'm sorry.

24        MS. PARKER:  Your Honor, for purposes of providing

25  copies, we redacted the top for the person who is not involved in

Jury Trial, Vol. III of V

398

1   this thing.  So she has the original.

2   BY MR. JACOBS:

3   Q.   And we don't care about somebody who is not a part of this

4   case.

5   A.   Okay.

6   Q.   So that's why somebody's name was taken off.

7   A.   Okay.

8   Q.   My question to you is, does that W-2 denote that monies were

9   withheld and paid in for Social Security?

10   A.   Yes.

11   Q.   And shows that monies were paid in -- withheld and paid in

12   for federal taxes?

13   A.   Yes.

14   Q.   Shows money was withheld and paid in for, what's that called

15   Medicare, Medicaid, medical?

16   A.   Yes, Medicare tax.  I guess I should say how much is

17   reported or withheld on the forms.

18   Q.   On the forms?

19   A.   Mm-hmm.

20   Q.   Is that a yes?

21   A.    (Nods head)

22   Q.   That's a yes -- you're saying how much was reportedly

23   withheld.

24   A.   Correct.

25   Q.   All right.  Now, that Exhibit 62 there, you made a

Jury Trial, Vol. III of V

399

1  reference -- I will let you try and find it -- you thought that

2  was Martha Butler's handwriting?

3  A.   Let me see if I can find 62.  Here is 63, 64, 65, 62, okay.

4  That one.  Yes.

5  Q.   Is Martha Butler the lady in your office who passed away?

6  A.   She is not.

7  Q.   So she is still around, Martha is?

8  A.   Yes, she retired.

9  Q.   Oh, she retired.

10  A.   She no longer works for us.

11  Q.   Was she one of your full-time employees back then?

12  A.   In '98?  Oh, this is '05.

13  Q.   Yes.

14  A.   In '05, that's when she retired.

15  Q.   That was the year she retired?

16  A.   I believe it.

17  Q.   Or approximately around there.

18  A.   Yeah, it was somewhere back in there.

19  Q.   All right.  And if you peek at 63 there.

20  A.   Okay.

21  Q.   Sorry to make you dig through --

22  A.   That's okay, I found it.

23  Q.   You found it.  That's the one where it's typed in the

24  percentage of time at the business.

25  A.   Devoted to the business.

Jury Trial, Vol. III of V

400

1   Q.   Devoted to the business.  And it says Maxine a hundred

2   percent -- Maxine Pochmara a hundred percent, Gary Wilson, a

3   hundred percent, Sue Wilson, a hundred percent?

4   A.   Correct.

5   Q.   Does that document also say -- and it might not be the one

6   that I'm asking for -- does that document also denote the

7   ownership interest or the number of shares that people own?

8   A.   It says percentage of corporation stock owned on it, yes.

9   Q.   All right.  And what does it have for Maxine on that one?

10   A.   Forty-five percent.

11   Q.   And for Gary Wilson?

12   A.   It's 27.5 percent.

13   Q.   And for Sue Wilson?

14   A.   Again, 27.5 percent.

15   Q.   Where do you get the information to put, like that, the

16   stock ownership?  Where do you receive that information to put in

17   the actual tax form?  How do you get it?

18   A.   Well, a lot of times, it just comes forward from a prior

19   return.

20   Q.   All right.  Prior return.  So you use the same percentage?

21   A.   Unless I'm told of a change or something, yes.

22   Q.   You use the same designation as far as what a person's

23   occupation is, secretary, laborer, whatever?

24   A.   Yes.

25   Q.   All right.

Jury Trial, Vol. III of V

1        MR. JACOBS:  Approach the witness, your Honor?

2        THE COURT:  You may.

3   BY MR. JACOBS:

4   Q.   Why don't we put the rest of these aside.

5   A.   All of these?  Okay.

6   Q.   Let's screw up Miss Parker's order.

7   A.   I'm sorry.  I'm not meaning to.

8   Q.   Ma'am, the first document that I'm showing you is Proposed

9   Defense Exhibit 202.  Have you ever seen that before?  It's a

10  two-page document.

11  A.   I'm sure I have.

12  Q.   And why do you say, "I'm sure I have"?

13  A.   Because I would typically be the one who typed it up.

14  Q.   All right.

15  A.   If our office prepared it.

16  Q.   Well, why are you making some assumptions that your office

17  prepared it?

18  A.   It looks like the same font as the program that I had to use

19  back then, to type those types of documents up.

20  Q.   And do you recognize any of the purported signatures on the

21  first page or the second page?

22  A.   I recognize all of them on the first page.  I recognize all

23  but Maxine and Robert Pochmara on the second page.  I don't

24  recognize theirs but --

25  Q.   In fact, it was notarized by somebody from your office?

Jury Trial, Vol. III of V

402

1   A.   Yes.

2   Q.   All right.  But you're saying you don't specifically recall

3   typing up this particular document, is that what you're saying?

4   It was back in 1998.

5   A.   Exactly.  I wouldn't remember typing something 15 years ago,

6   necessarily, so, sorry, my memory isn't that good.

7   Q.   Other than seeing this recently through me, do you recall

8   even seeing this document before?

9   A.   Do I remember it?  No.

10  Q.   Do you remember a situation where Gary and Sue Wilson sold

11  some stock?

12  A.   Maybe.

13  Q.   Maybe.  And what do you mean by "maybe," ma'am?

14  A.   Like I said, this is 1998.  I was part-time.  If -- if I

15  typed this, which I may have, then I would have, you know, had

16  that information around at the time.  But I don't recall it

17  now.

18  Q.   Would this be part of the business records that if your --

19  if your office typed this up, would this be in Gary and Sue

20  Wilsons' records?

21  A.   I would assume so.

22  Q.   You're familiar with your husband's signature, is that

23  correct?

24  A.   I am.

25  Q.   Is that in fact his signature?

Jury Trial, Vol. III of V

403

1  A.   It is.

2  Q.   Are you familiar with Gary and Sue Wilsons' signatures?

3  A.   Yes.

4  Q.   Is that in fact their signatures?

5  A.   It is.

6  Q.   You're familiar with the lady who worked in your office,

7  Martha Butler.

8  A.   Yes.

9  Q.   Is that in fact her signature as a notary?

10  A.   It is.

11  Q.   And, boy, it's kind of hard to read.  Can you tell the

12  other signatures as witnesses in the left-hand side of the second

13  page?

14  A.   Yes.  That's June Plume.  She has since passed away.

15  Q.   Is she the employee that passed away?

16  A.   She is.

17  Q.   All right.  And the other signature appears to be?

18  A.   Well, my husband's.

19  Q.   Your husband.  Your husband is on both the first page and

20  the second page?

21  A.   Yes.

22       MS. PARKER:  I hate to interrupt you, counsel.

23       MR. JACOBS:  Sure.

24       MS. PARKER:  But I think you're looking to lay a

25  foundation and I would object to the --

Jury Trial, Vol. III of V

404

1          MR. JACOBS:  Oh, okay.

2          MS. PARKER:  Sorry.

3          MR. JACOBS:  Yes.  Then I would move for admission of

4     Exhibit 202.

5          MS. PARKER:  The government will not object.

6          MR. JACOBS:  That made it a lot easier.  I will ask that

7     first before I go to another exhibit, your Honor.

8          THE COURT:  Wait a moment.

9          MR. JACOBS:  Uh-oh, Mr. Piazza.

10         THE COURT:  We may have an objection.

11         MR. JACOBS:  Sorry.

12         MR. PIAZZA:  I have no objection.

13    BY MR. JACOBS:

14    Q.   What is Exhibit 202, ma'am?

15    A.   The whole thing?

16    Q.   Yeah.  Well --

17    A.   The two pages?  Yeah, it appears to be a sales agreement.

18    That it appears to be that -- let me see, looks -- looks like

19    there is a sale between the corporation and the Pochmaras and

20    that they purchased 45 percent of the stock of the company for

21    $70,000.

22    Q.   So 202 is on the bottom of this document, is that correct?

23    A.   Correct.

24    Q.   Uh-oh.  I'm not good with these machines.  And then we are

25    going to look at the top and that's where it says sales

Jury Trial, Vol. III of V

405

1   agreement, is that correct?

2   A.   Correct, yes.

3   Q.   All right.  Thank you.  So this appears to be the sales

4   agreement -- you weren't here, other people have talked about a

5   sales agreement -- that occurred January 5th, 1998, between

6   Gary -- GW & SW, Inc., selling some shares of their ownership as

7   sellers to Maxine and Robert Pochmara, husband and wife, is that

8   correct?

9   A.   Yes.

10  Q.   And it -- and in essence, it says they are selling 45

11  percent of the value of the corporation, is that fair to say?

12  A.   Yes, that's exactly what it says.

13  Q.   And for $70,000, is that correct?

14  A.   Yes.

15  Q.   Now, we're going to take these one at a time.  We are going

16  to go to the next document and that's Proposed Exhibit 203.

17  A.   Okay.

18          MR. JACOBS:  Move for the admission of 203, your Honor.

19          MS. PARKER:  It hasn't really been identified but --

20          MR. JACOBS:  Oh, I'm sorry.

21          MS. PARKER:  -- I'm not objecting to the foundation or

22  the relevance.

23          MR. PIAZZA:  No objection.

24          THE COURT:  It is received.

25  BY MR. JACOBS:

Jury Trial, Vol. III of V

1   Q.   Is this document a single business tax schedule of

2   shareholders and officers for 1998 regarding GW & SW, Inc.?

3   A.   It is.

4   Q.   It is.  And that lists the shareholders as Gary Wilson, Sue

5   Wilson and Maxine Pochmara?

6   A.   Yes.

7   Q.   Is that correct?

8   A.   Yes.

9   Q.   Now, that one, out on the right, it notes time, a hundred

10  percent for Mr. Wilson, fifty percent for Mrs. Wilson, a hundred

11  percent for Maxine Pochmara, is that correct?

12  A.   Correct.

13  Q.   All right.  And then it lists shares of stock, 51 percent

14  joint for Gary and Sue Wilson and 49 percent for Maxine Pochmara,

15  is that correct?  That's what the document says.

16  A.   That's what the document says.

17  Q.   All right.  But we know from other documents, from the

18  sales -- I'm sorry.

19        MS. PARKER:  I'm going to object to the form of the

20  question.

21        MR. JACOBS:  Is that -- I'll ask it a different way.

22  BY MR. JACOBS:

23  Q.   Is that consistent with other single business tax

24  shareholder of -- schedule of shareholders and officers that

25  you've seen for GW & SW, Inc., for other calendar years, the

Jury Trial, Vol. III of V

407

1  percentage of stock?

2  A.   The percentage of stock looks different.

3  Q.   Sure it does.  That's just a mistake?

4        MS. PARKER:  Objection.  Calls for a conclusion.

5        THE COURT:  Sustained.

6        MR. JACOBS:   All right.  I will let that -- that's

7  fine, your Honor.

8  BY MR. JACOBS:

9  Q.   Do you know why that 51 and 49 percent are on the document,

10  if you know?

11  A.   I don't know for certain.  It may have to do with the date.

12  Because it isn't a full year, I guess.  It was January 5th so

13  it's close but maybe the percentages changed because of that.

14  I -- I don't know.  Or it could be a mistake.  I simply don't

15  know.

16  Q.   Ma'am, I'm going to show you what's been --

17        MR. JACOBS:  Did we accept 203?

18        MS. PARKER:  Yes.

19  BY MR. JACOBS:

20  Q.   Ma'am, I'm going to now want you to pull out what appears to

21  be Defendant's Proposed Exhibit 204.

22  A.   Yes.

23  Q.   Ma'am, what does that proposed exhibit appear to be?

24  A.   It appears to be a bill.

25  Q.   A bill.  A bill from whom?

Jury Trial, Vol. III of V

1   A.   From our office.

2   Q.   From J. W. Kieliszewski, am I pronouncing that right?

3   A.   You got it.  Congratulations.  Most people can't.

4   Q.   And what's the date on that bill?

5   A.   June 22nd, 1999.

6   Q.   And who is it to?

7   A.   GW & SW, Inc.

8   Q.   And it's for certain services rendered, is that fair to say?

9   A.   Yes.

10  Q.   All right.

11       MR. JACOBS:  Move for admission of Exhibit 204.

12       MS. PARKER:  No objection.

13       MR. PIAZZA:  No objection.

14       THE COURT:  It is relevant in -- because I don't have

15  the document, how is it relevant to the case?

16       MR. JACOBS:  I would have to read, and if the Court

17  would like me to do that, it has to do with the tax preparation

18  closing out a general ledger and also, in connection with

19  consulting correspondence and other matters related to proposed

20  sale of business.

21       So that would be the relevancy, your Honor.

22       THE COURT:  We will conditionally admit it --

23       MR. JACOBS:  Yes, sir.

24       THE COURT:  -- under the assumption that the transaction

25  is relevant to the questions that are being posed to the jury.

Jury Trial, Vol. III of V

409

1          MR. JACOBS:  Yes, sir.

2   BY MR. JACOBS:

3   Q.   Ma'am, you also did balancing of books and looking at checks

4   regarding GW & SW, Inc., is that fair to say?

5   A.   Over the years, yes.

6   Q.   Over the years.  And you also have seen these checks that

7   are -- or at least copies of checks that said NAPA W & W Auto

8   Parts.  Have you seen those before?

9   A.   I'm sure I have.

10  Q.   But you would --

11  A.   I don't usually see the checks.

12          MS. PARKER:  I'm not sure what checks -- excuse me, your

13  Honor.  I'm not sure what checks you are referring to.

14          MR. JACOBS:  I'm trying to lay a foundation for the next

15  proposed exhibit, 205.

16          MS. PARKER:  Well, I still need to understand what

17  you're referring to.

18          THE COURT:  The objection is sustained.  We need to be a

19  little more specific, sir.

20  BY MR. JACOBS:

21  Q.   Ma'am, I believe you just said that you have seen copies of

22  checks and utilized the NAPA W & W Auto Parts checks.  You've

23  seen those before.

24  A.   I'm sure I have.

25  Q.   All right.  And are you aware of who had the authority to

Jury Trial, Vol. III of V

410

1  sign the various checks?

2  A.   I am not.

3  Q.   You're not personally aware of that.

4  A.   No.

5  Q.   And -- but you have in fact viewed these checks before.

6  A.   Yes.

7  Q.   And I would like you to look at Proposed Exhibit 205.

8  A.   Okay.

9  Q.   And what does that purport to be?

10 A.   It appears --

11       MS. PARKER:  Well, I think before we go into it, I think

12 there ought to be some foundation that she recognizes it.  I can

13 tell you what it appears to be but that doesn't mean I can

14 provide a foundation.

15       THE COURT:  I would agree.

16       MR. JACOBS:  I will ask it a different way, your Honor.

17 BY MR. JACOBS:

18 Q.   Ma'am, have you ever seen that check or a similar type check

19 that reads NAPA W.W. Auto Parts on the top left?

20 A.   I have seen checks that have that, yes.  It appears to be

21 one of NAPA's checks, yes.

22 Q.   That you have seen before in your -- in your occupation as

23 working as the accountant for GW & SW, Inc., is that fair to say?

24 A.   Yes, yes.

25 Q.   All right.  And it appears to be signed by someone, is that

Jury Trial, Vol. III of V

1  fair to say?

2  A.   Yes.

3  Q.   Okay.  And that someone is?

4  A.   Maxine --

5       MS. PARKER:  Objection, your Honor.  That goes into the

6  content of the document that's not in evidence.

7       MR. JACOBS:  I will move for admission of the document

8  at this point in time.

9       MS. PARKER:  I object on relevance grounds.

10       MR. JACOBS:  Your Honor, I don't know if we want to do

11  this on the record but I'll --

12       THE COURT:  Let's -- let's take a look, because I'm not

13  familiar with the documents.

14       (Whereupon sidebar conference held on the record as

15       follows)

16       MR. JACOBS:  Your Honor, the government's theory has

17  been that Bob Pochmara was there as an employee and that Maxine

18  Pochmara had no connection to our business.  And this is a

19  document, one of many checks that we received from them through

20  discovery, that shows that Maxine Pochmara actually had some

21  interest in the business and was authorized to write checks.

22       MS. PARKER:  Well, your Honor, we never said she had no

23  interest in the business.  I don't think that is at all the case.

24  In fact, in one of our exhibits yet to be provided is a signature

25  card putting Robert and Maxine as signatories.  That doesn't make

Jury Trial, Vol. III of V

1   this document relevant to the issues in the case.

2          MR. JACOBS:  Sure, it is.

3          MR. PIAZZA:  The problem is that Maxine didn't work

4   there.  She is doing something by signing the checks.

5          MS. PARKER:  She took $36.70 and you think that

6   warrants --

7          MR. PIAZZA:  That's one check.  There are others.  She

8   did something --

9          MS. PARKER:  That's the best one you've got.  I'm

10  assuming that's why you picked it.

11         MR. PIAZZA:  He picked it.

12         MR. JACOBS:  I picked it.

13         MS. PARKER:  I don't think it's relevant.

14         MR. JACOBS:  It's still a check written by her showing

15  her --

16         THE COURT:  Sorry.  I don't see how it connects -- is

17  connected with any question in the case.

18         MR. JACOBS:  That she -- she does not have any role as a

19  signatory --

20         MS. PARKER:  He didn't falsely report the wages.

21         MR. JACOBS:  All right.

22         THE COURT:  Yep.  If we go through exhibits they've

23  introduced with the bank statements, she was probably an

24  authorized signatory.

25         MR. JACOBS:  Well, they are going to introduce it.  I

Jury Trial, Vol. III of V

413

1  don't know if that one has been.

2       MS. PARKER:  Not yet.  It's part of what I plan on

3  putting in.

4       MR. JACOBS:  Yeah.

5       THE COURT:  Onward.

6       (Whereupon sidebar concluded)

7       MR. JACOBS:  Ma'am, we are going to skip that one and I

8  will deal with that issue with another witness.  We will put

9  Proposed 205 aside.

10 BY MR. JACOBS:

11 Q.   One more document in front of you, Proposed Exhibit 206.

12 A.   Okay.

13 Q.   Have you seen this document before?

14 A.   Probably.

15 Q.   Probably.  Now, why do you say "probably"?

16 A.   Again, it was five years ago.

17 Q.   Yes.

18 A.   It's -- but probably, yes.

19 Q.   And why do you say "probably"?

20 A.   Same reason.  It looks like something that would have been

21 produced for clients in our office.

22 Q.   Do you know any of the purported signatures on the second

23 page of the document?

24 A.   Gary and Sue.

25 Q.   All right.  Are you familiar with the other signatures on

1  there?

2  A.   I think --

3  Q.   You told us you don't know Maxine.

4  A.   Maxine, it looks to be the same signature as the other

5  document back in 1998.

6  Q.   No, I'm just asking --

7           MS. PARKER:  Your Honor, I ask --

8           MR. JACOBS:  That doesn't matter, ma'am.

9           MS. PARKER:  I'm going to --

10          MR. JACOBS:  I'm asking if you know the other names on

11  the document.

12          THE WITNESS:  I can't read them.

13          MS. PARKER:  I'm trying to interpose an objection here.

14          MR. JACOBS:  Oh, sorry.

15          MS. PARKER:  That I don't think she can say -- should be

16  opining as to the similarities of the signatures.  That's

17  something that the jury could determine on their own.

18          MR. JACOBS:  And that's why I cut her off, your Honor.

19          THE COURT:  All right.

20          MS. PARKER:  Well, I want that portion of her answer,

21  the jury be instructed to disregard it.

22          THE COURT:  We will disregard the response.  You can ask

23  the question again, sir.

24  BY MR. JACOBS:

25  Q.   Thank you.  The other signatures on what I will call the

Jury Trial, Vol. III of V

                                                                              415

1  left-hand side of the second page --

2  A.    Okay.

3  Q.    -- are you familiar with any of those signatures?

4  A.    No.

5  Q.    No?

6  A.    No.

7  Q.    Were you familiar or part of any communications or

8  discussions regarding the sale of stock back in 2005?  If you

9  weren't, you weren't.

10 A.    In 2005?

11 Q.    Excuse me.  I'm looking at the wrong document.  This is in

12 2009.

13 A.    Right.  Am I -- I'm sorry.  I can't remember what the

14 question was.  Am I familiar with something and I don't remember

15 what it was.

16 Q.    Were you privy -- did you have any knowledge, were you part

17 of the conversations regarding having personal knowledge

18 regarding the sale of stock or ownership of GW & SW, Inc., in

19 2009?

20 A.    I don't recall it.

21 Q.    All right.

22        MR. JACOBS:  I have no further questions, your Honor.

23        THE COURT:  Mr. Piazza?

24        MR. PIAZZA:  Thank you, your Honor.

25        MS. PARKER:  I take it that document has not been

Jury Trial, Vol. III of V

1  offered.

2         MR. JACOBS:  No.

3         MS. PARKER:  Okay.

4         MR. JACOBS:  No.

5         MS. PARKER:  Thank you.

6         MR. JACOBS:  I don't think I could lay the foundation

7  for that.

8                      CROSS-EXAMINATION

9  BY MR. PIAZZA:

10  Q.   Good morning, ma'am.

11  A.   Good morning.  Yes, I guess it is still morning.

12  Q.   Still morning, although it probably seems a lot longer for

13  you up there.

14  A.   For me, yes.

15  Q.   Okay.  Now, is it Kieliszewski?

16  A.   That's close.

17  Q.   Kieliszewski?

18  A.   Kieliszewski.

19  Q.   Kieliszewski.  All right.  Last name Piazza, people

20  mispronounce that all the time.

21  A.   I can understand it.

22  Q.   Thank you.  You indicated that you've -- your husband is a

23  CPA, is that correct?

24  A.   Correct.

25  Q.   He has his own firm or your business, is that correct?

Jury Trial, Vol. III of V

417

1   A.   Yes.

2   Q.   And he has numerous business clientele as well as personal

3   clientele, is that correct?

4   A.   Yes.

5   Q.   He does personal income taxes as well as business

6   situations, is that correct?

7   A.   Yes.

8   Q.   And during the course of his business, he consults with

9   business clientele, is that correct?

10  A.   Yes.

11  Q.   And in fact, I believe one of the documents that Mr. Jacobs,

12  the attorney that just asked you questions, had a bill for

13  preparation of tax work and consulting, is that correct?  I

14  believe that was --

15  A.   Correspondence and other matters relating to the proposed

16  sale of business, yes.

17  Q.   Yes.  All right.  So business clientele would consult with

18  him, meet with him, talk with him, discuss options dealing with

19  taxes and their business, correct?

20  A.   Yes.

21  Q.   Sure.  You yourself wouldn't be involved in those meetings

22  for the most part?

23  A.   That's way above my pay grade.

24  Q.   All right.  And in fact, you, when you're working for your

25  husband, only worked part-time for a while.  Did you ever work

Jury Trial, Vol. III of V

418

1   full-time for him?

2   A.   Tax season, I'm full-time then.

3   Q.   Okay.

4   A.   Otherwise, no.  At first, we still had a lot of minor

5   children at home and I tried to be at home as often as I could

6   with them.

7   Q.   So primarily, you're part-time.

8   A.   Yes.

9   Q.   And, also, I believe you indicated on direct examination

10  that Sue Wilson was employed for a short period of time at that

11  firm, is that correct?

12  A.   Yes.

13  Q.   In fact, she only worked during a couple of tax seasons, is

14  that correct?

15  A.   Yes.

16  Q.   Now, with Sue Wilson working there, she was not a CPA, was

17  she?

18  A.   No.

19  Q.   She didn't have a degree in accounting to your knowledge,

20  did she?

21  A.   I don't believe any of us do except Jerry.

22  Q.   Okay.  In fact, to your knowledge, she probably only had a

23  high school education, I believe?  If you know.

24          MS. PARKER:  Objection, your Honor.

25          THE COURT:  Sustained.

Jury Trial, Vol. III of V

419

1          MR. PIAZZA:  Yeah, I will move on.

2    BY MR. PIAZZA:

3    Q.   When she worked there, all she did basically was filing

4    during tax season, is that correct?

5    A.   Primarily, yes.

6    Q.   She didn't work on any books or dealt with clients or

7    anything like that?

8    A.   Nothing like that.  May have made some phone calls or

9    answered the phone.  We all have to chip in on that.

10   Q.   Okay.  Especially during the tax season.

11   A.   You got it.

12   Q.   So she worked what, two seasons, maybe?

13   A.   Maybe.  I can remember one for sure.  I can't remember if

14   there was a second one or not.

15   Q.   All right.  And during tax time, you're talking about, what,

16   a couple months?

17   A.   Yes.

18   Q.   Now, the government has shown you numerous exhibits.  And

19   you've got a stack there.

20   A.   Yes.

21   Q.   And if you bear with me, if you can look at Exhibit 59, I

22   believe, if you could find it.

23   A.   Let's see if I can find it.  There we go, 59, have it.

24   Q.   Fifty-nine.  And that's a small business tax schedule for

25   the State of Michigan for 2005, is that correct?

Jury Trial, Vol. III of V

420

1   A.   That's one of the schedules from their annual return, yes.

2   Q.   All right.  And in that, it breaks down between the

3   shareholders of the two Wilsons and Maxine Pochmara, is that

4   correct?

5   A.   Yes.

6   Q.   And it shows, also, you know, income, is that correct?

7   A.   Yes.

8   Q.   And that's in Subsection I, is that correct?

9   A.   Salaries, wages and/or director's fee.

10  Q.   Yes, salaries, wages, and/or director's fees.  And you have

11  an amount, C, for Maxine Pochmara, is that correct?

12  A.   Amount C.

13  Q.   Yeah, if you look at Line C, there is an amount there.

14  A.   Oh, yes, she is on Line C.

15  Q.   And it doesn't distinguish between salaries, wages or

16  director's fees.  It just has a gross amount, is that correct?

17  A.   Yes.

18  Q.   On 60A, I believe, the next exhibit?

19  A.   Let me find it.  Yes, 60A, okay, found it.

20  Q.   And that is, I believe, the W-2s for Maxine Pochmara?

21  A.   Yes.

22  Q.   Now, regarding -- listed No. 1, refers to the gross income,

23  is that correct?

24  A.   Yes.

25  Q.   And that includes wages, tips and other compensation, is

Jury Trial, Vol. III of V

421

1   that correct?

2   A.   Yes.

3   Q.   It doesn't break down between tips and wages and other

4   compensation, just a gross, is that correct?

5   A.   Yes.

6   Q.   All right.  Now, moving on to 61, I believe, A?

7   A.   Let's see if I can find it.  It's 61A?

8   Q.   Yes.  Take a look -- that is wage detail reports for GW &

9   SW, Inc., is that correct?

10  A.   Yes.

11  Q.   And that's A, B, C and D.

12  A.   For 2005, correct.

13  Q.   Yes.  Sue Wilson was not even listed as an employee at that

14  time, was she?

15  A.   No.

16  Q.   Exhibit 80, if you can find that, that's the client note.

17  A.   Okay.  Yes.

18  Q.   Okay.  That is -- it's indicated at the bottom, relating to

19  a $25 adjustment, "Per JWK, do nothing."  That JWK is what?

20  A.   Pardon?

21  Q.   What is JWK?

22  A.   That's my husband's initials.

23  Q.   Okay.  Nothing in that document refers to Sue Wilson, does

24  it?

25  A.   No.

Jury Trial, Vol. III of V

422

1    Q.    Okay.

2    A.    It's an internal note.

3    Q.    Okay.  Take a look at Exhibit, I believe, 50.

4    A.    Okay.

5    Q.    Let me catch up with you then.

6    A.    I just happened to find it.  It was on one of the crossed

7    ones so I got lucky.

8    Q.    Exhibit 50 is an U.S. corporate -- corporation income tax

9    return, is that correct?

10   A.    Yes.

11   Q.    And that's for 1998, is that correct?

12   A.    Yes.

13   Q.    And this is obviously before electronic filing.  There is an

14   actual signature on that tax return, is that correct?

15   A.    There are two signatures on this return.

16   Q.    One, is that of your husband's?

17   A.    Yes.

18   Q.    And that is as preparing it, is that correct?

19   A.    Yes.

20   Q.    And the other is of Gary Wilson, is that correct?

21   A.    It appears to be, yes.

22   Q.    There appears to be no signature alluded to that of Sue

23   Wilson on that document, is there?

24   A.    No.

25   Q.    Exhibit 51?

Jury Trial, Vol. III of V

423

1   A.   Okay.

2   Q.   Is also a federal tax return for the corporation, is that

3   correct?

4   A.   Yes.

5   Q.   And the signature there was that of Gary Wilson and, of

6   course, your husband as preparer, is that correct?

7   A.   Correct.

8   Q.   Exhibit 52, again, U.S. corporate income tax return, signed

9   by Gary Wilson on behalf of the corporation and also your husband

10  as preparer, is that correct?

11  A.   Yes.

12  Q.   Exhibit 53, another United States corporation income tax

13  return with the federal government signed by Gary Wilson,

14  correct?

15  A.   Yes.

16  Q.   And, you know, prepared by your husband, is that correct?

17  A.   Yes.

18  Q.   And that was 2001.  In Exhibit 54, 2002, again, it's signed

19  by Gary Wilson and prepared by your husband, is that correct?

20  A.   Yes.

21  Q.   Exhibit 55, 2003, again, it is signed by Gary Wilson.

22  A.   Yes.

23  Q.   2004, apparently, we start the electronic filing but the --

24  for the signature, there is typed in, Gary Wilson, is that

25  correct?

Jury Trial, Vol. III of V

424

1   A.   Yes.

2   Q.   2005, again, a federal income tax return for the corporation

3   signed or at least typed in, Gary Wilson, is that correct?

4   A.   Where is that?

5   Q.   Fifty-seven.

6   A.   Fifty-seven.  I don't know that I have that one out here.

7   Let me see if I can find it.  I'm sorry, I'm trying.

8   Q.   That's quite all right.

9   A.   Here it is, 57, yes.

10  Q.   And that is typed in for electronic filing, Gary Wilson, is

11  that correct?

12  A.   Yes.

13  Q.   So all the documents that was filed for the United States

14  corporation income tax returns that you've seen, that has been

15  disclosed to you, has been listed as either signature or typed in

16  Gary Wilson as prepared by your husband.

17  A.   Yes.

18  Q.   In dealing with bank statements, you have for signatures,

19  husband and wife normally signs so that both can, you know, sign

20  checks and withdraw, would that be common practice?

21  A.   Very common.

22          MS. PARKER:  Objection.  Beyond the scope of direct.

23          THE COURT:  Overruled.

24          MR. PIAZZA:  Thank you.  If I may have a brief moment,

25  your Honor.

Jury Trial, Vol. III of V

425

1          (Whereupon defense counsel confer off the record)

2          MR. PIAZZA:  Thank you, your Honor.  I have no further

3   questions.

4          THE COURT:  Redirect?

5          MS. PARKER:  Yes, your Honor.

6                         REDIRECT EXAMINATION

7   BY MS. PARKER:

8   Q.   You still have those Exhibits 50, 51, 52, 53, 54, 55 handy?

9   A.   Yeah, relatively.  They are out of order now.

10  Q.   Well, I was hoping that since they were recently discussed,

11  they would be close to the top.

12  A.   Yeah, I have them kind of together here on the side.

13  Q.   All right.  Can you display the signature box on 50, please,

14  at the bottom.

15         You indicated previously you thought you could recognize

16  the signature of Gary Wilson.

17  A.   Yes.

18  Q.   Does that appear to be the signature of Gary Wilson to you?

19         MR. PIAZZA:  Well, I will object to that, your Honor.

20  You know, she has not been qualified as a handwriting expert.

21         MS. PARKER:  I'm not purporting to qualify her as a

22  handwriting expert but they listed that it was signed by Gary

23  Wilson and she had previously indicated on cross-examination that

24  she recognizes Gary Wilson's signature on documents.

25         I'm asking her, does this appear to be one.

1    THE COURT:  There was no objection by the government

2  when the question was asked by the defendant.

3    MS. PARKER:  All right.  But I still think the

4  foundation has been laid and she has provided information that

5  she recognizes their signature and I'm asking her if she

6  recognizes this as being one of his.

7    THE COURT:  Defendant maintain your objection?

8    MR. PIAZZA:  Pardon?

9    THE COURT:  You maintain your objection?

10    MR. PIAZZA:  Yes, I do, your Honor.

11    THE COURT:  Sustained.

12  BY MS. PARKER:

13  Q.  All right.  Let's go to Exhibit 51.

14  A.  Yes, okay.

15  Q.  Okay.  Do you notice -- can you display those side by side?

16  You should have a monitor, ma'am, on the witness box.

17  A.  Okay.

18  Q.  Can you tell us if the signature as displayed on Exhibit 50

19  on the monitor is accurate to the actual document you have in

20  front of you?

21  A.  Yes.

22  Q.  And on 51, is that an accurate display of the signature on

23  Exhibit 51?

24  A.  Yes.

25  Q.  All right.  Could you take off the one from 51 and put on

Jury Trial, Vol. III of V

427

1  the signature block of 52?

2         Is that an accurate display of that?

3  A.   Yes.

4  Q.   Fifty-three, is that signature block accurately displayed?

5  A.   Yes.

6  Q.   Fifty-four?

7  A.   Yes.

8  Q.   And 55?

9  A.   Yes.

10  Q.   Okay.  Thank you.  Could we now have the second page of

11  Exhibit 50 displayed.  And Section -- where it's Schedule E.

12  A.   Okay.

13  Q.   All right.  It indicates there for percentage of ownership

14  for Gary Wilson as how much?

15         MR. PIAZZA:  Your Honor, I'm going to object.  That's --

16  she has already been questioned about that on direct by the

17  government about the percentages and on these documents.  To go

18  over them again is redundant.

19         MS. PARKER:  Your Honor, they used a tax document that

20  had that same percentage in a different year and indicated that

21  there was some mistake and reason for it.

22         THE COURT:  All right.  Overruled.

23  BY MS. PARKER:

24  Q.   I would like to ask you to look at what the percentage of

25  ownership reflected there is for each person.

Jury Trial, Vol. III of V

428

1   A.   On the second page of 98?

2   Q.   Yes.

3   A.   Okay.  Percentage of ownership, 25 and a half, 25 and a

4   half, 49 percent.

5   Q.   Okay.  Go to 51, please, the second page.

6   A.   Fifty-one, second page.  Okay, 25 and a half, 25 and a half,

7   49 percent.

8   Q.   So as I understood your testimony on cross-examination, you

9   said, as I think I understood you, that the percentage is not

10  being reflected as 45 on the '98 return, could have been the

11  result of partial year ownership because the ownership didn't

12  allege to begin until January 5th.

13  A.   It's a possibility.  I don't know.

14  Q.   Well, this next one, though, 51, is for the following year.

15  Are the percentages the same on 51 as on 52?

16  A.   They are.

17  Q.   And would that be a full year?

18  A.   That would be a full year.

19  Q.   Are you familiar with 1099s?

20  A.   I am.

21  Q.   And does your firm prepare 1099s?

22  A.   We do.

23  Q.   What is a 1099?

24  A.   For somebody who isn't an employee but has their own

25  business, for example, and they are a sole proprietor, they run

1   it out of their house type of thing or something, usually, or we

2   see it, for example, sometimes with truckers or something like

3   that.  There are certain kinds of entities that also have to

4   report on a -- on their personal return instead of a federal

5   return.  They are an organization, a company, is required by law,

6   I think, the current rate is $600 or more, if someone receives

7   that in compensation, then they are required to fill out one of

8   these 1099s to give to the person so that they can prepare their

9   own personal returns.

10  Q.   And did your firm prepare any 1099s and issue them to Maxine

11  Pochmara for GW & SW, Incorporated?

12       MR. JACOBS:  Your Honor, I would object.  We are on

13  redirect examination.  We never addressed 1099s in our

14  cross-examination.

15       MS. PARKER:  I believe that was the implication of Mr.

16  Piazza's inquiry regarding what was -- could be included under

17  wages or other things.

18       THE COURT:  Overruled.

19  BY MS. PARKER:

20  Q.   Did your firm prepare any 1099s for Maxine Pochmara for GW &

21  SW, Gary and Sue Wilson?

22  A.   Not to my knowledge.

23       MS. PARKER:  Thank you, your Honor.  I'll pass the

24  witness.

25       THE COURT:  Any concluding recross?

1          MR. JACOBS:  No, sir.

2          MR. PIAZZA:  No further cross.

3          THE COURT:  Thank you, ma'am.

4          Government's next witness, please.

5          MS. PARKER:  Just one second.

6          THE WITNESS:  What do I do with all of these?

7          MS. PARKER:  Your Honor, next we will call Michael

8  Wisniewski.

9          THE WITNESS:  Do I leave all of these laying here or

10  what do I do with all of these?

11          MS. PARKER:  Oh.  Yeah, we'll --

12          THE WITNESS:  Sorry.

13          MS. PARKER:  Your Honor, may the witness be excused?

14          THE COURT:  She may be excused.

15          THE WITNESS:  Okay.  Thank you.

16          (At 11:45 p.m. - witness excused)

17          THE COURT:  Good morning.

18          THE WITNESS:  Good morning.

19          THE COURT:  If you could raise your right hand, please.

20          Do you solemnly swear that the testimony you are about

21  to provide will be the truth, the whole truth and nothing but the

22  truth so help you God?

23          THE WITNESS:  I do.

24          THE COURT:  And the witness stand is on your far left,

25  sir.

431

1              MICHAEL WISNIEWSKI

2  Having first been duly sworn at 11:45 a.m., testified as follows:

3              DIRECT EXAMINATION

4  BY MS. PARKER:

5  Q.   Can you state your full name and spell it for us, please?

6  A.   Michael Wisniewski, W-I-S-N-I-E-W-S-K-I.

7  Q.   How are you employed?

8  A.   I'm a revenue agent with the Internal Revenue Service.

9  Q.   And how long have you been a revenue agent?

10 A.   About 22 years.

11 Q.   And what does a revenue agent do?

12 A.   Generally, a revenue agent is a field tax auditor.  We

13 audit, well, large Schedule C's, corporations, partnerships,

14 LLCs.

15 Q.   Do you have any specialized training for that type of work?

16 A.   Well, besides the IRS training, I hold a Master's degree in

17 Accounting.

18 Q.   And --

19 A.   I'm also a CPA.

20 Q.   Okay.  And when you -- you listed off LLCs and large C's.

21 What do those terms mean to us?

22 A.   Well, LLC is a Limited Liability Company.  They can also be

23 treated as corporations or partnerships or sole proprietorships.

24 Q.   And you mentioned that you had some training from the IRS.

25 Is that something that's fairly continuous?

Jury Trial, Vol. III of V

432

1  A.   Yes, it is.  I -- I am required to take at least 40 hours

2  worth of training every year from the IRS, plus I receive

3  additional training every year from the American Institute of

4  Certified Public Accountants.

5  Q.   And I know you mentioned that you had a Master's degree in

6  Accounting.  What was your undergraduate degree in?

7  A.   Business Management with a major in Accounting.

8  Q.   Okay.

9       MS. PARKER:  Your Honor, I would wish to proceed to

10  elicit opinion testimony from this witness.

11       MR. JACOBS:  I have no objection, your Honor.

12       MR. PIAZZA:  No comment, your Honor.

13       THE COURT:  You may.

14  BY MS. PARKER:

15  Q.   Are you familiar with the term FICA?

16  A.   Yes, I am.

17  Q.   What does that mean?

18  A.   Federal Insurance Contribution Act.  It's part of what is

19  considered to be Social Security taxes.

20  Q.   And are FICA taxes taken out of W-2s?

21  A.   Yes, they are.

22  Q.   Are they taken out of 1099s?

23  A.   No, they are not.

24  Q.   What -- without getting too complicated, what's the

25  difference between a W-2 and a 1099?

Jury Trial, Vol. III of V

433

1  A.   A W-2 would indicate an employer/employee relationship.  A

2  form 1099 relationship would indicate a sole proprietor or

3  somebody that is self-employed.

4  Q.   In terms of record-keeping, are Social Security numbers

5  used in a variety of ways to keep track of records relating to

6  people?

7  A.   Yes, they are.

8  Q.   Businesses don't have Social Security numbers, do they?

9  A.   No, they do not.

10 Q.   What do they have?

11 A.   They have employer identification numbers.

12 Q.   All right.  Is there a connection between the use of Social

13 Security numbers and related information between the IRS, Social

14 Security, and the Railroad Retirement Board?

15 A.   Yes, there are.  Well, Social Security numbers are issued by

16 the Social Security Administration.  Employer identification

17 numbers are issued by the Internal Revenue Service.  When W-2s

18 are issued to individuals for employment tax purposes -- for

19 employment purposes, that information first goes to the Social

20 Security Administration and then it's automatically available to

21 the IRS via computers.  The 1099s are sent in directly to the IRS

22 and maintained by the IRS.

23 Q.   All right.  Going back to W-2 wages, is that information

24 made available to the IRS, Social Security, and the Railroad

25 Retirement Board?

Jury Trial, Vol. III of V

434

1  A.   Yes, it is.

2  Q.   How does that information get to the agencies?

3  A.   Well, all of the W-2s that are issued by employers are sent

4  directly to the Social Security Administration.  After they have

5  been input into their computers, then they are available -- that

6  information is available both to the IRS and to the Railroad

7  Retirement Board.

8  Q.   All right.  So one source of information of W-2 wages and

9  withholdings is information that the employers are required to

10 provide?

11 A.   That they are required to provide, yes, that is correct.

12 Q.   And is there a second source of W-2 information?

13 A.   I'm --

14 Q.   In terms of when the individual employees file their tax

15 returns.

16 A.   Yes, they are also required to attach a copy of their form

17 W-2 to their form 1040 that they file with the IRS on an annual

18 basis.

19 Q.   And is one of the things that is done in the process of

20 administering the tax system, is making sure that these numbers

21 match?

22 A.   That is correct.  The IRS has special matching computers for

23 that purpose.

24 Q.   And are those computers linked, also, to the Railroad

25 Retirement Board computers?

Jury Trial, Vol. III of V

435

1   A.   Yes, they are.

2   Q.   And do you also look to make sure the names and the Social

3   Security numbers match?

4   A.   Yes, that is correct.

5   Q.   If that doesn't match, is that an issue?

6   A.   Yes.  It's automatically highlighted by the computer and

7   then somebody from either Social Security Administration or the

8   IRS or both have to look into the matter a little farther.

9   Q.   Okay.  Does the amount of money one pays into Social

10  Security affect the size of benefits one can get monthly checks

11  when they retire?

12  A.   Yes, it does, up to a certain limit.

13  Q.   And that limit would be at a higher end?

14  A.   Yes.  And that limit changes every year.  I can remember

15  when it was down around $90,000 and now, I believe it's up to

16  around $112,000 or $113,000 for the maximum amount of wages that

17  would be subject to a FICA tax.

18  Q.   Now, you reviewed various tax returns that were in my office

19  before you came to testify?

20  A.   Yes, ma'am, that is correct.

21  Q.   I would like to show you Government's Proposed Exhibits 100

22  to 106.  Do you recognize what type of documents those are?

23  A.   Yes, I do.  They are Internal Revenue computer print-outs.

24  Q.   All right.  Are those the kind of print-outs that you have

25  familiarity with through your work for the IRS?

1 A.   Yes, ma'am.

2 Q.   All right.

3        MS. PARKER:  Your Honor, I would offer Government's

4 Proposed Exhibits 100 through 106.

5        MR. JACOBS:  Your Honor, I don't understand the

6 documents.  I believe we'll have to do a voir dire or get a

7 better explanation of the document itself.  As far as objecting

8 to the foundation, no.  I don't object to the foundation.  I just

9 need an explanation.

10       THE COURT:  So do I.  Miss Parker, I don't have those

11 exhibits with me.  If you could elicit through the witness what

12 the documents are, I would appreciate it.

13       MS. PARKER:  All right.  I will try to do that without

14 going too far.

15       THE COURT:  Okay.

16 BY MS. PARKER:

17 Q.   Can you explain for us what type of document that is?

18 A.   It's a document that summarizes income for a particular

19 taxpayer for a particular year.  A particular individual

20 taxpayer.

21 Q.   All right.  And is there a Social Security number on that?

22 A.   Yes, ma'am, there is.

23 Q.   And what is that Social Security number?

24 A.   The Social Security number is xxx-xx-7553.

25 Q.   All right.  I'm going to show you what's already in evidence

Jury Trial, Vol. III of V

1  as Exhibit 84B.  At the bottom, do you see a W-2?

2  A.   Yes, ma'am, I do.

3  Q.   And is there a Social Security number on that W-2?

4  A.   Yes, ma'am, there is.

5  Q.   And is that the same Social Security number?

6  A.   Yes, it is.

7       MR. JACOBS:  To expedite matters, I guess I should have

8  spoke up sooner.  We stipulate that that's my client's Social

9  Security number regarding that document.

10      MS. PARKER:  All right.  So that will help.

11 BY MS. PARKER:

12 Q.   All right.  So you would -- let me just ask the question.

13 Is that the Social Security number for Gary Wilson then?

14 A.   Yes, it would be.

15 Q.   All right.  And on this particular document, what

16 information would be on there for Gary Wilson?

17 A.   The amount of wages that he made for 1998, amount of

18 interest income for 1998, taxable income, taxable positive income

19 which is more or less for IRS use, also his adjusted gross income

20 and the tentative tax, as well as withholding and prior year

21 estimated tax payment.

22 Q.   And for what year?

23 A.   This is for 1998.

24 Q.   And how do you know that?

25 A.   Well, up on the top line, after the Social Security number,

Jury Trial, Vol. III of V

438

1  there is a code three zero, which is an IRS code indicating

2  for -- that belongs to an individual taxpayer.  Right alongside

3  that, there is a 1998 for the year, the 12 means that the tax

4  year for that particular taxpayer ends at the end of December.

5  Q.   Okay.  And does this indicate whether it's a joint return?

6  A.   Um, yes, it does.

7  Q.   All right.  And the -- you were referring to Exhibit 100.

8  Exhibit 101 through 106 would all be for the same Social Security

9  number and following the years after 1998, so 101 would be for

10  '99?

11  A.   That is correct.  There is a print-out sheet for 1999, 2000,

12  2001, 2002, 2003, and 2004.

13  Q.   Okay.  So those would be --

14  A.   Income summaries for all of those years.

15  Q.   Okay.

16        MS. PARKER:  Your Honor, again, I would offer

17  Government's Proposed Exhibits 100 through 106.

18        MR. JACOBS:  I have no objection, your Honor.

19        MR. PIAZZA:  No comment, your Honor.

20        THE COURT:  Received into evidence.

21  BY MS. PARKER:

22  Q.   Could we have that displayed, please.  One hundred, please.

23  Can you see on the display?  You can either use the display or

24  the document.  You have both, you get to pick.

25  A.   Either or.

Jury Trial, Vol. III of V

439

1  Q.   You were telling us where to find the time frame covered by

2  this report and the Social Security number.

3  A.   Yes.

4  Q.   Again, where are they on this document?

5  A.   Once again, they are up on the top line.   IMFOLR is the name

6  of a computer program within the Internal Revenue Service.

7  Following that is the Social Security number for this particular

8  taxpayer.   Following that would be the three zero which would

9  indicate it's an IRS code for individual taxpayer.   Following

10  that, is the 1998, 12, which would be an indication that it's

11  for 1998 tax year, and ends after the 12th month of that year.

12  Q.   All right.   And you indicated this was a joint return.

13  A.   Yes.

14  Q.   And how do you know that?

15  A.   On the far right, near the top, there is an indication that

16  there was an exemption amount claimed for self, also an exemption

17  amount claimed for spouse right under that, and also three

18  exemption amounts claimed for children at home.

19  Q.   Okay.   Is there a place on this form where wages are

20  reported?

21  A.   Yes.

22  Q.   Okay.

23  A.   That would be, again, on the far left and in about the

24  middle of the page.   There is a line that indicates wages, with

25  an amount of $29,865.

1   Q.   And that would be all of the wages reported on the tax

2   return.

3   A.   That is correct.

4   Q.   Is there any 1099 income reported on this tax return and if

5   so, where?

6   A.   Well, there is interest income of $4,438 listed right below

7   the wages and interest income is normally reported on a 1099-INT.

8   And I am not seeing any other 1099 income being reported on that

9   particular document.

10   Q.   Let me give you some exhibits.  I would like to show you

11   Government's Proposed Exhibits 50.  That's already in evidence

12   but is that a corporate tax return?

13   A.   Yes, ma'am, it is, for 1998.

14   Q.   And for what business entity?

15   A.   For a business called GW & SW, Incorporated.  And then below

16   that would be -- my assumption would be a d/b/a, that would be

17   W & W Auto Parts from Rogers City, Michigan.

18   Q.   And on this form, is there an indication of the taxable

19   income for the business in 1998?

20   A.   Well, the total gross receipts would be $458,123 and it has

21   been reduced down to taxable income of $16,028.

22   Q.   And what line has the taxable income on it?

23   A.   That would be Line No. 28.  Actually, on Line No. 30 as well

24   since there were no other adjustments to that income.

25   Q.   Okay.  And the very last page of that exhibit is a photocopy

1  of an envelope?

2  A.   Yes, ma'am.

3  Q.   What would that indicate to you?

4  A.   That would indicate to me that this particular tax return

5  was mailed in to the IRS on the 25th of June of 1999.

6  Q.   And in reviewing that form, did you see any indication that

7  the business received an influx of capital of $70,000?

8  A.   Are we assuming to the -- well, to any increase to the

9  capital stock for the year?

10  Q.   Okay.

11  A.   And if that is the case, then the answer would be no.  The

12  beginning amount for the capital stock for 1998 would be $40,000

13  and the ending amount would also be $40,000.

14  Q.   If someone had purchased $70,000 in stock from the

15  corporation, should that have been reflected there somehow?

16  A.   Yes, it should have.  The capital stock account should

17  have gone up from $40,000 to $110,000 based on that $70,000

18  influx.

19  Q.   And where would that belong on the form?

20  A.   That would show up on Line 22B, under Column C, initially,

21  and then it would flow through to the same line, but Column D, as

22  the ending balance for the stock.

23  Q.   Also, I would like for you to look at Page 2 of Exhibit 50

24  and the Schedule E.

25  A.   Okay.  I have it.

Jury Trial, Vol. III of V

442

1   Q.   Do you see an indication of -- in Schedule E, Column A of

2   the percent of time devoted to the business?

3   A.   Yes, ma'am, I do.

4   Q.   And what is that?

5   A.   That would indicate that, a particular shareholder has

6   devoted a percentage of his time directly to the business.  For

7   example, number one shareholder listed is Gary Wilson and

8   according to this, it would indicate that he has devoted a

9   hundred percent of his time working at that business.

10   Q.   All right.  What about the other --

11   A.   The next shareholder would be Sue Wilson and this indicates

12   that she is -- she has devoted fifty percent of her time working

13   in the business.  And the third shareholder is a Maxine Pochmara

14   and this indicates that she is also devoting one hundred percent

15   of her time working within this business.

16   Q.   And is that number of significance to the IRS?

17   A.   There are instances where it could be but normally, we don't

18   put a lot of credibility into this.  Well, right now, I'm dealing

19   with some cases where there are individuals that have between 30

20   and 50 different business entities and they claim to devote a

21   hundred percent of their time to each one of them.  And

22   considering there is only 8,740 hours in a calendar year, I find

23   that a little hard to believe.

24   Q.   So if someone had a full-time job working 80 hours a week at

25   a different job, would it be of concern if they were reporting a

Jury Trial, Vol. III of V

443

1   hundred percent there?

2   A.   Yes, it would be, due to the fact that, you know, people

3   have to rest from time to time as well.  If they were really

4   working 80 hours a week at some other business, then that

5   doesn't leave a whole lot of time to work at this particular

6   business.

7   Q.   All right.

8   A.   I've had instances in my own life where I've had to work

9   between 90 and 95 hours a week to make ends meet and I think we

10   can all do that for a while but that's a quick trip to an early

11   grave if you do it for too long.

12   Q.   You can't do that very often.

13   A.   I did it for six months and I needed a very long vacation

14   afterwards.

15   Q.   I would like to show you Exhibits 140, 141, 142, 143, 144

16   and 145.  Do you recognize those?

17   A.   Yes.  These are also IRS print-outs.

18   Q.   Similar to the one --

19   A.   Similar to the -- that is correct, yes.

20   Q.   And would those be for a different Social Security number?

21   A.   Yes, they are.  You want me to read the Social Security

22   number that these are for?

23   Q.   All right.  How about this.

24   A.   Okay.

25   Q.   Let's show you a different document.  And compare it.

Jury Trial, Vol. III of V

444

 1  Sorry, wrong one.  Sorry.

 2        MR. JACOBS:  Ms. Parker, would you like a stipulation as

 3  to the Social Security number of an individual?  I will do that

 4  if you just read it out.

 5  BY MS. PARKER:

 6  Q.   Go ahead.

 7  A.   Okay.  The Social Security number on the forms that I have

 8  here in front of me right now are xxx-xx-6475.

 9  Q.   And does that appear to be the Social Security number of

10  Robert Pochmara?

11  A.   Yes, ma'am, it does.

12  Q.   All right.  Sorry.

13  A.   That's okay.

14  Q.   And again, would all of those documents be for that Social

15  Security number?

16  A.   Yes, ma'am, they are.

17  Q.   All right.  And for the time periods, the first one being

18  what year?

19  A.   1998.

20  Q.   The last one?

21  A.   And this runs through 2003.

22        MS. PARKER:  Your Honor, I offer the --

23        MR. JACOBS:  What number again, Miss Parker?  I'm sorry.

24        MS. PARKER:  The exhibit numbers?

25        MR. JACOBS:  The exhibit numbers.

Jury Trial, Vol. III of V

445

1          MS. PARKER:  They are 140 through 145.

2          MR. JACOBS:  No objection, your Honor.

3          MR. PIAZZA:  No comment.

4          THE COURT:  Received.

5  BY MS. PARKER:

6  Q.   All right.  For demonstrative purposes, again, could we have

7  140 displayed?

8          Just for demonstrative purposes, could you, again,

9  explain where you find the tax year that's covered by this?

10 A.   Okay.  Once again, on the very top line, starting from the

11 left, the IMFOLR is an IRS code for a particular computer

12 program.  This is followed by the Social Security number, with a

13 blank space and then three zero indicating, once again, an

14 individual summary.  Following that is 1998 tax year and 12 would

15 mean that the tax year ends at the end of the 12th month.

16 Q.   All right.  And on this particular form, are any wages

17 indicated?

18 A.   For 1998, there is no wages indicated at all.

19 Q.   Would you look at all those forms and see if any wages are

20 indicated.

21 A.   No, there are no wages indicated on any of these forms.

22 Q.    Is there an indication of income, however?

23 A.    Yes.  Each of the forms are -- have an amount listed for

24 taxable income.  Just as a matter of example, for the 1998 tax

25 year, this particular individual had taxable income of $10,726

Jury Trial, Vol. III of V

446

1   and he had total positive income of $17,676.

2   Q.   And can you tell from this form the source of that?

3   A.   No, not the source on this particular form.

4   Q.   Did I hear you say passive income?

5   A.   No.  It's -- based just on this form alone, it is not

6   possible to tell if it's active or passive income.

7   Q.   But you can tell it's not wages.

8   A.   It is not wages, that is correct.

9   Q.   Next, I would like to show you Government's Proposed

10  Exhibits 120 through 126 and show you another tax return here to

11  assist you.  If you can compare the Social Security numbers.

12  A.   Okay.  The numbers between the IRS forms and the tax

13  returns do match.  Would you like me to read the Social Security

14  number?

15  Q.   Might as well.

16  A.   Okay.  This one is xxx-xx-0934.

17  Q.   And that's the Social Security number for what taxpayer?

18  A.   For Maxine Pochmara.

19  Q.   All right.

20       MS. PARKER:  Your Honor, I will offer Government's

21  Proposed Exhibits 120 through 126, your Honor.

22       MR. JACOBS:  I have no objection, your Honor.

23       MR. PIAZZA:  No comment, your Honor.

24       THE COURT:  Received.

25  BY MS. PARKER:

Jury Trial, Vol. III of V

447

1  Q.   And, sir, again, what years are covered by these
2  print-outs?
3  A.   These documents start with the 1998 tax year and they run
4  through 2004.
5  Q.   And let me just ask this.  Would these print-outs be
6  available because the tax returns were no longer being kept?
7  These are computerized records?
8  A.   Yes, that is correct.  The IRS, itself, generally only has
9  tax returns back four or five years in our computers.  After
10  that, they are sent to archive.
11  Q.   And I believe you said this information basically is taking
12  information from the tax return and transferring it to about a
13  half page.
14  A.   That is correct, yes.
15  Q.   Let's look quickly again at 120.  For Maxine Pochmara, just
16  on this first one, for example, are wages reported there?
17  A.   Yes, ma'am, there are.  For 1998, the total is $41,444.
18  Q.   It doesn't break it down by different sources, however.
19  A.   No, not on this particular document.
20  Q.   And is there a 1099 income reflected?
21  A.   Yes, there is interest income reported of $73.  That would
22  have been reported to her on a form 1099-INT.
23  Q.   All right.  Like interest on a bank account or savings
24  account of some sort, something like that?
25  A.   Yes, that is correct.

1  Q.   Let me ask you this.  How are wages that are paid to

2  employees of a corporation treated on the corporation's tax

3  return?

4  A.   They are a deduction to the corporation's tax return and --

5  well, as an example, I have here in front of me Exhibit 50, wages

6  paid to officers, would appear on Form 1120 on Line 12.

7  Sometimes the lines -- numbers do vary because of changes made to

8  the actual tax returns.

9  Q.   All right.  So if wages are paid to employees or officers,

10 those are deductions taken against the business.

11 A.   That is correct.

12 Q.   All right.  And that has what effect on the amount of

13 corporate profits that would be subject to taxation?

14 A.    It lowers the amount of the corporate income that will be

15 subject to taxes.

16 Q.   What about stock dividends?  How are those treated on

17 corporate tax returns?

18 A.   They are not even going to show up on corporate tax return.

19 Stock dividends are supposed to be paid from -- from

20 additional -- well, from taxable income that the corporation

21 incurs over the course of the year.  And the dividends that are

22 paid by the corporation are not deductible to the corporation

23 whatsoever.

24 Q.   So paying dividends wouldn't reduce the tax liability of the

25 corporation.

Jury Trial, Vol. III of V

449

1   A.   No, it would not.

2   Q.   And if the corporation's taxes are lowered by payment of

3   things that are deductible, do the owners of the corporation get

4   to keep more money from the corporation?

5   A.   Depending on how they have structured their wage packages,

6   you know, it's going to lower the amount of available profits to

7   the corporation.  For a corporation such as this, there are only

8   basically two ways to legally remove money from the corporation

9   and that would be either through wages or through dividends.

10        So if they are taking out more in wages, that lowers

11  their taxable profits and leaves more -- or less profit, I should

12  say, to be taken out as dividends by the shareholders of the

13  corporation, either during the year or at the end of the year.

14        MS. PARKER:  Thank you, your Honor.  I will pass the

15  witness.

16        THE COURT:  Cross?

17        MR. JACOBS:  Thank you, your Honor.

18                    CROSS-EXAMINATION

19  BY MR. JACOBS:

20  Q.   Sir, I'm Steve Jacobs and I represent Gary Wilson.  We met

21  before.

22  A.   I think we have.

23  Q.   Yeah, we have.  I won't talk about that audit.  Let's see.

24  That was a joke.  Sir --

25        MR. JACOBS:  Approach the witness, your Honor?

1         THE COURT:  Yes, sir.

2    BY MR. JACOBS:

3    Q.   Sir, I'm showing you what's already been introduced into

4    evidence, and it's Exhibit 135.  What does that in fact appear to

5    be to you?

6    A.   It is a 2009 federal income tax return for, or 1040, for a

7    Maxine Pochmara.

8    Q.   And does that particular return denote that she sold some

9    stock that year and received some income?  Go ahead and look

10   through it.

11   A.   Yes, it does.  It indicates that there was a Schedule D

12   prepared for stock sale.  Schedule D is also attached to this

13   return.  It shows that there was a quantity of NAPA Auto Parts

14   stock sold on March the 24th of 2009, for $90,000.

15   Q.   Does it differentiate what the $90,000 -- does it give a

16   distinction between seventy thousand and twenty thousand on

17   there, on that particular form?

18   A.   Yes.  It indicates that she had a basis in the stock of

19   $70,000 and sustained a long-term capital gain of $20,000.

20   Q.   What do they mean by you have a basis in the stock of

21   $70,000?

22   A.   Well, that would indicate that she paid $70,000 for the

23   stock.

24   Q.   All right.  So sometime earlier, she paid seventy thousand

25   for the stock, sold it for ninety, so had to pay a tax on the

Jury Trial, Vol. III of V

1   $20,000 difference.

2   A.   That is correct.

3   Q.   All right.  When you said you had additional training, you

4   also mentioned the American Institute of Certified Public

5   Accountants.  What's that?

6   A.   It's is a nationwide organization for CPAs.  It's not set up

7   by the states or anything but it's one of the organizations that

8   regulates the CPA profession.

9   Q.   Would you say most CPAs belong to that group?

10  A.   Yes.  Yep.

11  Q.   And does that group also, through that group, have some

12  additional yearly education or training?

13  A.   All of the training through that group is optional.  You can

14  subscribe to their training or you can take training through

15  other organizations.

16  Q.   You mentioned when you were talking about people putting

17  down a hundred percent dedicated to a business, you mentioned,

18  you know people with many, many businesses and yet on their

19  forms, they say they dedicate a hundred percent of their time

20  to each and every one of those businesses.  You've seen that

21  before.

22  A.   Yes, I have.

23  Q.   In fact, it kind of makes you scratch your head because you

24  wonder how somebody could do that.

25  A.   There are so many hours in a day, so many hours in a week.

Jury Trial, Vol. III of V

452

1    So sometimes, yes, it makes me wonder.

2    Q.    But a person can be what's commonly referred to as an

3    absentee owner regarding a business, can't they?

4              MS. PARKER:  Objection.  Beyond the scope of direct.

5              MR. JACOBS:  All right.  It may be but it's --

6              THE COURT:  Overruled.  Overruled.

7    BY MR. JACOBS:

8    Q.    You can be an absentee owner, is that --

9    A.    That is correct, yes, they can.

10   Q.    And why don't you give us -- explain to us what an absentee

11   owner is.

12   A.    That's somebody that owns a portion of a business but

13   generally, they do not engage in operation of the business.  They

14   don't devote any of their time to the business.

15   Q.    Business might be in Michigan and you might live in Arizona

16   but you're still an absentee owner and you own that business,

17   something like that?

18   A.    Or at least a portion of it, yes.

19   Q.    Sure.  Now, if a person is a bona fide absentee owner and

20   has no business role in that business, can that person draw a

21   paycheck from the business?

22   A.    Well, I've seen numerous instances in the past where they

23   did but technically, they are not supposed to.  You're supposed

24   to be paid a reasonable wage for the amount of work that you do

25   for the business.

Jury Trial, Vol. III of V

453

1   Q.   Sure.  But yet you see people in that example, the Michigan

2   business and living in Arizona, that person --

3          MS. PARKER:  Your Honor, I'm going to object.  I think

4   this is way beyond the scope of direct.

5          THE COURT:  Respectfully, I will overrule the objection.

6          MS. PARKER:  Okay.

7   BY MR. JACOBS:

8   Q.   That person, in their home in Arizona, is writing some

9   checks for the business and doing some paperwork and sending

10  things in to the accountants.  That person is arguably doing some

11  work for the business which would justify receiving a paycheck,

12  is that fair to say?

13  A.   That would be fair.

14  Q.   All right.  And if you own five businesses, you could

15  actually draw -- as long as you work for those businesses, you

16  could draw a paycheck from each and every one.

17  A.   That is correct.

18  Q.   You're saying it's arguable how much they legitimately could

19  receive from each business but --

20  A.   Yeah, there are standards of reasonableness that sometimes

21  we have apply at audits.  I mean, if they are just writing a

22  couple of checks and drawing a million dollars a year, then we

23  would have some issue with that.

24  Q.   Raise a red flag, you're saying.

25  A.   Yes.

Jury Trial, Vol. III of V

454

1  Q.   All right.  Speaking of red flags, on those forms, like 140,

2  you talked about positive income or -- and you said that number

3  is used by the IRS.  What do you mean by that?

4  A.   Ah, well, through the course of the years, we've seen a lot

5  of instances where people will have, particularly Schedule C,

6  sole proprietorship type of businesses that will show large

7  losses to apply against whatever -- whatever other positive

8  income that they have earned through the course of the year.

9         Well, probably my favorite example of that is people who

10 have horses on the side and decide to put their horses on their

11 tax return.  I see very, very few instances where people will

12 ever generate any profits from horses.  A lot of times, they

13 will have substantial salaries from other businesses that they

14 have.

15 Q.   Like Christmas tree farms?

16 A.   Yeah, that's another one.

17 Q.   That's another one, yeah.

18 A.   Yeah, so we track the positive -- the total positive income

19 as well, just to give us another indication that they have some

20 money coming in, that they can use to live on.

21 Q.   All right.  And that -- without getting into any more detail

22 because it doesn't really apply here, it raises certain red flags

23 to you.

24 A.   That is correct.

25 Q.   All right.  And the last thing, if I understand correctly,

Jury Trial, Vol. III of V

455

1  regarding like that Exhibit 140, noting Robert Pochmara's income,

2  you can tell on the form whether it's wages or whether it's a

3  1099, is that correct?

4  A.   Not entirely.

5  Q.   Oh.

6  A.   There are other 1099s that would not -- well, I should say

7  there would be other 1099 types of income that would not be

8  reflected on this form.  For instance, a lot of Schedule C

9  businesses receive 1099s in their business and that would not be

10  reflected on this form.  Dividend income, however, if there had

11  been any, that would have been reflected on this form.

12  Q.   This person receives a railroad retirement disability

13  check.

14  A.   Mm-hmm.

15  Q.   Would that be reflected on the form?

16  A.   No, there is not going to be a separate line item on this

17  particular form for that.  That would still show up, though, as

18  being part of the total positive income.

19  Q.   All right.  So if I'm right in asserting -- oh, yes, this

20  person receives a railroad retirement disability check, you're

21  saying you can -- you can see under the positive income, they

22  received some monies.  You couldn't tell me it was railroad

23  retirement disability, is that it?

24  A.   That is correct.  It could be railroad retirement

25  disability.  It could be rental income.  It could be from a

Jury Trial, Vol. III of V

456

1  Schedule C corporation.  It could be from any of a number of

2  different sources and we would not be able to tell exactly what

3  type of income it was just from this form.

4  Q.   All right.  But the form does show some sort of income

5  coming in --

6  A.   Yes, that is correct.

7  Q.   -- for Mr. Pochmara, 140.  And we were looking at 140,

8  correct?

9  A.   We were looking at 140, yes.  The total positive income was

10 $17,676.

11         MR. JACOBS:  I have nothing further, your Honor.

12         THE COURT:  Sir?

13                    CROSS-EXAMINATION

14 BY MR. PIAZZA:

15 Q.   Good afternoon, sir.

16 A.   Hi.

17 Q.   The government asked you questions relating to like

18 employee's wages that are tax deductible, is that correct, for a

19 business?

20 A.   Could you repeat your question, please?

21 Q.   Employee's wages, that's a deduction for a business.

22 A.   That is correct, yes.

23 Q.   Okay.  Dividends are not.

24 A.   That is correct.

25 Q.   And the IRS, they look at wages to see if it's out of line

Jury Trial, Vol. III of V

457

1   with similar, you know, businesses, to see if the wages are out

2   of line at times.

3   A.   Yes.  We have a range for different types of businesses.

4   Q.   For example, if I own a restaurant and I pay myself $40,000

5   a year as a manager of a restaurant and I have an assistant

6   manager, and I pay them, you know, thirty-five thousand, forty

7   thousand, that would not be out of line.  That would be a valid

8   tax deduction for the business, would that be fair?

9   A.   That would be fair, yes.

10   Q.   If I paid myself $600,000 a year as a manager of a small

11   restaurant, that might indicate, you know, an investigation by

12   the IRS, indicating that that is -- I'm hiding dividends by

13   putting it into wages.  Possibly.

14   A.   Possibly, yes.

15   Q.   Okay.  But that does raise a red flag.

16   A.   Yeah, well, the concept of reasonableness comes into, if

17   your restaurant only makes $600,000 a year and you're drawing the

18   whole thing as salary and you have other expenses, yeah, that

19   would raise a red flag.

20   Q.   Yeah, you have a ma and pa restaurant that grosses that

21   amount, then that would raise a red flag.  But if I have a

22   $40,000 salary in a mom and pop type of business, that really --

23   you know, that seems to be a valid deduction on its surface.

24   A.   That is correct, yes.

25   Q.   Okay.  And if an employee makes thirty thousand, forty

Jury Trial, Vol. III of V

458

1  thousand, or a co-owner makes that, that would appear on the

2  surface to be a valid deduction and not trying to, you know,

3  evade taxes or something like that.  On the surface.

4  A.   On the surface, yes, that would be correct.

5  Q.   Okay.  So whether we are talking about a restaurant, a

6  grocery store, an auto parts store, you look at to see whether or

7  not the wages seem to be appropriate.

8  A.   Yes.

9  Q.   Okay.

10          MR. PIAZZA:  Could I have a moment, your Honor?

11          (Whereupon defense counsel confer off the record)

12          MR. PIAZZA:  Thank you.  No further questions.

13          THE COURT:  Redirect?

14          MS. PARKER:  Just a few, your Honor.

15                    REDIRECT EXAMINATION

16  BY MS. PARKER:

17  Q.   You referred -- you were asked on cross-examination about an

18  absentee owner who puts no time into the business.

19  A.   Yes.

20  Q.   That's perfectly legitimate.

21  A.   Yes, it is.

22  Q.   How would that absentee owner be compensated?

23  A.   Through dividends.

24  Q.   Not through wages.

25  A.   That is correct, not through wages.

Jury Trial, Vol. III of V

459

1   Q.   And would -- if you had wages for one person reported under

2   someone else -- one person's Social Security number and another

3   person's name, would that be an issue?

4   A.   Yes, that would be.

5   Q.   And just to clarify one thing, you said that 1099 income to

6   a corporation would not be on the type of document you were

7   referring to at that time, which is Exhibit 140 -- I'm sorry.

8   A.   Well, there are some -- 1099 income that could show up on a

9   document such as this for a corporation, okay, but this document

10  happens to be for an individual.  There are types of 1099 income

11  that would show up on this document for the individual and there

12  are types of 1099 income that would not show up on this

13  particular document.

14  Q.   All right.

15  A.   Not directly, anyway.

16  Q.   What I'm trying to -- just trying to clarify and maybe I'm

17  not doing it well enough -- but if a corporation receives income

18  for doing something for someone else or in some other entity, it

19  gets a 1099 and reports that on its own tax return.

20  A.   That is correct.

21  Q.   Not on the individual tax return.

22  A.   That is correct.

23  Q.   And if a corporation gives the individual a 1099, then it

24  would appear on the individual's tax return.

25  A.   Yes, that is correct.

Jury Trial, Vol. III of V

460

1   Q.   But if somebody is working under someone else's name and

2   Social Security number, does that appear on any of these forms?

3   A.   No, it does not.

4        MS. PARKER:   Thank you, your Honor.

5        MR. JACOBS:   Just want to clarify this absentee owner,

6   dividends versus income thing.   Just one or two questions,

7   judge.

8        THE COURT:   Sure.

9        MR. JACOBS:   Thank you.

10                    RECROSS-EXAMINATION

11  BY MR. JACOBS:

12  Q.   Sir, people sometimes get confused with the absentee owner

13  designation so let's kind of put that aside.   If you're not at

14  the office every day but you balance the checkbook, write the

15  payroll checks, do things like that at the home, you're allowed

16  to draw a payroll check from that business, aren't you?

17  A.   Yes, you would be because you are performing services for

18  that particular entity.

19       MR. JACOBS:   Nothing further, your Honor.

20       THE COURT:   Sir?

21                    RECROSS-EXAMINATION

22  BY MR. PIAZZA:

23  Q.   And it doesn't matter the amount of work, you know, to

24  draw -- you could do a little bit of work and take a little bit

25  of money, fair?

Jury Trial, Vol. III of V

461

1  A.   That is correct.

2        MR. PIAZZA:  Thank you.  Nothing further.

3        THE COURT:  Are we at a conclusion?

4        MS. PARKER:  As to this witness.

5        THE COURT:  Thank you very much, your Honor.  You're

6  excused.

7        (At 12:35 p.m. - witness excused)

8        THE COURT:  Your next witness, please?

9        MS. POP:  The government calls Steve Porter.

10       THE COURT:  Good afternoon.

11       THE WITNESS:  Good afternoon.

12       THE COURT:  Will you raise your right hand, please.

13       Do you solemnly swear that the testimony you are about

14  to provide will be the truth, the whole truth and nothing but the

15  truth so help you God?

16       THE WITNESS:  I do.

17       THE COURT:  Please have a seat in the witness stand.

18                  STEVE PORTER

19  Having first been duly sworn at 12:36 p.m., testified as follows:

20                  DIRECT EXAMINATION

21  BY MS. POP:

22  Q.   Good afternoon.  Could you state your name and spell it for

23  the record?

24  A.   Steve Porter, P-O-R-T-E-R.

25  Q.   What is your occupation, Mr. Porter?

Jury Trial, Vol. III of V

462

1   A.   I am retired at this time.

2   Q.   And before you retired, what did you do?

3   A.   I used to work for E. H. Tulgestka & Sons as their parts

4   manager and mechanic.

5   Q.   And where was that located?

6   A.   In Rogers City.

7   Q.   How long did you work there for?

8   A.   Twelve years.

9   Q.   And did you have any dealings with a NAPA Auto Parts Store

10  in Rogers City?

11  A.   Yes, I did.

12  Q.   What kind of dealings did you have?

13  A.   They supplied me with parts.

14  Q.   How often would that happen?

15  A.   Once a week or more.  Once a week, they came in and took a

16  look at my inventory.

17  Q.   Who is that, "they"?

18  A.   Bob Pochmara.

19  Q.   Anybody else?

20  A.   I do not recall anybody else.

21  Q.   Okay.  So do you know Robert Pochmara?

22  A.   Yes, I do.

23  Q.   And how did you meet him?  Was it only through NAPA?

24  A.   Yeah, through the NAPA Store.

25  Q.   How long have you known him for?

Jury Trial, Vol. III of V

463

1   A.    Twelve years.

2   Q.    And what was Robert Pochmara doing for NAPA?

3   A.    He would come up and do the inventory that he needed to do

4   and then tell me what I needed to have on my shelf and he would

5   bring it back later that day or the next day or somebody from the

6   NAPA Store would bring it back to me.

7   Q.    And did you ever go to the NAPA Store yourself?

8   A.    Yes, I did.

9   Q.    And who would work there?

10  A.    I seen Gary there.  I seen Bob there.  And I can't remember

11  the other -- the names of the other employees that were there.

12  Q.    And what would Robert Pochmara do there at the store?

13  A.    Take -- if I needed a part, he would take the order and give

14  me the invoice and I would be on my way.

15  Q.    And what would Gary Wilson do at the NAPA Auto Parts Store?

16  A.    Same thing, if I needed --

17  Q.    He would wait on customers as well?

18  A.    He would wait on the customer.

19  Q.    Did Robert Pochmara wear a NAPA shirt?

20  A.    Yes.

21  Q.    What kind of shirt was that?

22  A.    Blue shirt.  I believe -- I don't know if it was a yellow

23  logo NAPA with a --

24  Q.    Had a NAPA logo?

25  A.    Yeah.

Jury Trial, Vol. III of V

464

1  Q.  Did he drive a NAPA pickup truck?

2  A.  Yes.

3  Q.  And what about Gary Wilson?  Did he wear a shirt and --

4  A.  Yes, he did.

5  Q.  Did he also drive the pickup truck?

6  A.  Yes.

7  Q.  Now, how often would you go to the store yourself?  How

8  often would you go there?

9  A.  Once, maybe twice a week.  Some weeks was more, some weeks

10 was less.

11 Q.  And do you know how Gary Wilson was associated with NAPA

12 Auto Parts Store?

13 A.  I assumed he owned it.

14 Q.  Have you ever met Maxine Pochmara?

15 A.  Yes.

16 Q.  And did you ever see her work at NAPA Auto Parts Store?

17 A.  I do not recall.

18 Q.  How about Sue Wilson, do you know her?

19 A.  Yes.

20 Q.  And did you ever see her at the NAPA Auto Parts Store?

21 A.  I seen her in her office.

22 Q.  In the NAPA office?

23 A.  NAPA office.

24 Q.  And have you talked to Gary Wilson in the last couple of

25 months about this case?

Jury Trial, Vol. III of V

465

1  A.   Yes, I have.

2  Q.   Could you tell us about it?  What did he tell you?

3  A.   I asked him what was going on when I was given a subpoena --

4  a subpoena.  I asked him what was going on.

5  Q.   And what did he tell you?

6        MR. PIAZZA:  Objection, your Honor.

7        MR. JACOBS:  I will object, your Honor.

8        MR. PIAZZA:  I will object as far as Sue Wilson because

9  it's a statement made by another defendant.

10        MR. JACOBS:  I would object to the -- as stated earlier,

11  as to relevancy.  We are getting from this witness that he

12  approached my client and asked him what was going on and he

13  responded.

14        THE COURT:  I will overrule the objection.

15  BY MS. POP:

16  Q.   Go ahead.  You can answer.

17        MR. PIAZZA:  Well, your Honor, at least for the record,

18  could the Court instruct the jury this is only toward Gary Wilson

19  and not to my client?

20        THE COURT:  We will.

21        MR. PIAZZA:  Thank you.

22  BY MS. POP:

23  Q.   What did Gary Wilson tell you?

24  A.   I don't know the exact words.  It was that if -- if the

25  people that were to testify -- testify against them, not just

1  him, but them, is the way he said it, that they could be sued.

2  Q.   Okay.  And how did that make you feel?  What was your

3  reaction to that?

4         MR. PIAZZA:  Objection, your Honor.  What's the

5  relevancy?

6         THE COURT:  I will sustain the objection.

7         MS. POP:  I'm sorry?

8         THE COURT:  Sustained.

9  BY MS. POP:

10  Q.   Did he tell you why people testifying against them at trial

11  would be sued?

12  A.   For degradation of character.

13  Q.   Okay.  And did you take his statements as a threat?

14         MR. PIAZZA:  Objection, your Honor.  Goes to the state

15  of mind of this witness which is not an issue.

16         MR. JACOBS:  It's also leading.

17         THE COURT:  Sustained.

18         MS. POP:  One second, your Honor.

19         (Whereupon government counsel confer off the record)

20  BY MS. POP:

21  Q.   Did Gary Wilson's statements cause you a reaction?

22         MR. PIAZZA:  Objection, your Honor.  I don't see the

23  relevance of that.

24         THE COURT:  Sustained.

25         MS. POP:  I have no further questions.

Jury Trial, Vol. III of V

467

1          THE COURT:  Cross?

2          MR. JACOBS:  Just real briefly, your Honor.

3                    CROSS-EXAMINATION

4   BY MR. JACOBS:

5   Q.   Sir, when did you retire?

6   A.   Pardon me?

7   Q.   I thought you said you retired.

8   A.   Yes, I did.

9   Q.   How long ago did you retire?

10  A.   January of 2012.

11  Q.   Okay.  So about a year ago.  About a year ago, you retired?

12  A.   A year and four months.

13  Q.   And then prior to retiring, you were working at -- I'm going

14  to slaughter the name, you can say it.

15  A.   Tulgestka.

16  Q.   Tulgestka Transport?

17  A.   Yeah, there were several companies all in one building.

18  It's all under the same --

19  Q.   All right.  That was a full-time job.

20  A.   Yes, it was.

21  Q.   And you mentioned that you've known Bob Pochmara for about

22  twelve years.  Are we talking twelve years from now or when you

23  say twelve years --

24  A.   Yeah, from now back.

25  Q.   So --

Jury Trial, Vol. III of V

1    A.   From the year 2000.

2    Q.   So from around the year 2000.

3    A.   Right.

4    Q.   And do you recall how you met him back in 2000?

5    A.   No, I do not exactly.

6    Q.   All right.

7         MR. JACOBS:  I have no further questions, your Honor.

8         MR. PIAZZA:  Just a couple questions.  May I stay here

9    or would the Court wish me to go to the podium?

10        THE COURT:  I would appreciate it, if you would, please,

11   particularly for the stenographer.

12        MR. PIAZZA:  Okay.

13                    CROSS-EXAMINATION

14   BY MR. PIAZZA:

15   Q.   Good afternoon, sir.

16   A.   Yes.

17   Q.   You never actually had any dealings with purchases or

18   obtaining products from Sue Wilson, have you?

19   A.   No, I don't believe so.

20   Q.   Okay.  And you might have seen her, you know, a couple of

21   times back in the office at the desk at NAPA?

22   A.   Yes.

23   Q.   Okay.  And you've been dealing with the NAPA Store, what,

24   about twelve years or longer?

25   A.   On a personal basis, I have longer but through the company I

Jury Trial, Vol. III of V

469

1 worked for, I worked there for twelve years so I was dealing with

2 them on an everyday basis.

3 Q.  All right.

4         MR. PIAZZA:  Thank you.  Nothing further.

5         MS. PARKER:  Any redirect?

6         MS. POP:  No, your Honor.

7         THE COURT:  Thank you, sir.  You're excused from the

8 stand.

9         (At 12:45 p.m. – witness excused)

10         MS. PARKER:  Your Honor, next I will call Stanley

11 Krajnik.

12         THE COURT:  Good afternoon.  Would you please raise your

13 right hand.

14         Do you solemnly swear that the testimony you are about

15 to provide will be the truth, the whole truth and nothing but the

16 truth so help you God?

17         THE WITNESS:  Yes.

18         THE COURT:  If you would please have a seat in the

19 witness stand.  Yes, sir.

20                    STANLEY KRAJNIK

21 Having first been duly sworn at 12:46 p.m., testified as follows:

22                    DIRECT EXAMINATION

23 BY MS. PARKER:

24 Q.  Good afternoon.  Would you state your full name and spell it

25 for us?

Jury Trial, Vol. III of V

470

1   A.   Stanley Kostanty Krajnik, K-R-A-J-N-I-K.

2   Q.   You've got to do the middle name, too, sir.  I can't begin

3   to guess and I don't think the reporter will either.

4   A.   Okay.  K-O-S-T-A-N-T-Y.

5   Q.   Thank you, sir.  Where are you from?

6   A.   Rogers City.

7   Q.   Are you in business there?

8   A.   Yes, I am.

9   Q.   What is your business?

10  A.   K. J. Alignment.

11  Q.   And how long have you been in business?

12  A.   Forty-two years.

13  Q.   Where is that relative to the NAPA Store in Rogers City?

14  A.   Oh, it's about seven, eight blocks away.

15  Q.   Did you do business with the NAPA Store?

16  A.   Yes, I do.

17  Q.   When you have been at the NAPA Store, have you had contact

18  with Sue Wilson?

19  A.   Not -- she was there but not selling parts, nothing like

20  that.

21  Q.   All right.  She was there.  What was she -- what did she

22  appear to be doing?

23  A.   Could have been visiting with Gary or, you know, something,

24  you know.

25  Q.   She wasn't waiting on people?

Jury Trial, Vol. III of V

471

1   A.   No.

2   Q.   Was she behind the counter?

3   A.   Way behind, yeah, yeah.

4   Q.   Back in the business part.

5   A.   Right, yeah.

6   Q.   Did you ever see Maxine Pochmara at the store?

7   A.   I got to say not during business hours, no.

8   Q.   How often would you go to the NAPA Store?

9   A.   Boy, that would vary.  Sometimes maybe eight, ten times a

10  day.

11  Q.   A day?

12  A.   Yes.

13  Q.   Okay.  Did you have times that you would have parts

14  delivered to you from the NAPA Store?

15  A.   Yes.

16  Q.   And who would do the deliveries?

17  A.   Sometimes Gary would, sometimes Bob would do it.

18  Q.   What are the last names of Gary and Bob?

19  A.   Oh, I'm sorry.  Wilson -- Gary Wilson and Bob Pochmara.

20  Q.   Was there one person who seemed to be more involved in

21  making deliveries than the other?

22  A.   Yes, that would be Bob Pochmara.

23  Q.   And how would you pay for your purchases?

24  A.   I have a monthly account.

25  Q.   And would you get a bill once a month then for everything

Jury Trial, Vol. III of V

472

1   you bought over the month?

2   A.   That is correct.

3   Q.   And when you would pay that bill, how would you go about

4   doing that?

5   A.   I drop a check off there and most of the time, Gary Wilson

6   would take my check or whoever was working there at the time, Bob

7   Pochmara, take my check and then he would run it through their

8   computer, cash register, whatever, and give me a receipt.

9   Q.   Okay.  Were there times when Mr. Pochmara would make a

10  delivery to your store and you might be busy with a customer or

11  on the phone?

12  A.   Yes.

13  Q.   How would he -- what would he do if he got there to deliver

14  something and you were on the phone?

15  A.   Well, if he knew that I was busy, he would just write on

16  the -- on the ticket, delivered by Bob.

17  Q.   And did Mr. Wilson come to your shop after you were served

18  with a subpoena?

19  A.   Yes, he did.

20  Q.   And what if anything did he tell you about people who would

21  testify against him?

22          MR. PIAZZA:  Again, your Honor, ask the Court to

23  instruct the jury that that would be limited only to Gary Wilson

24  and not to my client.

25          THE COURT:  We will provide that instruction at the

1  relevant period of time.

2          MR. JACOBS:  Continuing objection, your Honor.

3          THE COURT:  Noted.

4          MR. JACOBS:  Thank you.

5  BY MS. PARKER:

6  Q.   All right.  Now that that's over, what did Mr. Wilson tell

7  you about people who would testify against him?

8  A.   Well, he came -- he had came over there and he says that the

9  people that would testify would really be in big trouble.

10  Q.   Did he say how?

11  A.   I don't -- well, not really specified how, but he just said

12  that they would be in big trouble if they will testify.

13          MS. PARKER:  Pass the witness, your Honor.

14          THE COURT:  Cross?

15          MR. JACOBS:  Just a couple, your Honor.

16                      CROSS-EXAMINATION

17  BY MR. JACOBS:

18  Q.   Sir, maybe I misunderstood.  Did you say you would go to the

19  NAPA Store about ten times a day?

20  A.   That is correct.

21  Q.   All right.  And then did you also -- and would that be five

22  days a week?

23  A.   Five days, yes.

24  Q.   All right.  So that would be fifty to a hundred times a

25  week.

Jury Trial, Vol. III of V

474

1   A.   Sometimes, yes.

2   Q.   Sometimes, yes.  All right.

3   A.   Yeah.

4   Q.   Do you remember back on January 13 of 2010, being

5   interviewed by this man right here, Mr. Hackett, Special Agent

6   Hackett?

7   A.   January 13th?

8   Q.   Yeah, a couple few years ago.  Do you remember being

9   interviewed by a representative of the federal government about

10  three years ago?

11  A.   Yes, yes.

12  Q.   All right.  And he asked you about the number of times that

13  you went into the NAPA Store, is that fair to say?

14  A.   Yes, right.

15  Q.   All right.  Do you recall saying back then that you went to

16  the store approximately ten to twelve times a week to pick up

17  parts at the NAPA Store?  If you remember saying that.

18  A.   Yes.

19  Q.   You did say that back then?

20  A.   Yes.

21  Q.   All right.  So ten to twelve times a week, you're saying,

22  yes, I did tell him that but you're telling us, five to ten times

23  a day.  I'm not trying to confuse you --

24  A.   No, but --

25  Q.   -- but I'm just trying to clarify how often you went there.

Jury Trial, Vol. III of V

475

1   A.   Well, I guess it all depends on what kind of job I got.  You

2   know, it all varies, you know.  Sometimes, if I had three or four

3   brake jobs in a row and if they were busy, then I would run down

4   there and get the stuff I need.  Or if -- while I'm doing that

5   particular job, if a part broke, well, I would have to run back

6   down there again and get something else.

7   Q.   So if I understand correctly, you're saying, yes, I did tell

8   an agent a couple years ago that I went there approximately ten

9   to twelve times a week.

10  A.   That is correct.

11  Q.   That's fair to say.

12  A.   Yes.

13  Q.   But you're telling us today, it was, I admit I said that but

14  I also went there five to ten times a day.

15  A.   It's possible, yes.

16  Q.   I'm not -- this is your testimony.

17  A.   Right.

18       MR. JACOBS:  Nothing further, your Honor.  Your Honor,

19  can I just ask another thing that I forgot.

20  Q.   Sir, you said to us that you saw Maxine Pochmara, when you

21  were asked -- you were asked if you saw Maxine Pochmara at the

22  NAPA Store and your response was, "not during business hours."

23       Are you saying that you saw her at the NAPA Store at

24  other hours?

25  A.   Well, sometimes, like we would have a Christmas

Jury Trial, Vol. III of V

476

1  get-together, you know, at the store, at his store, and then she
2  would be there.
3  Q.   All right.  So if there was some sort of Christmas party or
4  birthday party, you would see her there?
5  A.   Yeah, that is correct.
6  Q.   All right.  And had you ever seen Gary at the NAPA Store on
7  Sundays, coming in and working on Sundays?
8  A.   Yes.
9  Q.   All right.  Did you ever see Maxine going in the store on
10 Sundays?
11 A.   No, I haven't.
12 Q.   All right.  Other than a Christmas party or a birthday
13 party, you never seen her at the NAPA Store?  By her, we are
14 referring to Maxine Pochmara.
15 A.   No, I have not, no.
16         MR. JACOBS:  Nothing further, your Honor.
17         MR. PIAZZA:  No questions.
18         MS. PARKER:  No further questions, your Honor.
19         THE COURT:  Thank you very much, sir.  Thank you.
20         THE WITNESS:  Oh.
21         THE COURT:  You're excused.
22         THE WITNESS:  Okay.
23         (At 12:55 p.m. - witness excused)
24         MS. POP:  The government calls Michael Kroll.  Shouldn't
25 be more than ten minutes.

Jury Trial, Vol. III of V

477

1       THE COURT:  Okay.  May I inquire, this isn't another

2  customer, is it?

3       MS. POP:  Yes, but he also worked for NAPA.

4       THE COURT:  Good afternoon.

5       THE WITNESS:  Good afternoon.

6       THE COURT:  If you could raise your right hand.

7       Do you solemnly swear that the testimony you are about

8  to provide will be the truth, the whole truth and nothing but the

9  truth so help you God?

10      THE WITNESS:  I do.

11      THE COURT:  If you could have a seat, please.

12                      MICHAEL KROLL

13 Having first been duly sworn at 12:56 p.m., testified as follows:

14                    DIRECT EXAMINATION

15 BY MS. POP:

16 Q.   Could you please state your name and spell it for the

17 record?

18 A.   Michael Kroll, K-R-O-L-L.

19 Q.   What do you do for a living?

20 A.   I am a counter person at Bob's Auto Parts in Rogers City.

21 Q.   And how long have you been doing this for Bob's Auto Parts?

22 A.   I've been doing this for 13 years.

23 Q.   And did you ever have any dealings with a NAPA Auto Parts

24 Store in Rogers City?

25 A.   Yes, I have.

Jury Trial, Vol. III of V

478

1  Q.   Can you explain that?

2  A.   Sometimes when they are -- when we did not have a part, I

3  would call down there to see if they had the part for the

4  customer.

5  Q.   So would you be buying parts from them?

6  A.   No, not myself, personally.  Like I said, if we did not have

7  it and the customer needed it right away, I would call down

8  there to see if they had the part and send the customer down

9  there.

10 Q.   Did you ever work for the NAPA Auto Parts Store?

11 A.   Yes, I did.

12 Q.   When did you work for NAPA?

13 A.   Approximately 1994 through 1998.

14 Q.   And what were you doing there?

15 A.   I was a counter person.

16 Q.   And did you get paid?

17 A.   Yes, I did.

18 Q.   How often would you get paid?

19 A.   It's been so long ago, I don't remember if it was weekly or

20 bi-weekly.

21 Q.   Did you receive paychecks?

22 A.   Yes.

23 Q.   And who would write those checks to you?

24      MR. PIAZZA:  Your Honor, I'm going to object to this

25 line of questioning at this point.

Jury Trial, Vol. III of V

479

1        JUROR TWO:  (Coughing)  Excuse me.

2        MR. PIAZZA:  He indicated he worked through 1998.  You

3   know, the indictment says from 1998 on.  This is before, you

4   know, the events here.  So I don't see the relevancy of what

5   happened prior to this.

6        THE COURT:  I have the same question.

7        MS. POP:  Yes.  This just describes the NAPA Auto Parts

8   Store's practice when it comes to paying employees and who is

9   handing them the checks, the W-2s.  Also, there is an overlap

10  there with Robert Pochmara from 1998.

11       THE COURT:  If the question was particularly tailored to

12  Mr. Pochmara, I would agree.  Otherwise, I will sustain the

13  objection.

14       MR. PIAZZA:  Thank you.

15  BY MS. POP:

16  Q.   So do you know Robert Pochmara?

17  A.   Yes, I do.

18  Q.   And did he -- how did you meet him?

19  A.   When I worked at the NAPA Store before, he would come in

20  once in a while.  I know he is friends with Gary and Sue.  He

21  would also come in and purchase parts for himself.  I also --

22  after I left NAPA, working at Bob's Auto Parts, I would meet him

23  at customers doing sales calls.

24  Q.   Was he wearing an uniform?

25  A.   Yes, he was.

Jury Trial, Vol. III of V

1   Q.   What kind of uniform was he wearing?

2   A.   Blue shirt with a yellow NAPA emblem on it and I believe

3   W.W. Auto Parts embroidered on it.

4   Q.   And did he drive the NAPA pickup truck?

5   A.   Yes.

6   Q.   And do you know Gary Wilson then?

7   A.   Yes, I do.

8   Q.   How was he associated with NAPA Auto Parts Store?

9   A.   He is the owner of NAPA Auto Parts Store, as far as I know.

10  Q.   And would he also work for the store?

11  A.   Yes.

12  Q.   And what would he do there?

13  A.   Gary was a counter person.

14  Q.   And do you know Sue Wilson?

15  A.   Yes, I do.

16  Q.   How do you know her?

17  A.   When I worked there, she was the one doing --

18        MR. PIAZZA:  Your Honor, again, I'm going to object to,

19  you know, any type of procedures before 1998.

20        THE COURT:  Sustained.

21  BY MS. POP:

22  Q.   So did you ever see Sue Wilson work at the NAPA Auto Store?

23  A.   No.

24        MR. PIAZZA:  Again, I will object to that as to the time

25  frame.

Jury Trial, Vol. III of V
481

1   BY MS. POP:

2   Q.   Again, 1998 and after.

3   A.   No.

4   Q.   Do you know Maxine Pochmara?

5   A.   Yes, I do.

6   Q.   Did you see her work at the NAPA Auto Parts Store?

7   A.   No.

8        MS. POP:  One second, your Honor.

9        (Whereupon government counsel confer off the record)

10  BY MS. POP:

11  Q.   In the time frame that both you and Robert Pochmara were

12  working for the NAPA Auto Parts Store in 1998, would you both

13  receive paychecks?

14       MR. PIAZZA:  Your Honor, I will object to that.  I

15  don't believe this witness indicated that they were working

16  together.  He said he knew Robert Pochmara from coming in --

17  going into the store but not working together.  There is no

18  testimony to that.

19       THE COURT:  I will sustain the objection.

20  BY MS. POP:

21  Q.   When did you quit working for NAPA Auto Parts Store?

22  A.   I would have to say in late 1998.

23  Q.   And before you quit working for NAPA Auto Parts Store, was

24  Robert Pochmara working there?

25  A.   No.

Jury Trial, Vol. III of V

482

1          MS. POP:  No more questions, your Honor.

2          MR. JACOBS:  Just briefly, your Honor.

3                       CROSS-EXAMINATION

4    BY MR. JACOBS:

5    Q.   Sir, I don't know how I would be able to tell you what month

6    in 1998 I no longer worked at the NAPA Store but you used the

7    word late so you're pretty comfortable that's in the fall, the

8    winter?

9    A.   I would say the fall, yes.

10   Q.   Fall of 1998.

11   A.   Yes.

12   Q.   All right.  And when -- and when you worked there in 1998 up

13   until the fall of 1998, you were there how many days a week?

14   A.   Five to six days a week.

15   Q.   Five to six days a week.  Approximately how many hours a

16   day?

17   A.   Eight.  Eight hours a day.

18   Q.   So you were a 40-hour-a-week employee?

19   A.   Right.

20   Q.   And Bob Pochmara did not work there, is that correct?

21   A.   That is correct.

22          MR. JACOBS:  Nothing further, your Honor.

23          MR. PIAZZA:  No questions.

24          MS. POP:  No other questions, your Honor.

25          THE COURT:  Thank you, sir.  Appreciate it.

Jury Trial, Vol. III of V

483

1          (At 1:02 p.m. - witness excused)

2          THE COURT:  Are there any citizens from Rogers City

3   still residing there?

4          MS. PARKER:  We left a few, judge.  We are going to let

5   a few go back.

6          MR. JACOBS:  At the stoplight.

7          THE COURT:  Are we at a good place to break for the day?

8          MS. PARKER:  Yes, your Honor.

9          MR. JACOBS:  Your Honor, I have an exhibit question

10  having to do with housekeeping that we might need to talk to the

11  Court outside the presence of the jury.  I could also just ask

12  Miss Parker in trying to mimic the way she is handling them.

13         THE COURT:  We will take that issue up in a few minutes.

14         Any of the jurors have any questions concerning

15  logistics?  Tomorrow will be essentially the same as today and we

16  will see you in the morning.

17         Please rise for the jury.

18         (At 1:04 p.m. - jury leaves the courtroom)

19         THE COURT:  We are outside the presence of the jury.

20  The issue, sir?

21         MR. JACOBS:  Not really an issue, your Honor.  It's more

22  logistically how we comply with a protective order that was

23  issued.  Like my exhibit that's been accepted, is 203, lists Gary

24  Wilson, Sue Wilson and Maxine Pochmara's Social Security numbers.

25  I will let -- Miss Parker shared with me that we are just leaving

484

1  those on.

2         Is that okay with the Court?

3         THE COURT:  The preference would be to redact it.

4         MS. PARKER:  Your Honor, the documents become

5  untraceable once you do that because some of them don't have

6  names on them, they just have Social Security numbers.

7         MR. JACOBS:  Like the 140 series.

8         MS. PARKER:  And once you start using -- once it's out

9  there, it's out there.

10        THE COURT:  Yeah.

11        MS. PARKER:  What I've done for purposes of giving

12 things to the jury, we'll take off the W-2s of -- sometimes, they

13 are two to a page based on how we received them in the records

14 and we are taking off the person who is not one of the

15 defendants.

16        But other than that, once you start taking off the

17 Social Security numbers, we are going to lose track of things

18 here.  I think you can instruct the jury that they ought not to

19 record that information and make use of it outside of their jury

20 deliberations.

21        THE COURT:  I think that handles it properly.

22        MR. JACOBS:  Thank you, your Honor.  I just wanted to

23 clarify that.  I didn't want to be violating any order.

24        THE COURT:  How are we coming on the government's

25 proofs?

Jury Trial, Vol. III of V

485

1        MS. PARKER:  I think satisfactorily, your Honor.  I

2   believe that -- I haven't checked but I think we'll just resume

3   with Mr. Hackett and that will be the conclusion of the case in

4   chief.  I don't think we -- do we have another?  No.  That will

5   take care of it.

6        THE COURT:  Critiques on jury instructions?  Have you

7   had a chance to do that?

8        MR. PIAZZA:  I have gone over them briefly.  I would

9   have some objections but I will go over them again tonight.

10        THE COURT:  If you could give me a copy of any of your

11   commentary on them, even if it's just simply to print them and

12   write your critiques in the margins, I will get through those and

13   at least familiarize myself with your criticisms and suggestions

14   while taking proofs.

15        MR. PIAZZA:  Mostly, your Honor, I've got the wording,

16   like on willfulness, knowingly, and the proposed good faith.  I

17   had submitted my version of that to the Court previously so that

18   will be the only difference, I believe.

19        THE COURT:  Okay, good.  We will see you in the

20   morning.

21        MR. PIAZZA:  Your Honor, one other question.  If we get

22   through with testimony tomorrow, we are not going to be closing

23   tomorrow.

24        THE COURT:  Why not?

25        MR. PIAZZA:  That's -- that was a question.

Jury Trial, Vol. III of V

486

1        MR. JACOBS:  I don't see that happening, your Honor,

2   logistically.  I'm going to have that other accountant person who

3   is under subpoena be here tomorrow.  We will have to -- if we

4   were to get done with Mr. Hackett and we also have taped

5   statements of our clients that might be introduced.

6        If we get done with Mr. Hackett, I think we will be

7   taking up the rest of the day with Mr. Kieliszewski and in the

8   event he were to exercise the Fifth, then I might have my client.

9   So I doubt we will get to closing.

10       MS. PARKER:  Well, your Honor, just for scheduling

11  purposes, I think we have less than an hour of additional direct

12  of Mr. Hackett and I don't know what the cross-exam will be but I

13  don't think it's nearly as long as might be feared by some.

14       But in any case, I do continue with the government's

15  position that Mr. Kieliszewski's testimony is dependent upon

16  foundation being laid unless it's other than to offer documents

17  which are -- I believe, there are very few of them that are not

18  already in evidence.  That would not take very long and that

19  being the case, I think we would be arguing tomorrow.

20       MR. JACOBS:  Then we will be prepared, your Honor.

21       THE COURT:  Very good.

22       MR. PIAZZA:  Yeah, I just wanted to know,  you know, the

23  schedule.

24       MS. PARKER:  My only concern on that, judge, is you

25  didn't, as I recall, tell the jury that once the case was to

Jury Trial, Vol. III of V

487

1  them, it would be full-day sessions.  If I missed that -- but you

2  may want to touch base on that.

3          THE COURT:  My experience is that we rarely upset the

4  jury by telling them that we are getting done more rapidly than

5  we had anticipated.

6          MS. PARKER:  No, but I'm talking about going to full

7  days rather than until one.

8          THE COURT:  We will cover it with them if they are

9  still here.  Otherwise, I think they will be pleased to invest

10  the time on Friday afternoon rather than continuing into the next

11  week.

12          MS. PARKER:  I totally concur with that.

13          THE COURT:  Very good.  Have a good evening and we will

14  see you in the morning.

15          (At 1:09 p.m. - proceedings recessed)

16                          *****

17

18

19

20

21

22

23

24

25

Jury Trial, Vol. III of V

488

1              *CERTIFICATE OF COURT REPORTER*

2

3

4              I, PEG L. GOODRICH, Official Court Reporter

5       in and for the United States District Court, Eastern

6       District of Michigan, appointed pursuant to the

7       provisions of Title 28, United States Code, Section

8       753, do hereby certify that the foregoing proceedings

9       held before the HONORABLE THOMAS L. LUDINGTON, District

10      Court Judge, is a true and correct copy of the transcript

11      originally filed with the Clerk of the Court on November 12,

12      2013, and incorporating redactions of personal identifiers

13      requested by the following attorneys of record or parties:

14      Michael Skinner on behalf of Gary and Sue Wilson, in

15      accordance with Judicial Conference policy.  Redacted

16      characters appear as an "x" in the transcript.

17

18

19

20
                        s/Peg L. Goodrich
21                      Peg L. Goodrich, CSR, RPR, RMR
                        Federal Official Court Reporter
22                      United States District Court
                        Eastern District of Michigan
23

24

25