UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.                                File No. 12-20607

ROBERT J. POCHMARA, MAXINE C. POCHMARA,
GARY L. WILSON and SUE A. WILSON,

        Defendants.

_____/


EVIDENTIARY HEARING


BEFORE THE HONORABLE THOMAS L. LUDINGTON

United States District Judge

United States Post Office Building

1000 Washington Avenue

Bay City, Michigan  48708

Monday, December 9, 2013

Evidentiary Hearing

2

APPEARANCES:

For the Plaintiff:          JANET L. PARKER (P34931)
                            ANCA POP (P70032)
                            U.S. Attorney's Office
                            Eastern District of Michigan
                            101 1st Street, Ste 200
                            Bay City, Michigan  48708
                            Phone: (989) 895-5712
                            janet.parker2@usdoj.gov
                            anca.pop@usdoj.gov


For Defendant Robert
Pochmara:                   DAVID A. KOELZER (P41273)
                            Federal Defender Office
                            653 S. Saginaw Street, Ste 105
                            Flint, Michigan   48502
                            Phone:  (810) 232 3600
                            david_koelzer@fd.org


For Defendant
Maxine Pochmara:            JEFFREY JAMES RUPP (P61749)
                            1107 Gratiot Avenue
                            Saginaw, Michigan   48602
                            Phone:  (989) 799-6000
                            jrupp@brisbois-attys.com


For Defendant Gary
       Wilson:              STEVENS J. JACOBS (P37740)
                            Jacobs Law Office
                            45 N. Tuscola Road
                            Bay City, Michigan   48708
                            Phone:  (989) 892-8611
                            jacobslawoffice@sbcglobal.net


For Defendant Sue
       Wilson:              JAMES F. PIAZZA (P30172)
                            803 Court Street
                            Saginaw, Michigan   48602
                            Phone:  (989) 791-1813
                            jfpia@aol.com


PEG L. GOODRICH, CSR-0258, RMR
Federal Official Court Reporter
www.transcriptorders.com

Evidentiary Hearing

3

# T A B L E   O F   C O N T E N T S

|  | PAGE |
|---|---|
| OPENING STATEMENT BY THE COURT: | 6 |
| ARGUMENTS REGARDING ROLE IN OFFENSE: | |
| By Ms. Parker | 10 |
| By Mr. Jacobs | 14 |
| By Mr. Piazza | 18 |
| By Mr. Koelzer | 20 |
| By Mr. Rupp | 25 |
| By Ms. Parker | 29 |
| COURT'S RULING REGARDING ROLE IN OFFENSE: | 32 |
| ARGUMENTS REGARDING SPOUSAL PRIVILEGE: | |
| By Mr. Koelzer | 35 |
| By Mr. Rupp | 40 |
| By Ms. Parker | 43 |
| By Mr. Rupp | 47 |
| COURT'S RULING REGARDING SPOUSAL PRIVILEGE: | 48 |
| WITNESS: | |
| GARY WILSON (Sworned) | 49 |
| Direct Examination by Mr. Jacobs | 50 |
| Cross-Examination by Ms. Parker | 59 |
| COURT'S RULING REGARDING INTIMIDATION OF WITNESSES: | 64 |
| ARGUMENTS REGARDING AMOUNT OF LOSS: | |
| By Ms. Parker | 66 |
| By Mr. Koelzer | 67 |
| By Ms. Parker | 73 |
| By Mr. Jacobs | 75 |
| COURT'S RULING REGARDING AMOUNT OF LOSS: | 82 |

Evidentiary Hearing

4

T A B L E   O F   C O N T E N T S (Continued)

PAGE

ARGUMENTS REGARDING FINANCIAL DISCLOSURES:

    By Mr. Jacobs                                        84
    By Ms. Parker                                       87
    By Mr. Jacobs                                       125
    By Mr. Piazza                                       126
    By Ms. Parker                                       127

WITNESSES:

    JEROME KIELISZEWSKI (Sworn)                         89
        Direct Examination by Mr. Jacobs             90
        Cross-Examination by Ms. Parker              94

    GARY WILSON
        Direct Examination by Mr. Jacobs             104
        Cross-Examination by Ms. Parker              106
        Redirect Examination by Mr. Jacobs           119
        Examination by the Court                     122
        Redirect Examination by Mr. Jacobs           123
        Recross-Examination by Ms. Parker            123

COURT'S RULING REGARDING FINANCIAL DISCLOSURES:        129

CERTIFICATE OF COURT REPORTER:                         137

EXHIBITS:                                    IDENTIFIED RECEIVED

    None marked.

Evidentiary Hearing

5

1                    Bay City, Michigan

2                    Monday, December 9, 2013

3                    At 9:47 a.m.

4          (Court, counsel and parties present)

5          THE LAW CLERK:  Calling the case of United States versus

6  Gary Wilson, Sue Wilson, Robert Pochmara and Maxine Pochmara,

7  Case No. 12-20607.

8          THE COURT:  Good morning.  If we could have counsels'

9  introductions, please.

10         MS. PARKER:  Good morning, your Honor.  Janet Parker for

11  the United States.  With me is Jeff Hackett, the Railroad

12  Retirement Board Special Agent.

13         THE COURT:  Good morning.

14         MR. JACOBS:  Good morning, your Honor.  Steve Jacobs on

15  behalf of Gary Wilson who is also present, your Honor.

16         THE COURT:  Good morning.

17         MR. PIAZZA:  James Piazza on behalf of Sue Wilson who is

18  present in the first row.  And question, does the Court wish us

19  to rearrange the furniture around here or is that sufficient for

20  the clients remaining where they are?

21         THE COURT:  That's -- that's sufficient.  If you don't

22  mind leaving the furniture where it is, we'd appreciate it.

23         MR. KOELZER:  Good morning, your Honor.  David Koelzer

24  from the Federal Defender Office on behalf of Defendant 1, Robert

25  Pochmara, who is seated behind me.

Evidentiary Hearing

6

1           THE COURT:  Good morning.

2           MR. RUPP:  Good morning, your Honor.  Jeffrey Rupp on

3    behalf of Maxine Pochmara who is also present.

4           THE COURT:  And good morning.  We were -- when the cases

5    were originally assigned for sentencing dates the last time, we

6    ended up with a fair number of objections that were made to the

7    original pre-sentence report that needed additional attention.

8           After meeting with counsel, we entered an order on

9    October the 10th, requesting supplemental briefing on a number of

10   issues.  According to my review at this stage, we had a number of

11   issues that were in common among the defendants that needed

12   resolution.

13          There were differences of opinion concerning scoring

14   with respect to guidelines on the role in the offense.  We had at

15   least a recommendation of two of the defendants by the probation

16   officer to receive enhancements for being organizers, leaders or

17   managers, as well as some suggestions by the government that more

18   than one party should receive that two-level enhancement.

19          In addition, the Wilsons in particular sought reductions

20   as a result of their having minor roles with respect to the fraud

21   that was involved in the case.

22          In addition to role of the offense, we had an additional

23   common question concerning a two-level increase for Mr. and Mrs.

24   Pochmara as a result of their marital activities, or lack

25   thereof.

Evidentiary Hearing

7

1          A third issue concerning Mr. Wilson's objection to the

2    two-point enhancement for obstruction of justice based on the two

3    witnesses that we heard during the course of the trial and their

4    suggestion that he sought to intimidate them concerning the

5    testimony that they were to provide.

6          The fourth issue was the amount of loss and that was in

7    part at least at the time encompassed by a question on the

8    appropriate assessment of the Social Security that Maxine

9    Pochmara would have received in lieu of that being paid

10   appropriately with respect to Robert.

11         And a remaining question concerning the adequacy of the

12   financial disclosures.

13         My intent at this point would be to take up those five

14   issues while we are in common session, resolve each one of those.

15   There may be times where we may need some argument by counsel.

16   Counsel may consider it appropriate with respect to any one of

17   those issues, to offer additional testimony.

18         Once we have resolved the guideline questions, those in

19   particular, we'll take a break and then return at that point for

20   individual sentencing hearings with respect to each of the four

21   folks that are calendared for sentencing today.

22         Any objection to the procedure by the government?

23         MS. PARKER:  No, your Honor.  Thank you for the

24   clarification.

25         THE COURT:  Defense counsel comfortable with the

Evidentiary Hearing

8

1   approach?

2          MR. JACOBS:  Yes, sir.

3          MR. PIAZZA:  No objection, your Honor.

4          MR. KOELZER:  No objection.

5          THE COURT:  All right.

6          MR. RUPP:  No objection.

7          THE COURT:  Let's begin with the role in the offense.

8   As indicated in our earlier opinion, it's a bit of a difficult

9   set of circumstances for us.  We had -- we've received two guilty

10  pleas from two of the defendants, Mr. and Mrs. Pochmara.  Mr.

11  Pochmara's explanation of the events was somewhat limited in his

12  explanation to he and Maxine's involvement in the -- in the

13  fraud.

14         His testimony did not extend to the Wilsons'

15  involvement.  The Wilsons, on the other hand, have maintained

16  their innocence but not to the extent that a jury found that

17  sound.

18         The question then becomes who were the primary leaders

19  and organizers, who were the primary followers.  The evidence

20  from the Court's point of view has been fairly clear that the --

21  they were all quite aware of the fraud that was being perpetrated

22  on the railroad pension fund.  It was the only way in which it

23  could be implemented.

24         The fraud was, frankly, breathtaking and clear in its

25  simplicity.  All that was done was to, as much as possible, hide

Evidentiary Hearing

9

1  Robert's receipt of the pension under circumstances where he

2  recognized it needed to be reported.  And everyone at one level

3  or another participated in trying to maintain that information

4  and maintain it privately, without the pension board knowing it.

5       And it was remarkable.  I mean, even before trial when I

6  looked at the exhibits that were going to be offered, including

7  even Susan Wilson's explanation to the pension board, that -- and

8  I'm quoting from the December 10, 2008 document that she

9  furnished to the pension board:

10      "Robert has never/does not, draw earnings from

11      NAPA W.W. Auto Parts.  Only Maxine Pochmara does.

12      Robert works on behalf of Maxine."

13      Incredibly simple in its explanation and so inherently

14  wrong on its face.

15      So what do we have at this stage to make a determination

16  about who was responsible for the fraud, who was an organizer or

17  leader.  The Wilsons have not furnished any particular

18  explanation.  They have maintained their innocence and gone to

19  trial.  Mr. Pochmara says only he and his wife knew.  Maxine says

20  everybody did.  And the circumstantial evidence suggests

21  everybody did.

22      What does the government think that we should do here?

23  Who do you believe should receive increases in the level for

24  their participation and who do you think, if any, are entitled to

25  reductions as a result of only playing a minor role?

Evidentiary Hearing

10

1        MS. PARKER:  Your Honor, I would submit that no one is

2    entitled to a reduction for a minor role.  As the Court has

3    already indicated, all participated in various ways that were

4    critical to the scheme to make it succeed at various times.  To

5    me, there is just really no basis whatsoever for saying anyone

6    was a minor participant.

7        As far as who should get a role enhancement, I think

8    that one could argue that at different points in time, different

9    people took a leadership role.  But I think as an initiation of

10   the scheme, based on what we have of record, and the defendants

11   have been offered an opportunity to provide something to the

12   contrary and have not done so, what the record reveals between,

13   as the probation officer pointed out, the transcripts from the

14   Pochmaras' pleas and Mrs. Pochmara's concession that she could

15   have been the person who came up with this idea, I would think

16   that, frankly, she is the leading candidate for the greatest role

17   increase.

18       I don't see that the Wilsons would have had a reason for

19   coming up with this scheme.  I think they might have said, we

20   need an employee, do you want to come and work for us, Mr.

21   Pochmara.  You know, you're not doing, you know, other employment

22   at this time, would you be willing to do this.

23       That wouldn't have necessarily been an overture based on

24   their knowledge of what became the critical facts in the scheme,

25   that is that Mr. Pochmara was collecting disability and if he

Evidentiary Hearing

1   worked under his own name and Social Security number, that would

2   potentially impact that, either reduce or eliminate those sort of

3   benefits.

4          So I would think that at the outset, logic at least

5   suggests that the Wilsons were not the originators of the scheme.

6   You have Mr. Pochmara's statements under oath.  You have Maxine

7   Pochmara's statements under oath suggesting that there was

8   participation by her with the Wilsons which is not acknowledged

9   as has been pointed out by Mr. Pochmara.

10         Plus she also stood the most to gain.  If you think

11  about it, not only was she in the position of sharing the

12  proceeds from the scheme in terms of the Railroad Retirement

13  Board benefits, compounding what was being brought in through her

14  legitimate employment and then the illegitimate employment by Mr.

15  Robert Pochmara, you also had the enhancement to her own Social

16  Security account.  So she had the most to gain and she's

17  acknowledged both under oath that she dealt with the Wilsons in

18  the origination of the scheme and her statement within her

19  response to the Court's order that she could have been the

20  person.

21         And I think, frankly, collectively, all of this

22  information certainly in the absence of any information to the

23  contrary, would indicate that she was the person who basically

24  hatched this scheme and would entitle her to the greatest role

25  enhancement.

Evidentiary Hearing

12

1        At the same time, as I argued in my responses, other

2   people at various times and in various ways played a controlling

3   role.  And oh, by the way, Maxine stood to gain the greatest

4   financially, because not only was she getting the enhancement to

5   her own household income as was Mr. Pochmara, but she was also

6   gaining in her own Social Security account which is another

7   factor that the Court can consider in determining the magnitude

8   of the role enhancements.

9        But moving on to the other thing, Mr. Wilson, at any

10  time, could have brought the scheme to an end.  All he had to do

11  was stop paying Robert Pochmara.  Same thing for Sue Wilson.  All

12  they had to do was refuse to pay Robert Pochmara by making checks

13  out to Maxine.  Simply make them out to Robert, do the tax and

14  Social Security reporting using his Social Security number.  It

15  probably would have brought this scheme to an end and certainly,

16  at that point, would have taken themselves out of involvement in

17  the conspiracy.

18       At the same time, Robert Pochmara was the person who had

19  a role in it because he could have said, I'm not going to do

20  this.  I'm either not able to work or I realize this is

21  fraudulent.  I'm not going to do it and, of course, if he had

22  withdrawn his services from the conspiracy, there would have been

23  no basis for the operation of the conspiracy.

24       So I think in different ways, all provided a critical

25  role and as the Court has pointed out, when we get to the, sort

Evidentiary Hearing

13

 1   of the denouement of the conspiracy when things are coming

 2   towards a conclusion, Sue Wilson comes forward and does what she

 3   can in terms of her communication with the Railroad Retirement

 4   Board, basically trying, again, against all obvious truths, to

 5   mischaracterize what is going on, what is being done, to try to

 6   legitimize it so the plan can continue.  She obviously didn't

 7   see any point in trying to discontinue the arrangement that had

 8   been going on successfully for more than a decade, eleven-plus

 9   years.  So --

10          THE COURT:  And -- and when I initially read that -- and

11   I don't have the benefit of understanding at this point of what

12   the Wilsons' point of view was -- it was somewhat surprising to

13   me, because it was either incredibly naive in suggesting that any

14   one individual can shift the reporting of earned income based on

15   labor to another taxpayer.  So it either fell into the category

16   of incredibly naive on the one hand, incredibly naive mistake, or

17   an attempt to bamboozle -- one more attempt to bamboozle.

18          MS. PARKER:  Your Honor, I think it falls in that latter

19   category because you have to look at it in the context of all the

20   other things that she signed.  Whenever she did a report where

21   she gave the names and Social Security numbers of the officers,

22   she omitted Robert Pochmara and put in Maxine Pochmara.  When

23   they did tax returns, it was the same thing.  They didn't do W-2s

24   for him.

25          I mean, time and time again -- they had other employees.

Evidentiary Hearing

14

1  They never did this with any other employees.  They never said,

2  you know, Joe Bitzfick, you can work under the name of Marlene

3  Bitzfick.  Marlene Bitzfick would like to put a little more money

4  into her Social Security account.  That's fine.  We're okay with

5  that.  They never did that for any other employees.  It was only

6  this group of four that they engaged in this type of conduct.

7        They knew how to do it right.  They did it right with

8  regards to these other employees where they didn't have this

9  special relationship.  But I think that is what gives definition

10 and resolves the potential ambiguity in the statement that the

11 Court is discussing.

12       Every time -- and they've -- even today, they say, oh,

13 she did this report, it's got Pochmara's name -- Robert

14 Pochmara's name on it.  There is no Social Security number on it.

15 They never ever, when those two things are together, name and the

16 Social Security number, does she or Mr. Wilson provide that in an

17 official record.

18       THE COURT:  Now, I will indicate that I have fairly

19 carefully read all of the supplementary papers so my point here

20 is not necessarily to repeat but I would like highlights from

21 counsel with respect to their remarks with respect to their

22 individual clients.

23       Mr. Jacobs, do you want to lead first with respect to

24 Mr. Wilson?

25       MR. JACOBS:  Yes, your Honor.

Evidentiary Hearing

15

1        Your Honor, in that supplemental brief, I did inform the

2   Court that I would be presenting live testimony through Mr.

3   Kieliszewski, the accountant.  His testimony would be regarding

4   whether my client received a financial benefit which was referred

5   to in Miss Parker's brief and we assert they did not and they

6   were a certain C-type corporation.  And Mr. Kieliszewski would

7   also testify regarding the financial disclosure and information

8   in the pre-sentence report.

9        I don't know if I need to put him on at this point in

10  time but I will when that becomes an issue need to put him on.

11       THE COURT:  We will get there.

12       MR. JACOBS:  First in regards to Gary Wilson could have

13  stopped at any time and again, any paper --

14       THE COURT:  Now, may I understand that at this stage,

15  your client maintains his innocence and does not intend to take

16  the stand with respect to the sentencing variable?

17       MR. JACOBS:  That's correct, your Honor.  He does intend

18  to take the stand in regards to the enhancement, the alleged

19  enhancement of intimidating the witnesses.

20       THE COURT:  Yes, sir.

21       MR. JACOBS:  And to a small extent, I will ask him about

22  my proposed exhibits that we submitted with the Court regarding

23  the financial disclosure of assets.  But as to -- it would just

24  be as to those two categories.

25       THE COURT:  We will limit our remarks at this point to

Evidentiary Hearing
                                                                        16

1  the role of the offense variable.

2         MR. JACOBS:  I would assert in a paper crime type of

3  conspiracy, almost any one of the co-conspirators could stop the

4  conspiracy from occurring at any time by just failing to submit a

5  document or not submit a document for which is fraudulent or not

6  fraudulent and to -- this is what gets awfully frustrating in

7  this case.  We hear from the government that my client is somehow

8  sophisticated and -- and that in all the documents that were

9  filed with the government agency, we failed to list Robert

10 Pochmara's name.

11         And then when we present a document, our Exhibit 1 that

12 was filed with the government, the Department of Labor and

13 Economic Growth, listing Robert Pochmara as a vice president of

14 the corporation, and this is in August of 2004, and then in a

15 later document saying same as before in May of 2006, now we get a

16 different argument from the government.

17         Well, okay, now you showed us that you did in fact list

18 his name in certain filings with the government but you didn't

19 list his Social Security number.  So therefore, you're somehow

20 more sophisticated.

21         I would assert it's the government just going to Plan B

22 and I'm not going to get tracked down that well, for lack of a

23 better way of saying it.  I -- I do not hear them asserting that

24 my client needs an increase in the role of the offense, although

25 I do need to respond to Miss Parker saying that no one should get

Evidentiary Hearing

17

1  a decrease.

2       My client did not receive a financial benefit.  They

3  paid taxes regarding the monies earned and sent those tax monies

4  in, in 940s, 941s, 1028s, Michigan unemployment.  There is

5  absolutely no testimony that my client is a leader or organizer.

6  And it's pretty obvious that in not receiving a financial

7  benefit, that he should receive a reduction for his role in the

8  offense.

9       That's all, your Honor.

10       THE COURT:  We concede or I acknowledge that neither

11  your client, Mr. Wilson, or Mrs. Wilson, ended up with a nickel

12  in this whole process.  All they were involved with was

13  facilitating a scheme that benefited the Pochmaras.

14       The question I've got at this stage as I try to resolve

15  this variable, is that apart from that argument, what other

16  evidence do I have other than the circumstantial evidence and the

17  evidence that the Pochmaras have offered me in conjunction with

18  their guilty pleas.

19       Anything?

20       MR. JACOBS:  Nothing, your Honor, and I don't have a

21  duty to present any evidence.

22       THE COURT:  I'm not suggesting that you do.

23       MR. JACOBS:  What?

24       THE COURT:  I'm not suggesting that you do.

25       MR. JACOBS:  Oh.  We just have the facts and we have

Evidentiary Hearing

18

1   application notes that say one of the factors the Court is to

2   consider is whether someone receives a financial benefit and the

3   Court is conceding that my client didn't receive a financial

4   benefit.

5        And I think based on the facts that the Court has, the

6   Court cannot give an enhancement regarding Gary Wilson and can

7   legitimately give a reduction for role in the offense.

8        THE COURT:  Very good.  Thank you.

9        Good morning, Mr. Piazza.

10       MR. PIAZZA:  Good morning, your Honor.  I will not be

11  lengthy.  Most of my arguments are in my briefs and memorandums

12  and I rely on those.  Although a couple issues.

13       One, as I -- also, as Mr. Jacobs indicated, where is the

14  financial benefit?  There was none to Sue Wilson.  The

15  prosecution says, well, she sent these letters.  She sat down

16  with, you know, members of the government and says here are the

17  documents.  She wasn't hiding anything.  She gave everything to

18  them and then the government turns around and says, well, look

19  it, you know, you're guilty because of these documents that you

20  gave me.

21       THE COURT:  Well, recall, that the -- that the jury

22  agreed.

23       MR. PIAZZA:  Understand.  But we're talking about just

24  the minimal involvement in this particular matter and we are

25  arguing for a four-point reduction for the minimal involvement on

Evidentiary Hearing

19

1  behalf of Mrs. Wilson.

2       Prosecution says she is trying to hide things so she

3  must have been more involved than minimal by not giving, you

4  know, Robert Pochmara's name.  But in Exhibit 1 attached to my

5  original sentence memorandum, as well as incorporated with Mr.

6  Jacobs, you know, prosecution says, well, she didn't put down a

7  Social Security number.

8       Nowhere in that document that was filed by my client

9  requested the Social Security number of any of the individuals.

10 He was listed in various -- Robert Pochmara was listed in various

11 documents that was submitted to the government, both state and

12 federal.

13      So where is her involvement?  How deep is her

14 involvement?  I think the Court touched on it, as, you know,

15 extreme naivete.  During the trial, people said she was in the

16 office, over a ten-year period, a couple of times.  She signed

17 the checks.  She submitted, you know, the receipts, you know, to

18 the CPA.  And that's all that the testimony was.

19      THE COURT:  Recall that the jury concluded --

20      MR. PIAZZA:  I understand.

21      THE COURT:  -- that it wasn't a problem of limited

22 contact and simple naivete.  Their conclusion was different.

23      MR. PIAZZA:  We are in a different situation here in

24 asking for a minimal, you know, role.

25      THE COURT:  Agreed.

Evidentiary Hearing

20

1        MR. PIAZZA:  And the Court can take a look at that.  I

2   understand the jury verdict.  My client still maintains her

3   innocence.  But the Court has to make a decision on the role and

4   whether or not there is mitigation.  And looking at what was

5   introduced during the trial and the fact of no benefit to my

6   client, the Court can realistically look at minimal involvement.

7        And the fact that we have a high school, you know,

8   graduate who has been on medication, has been sick throughout

9   her life, where is the sophistication for her to come up with

10  this and become, you know, more involved?  At best, according to

11  the jury verdict and not conceding that, she was minimally

12  involved.

13       THE COURT:  I appreciate your remarks.  Good morning,

14  Mr. Koelzer.

15       MR. KOELZER:  Good morning, your Honor.

16       The Court says with regard to role, who were the leaders

17  and organizers.  I would suggest the answer could be no one.  I

18  think the government's approach here has been there are a certain

19  number of points that have to be distributed and where do they

20  fall.  There are times where there is no leader.

21       This is -- as co-counsel, Mr. Rupp, pointed out in one

22  of his presentations, there is a chatter, talk, get-together,

23  people come to an agreement, maybe someone suggests it, maybe

24  someone doesn't.  This is twelve or more years ago.  That doesn't

25  necessarily mean there is a leader or leadership points are

Evidentiary Hearing

21

1  appropriate.

2          The other more general point before I get to one

3  specific point is this whole idea of anyone could have brought

4  this scheme to an end by Robert could have said no to this, Sue

5  could have not written the checks, Gary could have said this.

6  The fact that someone could have brought this scheme to an end I

7  don't think furthers the government's effort to meet its burden

8  in any way.

9          It doesn't mean that a person has a leadership role

10 because they had a role in the offense such that if, at some

11 point, that person wanted to withdraw, that person could stop the

12 scheme.  I don't think that that -- I don't think it follows as

13 night follows day, that that means there are leadership points

14 there.

15         The more specific point and I keep -- I read first in

16 the Court's order and then I tried to respond and then I heard it

17 again in the government's response, words to the effect of Robert

18 Pochmara was unwilling to involve anyone -- unwilling to testify

19 at his plea hearing as to anyone else's involvement.  I think

20 that's a mischaracterization.

21         At the plea, as I said in my brief and I won't belabor

22 it, the point is to make a factual basis.  So in order to meet

23 the elements of the offense, a person has to conspire with one

24 other person, certainly not a government agent.  There always has

25 to be at least one other conspirator and we established that

Evidentiary Hearing

22

1   Robert Pochmara conspired with Maxine Pochmara and didn't need to

2   go further.  The government accepted that.  The Court accepted

3   that.

4          Now, it's kind of being twisted where I can only

5   speculate that somehow he is trying to protect others or there is

6   some sort of spin on it that I think is far afield from what we

7   actually did which was to make -- as the transcript shows, to

8   make a factual basis out for a guilty plea.

9          So I guess I don't like to see that blow up in his face

10  particularly since it was with my advice that we kept the factual

11  basis simple in order to meet the elements of the offense, accept

12  responsibility, plead guilty.

13         This whole issue of he didn't go far enough into detail

14  about the relative responsibilities of others, I don't think

15  should be held against him in any way.  And I certainly don't

16  think that it enhances in any way his role in the offense.

17         So I would suggest -- I understand the Wilsons are

18  arguing minimal role.  We haven't presented that argument but I

19  would suggest that flat out zero points here would be appropriate

20  for role in the offense.  The fact that my client was involved

21  and admits that he did something wrong and could have done

22  something by withdrawing at some point, I don't think any of

23  those factors lead to proper imposition of any points for the

24  role in the offense.

25         THE COURT:  Now, while we have you present because it

Evidentiary Hearing

23

1   will have an impact on one of the other variables that I saw in

2   the supplementary papers, the government's computation that the

3   benefit that your client received was not $325,000.  It was

4   $428,585.

5           How is that possible?

6           MR. KOELZER:  Well, I don't know that I can answer that.

7   The government came up with that, I would say at the twelfth

8   hour, not just the eleventh hour.  The government's theory

9   appears to be, that he's not really disabled so all the money he

10  made from the beginning was fraudulent.  I think it -- I mean, I

11  will get to this when we talk about that issue specifically --

12  but I think it really misses the boat because he may be disabled

13  from the railroad.  He had a serious injury.  By all accounts,

14  the pre-sentence report confirms that.  He can't work for the

15  railroad.  That doesn't mean he couldn't theoretically do

16  something less physically taxing.

17          So I don't think it makes any sense to say that the loss

18  amount is over four hundred thousand by virtue of that theory.

19  It's a -- as co-counsel said, it's another Plan B argument.  The

20  government -- we start with $218,000.  Then it becomes three

21  twenty-five because it goes farther along in time.  Then it

22  becomes four oh two because of some mysterious Social Security.

23  And now it becomes four twenty-eight because it was all

24  fraudulent from the beginning which comes out, you know, in

25  November of 2013.

Evidentiary Hearing

24

1      So I would suggest that the loss amount -- and again,
2  I'm getting ahead of myself but that's my answer with respect to
3  that issue.
4          THE COURT:  And what I would like to do is clarify my
5  understanding that the beginning point for those calculations was
6  the same.  But that the $325,000 was through 2009 but apparently,
7  he continued to receive the benefit?
8          MS. PARKER:  Up until the time of the plea.
9          THE COURT:  And so --
10          MS. PARKER:  Because there wasn't an official
11  determination, a basis for ceasing the payments until the plea
12  was entered or until there was an adjudication by virtue of a
13  jury verdict, so he continued to collect through that point.
14          MR. KOELZER:  That's correct, judge.
15          MS. PARKER:  And I think that is the basis.  I would
16  submit that would only apply to the Pochmaras and not the Wilsons
17  because the point ceased -- the other figure, the roughly
18  $325,000 figure, is computed up to the point where they stopped
19  paying him.
20          THE COURT:  Where the --
21          MS. PARKER:  The NAPA Auto Store ceased paying, I should
22  say, Maxine for Robert's work.
23          THE COURT:  All right.  Did he continue to receive
24  checks and deposit them even after being indicted?
25          MS. PARKER:  Yes.

Evidentiary Hearing

1          THE COURT:  Really.

2          MS. PARKER:  Yes.

3          THE COURT:  Hmm.

4          MR. KOELZER:  That's my understanding as well, your

5    Honor.  In fact, it was one of the reasons he had to contribute

6    to his attorney's servicing -- to pay, to reimburse the taxpayers

7    because he still had the income.  I can only imagine that until

8    there is an adjudication of improper gain in some way, then the

9    money keeps coming.

10          THE COURT:  Yeah, I appreciate the fact that the money

11   keeps coming.  But it isn't mandatory that you deposit it.

12          MR. KOELZER:  Well --

13          MS. PARKER:  I believe it was direct deposited.

14          THE COURT:  It was direct deposited.

15          MS. PARKER:  But it was also withdrawn, I believe,

16   too --

17          THE COURT:  All right.  I appreciate your point.

18          MS. PARKER:  -- based on the financials.

19          THE COURT:  And I thank you, Mr. Koelzer.

20          MR. KOELZER:  Yes.

21          THE COURT:  Mr. Rupp, from a small town.

22          MR. RUPP:  Thank you, your Honor.

23          With regard to Maxine, as I understand it, there is a

24   couple of arguments offered by the government why she should be

25   the most culpable for leadership and before I address that, I

Evidentiary Hearing

26

1   would agree with and adopt the comments made by Mr. Koelzer as it

2   relates to Robert Pochmara.  I think they are roughly equally

3   applicable to Maxine.

4          One argument is that she stood the most to gain, that it

5   increased her Social Security and that this was something that

6   she was pulling the strings on the puppets of the others involved

7   here to increase her Social Security benefits.

8          Other than the government's imagination, there isn't any

9   evidence offered that that was ever an intent or object of what

10  any of these parties were doing to increase the Social Security

11  benefits that Maxine Pochmara might be entitled to.

12         In my supplemental brief, I acknowledge as the

13  government points out, that given the passage of time, we are not

14  clear who first came up with the idea or exactly how it was

15  hatched.  And Maxine acknowledges that maybe it was my idea.  But

16  I've also cited case law that says hatching the idea does not

17  equal leadership.  The argument also puts forth that any one of

18  the four, in fact all of the four, were leaders at some point

19  because they could have put an end to the conspiracy by deciding

20  not to participate anymore.  I think that, without justification,

21  equates participation in a conspiracy to leadership in a

22  conspiracy.

23         In the government's supplemental brief, particularly

24  with regard to Maxine, the argument is presented that we should

25  apply common sense and on that point, I agree with the

Evidentiary Hearing

1  government.  We should apply common sense.

2       As the Court indicated this morning, this scheme came

3  together and was executed with breathtaking simplicity.  This is

4  not a group of people or an individual who is commanding anybody

5  else, managing anybody else.  Maxine is not pushing buttons so

6  that she can increase her Social Security.

7       The benefit to the Wilsons is that they had a business

8  that was in danger of going under.  They needed an influx of

9  capital.  Gary Wilson approaches Robert Pochmara for an

10  opportunity to buy into the business.  Robert Pochmara doesn't

11  have the bank account or the credit score to do so.  Somehow, the

12  idea or the opportunity is passed along to Maxine and she is able

13  to do so, gets a loan, buys into the business, helping out the

14  Wilsons and the NAPA Auto Parts Store.

15       Somewhere along the way, the idea is Robert is at the

16  store all the time, maybe he can do a little bit of work there,

17  pull some income.  We don't want to impair his ability to keep

18  collecting the railroad disability payments so we will make the

19  paychecks out to Maxine.

20       I think it's fair to say that all four of the

21  participants here are simple folk and that they are not -- no one

22  of them has the foresight to order around the others in order to

23  increase their Social Security benefits.  We have somebody

24  working, we have to write a paycheck.  We don't want to write the

25  paycheck to Robert because that will impair his benefits so we

Evidentiary Hearing

28

1  will write it to Maxine.  It's a paycheck so you pay your taxes

2  on it.

3        There was a tangential effect or ripple effect that,

4  yes, it can, and likely did increase her Social Security benefits

5  if she got to the point of actually collecting them but there is

6  nothing other than speculation or imagination to get to that

7  point from the government.

8        THE COURT:  Now, having received, within the family, in

9  excess of $425,000 under circumstances where the Wilsons did not,

10  your suggestion to me is that we should treat the Wilsons as

11  equally culpable as your client?

12        MR. RUPP:  That may be another way of stating it.  What

13  I'm saying -- my point is, is that no one person in this is a

14  leader.  I'm not saying that it's Maxine or Robert, Gary or Sue.

15  That's not my purpose or that's not the point of my argument that

16  they are all on equal footing.  I'm arguing that Maxine is not

17  a leader and furthermore, that not one of these people is a

18  leader.

19        THE COURT:  They just kind of fell into half a million

20  bucks.

21        MR. RUPP:  Well, that's if you accept the government's

22  calculations.  Mr. Koelzer has already addressed or we've already

23  discussed the payments between 2009 when the conspiracy came to

24  an end and the continuation of payments to Robert.  But it

25  also -- that $428,000 figure also includes every payment that

Evidentiary Hearing

1   Robert ever received from the Railroad Retirement Board from 1991

2   up until 1999, when the conspiracy began.  The government's

3   theory being he was at all times able to --

4           THE COURT:  Now, just a couple remaining questions that

5   I would appreciate at least your view on.  Apparently, I see from

6   the pre-sentence report, that Mrs. Pochmara ended up in trouble

7   with her employer that post-dated the events of the indictment.

8   She apparently had been reporting Robert as her spouse in order

9   to take advantage of a benefit.  And ended up having to make

10  adjustments there because that wasn't true either.

11          Should I consider that in trying to evaluate her role in

12  the initial effort to scam the U.S. government as opposed to her

13  employer?  Does that have any bearing do you think in resolving

14  that issue?

15          MR. RUPP:  I don't believe it does, your Honor.

16          THE COURT:  How about withholding the title on the, I

17  guess it was a motorhome, until the son's marital problems were

18  addressed?

19          MR. RUPP:  Again, I don't believe it has a bearing on

20  the Court's determination on whether she has a leadership role in

21  this conspiracy.

22          THE COURT:  I agree with you.  Any concluding remarks

23  from the government?

24          MS. PARKER:  Yes, your Honor.  I agree with the Court

25  that the issue of who stood to profit the most is not the sole

Evidentiary Hearing

30

1  determination or factor used to determine a leadership role.  It

2  is a factor but it's not the sole factor.

3          I would challenge Mr. Piazza to find a single document

4  that was submitted by his client to the federal government that

5  had Mr. Pochmara's name and Social Security number on it other

6  than the exhibits -- Government's Exhibits 24 and its sub-parts

7  in 25, which the Court has alluded to in response to the Railroad

8  Retirement Board.

9          At the same time that they point to their Exhibit 1,

10  saying, here, there is the name Robert Pochmara, the very same

11  time they are filing other documents with the federal

12  government -- this is a document submitted to the state

13  government.  All the things that go to the federal government,

14  both to the IRS and to Social Security and the Railroad

15  Retirement Board totally omit Mr. Pochmara's name and Social

16  Security number.

17          They are not making things directly to the Railroad

18  Retirement Board but there is a connection between, as there was

19  testimony during the trial, the data between -- they shared as

20  far as income and Social Security numbers, between those three

21  entities.  And by making everything that went to the federal

22  government false, Sue cannot stand here and Gary Wilson cannot

23  stand here and say, oh, yeah, that's not true, we reported his

24  name when this is a state document and at the very same time,

25  everything federal was without that information.

Evidentiary Hearing

31

 1        I think what they would like to ignore is the fact that
 2   for eleven years, every week, they made out a paycheck, Gary
 3   Wilson or Sue Wilson.  And signed it, knowing and -- recorded it
 4   on their records, knowing that that was not what was going on.
 5   And to say that they were oblivious or somehow less culpable is
 6   extremely inconsistent with the facts.
 7        But I will like to respond to Mr. Rupp's argument in
 8   part because it is not fancy on the part of the government.  If
 9   you look at the objective record, what he describes is to gloss
10   over the facts, that somehow all these things happened and there
11   is no actor behind it.  But the objective record shows that
12   nobody gained more than his client.  She gained more than Mr.
13   Pochmara and she wasn't even married to him and stood to keep
14   more up until the time it served their purposes relative to this
15   litigation to get married.  So she definitely stood to gain more,
16   even than Mr. Pochmara.
17        So I think to the extent that the financial stake in the
18   outcome, yes, I think she definitely has the leading edge on
19   that.  And the other factors that the Court referred to, her
20   fraud against her employer and other transactions that she
21   engaged in where she uses title to her favor when it works and
22   doesn't have title when it's not to her favor, that just shows --
23   I think it's sort of a 404(b) type of thing.
24        No, it doesn't directly go to leadership but it shows
25   that she has the ability and the sophistication to cut every

Evidentiary Hearing

1   single cut so that she gets the better part of what's severed.

2   No matter how things are done, she comes out ahead.  Everybody

3   else loses, her employer, her friends, everybody.  They are the

4   ones who suffer the consequences of her actions.

5           THE COURT:  Thank you.

6           MR. JACOBS:  Briefly, your Honor, I would just like to

7   point out, of course, 3B1.1, you increase by four levels for five

8   or more participants if someone is an organizer or leader and we

9   still haven't even addressed that issue.  There are only four

10  individuals involved in this matter.

11          THE COURT:  Depends who how you look at it.

12          MS. PARKER:  I think that's a fair characterization.

13  Depends on how you look at it.

14          THE COURT:  And I'm not sure -- and I'm comfortable in

15  suggesting to you that the jury did not, that the directing the

16  tax reporting in the case at a minimum involved parties beyond

17  those that were indicted here.  And I would respectfully conclude

18  that there are more than four involved on that basis.

19          As a preface to resolving this first variable, I must

20  say that I'm unhappy.  I'm unhappy on a personal level in having

21  to sit and sentence these four individuals today.  These are

22  people that I know and am comfortable, are good people, that made

23  significant contributions within their community.  And have been

24  responsible members within their family.

25          And yet, we have this ugly problem to deal with.  And it

Evidentiary Hearing

33

 1   is ugly in the sense that at least the Pochmaras pocketed in

 2   excess of four hundred thousand -- we'll accept, let's say, three

 3   hundred thousand worth of funds that they were at least obligated

 4   to inform the Railroad Disability Board about.  They cheated

 5   someone out of a benefit as a result.

 6         The difficulty in assigning a role in the offense is,

 7   notwithstanding that ugly problem and good people, no one

 8   wants -- no one really wants responsibility for the offense or to

 9   necessarily describe the other parties' role in accomplishing

10   that.

11         The Probation Officer Burns concluded that both of the

12   Pochmaras were entitled to at least a two-level increase and I

13   think he is correct.  They clearly were the beneficiaries,

14   necessarily involved in even the proposal for accomplishing the

15   fraud.

16         The Wilsons, in my view, cannot be described as having a

17   minor role in the process or even any suggestion of a more modest

18   role.  All of the reporting that was required, essentially, over

19   an eleven-year period of time, necessarily require Mr. Wilson's

20   knowledge and participation and if you don't accept the argument

21   that any one of them could have stopped it, at least his role was

22   necessary.

23         I have struggled a bit more with Mrs. Wilson's

24   participation and concluded that while she is not entitled to any

25   reduction, I can't see a factual justification for suggesting

Evidentiary Hearing

34

1   that she was a leader or manager in the same sense that the

2   Pochmaras and her husband were.  The only way that I can connect

3   her at this point are these responses that were provided to the

4   Railroad Retirement Board, that while remarkable to me as

5   initially as I indicated in their naivete, were nevertheless,

6   while a complete misstatement of what was permissible under law,

7   were naively acknowledging of the facts.

8           She describes all of the income that the NAPA Auto Store

9   paid to Robert over the course of a number of years and then

10  leaves us with the suggestion that only Maxine works for the NAPA

11  Store and Robert works on her behalf.  That's astonishing to me.

12  It was astonishing when I first read it.  I can't at this stage

13  on that basis, however, reduce her role in the offense.  On the

14  other hand, I don't see her as a manager or leader.  I

15  distinguish her from the other three defendants.

16          Takes us to our next guideline question.  The probation

17  officer recommended a two-level increase concerning the

18  Pochmaras' effort to, in his view, provide themselves some legal

19  protection by a prompt marriage in order to trigger the adverse

20  spousal testimony privilege.

21          The supplementary papers that I have received suggest

22  that's not why they did that, that the reason that they did that

23  was essentially grandchildren's requests, particularly at a point

24  where their -- things were not on stable ground with the

25  grandchildren's parents, that this is something that they wanted

Evidentiary Hearing

35

1  done.

2         The government says that doesn't make any sense.  The

3  grandchildren wouldn't have heard about the indictment.  None of

4  it was public until after the date that they got married.

5         So I have a good understanding of the government's

6  argument.  If we could hear from Pochmaras' counsel as to how you

7  think we ought to resolve that question.

8         MR. KOELZER:  Your Honor, this is an extremely unusual

9  issue.  I've never seen something like this where people who get

10  married are then accused of trying to set up a privilege.  There

11  is one case that the probation officer cited, that presumably was

12  hand-delivered by the government to him, and I think that that

13  case illustrates why we don't have a similar situation.

14         In -- in *Blair,* which I discuss in my primary letter,

15  there is a witness who doesn't want to testify before a Grand

16  Jury, a female.  So he and his -- the witness, the female, and

17  the male, talk to a lawyer and the lawyer says, if you get

18  married, you can avoid having to testify.  And so they do.  They

19  get married for the obvious purpose of setting up an adverse

20  spousal privilege.

21         Well, that case is certainly a far cry from our case and

22  one of the main ways, which -- which Mr. Rupp pointed out and I

23  want to kind of reiterate, is that it doesn't even make sense

24  because the holder of the adverse spousal testimonial privilege

25  is the witness spouse.  I think we can all agree on that.

Evidentiary Hearing

36

1       Well, in this case, each witness spouse has a Fifth

2  Amendment right not to testify in the first place so it's

3  completely duplicative of a right that they already have.  But

4  even more basic -- and that just goes to whether they were tried.

5  I understand the government's position that it doesn't have to

6  make any difference or work as long as it was attempted.

7       But even more basic, which I probably should have

8  started with, is this whole thing attributes a level of

9  sophistication to Bob and Maxine Pochmara that is not even

10 close.

11       THE COURT:  And I guess here is my question.

12       MR. KOELZER:  Yes.

13       THE COURT:  I accept your point.  These folks maintain

14 their Fifth Amendment right.  They didn't have to speak.

15 Plausible that there were reasons to get married other than to

16 impede the requirement that they furnish their testimony.

17       Do you intend to establish that through their testimony?

18       MR. KOELZER:  No, your Honor, and I don't think we have

19 to.  Certainly, the burden is on the government to show that my

20 client and his now wife got married for the purpose of attempting

21 to obstruct justice.  I think the arguments I've made in writing

22 and today suggest that that's not why they did it.

23       We did suggest per the Court's invitation, that the

24 grandchildren's desire that they be married, did offer somewhat

25 of an explanation, although the time line is a little off.  It's

Evidentiary Hearing

37

1  been apparent from the start in this case that my clients have

2  stated that --

3          THE COURT:  Well --

4          MR. KOELZER:  -- the grandchildren wanted them to get

5  married from the start so --

6          THE COURT:  Where did, by proximity in terms of time

7  chronology, the marriage occur in relationship to the problems

8  with Maxine's employer?

9          MR. KOELZER:  I don't know the answer to that, your

10  Honor.  I think -- I don't know if Mr. Rupp knows the answer

11  but --

12          THE COURT:  Was getting married in any way responsive to

13  that particular problem?

14          MR. KOELZER:  I don't know the answer because it relates

15  to Maxine.

16          THE COURT:  Okay.

17          MR. KOELZER:  So -- I know that per what I've read, that

18  it had an adverse effect on her.

19          THE COURT:  Apparently.

20          MR. KOELZER:  And I would suggest that that suggests

21  even more reason why they didn't get married for the purpose of

22  trying to obstruct justice or set up a privilege because it -- it

23  actually hurt her.  But I will let Mr. Rupp deal with that.

24          THE COURT:  Any other witnesses that you would like to

25  offer that would then be amenable to cross-examination on the

Evidentiary Hearing

38

1  question?

2          MR. KOELZER:  No, your Honor.  I don't have any other

3  witnesses.  I just wanted to be at least clear from our

4  perspective that the government has the burden and has the

5  burden -- we always hear about circumstantial evidence.  This is

6  a circumstance, is all it really is, a circumstance which is that

7  my clients got married at a time between the letter saying you

8  have been indicted and their first court appearance, you know, in

9  connection with that indictment.

10         I -- I really -- perhaps I'm not the smartest guy around

11  but I really don't see where that, in and of itself, and I think

12  concessions should abound but that's all there is.  There is

13  nothing else here.  There is nothing like in *Blair*.

14         There is no meeting.  There is not even a level of

15  sophistication of the defendants that would suggest that they

16  would have any idea about -- I mean, we can dissect the spousal

17  privilege and the marital communications privilege and the

18  marital communications privilege wouldn't have been in effect

19  because they weren't married but there is also a joint criminal

20  activity exception.  There is -- there is ups and downs and

21  nuances everywhere in the law.

22         And to suggest that Bob and Maxine Pochmara, simple

23  folk, as Mr. Rupp said, would get married for the purpose of

24  trying to set up a privilege so that they could not have to

25  testify against the other, when they didn't have to testify

Evidentiary Hearing

1  against the other ever, anyways, it just doesn't make sense to

2  me.  I realize that the force with which the government is

3  arguing it and the Court's treatment of it suggests that the

4  Court believes there is something to this theory.

5        I don't think it's close.  And it's not just because I'm

6  their lawyer and I have to think that way.  I just look for more.

7  I understand circumstantial evidence.  I spend a lot of time at

8  parties with people and people try to say circumstantial evidence

9  is weaker than direct evidence.  Well, not in the O.J. Simpson

10  case, for example, so I understand that circumstantial evidence

11  can be powerful.

12        This is about as weak as it gets, I believe, because it

13  is literally just one circumstance and the other evidence that's

14  out there to suggest which way -- what were Bob and Maxine

15  Pochmara really thinking.  I think the other evidence out there,

16  besides the timing, suggests that they had no such thought about

17  trying to set up a privilege.

18        THE COURT:  I've been getting kind of a refresher course

19  as I try, however unsuccessfully, to assist my son as he is

20  studying the concept of probability in mathematics --

21        MR. KOELZER:  All right.

22        THE COURT:  -- which attempts to assign a statistical

23  examination of the likelihood of one event occurring in relation

24  to another.

25        How many years had it been since the Pochmaras were

Evidentiary Hearing

40

1  divorced before they decided to be remarried?

2         MR. KOELZER:  Approximately 31, your Honor.  I -- I

3  understand the Court's question about probabilities as it is a

4  subject near and dear to my heart but we also have a human

5  element here.  And the human element is after living their whole

6  lives without any trouble, they get indicted in Federal Court and

7  the fact that they -- and this was a couple -- this was at least

8  a couple of weeks after they got the letter and, you know, if

9  they were distraught and banded together emotionally and got

10  drawn closer together, the grandchildren always wanted us to get

11  married anyways, let's just get married.  I mean, that's, to

12  my eyes, to my ears, a more plausible explanation.  But

13  certainly, the government's explanation I don't think carries its

14  burden.

15         THE COURT:  I appreciate your point.  Mr. Rupp?

16         MR. RUPP:  Thank you, your Honor.  Again, I join and

17  agree with the comments made by Mr. Koelzer and --

18         THE COURT:  May I understand that you don't have any

19  witnesses to offer either?

20         MR. RUPP:  That is correct.

21         THE COURT:  Okay.

22         MR. RUPP:  And just from my personal involvement in this

23  case, your Honor, I remember going back as early as the original

24  detention hearing, this is a theory or an argument that was

25  provided by the government that they had gotten married just a

Evidentiary Hearing

41

1   couple days before appearing for the indictment -- excuse me --

2   to preserve or create some kind of spousal privilege, one

3   ultimately that even if that was their goal, doesn't apply here

4   and is duplicated by the Fifth Amendment.

5           In talking with them and Mr. Koelzer at that very first

6   time meeting them in the hallway upstairs, why did you get

7   married?  It was for the kids, for the grandkids.  Meeting with

8   Mr. Burns at the pre-sentence interview, well, why did you get

9   married when you did?  It was for the kids, for the grandkids.

10          It has come up repeatedly during our discussions and our

11  briefings prepared ultimately for today's sentencing, why did you

12  get married?  For the kids, for the grandkids.  I submitted to

13  the Court with my supplemental briefing a letter from her

14  grandson as well as her ex-daughter-in-law, mother to the

15  grandson, that corroborates --

16          THE COURT:  Well, let's -- to be sure, they are not

17  going to be witnesses amenable to the government's

18  cross-examination.

19          MR. RUPP:  That is true.

20          THE COURT:  All right.

21          MR. RUPP:  But they did write letters on their behalf,

22  at least substantively corroborating the explanation that this

23  was something that came to the grandchildren's attention that

24  bothered them and that that was the motivation for eventually

25  finally getting remarried.  And I think as I explained to some

Evidentiary Hearing

1   extent in my supplemental briefing, that the service is something

2   that occurred at the county building up in Rogers City.

3          MS. PARKER:  I'm going to object, your Honor.  He is now

4   going into things which he is not prepared to provide testimony.

5   If he wants to use musical lyrics and imaginations in response

6   to try to establish laws and facts, that's fine, but I don't

7   think we should indulge a hearing where all we're doing is having

8   his description of something that nobody is willing to testify

9   to.

10          THE COURT:  Would you like to continue?

11          MR. RUPP:  Your Honor, the only thing I would add I

12   guess then is that in response to my supplemental briefing, the

13   government points out that the grandchildren potentially learning

14   about this through media attention as I suggested is impossible

15   because of the sealing of the indictment.

16          If that's the case and I can only offer my own

17   responsive speculation, is that perhaps the grandchildren -- the

18   grandchild who wrote the letter had the sequence of events

19   confused.  But I would note that as part of the government's

20   materials and government's exhibits, somewhere along the line --

21   frankly, I've lost track of where everything falls in -- the

22   Pochmaras received a letter at the end of September indicating

23   they needed to report to Court two or three weeks later for the

24   indictment.

25          Somewhere along the line, the family let the

Evidentiary Hearing

43

1    grandchildren know they weren't married.  It bothered them and

2    that is our offered explanation for it rather than the theory

3    that it was to create a spousal privilege.  Again, one that as a

4    practical matter doesn't apply here and couldn't apply here and

5    would effectively make it no different than wishing on a falling

6    star or a broken wishbone.

7              THE COURT:  I appreciate that.  Did you have some

8    concluding comments?

9              MS. PARKER:  Yes, your Honor.

10             One of the questions you asked of counsel for Mr. and

11   Mrs. Pochmara that they did not address today was when did the

12   problem Maxine Pochmara have with her legitimate employer arise

13   relative to her marital status?

14             And I would point to Defendant's Exhibit C appended to

15   Maxine Pochmara's response to the Court's order which is a letter

16   dated December 4, 2012, approximately two months after the

17   nuptials, that list or basically says, a demand letter for the

18   overpayment of medical benefits on behalf of Robert Pochmara

19   due to Maxine Pochmara's false representations that Robert

20   Pochmara was her husband during her period of employment with

21   Mid-Michigan -- or Northeast Michigan, excuse me, Community

22   Mental Health Services.

23             So I think that again puts the time line back into, to

24   answer one of the things the Court also suggested, 365 days,

25   times 31 years, is approximately 11,400 plus days, that the

Evidentiary Hearing

1   Pochmaras could have chosen to get remarried.  We're skipping

2   leap years and things like that.  They had plenty of other days

3   when they could have decided to get remarried.  But, no.  To her

4   employer, they represent they are married.  On their federal

5   income tax returns, they represent that they are not married

6   because that suits their purposes.

7          To say somehow that the Fifth Amendment privilege would

8   have prevented an obligation to testify, that's simply not true.

9   I can get a compulsion order.  I cannot get a compulsion order to

10  overcome a spousal privilege but I can get a compulsion order

11  when people are married.  But that's not the point.

12         They don't have to function at that level of legal

13  sophistication.  They are quite able to function at the level of

14  how do we cheat and steal everybody in sight, our employers,

15  everybody.  And the most reprehensible part of all of this, not

16  only did they try to use a marriage two days before their

17  arraignment to create a privilege, but then they use what they

18  purport to be letters from their families.  And we do not know

19  that.  Those are not certified letters.  They are not notarized.

20  There is no jurat.

21         As far as I know, the same people who fraudulently

22  created other documents in this case to misrepresent the truth,

23  could have fabricated those letters.  We don't know because we

24  don't have anything under oath.  There is no evidence.

25         But even if they did write them for them, it was

Evidentiary Hearing

1  obviously not accurate recall.  It was totally a

2  misrepresentation of what could have happened, that they were

3  willing to do out of their affection for the Pochmaras, if those

4  in fact were even written by the family members.  And that is

5  even more reprehensible to come to the Court and expect this

6  Court to buy that when the objective facts show that there was

7  nothing public about the indictment until the day of their

8  arraignment.

9         They got married two days before their arraignment.

10  They had time to make those arrangements, to get the blood tests,

11  do all that stuff and get married.

12         THE COURT:  What about the possibility that they got

13  married in an effort to try to resolve the problems with respect

14  to their maintenance of health benefits through her employer?

15  Would be unrelated to any obstruction of justice in the context

16  of this case.

17         MS. PARKER:  Well, that didn't become a problem until

18  the fact that they weren't married came to light and so that

19  wouldn't retroactively fix the problem.

20         The demand letter which is Exhibit C, it's roughly -- it

21  looks like it's about $50,000 in overpayments over the prior

22  course of time.  That would only fix a problem going forward.

23  And there was an alternative fix, just not claim Robert Pochmara

24  as a spouse.  Just accurately represent the situation, and

25  continue on in that way and just not give him benefits

Evidentiary Hearing

46

1  fraudulently.

2          But I submit to the Court, these people, Maxine's

3  employer became aware of it because of the indictment, because of

4  the -- it was an issue at the arraignment because that's when I

5  found out that they had gotten remarried.  And there were people

6  who ordered copies of the transcript of the arraignment because

7  this is a case of some notoriety up in the Rogers City area.

8          But it's not in the government's press release, it's not

9  something that was known until it was brought out at the

10  arraignment.  And to try to fabricate now an explanation that it

11  was for the grandchildren, as if -- I had the good fortune to

12  have two sets of grandparents for, long enough that I can at

13  least remember them and one up through -- I was through law

14  school or into law school.  To think that my affection for them

15  would somehow be adversely affected, or any other grandchild's

16  affection for their grandparents might be affected by their

17  marital status, especially in today's attitudes toward marriage,

18  is just ludicrous.

19          But the time line is what totally demonstrates that this

20  is yet another lie on top of the obstruction by committing

21  marriage.  Just another way to try to deceive the Court and to

22  avoid the consequences of their action.

23          Thank you.

24          THE COURT:  I appreciate your remarks.  There are a lot

25  of similarities.

Evidentiary Hearing

47

1          MR. RUPP:  May I respond just briefly, your Honor?

2          THE COURT:  Briefly.

3          MR. RUPP:  With regard to the -- just a couple random

4    comments -- that there was time for them to get blood tests.

5    Blood tests are no longer required in Michigan.  I would suggest

6    that the letter from her employer, the problem arising two months

7    after the marriage takes place, highlights or demonstrates that

8    getting married wasn't to her benefit, in fact, hampered her

9    through her employer.  And I had a third point but it escapes me

10   now.

11         THE COURT:  If you think of it, let us know.

12         MR. RUPP:  I will, your Honor.  Thank you.

13         THE COURT:  There is a remarkable similarity of this

14   issue to the first one.  From my point of view, there is

15   overwhelming circumstantial evidence of a particular fact --

16         MR. RUPP:  I -- I did remember the point.

17         THE COURT:  You did remember, okay.

18         MR. RUPP:  I did.  The government argues and if her

19   theory is correct, that they married to create this spousal

20   privilege in an attempt to obstruct justice and then employed or

21   abused the grandchild into writing a letter, I would agree that

22   that is reprehensible behavior.

23         I don't believe that Maxine Pochmara is that

24   reprehensible character who would exploit her grandchildren to

25   avoid a two-point increase at her sentencing.  As the Court

Evidentiary Hearing

1   indicated earlier this morning when we began, that this is a

2   troubling scenario to be sentencing these people.  She is not

3   that reprehensible person.

4          THE COURT:  And yet, apart from a guilty plea, I've

5   never had an opportunity to have any other experience with her.

6   And my suggestion here is not that they have an obligation to

7   take the stand or to bring their grandchildren in to corroborate

8   an accusation.

9          It just simply is the fact that there is, like with

10  respect to the first issue, overwhelming circumstantial evidence,

11  if one assesses the likelihood of the events, to suggest that the

12  marriage, after a 30-year hiatus, had any particular function

13  other than potentially to impede the necessity for disclosing

14  information.

15         And I'm satisfied that the circumstantial evidence in

16  this circumstance warrants that conclusion.  I believe that the

17  two points are appropriately assessed.

18         Which takes us to the next issue.  We have more than

19  circumstantial evidence.  We had two witnesses that testified

20  during the course of the trial that after subpoenas were issued

21  by the government, that Mr. Wilson made statements to them that

22  made them believe that he was attempting to alter or at least

23  advise them against providing testimony.

24         So like the first two questions, we are dealing -- where

25  we were dealing with circumstantial evidence, in my view,

Evidentiary Hearing

1  overwhelming circumstantial evidence that nobody wanted

2  particularly to dispute, we have a circumstance now where we have

3  direct evidence from two witnesses and we would like to argue

4  with those witnesses now, correct?

5          MR. JACOBS:  That's me, your Honor.  Yes.  And I -- and

6  I previously informed the Court that Gary Wilson would like to

7  take the stand as to that issue.

8          THE COURT:  Well, let's -- we will entertain the

9  gentleman.

10         MR. JACOBS:  Call him at this time?

11         THE COURT:  Please.

12         MR. JACOBS:  Mr. Wilson.

13         THE COURT:  Good morning, sir.

14         THE WITNESS:  Good morning, your Honor.

15         THE COURT:  If you could stop for just a moment and

16  raise your right hand.

17         Do you solemnly swear that the testimony you are about

18  to provide will be the truth, the whole truth and nothing but the

19  truth so help you God?

20         THE WITNESS:  Yes, I do, with the help of God, your

21  Honor.

22         THE COURT:  If you would like to have a seat, please.

23                          GARY WILSON

24  Having first been duly sworn at 11:03 a.m., testified as follows:

25         THE COURT:  And while the gentleman is making his way to

Evidentiary Hearing

1  the witness stand, one thing I have not had a chance to go back

2  and identify were the names of the two witnesses that I recall

3  from the trial.

4          MR. JACOBS:  I would have to ask Miss Parker for

5  assistance.

6          THE COURT:  Actually, I'm comfortable that Mr. Wilson

7  will know.

8          MR. JACOBS:  My client will acknowledge conversations

9  and will identify individuals.  I -- I just don't have it written

10  in front of me.

11          MS. PARKER:  Judge, I'm drawing a blank.  Stanley was

12  the name of one of them and it was a Polish --

13          THE WITNESS:  Steve Porter is the other one.

14          MR. JACOBS:  Hang on.  The judge will ask you in a

15  minute.

16          MS. PARKER:  And I'm drawing a total blank on the other

17  one.  But those were just representative witnesses.

18          THE COURT:  And Mr. Jacobs is right, I can absolutely

19  assure you that Mr. Wilson remembers those names.  So we will

20  take the testimony, sir.

21                    DIRECT EXAMINATION

22  BY MR. JACOBS:

23  Q.   State your full name.

24  A.   Gary Lee Wilson.

25  Q.   You heard two people testify at trial that they had

Evidentiary Hearing

1  conversations with you prior to their testifying, is that fair to

2  say?

3  A.   That is correct.

4  Q.   Who were those two people?

5  A.   Ah, I talked to Steve Porter and Stanley Krajnik.

6  Q.   Stanley --

7  A.   Krajnik.

8  Q.   Krajnik.  And Steve Porter?

9  A.   Steve Porter, that's correct.

10  Q.   All right.  First, as to Stanley, what if -- do you recall,

11  in relationship to their testimony, when you talked to him?

12  A.   Well, it was on a Monday morning.  Because on a Monday

13  morning is when I usually run out of cash flow from the weekend

14  so I knew I had to go to the bank.  I went up front to tell the

15  young gentleman who -- who is in charge of the countermen up

16  front -- his main position is to make sure all these other

17  countermen knows what's going on.  He needs to make sure how much

18  cash is in that cash box and --

19  Q.   Hang on, Gary.

20  A.   -- how much cash is in the drawer.

21  Q.   Stay with me.

22  A.   I just like to talk.

23  Q.   I know.  So we are going with when.  Was it after the

24  government sent us a witness list and we had names of their

25  different witnesses?

Evidentiary Hearing

52

1   A.   Yes, it was.

2   Q.   Okay.  So it was after we got a witness list.

3   A.   Yeah.

4   Q.   And you were aware that Steve Porter's name was on the

5   witness list and Stanley -- and I slaughter Stanley's last name.

6   A.   Krajnik.

7   Q.   Krajnik.  Krajnik's name was on the witness list.  All

8   right.  So that day, that Monday, you were talking about things

9   happening.  Was someone in the store, one of those two

10  individuals in the store?

11  A.   No.  As I was stating, I rattle, I went up front to get

12  everything organized so I could go to the bank.  There happened

13  to be a set of rear brake shoes and a spring kit that goes with

14  this job and Justin turned to me and said, Gary, if you're going

15  up town, would you please drop those off at Stan's place of

16  business.

17  Q.   All right.  What's Stan's place of business?

18  A.   K.J. Alignment.

19  Q.   Okay.  So you actually went to K.J. Alignment.

20  A.   Yes.

21  Q.   Dropped off a part.

22  A.   That's correct.

23  Q.   All right.  Did you talk directly to Stanley?

24  A.   Yes and no.

25  Q.   Okay.  What do you mean by that?

Evidentiary Hearing

53

1  A.   I went into the shop, I talked to Fred Osberger, who is a

2  member, sits as a trustee of our church, and we had a

3  conversation about the church.  And I walked through, went up to

4  the counter while -- or the bench, the workbench where Stan has

5  all these tools and these parts and it's just -- it's a mechanic

6  thing.  So I went up there, set the parts down.  Stan was over on

7  the other side of the room.

8          I said, "Stan, I'm dropping these parts off for you."

9          "Thank you, Gary.  By the way, Gary, why did I get a

10 subpoena to come to court on behalf of you?"

11         I said, "I guess they want information from you, Stan."

12         "What kind of information?"

13         I said, "I don't know.  Probably the same information

14 that Jeff Hackett gave."

15         He said, "Well, Jeff Hackett told me all this

16 information that I gave to him was on behalf of Robert Pochmara.

17 Had nothing to do with you."

18         I said, "Well, I don't know what to tell you, Stan."  I

19 said, "If that's what you were told, then you were told that."

20         You know, there is things in life, it's how close are

21 you to becoming a lie and how far is it in between that is really

22 the actual truth?  You know, this was -- Stan says, "Well, what

23 do I do?"

24         "You take the stand.  You know, you've got to."  I said,

25 "But remember one thing, Stan.  Don't get up there and tell any

Evidentiary Hearing

1  lies."

2          "Why?"

3          I said, "Because you will be in big trouble."  I said,

4  "For one thing, that's perjury.  Now the government is going to

5  come after you like they are coming after me.  And second of all,

6  don't say anything bad about my company or myself," I said,

7  "Because it always opens the opportunities."

8          And that's all I said.

9  Q.   "Don't say anything bad about my company or myself."  What

10 did you mean by that, sir?

11 A.   Lies, you know.  In a small town, you know, I thought a

12 small town was like Bay City but I found out it's not.  But, you

13 know, in respect, it is, because in a small town, if you told

14 somebody some gossip, in a small town, it's like rolling a marble

15 down the street.  When it hits the other end of the street,

16 you've got a bowling ball.  And I believe that marble was taken

17 way out of content and rolled down the street and blowed up into

18 a situation that a man that I grew up with -- when I first

19 started in mechanic business, I walked in to Johnny's Buick and

20 guess who the first person I ever met in Rogers City was?  Stan

21 Krajnik.

22 Q.   All right.  Did you tell Stan that you were going to sue

23 him?

24 A.   No, I did not.

25 Q.   We heard testimony at trial where somebody said you were

Evidentiary Hearing

1  going to sue them.

2  A.    Who -- where did that come from?

3  Q.    Never mind.  I will ask you about the -- so, no, you don't

4  believe you said anything to him about suing him.

5         Sir, it's hard for you to testify as to your own

6  reputation in your community but do you -- have you sued other

7  people in the Rogers City area?

8  A.    I can sit here under oath and state I, in my entirety of my

9  life, have never had the opportunity to threaten anybody or have

10  I ever sued anybody in my entire life, not even my own father.

11  Q.    Well, you --

12  A.    I think it was very disrespectful not only to me and to my

13  father but disrespectful for anybody without any type of evidence

14  against me, to have that brought into this courtroom,

15  disrespectable to the judge, disrespectable to the oath that was

16  taken by Janet Parker.

17  Q.    All right.  Did you -- did you fall off your father's roof

18  when you were working on his roof?  Just yes or no.

19  A.    Yes.

20  Q.    Did you fall off -- yes, okay.  And you were injured.  Is

21  that -- yes or no.

22  A.    Yes.

23  Q.    All right.  Did you sue your father as a result of that?

24  A.    No.

25  Q.    All right.  Did you get some insurance money as a result of

Evidentiary Hearing

1  it?

2  A.   No.

3  Q.   Okay.  Did you --

4  A.   As a matter of fact --

5  Q.   Hang on, no, no.  I don't want you to volunteer other stuff.

6  A.   All right.

7  Q.   Now, your son has special needs, one of your children, is

8  that correct?

9  A.   Yes, he does, you're correct.

10 Q.   And at some point in time, didn't your spouse sue the

11 doctor?

12 A.   My son and my wife sued an incompetent doctor, yes, they

13 did.

14 Q.   You weren't involved in that lawsuit.

15 A.   No, I was not.

16 Q.   All right.  But your mother, on behalf -- your spouse, on

17 behalf of your son, filed a lawsuit, a medical malpractice claim

18 against the doctor.

19 A.   That's correct.

20 Q.   All right.  And they received some monies on behalf of your

21 son, is that correct?

22 A.   That is correct.

23 Q.   All right.  Let's talk about the other person.  The other

24 person is Steve Porter?

25 A.   That's correct.

Evidentiary Hearing

1  Q.   All right.  Did you have a conversation with Steve Porter

2  before the trial?

3  A.   Steve Porter came into my store and I believe -- it was not

4  in the morning, it was in the afternoon, between Monday and

5  Friday.  And he was digging, trying to get me to give him some

6  information about Bob, what's going on with Bob.  And I told

7  Steve, I have no idea what's going on with Bob.

8        And the only conversation that I ever had with Steve

9  Porter is I -- I stated to Steve, about my company, the years

10  I've had in my company, all the good I've done in my company.  I

11  believe I can hold all my enemies in one hand.  I just couldn't

12  believe that there would be anybody in Rogers City that would

13  have the audacity to get up there and state that I make any type

14  of threats towards them.

15        The only thing I stated was that anybody that would get

16  up there and hurt myself, my company, my 21 years of my life, and

17  tell lies, would open their arms to some type of percussion, you

18  know.

19  Q.   Some type of repercussion, is that what you just said?

20  A.   Yes.

21  Q.   What did you mean by some type of repercussion?

22  A.   Well, I go right back to that word, you know.  That, you

23  know, if somebody says something about you and your company, you

24  know, they can be held responsible, you know.  We are back to

25  that word, that one word.

Evidentiary Hearing

1  Q.   Which is what?

2  A.   Hang on.  My mind just went blank.  I have a -- I've been

3  diagnosed with short-term memory.

4  Q.   Okay.

5  A.   That word is -- hang on.  My mind has come to a standstill.

6          THE COURT:  Mr. Rupp, any suggestions?

7          MR. RUPP:  I thought he was talking about repercussion.

8  BY MR. JACOBS:

9  Q.   Did you ever threaten anybody?

10  A.   No, I have not, Steve.

11  Q.   All right.  Do you see where somebody might say threatening

12  to sue someone is in essence a threat?  Do you follow me with

13  that?

14  A.   There is a word for suing somebody.  That's called

15  defamation of character.

16  Q.   All right.

17  A.   I believe it's -- it's -- it gives citizens the right to

18  stand up in what they believe in for somebody lying and stating

19  things that are incorrect about them.

20  Q.   And it is true that you --

21  A.   I -- I may have used the word.

22  Q.   You let people know that if they defamed you, if they said

23  false things about you and about your business --

24          MS. PARKER:  Objection.  Leading.

25          THE COURT:  Sustained.

Evidentiary Hearing

59

1   BY MR. JACOBS:

2   Q.   All right.  What message were you trying to get across to

3   Steve Porter?

4   A.   Absolutely none.

5   Q.   Well, were you telling him don't testify?

6   A.   No, absolutely not.

7   Q.   Were you trying to keep him from testifying?

8   A.   Absolutely not.  No.

9   Q.   Were you trying to sway his testimony?

10  A.   No.

11        MR. JACOBS:  Nothing further, your Honor.

12        THE COURT:  My presumption is that none of the other

13  defense counsel would have any questions of the witness.  Am I

14  correct in my understanding?

15        MR. PIAZZA:  Not on this issue, your Honor.

16        MR. KOELZER:  That's correct, your Honor.

17        MR. RUPP:  Correct.

18        THE COURT:  Cross-examination?

19        MS. PARKER:  Thank you.

20                    CROSS-EXAMINATION

21  BY MS. PARKER:

22  Q.   Mr. Wilson, how many people on the witness list did you talk

23  to?

24  A.   Have I talked to?

25  Q.   Between -- I should clarify that.  I'm sorry.

Evidentiary Hearing

60

1   A.   On a daily basis or --

2   Q.   No, please allow me to rephrase it.  Between the time that

3   you became aware of who was on the witness list and the start or

4   the end of the trial, how many of the people on the government's

5   witness list did you talk to?

6   A.   Steve Porter that came into my store and Stan Krajnik that I

7   dropped parts off to.

8   Q.   And those -- your testimony is those are the only two that

9   you talked to?

10  A.   About the case, yes.

11  Q.   And -- I'm sorry, maybe I didn't hear the answer but did you

12  have an occasion where you were injured while working on your

13  father's roof?

14  A.   It actually was my son -- would have been my

15  brother-in-law's because he had purchased that home from my dad

16  and my dad had a life lease.  They could stay there and live

17  there as long as they wanted.  But I did fall off that roof that

18  I grew up -- in the home I grew up in, yes.

19  Q.   And did you collect insurance money over that?

20  A.   No, I did not.  They never even paid my medical.

21  Q.   Does Steve Porter have a business of his own?

22  A.   Steve Porter has many businesses, yes, he does.

23  Q.   And that's in the same community that you're in.

24  A.   Yes.

25  Q.   And I'm going to call him Stanley because I will massacre

Evidentiary Hearing

1  his last name.

2  A.   He's Polish.

3  Q.   Yeah, I'm sorry.  I can usually get Polish names but I don't

4  have it written down and I'm forgetting it, so I'm sorry.  Does

5  Stanley have a business in Rogers City?

6  A.   That's correct, yeah, K.J. Alignment.

7  Q.   And in addressing or discussing the witnesses with Mr.

8  Porter and Mr. Stanley, did you mention defamation?

9  A.   Steve Porter brought that word to my attention and where he

10  heard it, I don't know, but he asked me, can people be sued for

11  defamation of character?  And I don't recall the comment I made

12  on that.  I really don't.

13  Q.   So you're attributing it to him now and not to you.

14  A.   He's the one that said that to me when he came into my store

15  and was digging for information, that's correct.

16  Q.   And did you use the term when you were talking to Stanley?

17  A.   And what was that term?

18  Q.   Defamation.

19  A.   I mentioned to Stanley that if people would get up and lie,

20  that they can be sued for defamation of character.  And they can

21  also be charged for perjury.

22  Q.   And the lawsuit that your son and your wife were involved

23  in, was that against a local doctor?

24  A.   Yes, it was.

25  Q.   Was there local publicity over that?

Evidentiary Hearing

1  A.   No, because the trial was held down here in Saginaw.

2  Q.   There was never any reporting of what happened on that case?

3  A.   Not that I'm aware of.

4  Q.   You don't think everybody in the community knows about that?

5  Or most people?

6  A.   We're -- we've got a marble on one hand and a bowling ball

7  on the other.  You know --

8  Q.   No.

9  A.   -- you're talking small town gossip.  How can we balance

10  that knowledge?  I -- I don't understand your question, Janet.

11  Q.   I think I will leave it there.  Did you tell Mr. Porter that

12  if anyone hurt you or your company, they would be subject to

13  repercussions?

14  A.   No, I did not.

15  Q.   Who did you say that to?

16  A.   I only talked to Stanley.  He's the one that approached me

17  with that word, defamation of character.

18  Q.   No.  It's a different question, sir.

19  A.   Oh, I'm sorry.  Then I would ask you to repeat the question.

20  Q.   Did you say to Mr. Porter, that anyone who hurt you or your

21  company would be subject to repercussions, or words to that

22  effect?

23  A.   I just said they could be sued for defamation of character.

24       MS. PARKER:  Just a moment, your Honor.  Pass the

25  witness, your Honor.  Thank you.

1          MR. JACOBS:  I have no further questions of Mr. Wilson

2   regarding this.  Of course, later on this morning, we have a lot

3   of exhibits as to the financial information.  I will be asking

4   Mr. Wilson about that financial information, your Honor.

5          THE COURT:  We will take it up then.

6          THE WITNESS:  Could I read a letter, your Honor?

7          MR. JACOBS:  No.  No.

8          THE WITNESS:  Can --

9          MR. JACOBS:  No, I don't want you to read a letter.

10          THE WITNESS:  Why not?

11          MR. JACOBS:  I want you back here.

12          THE WITNESS:  Can I give these letters to you, your

13   Honor?

14          MR. JACOBS:  Why don't you and I talk about that during

15   a break.

16          THE WITNESS:  One is from my daughter and the other one

17   is from my son.

18          MR. JACOBS:  Well, that's something that you and I can

19   talk about during the break, okay?

20          THE WITNESS:  Well, will I have the opportunity to come

21   back up here again?

22          MR. JACOBS:  Yes, you'll have an opportunity to come

23   back up again.  We're going to put you up regarding another

24   issue.

25          THE WITNESS:  Okay.  I'll live with that.

Evidentiary Hearing

64

1        THE COURT:  You're excused.

2        THE WITNESS:  Thank you, your Honor.

3        (At 11:22 a.m. - witness steps down)

4        THE COURT:  If not earlier, even the last interchange

5   with the witness, I think, is important to understanding how this

6   issue needs to be resolved.  As we spoke about earlier on in the

7   context of an earlier variable, Mr. Wilson and Mrs. Wilson have

8   not received any economic benefit.  To use some of the language

9   from counsels' -- counsels' supplementary memorandum, they were

10  approached about the way in which Mr. Pochmara's pension benefit

11  could be protected.

12       They didn't receive any money at all.  They are in this

13  courtroom as a result of the fact that in his view, friends, they

14  merely facilitated Bob's effort to retain that disability

15  payment.  And he's mad as hell that he's in this courtroom.  He's

16  mad as hell about all of the events that have taken place and the

17  accusations that have been made when he has lived his life in the

18  way that he has.

19       And when approached by these two other individuals, he

20  viewed himself as merely cautioning them that they damn well

21  better tell the truth when they get on the stand and that

22  repercussions could follow if they didn't.  And he sees that as

23  an honest way of cautioning them under circumstances where he's

24  besides himself about the nature of the accusations that are

25  being made.

Evidentiary Hearing

1        But I don't believe his intention was simply to offer

2   good faith suggestions in their interests to be sure that they

3   told the truth.  I heard those witnesses.  They knew that.  The

4   reason those statements were made by a man that was enormously

5   upset about the circumstance that he found himself in was to

6   caution them to not consider anything that might suggest his

7   responsibility.  He intended that they understand, indeed used

8   the language in one set of circumstances, that there would be

9   repercussions.  He was attempting to make sure that they

10  understood that their testimony needed to tow the line.  His

11  purpose was to be sure that their testimony followed in the way

12  that was most favorable to him.

13       I respectfully would find on the basis of the

14  testimony that we've received that his intention was to obstruct

15  justice.

16       MR. JACOBS:  Yes, sir.

17       THE COURT:  The next issue is the amount of loss.  We've

18  talked about this a short time earlier.  The reference made in

19  the pre-sentence report is to a figure of $325,500.  During the

20  course of a series of briefs, we have discussed the question as

21  to the appropriate attention to the Social Security benefit that

22  would have accrued to Maxine Pochmara as a result of the fact

23  that she was in effect adding Robert's salary to hers for

24  purposes of calculation of the Social Security benefit.

25       She would have been -- or Robert would have been

Evidentiary Hearing

66

1   responsible for -- it's seven percent of the reduction from his

2   compensation and seven percent from the employer.  The end result

3   is that in a series of documents that the probation officer

4   received, that the Social Security Administration asked to

5   maintain private, reflected a pension benefit, if Mrs. Pochmara

6   were to live to an appropriate life expectancy for someone her

7   age and to begin to draw that at 66 years, and they assessed her

8   life expectancy at 20.9 years, that they mark the value of the

9   benefit, would be $74,500.

10          The important point here is that when added to the

11   $325,000, we end up with a figure that would exceed the guideline

12   variable of four hundred.  The probation officer, Mr. Burns, had

13   originally assessed the guidelines based on a range of two

14   hundred to $400,000.

15          Let's begin first with the number that was included in

16   the government's supplementary papers, $428,585.  If the

17   government could clarify the manner in which that was calculated

18   and I want to make sure that the defendants have had the

19   opportunity to review those calculations.

20          MS. PARKER:  As I understand it, and I believe Agent

21   Hackett will correct me if I'm wrong, that's basically a

22   print-out that was done just listing the payments that were made

23   to Robert Pochmara by the Railroad Retirement Board for

24   disability benefits from the time he started receiving benefits

25   until the date -- until the time he pled guilty.  It's just a

1  straight line calculation of the actual numbers.  They are not

2  adjusted for inflation or anything like that.

3        THE COURT:  In terms of the guideline calculation, is

4  there any reason why -- and perhaps I would solicit some advice

5  from Probation Officer Burns, if he is familiar with that -- is

6  there a reason why the guideline would limit at least Mr.

7  Pochmara's assessment to the $325,000 if he continued to receive,

8  what, another $103,000 after that point in time?

9        MR. BURNS:  The only reason that I can see, on the

10  limitation of the amount collected, would be because the offense

11  conduct for the offense, him working at NAPA Auto Parts, had

12  ceased after March of 2009.  It is then the collection of

13  Railroad Retirement Board disability funds may be viewed as

14  legitimate since the Railroad Retirement Board funds have no

15  reason to shut it off and he is not committing a criminal act at

16  that particular time.

17        THE COURT:  Do you know whether or not there was any

18  disclosure to the Railroad Retirement Board by Mr. Pochmara after

19  the indictment?

20        MR. BURNS:  That would be something that the government

21  or maybe the case agent may be able to speak on.

22        MR. KOELZER:  Your Honor, I'm sorry to interrupt you.

23  I'm just trying to make sure we don't have a math problem here.

24  The original figure we got originally in discovery was $218,000.

25  Then including from '09 up until some date, the date of the plea,

Evidentiary Hearing

68

1  roughly, that's what makes it $325,000.

2        The government's theory, late-arriving theory, that it's

3  somehow four hundred eighteen thousand or four hundred

4  twenty-eight thousand, requires us to go backwards from the

5  beginning of the conspiracy -- yeah, from the beginning of the

6  conspiracy, which was in, about '99, roughly, back to '91, under

7  the theory that my client was disabled throughout the entirety of

8  his receipt of disability benefits.

9        So I guess I just want to make sure that we are all

10 talking about the same thing.  When the $325,000 came up, it was

11 not that big a -- we all knew where the grades fell, two hundred

12 to four hundred.  Whether it was two eighteen or three

13 twenty-five, the guidelines were the same.  And we didn't --

14 didn't really even think about questioning the three twenty-five

15 or where it came from or why did it change from two eighteen.

16        But to be clear, unless I'm not -- unless I'm not clear

17 in my own mind, the way to get over four hundred thousand, is to

18 go back and cover from '91 to '99.  That's an additional,

19 approximately one hundred thousand.  So --

20        THE COURT:  Now, we've been in here approaching two

21 hours.  We need a break in any event but that's also, I think, an

22 opportunity to review at least with Miss Parker and the agent

23 their calculations and source of the numbers so that you can

24 reach a level of satisfaction on that.

25        MR. KOELZER:  I agree, your Honor, just so we are all

Evidentiary Hearing

1 arguing about the same thing.  That's my only point for standing

2 up at this point.  So --

3         THE COURT:  Just in terms of length of available time, I

4 don't have anything until two o'clock this afternoon.  I don't

5 know if other parties have conflicting schedules.  It's gone a

6 little bit longer than I anticipated but I think that's

7 consistent with the way the case has been.

8         MR. KOELZER:  I don't, your Honor.  I mean, I'm --

9         MR. PIAZZA:  I just have to be upstairs at four o'clock

10 so --

11         THE COURT:  Which of the two locations?

12         MR. PIAZZA:  Magistrate's.

13         THE COURT:  We will take about a ten-minute break and we

14 will return.  Record is closed.

15         (At 11:34 a.m. - proceedings recessed)

16         (At 11:50 a.m. - proceedings resumed)

17         THE COURT:  Miss Parker, have you and the gentlemen had

18 a chance to review the figures with defense counsel?

19         MS. PARKER:  To some degree, your Honor, yes, I did.  I

20 don't know that we've arrived at any essential agreement but my

21 position is, as I previously stated, the Wilsons would not be

22 responsible for any loss attributable to the time period after

23 they no longer continued in the arrangement but I would submit

24 that Robert Pochmara is for a couple of reasons, one of which

25 the Court has already alluded to -- and I would submit, Maxine,

Evidentiary Hearing

70

1   also.  They continued to collect the money and use it.

2         And if you refer to Government's Exhibit 23 from the

3   trial which was a document that was sent to Mr. Pochmara in 2008,

4   which there were reports that he had to make, as you recall the

5   testimony was, every year, in the fall, as to whether there was

6   any change in condition.

7         And in August of 2008 or thereabouts, they sent out a

8   Continuing Disability Report which in Section 5, asks the

9   defendant to describe any change for better or worse in his

10  condition, if any, during the period covered by the report.  And

11  this is a continuing thing.  The defendant never reports an

12  improvement in his condition.  It's always continued to be the

13  same.

14        So I think the record that the defendant has created in

15  this case and if the Court would want, I can present Mr.

16  Hackett's testimony, who has reviewed the entire file, every

17  single report for every year, there is never a report that, I'm

18  better now, I can do light duty work or I can do something else.

19  I mean, there are other questions in there that defendant, Mr.

20  Robert Pochmara, doesn't answer candidly but as to his condition,

21  it always is the same or worse.  It's never an improvement.

22        So I think for that reason, that he should be

23  accountable as Maxine for the same reason as she receives it, she

24  lives with him.  She knows he is able to work.  She is willing to

25  have him work under her name.  So I think for that reason, for

Evidentiary Hearing

1  the entire period of time, the Pochmaras should be held

2  accountable and that would be the $428,000 figure.

3          MR. KOELZER:  Your Honor, can I address that?

4          First of all, to get -- I'm looking at Government's

5  Exhibit Z which is the total which comes out to four hundred

6  twenty-eight thousand plus.  The only way for the government to

7  get over four hundred thousand, even accounting for the -- if --

8  if we use the amounts right up to the date of the plea, the only

9  way to get over four hundred thousand which is included in this

10  chart is to go backwards from the date that the conspiracy

11  started, was January of 1998, and the date that the payments

12  started, was about November of 1991.  So the government is

13  trying to include approximately seven years worth of disability

14  payments that my client received before the conspiracy even

15  started.

16          I would suggest the government would have to -- I

17  suppose the government could have tried to charge something else.

18  It wouldn't even be the same charge.  But I think the government

19  is overreaching here by trying to go all the way back to 1991, to

20  the first disability payment in order to ratchet it up over four

21  hundred thousand.

22          I wanted to point out one thing for the Court and it's

23  Page 513 and 514 of the discovery.

24          THE COURT:  And I'm sure we have the information in the

25  report but what would be -- the inception date of their

Evidentiary Hearing

1  participation with the NAPA Store was in?

2      MR. KOELZER:  January of '98 is alleged in the

3  indictment.

4      THE COURT:  Okay.

5      MR. KOELZER:  But, your Honor, I do have one thing that

6  I wanted to present and I have -- I guess I would like to just

7  read.  It's Grand Jury testimony.  I can point out the page, it's

8  about eight lines long.  It's the testimony of Agent Jeffrey

9  Hackett on April 27, 2011.  It's Page No. 513 and 514 in the

10  discovery.  A grand juror asks:

11          "Is this just an issue of not reporting income or

12      is it also that he was certified as disabled but

13      currently working?  Is it both or just about not

14      reporting income?"

15          The witness, Mr. Hackett says:

16          "Are you asking if we're questioning his actual

17      disability?"

18          The grand juror says:  "Yes."

19          Mr. Hackett says:

20          "No, we're not questioning the disability, just

21      the income."

22          So the whole theory of the case is, that he is failing

23  to report his income while he is receiving disability.  That

24  occurs from -- his income starts in or about January of 1998 and

25  even if we go all the way up to the present, that would cover an

Evidentiary Hearing

73

1  amount approximately three hundred twenty some odd thousand.  I
2  think it's overreaching to go any farther back than that and I
3  don't think the government can get over that threshold.
4          THE COURT:  Do you agree with the gentleman?
5          MS. PARKER:  No, your Honor.
6          First of all, I think that taking Mr. Hackett's Grand
7  Jury testimony out of context, at that point, we weren't going to
8  be engaging in a -- you know, proofs of his status regarding his
9  medical condition and getting into a medical battle but rather,
10 for the time period that he was working at the NAPA Auto Store,
11 he was working and he wasn't reporting it, and that's the essence
12 of the crime.
13         But for purposes of sentencing, the defendant has the --
14 I think, the obligation as we've shown through the proofs, to
15 report any change in condition.  He never reports a change in
16 condition.
17         He's obviously able to work and therefore, I think it
18 makes the collection of the payments back to the initial payments
19 to be fraudulent and particularly, I would submit, after the
20 point that he stops working at the NAPA Store, he doesn't stop
21 there because of a change in his condition.  He stops working
22 there because of the investigation and he keeps taking the money.
23         And I think, again, that demonstrates that his
24 collection of the money was part of a fraud scheme and it's
25 all -- if not specifically -- I mean, every year, he is making a

Evidentiary Hearing

74

1   false representation so I think that could be -- could have been

2   charged.

3           We just didn't go back to the beginning of time because

4   he wasn't particularly working then but I think in hindsight,

5   based on all we've seen, we know that he could have been.  And at

6   least we don't see any report of change in condition by him.  If

7   he said, I'm a little better but I still can't come back to work

8   on the railroad, we'd be in a different position.  But we are not

9   there.  We have him saying no change or worsening.

10          THE COURT:  If I do accept your position and I think --

11  which is that commencing in November of '91, there is a

12  determination made by the Railroad Retirement Board, perhaps

13  based on information that was available to them only through the

14  recipient, that he nevertheless qualified for the disability

15  payments, it's just in January of 1998 that he substantiates the

16  fact that the full amount of the benefit was something probably

17  he was not entitled to.

18          MS. PARKER:  Absolutely.

19          THE COURT:  I don't want to litigate the question nor do

20  I think the guidelines necessarily require us to give attention

21  to his benefit between November of '91 and January of '98, when

22  the operative conduct of failing to disclose his income and his

23  physical ability to generate income occurred so far as this

24  offense was concerned.

25          However, that leaves us with a figure of -- if

Evidentiary Hearing

1  commencing in January of '98, of $325,000, through the date of

2  the termination of his employment with the parts store, is that

3  accurate?

4          MR. JACOBS:  No.

5          MR. KOELZER:  No, I don't think so.  It's a lower

6  amount.  I will let Mr. Jacobs address that.

7          MR. JACOBS:  Your Honor, I'm looking at Government's

8  Exhibit Z and that's payments made to Mr. Pochmara.  And if we go

9  from December 1st of '98, through the end of that page, through

10 December 1st of 2012, I get a total of $309,005.

11         I assert to this Court that the cutoff date should be

12 March of 2009, when he ceased employment and that that would be

13 one fourth of the $23,000 he received in 2009, which is

14 approximately $5,884.  If we take from December 1st, 1998,

15 through December 1st, 2008, and add that $5,884, we end up with

16 $231,220.  That's the correct number.

17         MR. PIAZZA:  And on behalf of Sue Wilson, that's our

18 calculation as well.  During the time of the indictment and

19 employment, that Mr. Pochmara received $231,220.

20         THE COURT:  I'm not understanding the reduction from

21 your explanation between the 309 to the 231.  Do you know what

22 their --

23         MR. JACOBS:  The Exhibit Z, your Honor, goes from

24 December -- well, at least for me to get the 309, I go from

25 December 1st of 1998 through December 1st of 2012.  The

Evidentiary Hearing

1    conspiracy ended in March of 2009.  Mr. Pochmara is no longer in

2    the store.  He is no longer receiving monies from my -- my

3    clients or Maxine Pochmara is no longer receiving monies and

4    that's why I end up in March of 2009, to answer the Court's

5    question.

6             THE COURT:  And with that concluding at two hundred

7    thirty-one thousand, two --

8             MR. JACOBS:  Two twenty, the amount of monies that were

9    paid to Maxine Pochmara, allegedly -- well, not allegedly.  The

10   jury found that Mr. Pochmara was the employee.

11            THE COURT:  Yes.  And the government's accepting that

12   or --

13            MS. PARKER:  I'm not.  I just haven't had -- I'm not

14   going to agree to -- I don't do the math in my head well enough

15   to agree or disagree, frankly, your Honor, and I don't think

16   that's an appropriate basis because as I indicated, I think it's

17   relevant conduct.  The defendant manifestly was able to work and

18   continued to report, even after he terminated his employment with

19   the NAPA Store, that he was unable to work.

20            THE COURT:  And that part I agree with you, with respect

21   to the Pochmaras.  I'm focused right now solely with respect to

22   the Wilsons.

23            MS. PARKER:  All right.  I would need to have a few

24   moments with an adding machine with a tape to make sure the

25   numbers are right.  I just --

Evidentiary Hearing

1          THE COURT:  All right.

2          MS. PARKER:  I'm not going to do it off the top of my

3    head.

4          THE COURT:  With respect to the Pochmaras, let's see if

5    we can work our way back through the numbers.  I'm in agreement

6    that both the restitution amount and the amount of the loss

7    ought to be the total amount received beginning after January of

8    1998.

9          Do we know what those numbers ultimately culminate at?

10         MR. RUPP:  Your Honor, if I may, Government's Exhibit 26

11   from the trial is a spreadsheet that details and totals payments

12   from January of '98 through April of 2013, and reflects a total

13   amount paid of $323,500.25.

14         THE COURT:  All right.  I want to make sure the

15   government has a chance to review the calculations.  However,

16   relevant to our determination here with respect, excuse me, to

17   the amount of loss, is whether or not the amount exceeds four

18   hundred thousand.

19         The additional arguments that are left for attention to

20   is the argument that in addition to the railroad benefit, we

21   should also include the amount of the Social Security benefit

22   that Maxine received but that Bob should have.

23         The pre-sentence report had reflected the fact that

24   Maxine's employer had some unique arrangement, it was like a

25   401(a) account, that permitted an election to treat the Social

Evidentiary Hearing

1  Security contributions as applying to a -- at least as regarding

2  old age benefits, the equivalent of a retirement benefit.

3        Did we learn anything more about that at all, Mr. Rupp,

4  from the employer?

5        MR. RUPP:  Yes, your Honor.  I was able to get a hold of

6  and spoke with the human resources director and I'm just trying

7  to find my notes here from that conversation.

8        The gist of it was that at the relevant time period and

9  I want to say it was in the late '90s, Community Mental Health

10  was designated or became an agency as that term is used, as -- in

11  a technical fashion or as a term of art.

12        When they did that, under the tax code, they had the

13  opportunity to use this alternative to Social Security.  It was

14  put to a vote with all of the employees.  The majority ruled --

15  was just that, majority ruled.  Whether you voted for or against

16  it, if it was approved, everybody participated in it.  And

17  payments were pulled from paychecks and put into an

18  individualized account for each employee under a larger mutual

19  fund.  So monies that were pulled from Maxine's earnings and put

20  into a -- into the account or accounts, were earmarked for

21  Maxine, added to a big general fund where people pulled from

22  after they retire.

23        THE COURT:  So it would work somewhat equivalent to a

24  contributory account like a 401(k) or an IRA.

25        MR. RUPP:  Correct.  And if I had the numbers and

Evidentiary Hearing

1   letters right, I believe -- I believe it was a 401(a) account

2   that was set up -- or accounts.

3          THE COURT:  The advantage -- the advantage of defined

4   benefit plans is that you receive money no matter how long you

5   live, monthly payments.  The disadvantage, if you die

6   prematurely, is that you don't necessarily get everything that

7   you've paid into the account.  The advantage of a contributory

8   plan on the other hand is that you have an asset, as you put it,

9   an account that is individualized to her.

10          What is the economic value of the account she has with

11   her former employer?

12          MR. RUPP:  Are you asking what is its value today?

13          THE COURT:  Yes.

14          MR. RUPP:  Zero.

15          THE COURT:  And the reason for that is?

16          MR. RUPP:  There was several -- there was more than one

17   account and she cashed all of those out.  The largest portion of

18   the haul from cashing those out was the thirty-some thousand

19   dollars paid back to Community Mental Health to reimburse for the

20   excess medical insurance premiums that were given to Robert as

21   her spouse when he was not legally her spouse.  The remaining

22   funds were used to pay towards other medical bills, I believe

23   towards a truck, and without referring to my written submissions,

24   I think there was a third item in particular but it's -- it's

25   escaping me at the moment.

Evidentiary Hearing

1          THE COURT:  So she used the funds to pay -- pay off a
2    personal liability.

3          MR. RUPP:  Correct.

4          THE COURT:  Okay.  I thought that was a separate
5    retirement account.  Was it solely the 401(a)?  There was no
6    additional 401(k) or equivalent retirement account?

7          MR. RUPP:  Not that I'm aware of, your Honor.

8          THE COURT:  Okay.  In any event, we know what the
9    economic value of that account was.  She used about thirty-eight
10   thousand and I'm pretty sure that the figure on that account was
11   included.

12         MR. RUPP:  I believe the numbers are in one of my
13   written submissions to the Court.  The numbers that are sticking
14   out in my head is that the total value of the accounts left
15   untouched at the time was fifty-some thousand dollars, that there
16   were losses attributable to taxes for early withdrawal.

17         THE COURT:  Roughly fifty-four thousand?

18         MR. RUPP:  I won't disagree.

19         THE COURT:  If we double check our numbers.
20   Interestingly enough, Miss Parker, the estimate that we had from
21   the Social Security Administration was in the range of
22   seventy-six thousand.  Now, you haven't convinced the defendants
23   yet that we ought to be including that Social Security number.
24   But even if we do, in my reviewing the Social Security
25   calculations, they came in at $74,500, but none of that is

Evidentiary Hearing

1   reduced to present value.  And when I did a quick present

2   calculation, I ended up with about fifty-five thousand, which

3   would be roughly equal to the principal amount in the 401(a).

4          MS. PARKER:  What was that number again, judge?

5   Approximately.

6          THE COURT:  I ended up with a present value of

7   fifty-five thousand.  And the 401(a) value, Mr. Rupp indicated

8   was around fifty-four thousand.  I know he's got it in his

9   papers.  I just don't have it immediately at hand.

10         Were you able to locate it, sir, just to verify?

11         MR. RUPP:  No, not yet, your Honor.

12         MS. PARKER:  Your Honor, were you looking for where the

13   $52,000 went?

14         THE COURT:  Nope, just trying to verify what the amount

15   was in the 401(a).  Because it places a value on the Social

16   Security or its equivalent benefit.

17         MS. PARKER:  The only thing we have on that, that I'm

18   aware of, is the Exhibit C, which says where the three different

19   account balances were -- how they would be applied.  Is that what

20   you're referring to?

21         MR. RUPP:  That's -- that's what I would have been

22   referring to as well, your Honor, and I don't have the exact, to

23   the penny calculation, but just a quick look at it, puts it right

24   at about fifty-four thousand.

25         THE COURT:  Okay.  Now, I want to make sure the

Evidentiary Hearing

82

1   government has a chance to double check the figures but in any

2   event, I see it less than four hundred thousand, even if we

3   utilize the Social Security or 401 benefit -- 401(a).

4           MS. PARKER:  I'm sorry?

5           THE COURT:  I see it as being below four hundred

6   thousand.

7           MS. PARKER:  As to which defendants?

8           THE COURT:  Both.  Because I think we're appropriately

9   at two hundred thirty-one thousand and change with respect to the

10  Wilsons and at three hundred twenty-three thousand five hundred,

11  with respect to the Pochmaras.  And so then if I add the

12  fifty-four thousand to the three twenty-three, it's still under

13  four hundred.

14          MS. PARKER:  Well, your Honor, I would submit that I

15  don't disagree as to the Wilsons.  As to Robert Pochmara, I think

16  it's important that we get -- and Maxine, we get the number right

17  and I don't submit that the three twenty-three is correct.  The

18  exhibit was prepared in anticipation of trial and it does not

19  include the payments that were made up to the point of the plea.

20          The Exhibit Z has an additional, if my math is correct,

21  $2,053.10 and that should also be included which wouldn't change,

22  I agree, the -- the -- I'm sorry, the assessment for loss in

23  terms of guideline scoring, but it does affect the restitution

24  and I want to get that correct.

25          THE COURT:  Okay.  And I appreciate your point.  It is

Evidentiary Hearing

83

1   important when it comes to restitution but respectfully, the

2   guideline also gives us some latitude in coming to the conclusion

3   that the technical effort to get at this precisely right, has a

4   point of diminishing returns and says, take your best shot and

5   frankly, I've given it my best shot.

6           For purposes of the amount of loss, I'm comfortable that

7   a range of two hundred thousand to four hundred thousand, is

8   scored correctly, and I will make sure and take you up on that

9   point that you have an opportunity before we get to restitution

10  to assess those numbers.  That's a different issue.

11          Next issue, was the propriety of the financial

12  disclosures.  The government has taken the position that they

13  have been so inadequate that two points ought to be -- two levels

14  ought to be added for obstruction of justice -- the obstruction

15  of justice enhancement pursuant to 3C1.1.

16          I spent a little bit of time with the papers, including

17  the supplementary papers.  I'm fully aware of the arguments with

18  respect to the accuracy of the Pochmaras' numbers.  I guess I was

19  still a little bit more focused on the propriety of the Wilsons'

20  financial information.

21          I'm aware of the fact that we have two accounts -- that

22  the Wilsons have two accounts at Chemical Bank as of December the

23  27th that would have, as I understand it, had been roll-overs

24  from the Edward Jones and Lord Abbott funds, in the amount of

25  thirty-five thousand for Sue Wilson, and change.  And forty-nine

Evidentiary Hearing

1  thousand and change, for Gary.  Those are not reflected in the

2  disclosures that were made to the probation officer.

3       On the other hand, there was a reference in the

4  pre-sentence report to them being entitled to monthly payments as

5  of a particular date that I think someone concluded was an

6  appropriate disclosure of those contributory accounts.

7       MR. JACOBS:  Yes, as to Gary Wilson and the forty-nine,

8  your Honor.  Earlier on, in the pre-sentence report, on the same

9  page, it says X amount per month payable at a certain date.

10 That's -- that's our reference to the forty-nine.

11      THE COURT:  But he does not disclose the principal

12 amount of the account.

13      MR. JACOBS:  That's correct, we didn't have the

14 forty-nine thousand down.

15      THE COURT:  It was omitted.

16      MR. JACOBS:  And we said he had a pension and asserted

17 that -- that retirement accounts through Chemical Bank which is

18 slated to pay $750 per month starting on May 25th, 2023.

19      THE COURT:  If those are contributory accounts, who

20 selected the date and who selected the amount rather than

21 providing the principal balance of the account as he did in the

22 other situations?  Why didn't he disclose the fact that it was

23 almost a $55,000 principal amount?

24      MR. JACOBS:  We would assert it was a harmless error.

25 And when they were asked about pensions and IRAs, they thought

Evidentiary Hearing

85

1   the government was asking how much money they would receive at a

2   later date.  So that's why they gave the answer they did.

3           THE COURT:  Well, with the contributory account, you get

4   to choose, up to the age of 78 and a half, when it's going to

5   begin, how much you're going to take down, so disclosure of the

6   monthly payment is in no way consistent with the disclosure of

7   the asset, as he did with respect to other contributory

8   accounts.

9           Why didn't he do that the same way?

10          MR. JACOBS:  Other than to put my client on the stand

11  and have him answer that question, I -- and he would say that --

12  one moment, your Honor.

13          (Whereupon defense counsel and Defendant Gary Wilson

14          confer off the record)

15          MR. JACOBS:  My client believes at least in some of the

16  documents that the Probation Department has, and I guess we will

17  ask the probation officer to review them, that they thought they

18  had put down the actual number and also put down that they would

19  receive a payout of a certain amount per month.

20          THE COURT:  We will give him a moment on that.

21          MR. JACOBS:  Yes.

22          (Whereupon document handed to defense counsel and

23          conversation take place off the record)

24          MR. JACOBS:  Just one moment, your Honor.

25          THE COURT:  Yes, sir.

Evidentiary Hearing

1           (Whereupon conversation takes place between defense

2           counsel and Wilson Defendants)

3           MR. JACOBS:  Your Honor, I would respond that the

4    documents provided by the Probation Department, that the clients

5    are to fill out, first asked for the type of asset, anticipated

6    assets, and that's where they put their IRA information.  And

7    they asked if it's individual or joint and they both list

8    individual.  And then the amount received or expected to be

9    received, the client -- my client wrote down $750 a month as to

10   him.  Date expected to receive, May 25th, 2023.  From where,

11   Chemical Bank, Rogers City.  And they did the same information as

12   to an IRA regarding my client's spouse.  They put down the

13   information that was requested on the form.

14           You're asking us to differentiate between a

15   contributory account and non-contributory.  They asked him --

16   they asked, how much do you expect to receive, when do you expect

17   to receive it and where you receive it from.  And that's what

18   they put down.

19           MR. PIAZZA:  And I would suggest, your Honor, on behalf

20   of Sue Wilson, they are not trying to hide anything.  At least

21   there is something there that reflects that there is an account.

22   And my client indicates she thought she turned over the documents

23   to the Probation Department but, you know, I will defer to the

24   Probation Department on that.

25           (Whereupon counsel confer off the record)

1          THE COURT:  Government's view?

2          MS. PARKER:  Well, your Honor, I'm just now getting to

3   look at this form but there is a question, the first item on the

4   form after your name and your Social Security number, is bank

5   accounts:  "Include all personal, business, checking and saving

6   accounts, credit unions, money market, certificates of deposit,

7   IRA, keynote accounts, thrift savings, 401(k)," et cetera.  It

8   seems to me this clearly comes within the parameters of that

9   request for information and disclosure.

10          After that, it's:  "Securities, all stocks and public

11  corporations, businesses," blah, blah, blah.  You know, it's --

12  it's an asset that they know they have and they are not listing

13  it anywhere on this form that I can see.

14          THE COURT:  Now --

15          MS. PARKER:  "All money owed to you by any person or

16  entity."  It's certainly their money given and placed in trust

17  with someone else until they decide to take it back.

18          THE COURT:  I appreciate your point.  They have

19  appropriately disclosed the principal balance of the IRA.  They

20  have not disclosed the principal balance of the roll-over 401(k).

21          On the other hand, they have furnished a monthly income

22  amount and they've selected a date that they believe it becomes

23  payable, the amount.  You have to run the calculation in order to

24  get there.  Somebody had to say, well, the commencement date on

25  this contributory account will be May 25th of 2023, and if we

Evidentiary Hearing

88

1 take down the full amount over a period of the beneficiary's

2 lifetime, the monthly amount will be $750.  And that's what we

3 are going the disclose.

4        And unfortunately, it reads like a defined benefit plan

5 which would terminate on the recipient's lifetime rather than

6 disclosing the fact that there is an asset value there.

7        Do we know why?

8        MR. JACOBS:  Your Honor, I asked that question to the

9 accountant who was going to help us with the value of the real

10 estate and whether they talked about that and he is present here

11 in the courtroom.

12        And his response to me over the telephone was, I don't

13 know if I gave him that number or if we made a phone call and

14 talked to -- hold on.  One moment, your Honor.

15        (Whereupon defense counsel confers with accountant off

16        the record)

17        MR. JACOBS:  They received a fax from Chemical Bank is

18 how they got that -- came up with that number, your Honor, and

19 I -- I can put him on the stand if the Court would like that.

20        THE COURT:  Sure.

21        MR. JACOBS:  May we call him at this time?

22        THE COURT:  Mm-hmm.

23        MR. JACOBS:  Jerry Kieliszewski.  Bring that document

24 with you.

25        THE COURT:  Good morning.

Evidentiary Hearing

89

1          THE WITNESS:  Good morning.

2          THE COURT:  Do you solemnly swear that the testimony you

3    are about to provide will be the truth, the whole truth and

4    nothing but the truth so help you God?

5          THE WITNESS:  Yes.

6          THE COURT:  Please have a seat, sir.

7                    JEROME KIELISZEWSKI

8    Having first been duly sworn at 12:30 p.m., testified as follows:

9          MR. JACOBS:  Your Honor, I was, with this witness, going

10   to ask him some other questions regarding value and fair market

11   value of the Millersburg cottage and the house.  Does the Court

12   want to get into those issues or just --

13         THE COURT:  I'm aware of the differences on the

14   valuation questions.  I'm at least satisfied that there is an

15   explanation for the difference in valuation.

16         The three issues that I was focused on, particularly

17   with respect to the Wilsons, are the one that we've been talking

18   about, the adequacy of the disclosure of the roll-over 401(k)s.

19         Second, the unexplained income from Northwestern Mutual

20   Life and Hartford Insurance that would have been disclosed in

21   2006.  The income from those investments in that one reporting

22   year was $26,000.  Obviously, the principal amount of that

23   investment would have to be substantially greater and I don't

24   know why or what happened with respect to those.

25         The third issue was the 2009 mortgage application.  It

Evidentiary Hearing

90

1    reflected approximately $400,000 in investments.  I believe
2    that's what it reflected.  The explanation that we most recently
3    have is that is a group term life insurance policy with no
4    asset value and a death benefit equivalent to four hundred
5    thousand.  And I guess I'm trying to get an understanding if that
6    is the explanation, then the financial report in the PSR is
7    accurate.
8            MR. JACOBS:  I would have to put my client on the stand
9    as to the income dealing with Northwestern Mutual and also, my
10   client on the stand as to the mortgage application and the four
11   hundred thousand dollar investment.  But this witness will --
12   we'll need just for that one 401(k) issue.
13           THE COURT:  We will take his testimony.
14           MR. JACOBS:  Thank you.
15                   DIRECT EXAMINATION
16   BY MR. JACOBS:
17   Q.   Your name, sir?
18   A.   Jerome W. Kieliszewski.
19   Q.   You're a certified public accountant?
20   A.   Yes.
21   Q.   How long have you been a certified public accountant?
22   A.   Maybe 1978, someplace around there.
23   Q.   You run a business?
24   A.   Yes.
25   Q.   What sort of business?

Evidentiary Hearing

1  A.   I have my own practice operated in Rogers City since

2  probably -- excuse me -- I guess I was certified in 1976 or

3  thereabouts.  Operated my office in Rogers City from someplace

4  in '78 until today's present date.

5  Q.   You knew -- you know, of course, the Wilsons.

6  A.   Yes.

7  Q.   And to my understanding, you've helped them at least give

8  some of the information regarding their financial disclosures for

9  the pre-sentence report, is that --

10  A.   That's correct, yes.

11  Q.   -- fair to say?  All right.  And you've been sitting here in

12  the courtroom so you've heard the discussion and we're asking

13  specifically about a 401(k) or pension that Gary had.  And he

14  listed it in his pre-sentence report as a -- as an asset that

15  would pay him --

16  A.   Seven hundred fifty -- well --

17  Q.   -- $750 per month starting May 25th of 2023.  Any idea how

18  they came to --

19  A.   First of all, those are not -- those are what are called

20  individual retirement accounts.  They have been rolled into

21  individual retirement accounts at Chemical Bank.  The amounts of

22  money, I think, is an aggregate based on the future value from

23  today's date to when they expect to retire.  And I think that was

24  in 19 -- I mean 2023 at age 65.  So we are giving some present

25  value weighting to that $750 number and it is both their

1 pensions -- or excuse me -- both their IRAs that add up to that

2 balance.

3        As of today's date or the date that I received from

4 Chemical Bank, we had talked to Mary Guest several times.

5 Q.   Who is Mary Guest?

6 A.   Mary Jo Guest is the investment officer at the Chemical Bank

7 office in Rogers City.  She is also the branch manager.  And she

8 basically had given us some numbers over the -- over the phone as

9 to what we could expect to receive based on the estimation of

10 what the value would be.

11       Some of the investment is held in an annuity situation.

12 Some of it is in what's called stocks, bonds, mutual fund

13 activities.  So, you know, those are subject to increase,

14 decrease.  Annuity has some value like that but we just kind of

15 used a representative value.  If everything works hopefully the

16 way it should given time value money, the joint value of that

17 pension distribution was going to be $750.

18       As -- if it was to be done today, the valuation or the

19 distribution -- or excuse me, it would be substantially less.

20 You know, she just came up with some numbers here, saying that if

21 Gary was 70 1/2 today, his required minimal distribution on the

22 one IRA was thirty-eight bucks.  Sue's was $64.  And the

23 annuities at age 65 was two sixty-five for Gary and Sue was one

24 sixty-five.  If I add those up, it comes up to $532.  So the $750

25 was actually giving some weighted value to hopeful performance of

Evidentiary Hearing

1  those funds.

2  Q.   And you're saying that $750 is referring to one IRA that

3  back in --

4  A.   It refers to the whole --

5  Q.   Hang on -- back in 2010, had a value of around forty-nine

6  thousand?

7  A.   Possibly yes.  Yes.

8  Q.   And the second one was Sue's IRA?

9      MS. PARKER:  Your Honor, I will object to the leading.

10 BY MR. JACOBS:

11 Q.   Okay.  Regarding IRAs, do you know specifically how much in

12 the IRAs?

13 A.   I would anticipate that those amounts were someplace around

14 that $49,000 number and the $30,000.  I thought between the two

15 of them, their value is under $80,000.

16      MR. JACOBS:  I have no further questions for this

17 witness, your Honor.

18      THE COURT:  Cross?

19      MS. PARKER:  May I see the exhibit, your Honor?

20      MR. JACOBS:  Oh, sorry.

21      MS. PARKER:  Is it going to be an exhibit?

22      MR. JACOBS:  You can have it if you want.

23      THE COURT:  Anybody have a spare?

24      MS. PARKER:  I'm sorry?

25      THE COURT:  Does anyone have a spare?

Evidentiary Hearing

94

1        MR. JACOBS:  No, sir.  It was just brought with him.  I

2   hadn't seen it prior to today.

3        MS. PARKER:  Why don't I let the Court look at this one

4   because I thought the witness was being called to testify as to

5   what was in the account and I don't see anything that answers

6   that question.

7        I do see that the fax was received October 31, 2013,

8   which is after the reporting was made to the probation officer.

9   I'm not sure of the date but I would assume that was in June that

10  you received financial information, Mr. Burns?

11       MR. BURNS:  I received their financial documents on May

12  31st, 2013.

13       MS. PARKER:  All right.

14       THE WITNESS:  Can I offer an explanation?

15       MS. PARKER:  Your Honor, I don't want to hear testimony

16  from somebody who is relying on something that he doesn't have

17  information on.  And that's essentially where we are.  This is

18  not an account that he has a statement for.

19       There should be and I assume the defendant should be

20  held responsible for, instead of providing this sort of

21  information, an account statement that says this is what's in the

22  account.  That's a very simple thing.  But we're going a long way

23  to avoid that.  And I object.

24       THE COURT:  I have a couple of questions for the

25  gentleman.

Evidentiary Hearing

1          THE WITNESS:  I could offer some questions -- or

2     observations.  If I'm not mistaken, I think there was a question

3     in regards to the transfer of those accounts from Edward Jones to

4     the Independent Bank and I think the questions raised by the

5     prosecution was there was an $80 difference.  So the numbers were

6     known because that's where they came from.  It came from a

7     cancellation from one IRA, transferred to another financial

8     institution.  So the numbers are in the records someplace because

9     there was a question.

10          As to the timing of that fax, we had prepared that by

11    Sue simply in the form of by telephone, we said, okay, we are

12    answering this question on this page.  And it asked for an amount

13    of expected benefits and we answered that question by a phone

14    call.  Then, we have the rebuttal of the prosecution challenging

15    some things.  So I said, okay, I guess we better get some

16    documentation at which point in time, I questioned Mary Jo at the

17    bank and then she faxed me that information.

18          So that's what I have.  I think we've overstated the

19    benefits to them in the future so we are not lying.  As to the

20    known valuation of the IRA, from my memory of reading some of the

21    questions and that we were trying to hopefully find answers for,

22    the prosecution or the government already knew about those

23    dollars.

24          Am I not correct?

25          THE COURT:  I think that the relevant question is the

Evidentiary Hearing

96

1  point in time.

2          A couple of quick questions.  As I understand it, and

3  was this consistent with your understanding, that these would be

4  roll-over IRAs, initially reflecting the Edward Jones and Lord

5  Abbott funds that were maintained through a different investment

6  service?

7          THE WITNESS:  That is correct.

8          THE COURT:  They must have a separate IRA with -- that

9  had a principal balance on May 25th, 2023, a principal balance of

10 $3,075.  That's included in the pre-sentence report, the

11 principal amount.

12         THE WITNESS:  They -- they probably have several

13 accounts.  Now, if you notice the way she registers that, they

14 are all IRAs.  The fact is, some might be held in the form of a

15 mutual fund, some might be held in the form of an annuity.  They

16 are all IRAs.  So at that point in time, you know, to state that

17 one is an IRA and one is something else, that's incorrect.  They

18 are all housed inside the corpus of an IRA and they are just held

19 in different formats of investment.

20         THE COURT:  And the IRA with the principal balance of

21 $3,075 is disclosed.

22         THE WITNESS:  Is disclosed and may represent -- and at

23 that point in time, I do not have the answer as to exactly what

24 it is but it is probably some form of a mutual fund of some kind

25 that the bank uses and it says that balance is $3,000.

Evidentiary Hearing

97

1        THE COURT:  That is the manner in which those funds

2   within the IRA are invested.

3        THE WITNESS:  That would be correct.

4        THE COURT:  Okay.  Now, our understanding is that there

5   are two IRAs, one held in Sue's name, one held in Gary's name, at

6   Chemical Bank with a principal balance on September 27th of

7   2013 -- in Sue's name with a principal balance of $35,487 and

8   change and in Gary's name of $49,415 and change.

9        THE WITNESS:  That sounds correct.

10       THE COURT:  Why or who was responsible for reporting the

11  economic value of those accounts of roughly $85,000 as an

12  account, quote, "Slated to pay out $750 per month starting May

13  25th of 2023"?

14       THE WITNESS:  I think probably Sue had the problem with

15  that part of that disclosure form and so she asked me the

16  question.  I asked the bank the question and we came up with an

17  answer and we put it on the page.  It's not trying to be

18  deceptive.  You know, we probably didn't -- I didn't review the

19  whole statement that was prepared.  I just helped them with

20  certain portions of it.  So at that point in time, the question

21  remains significantly, I think everybody knew those assets were

22  there.  It's just the mis -- it's just an error in preparation.

23  A simple error in preparation.

24       THE COURT:  Well, I read the pre-sentence report and I

25  had concluded from that statement that he was entitled to a

Evidentiary Hearing

98

1  pension benefit with a monthly payment, that would be exhausted

2  or available throughout the course of his lifetime.

3          THE WITNESS:  And the mis -- the use of nomenclature

4  that is an IRA pension or isn't it a pension?  Technically, it's

5  an individual retirement account.  We think -- everybody that's

6  self-employed, we think that's our pension.

7          THE COURT:  Well, I appreciate that, but let's assume

8  for purposes of discussion, that at six months after the

9  commencement date of the payment, if it was a defined benefit

10  plan, he passes away.  The $750 payment would be gone if it was a

11  defined benefit plan.

12          THE WITNESS:  Yes and no, depends on the selection

13  process of the payouts.  Because we always have, when going

14  through a retirement situation, which it is a qualified pension

15  plan, there are benefits that are allocated to payouts based on a

16  selection process, a hundred percent to me or fifty percent to

17  me, fifty percent to my wife or some appropriate percentage

18  differentials, 75, two-thirds.  There is normally on a defined

19  contribution plan, you have to consider spousal rights.

20          THE COURT:  Mm-hmm.

21          THE WITNESS:  And so in this situation, we don't have

22  that.  He has never had that.  It is not a pension.  It is an

23  individual retirement account.

24          THE COURT:  Indeed.  And that is exactly what I didn't

25  know in reading that sentence.

Evidentiary Hearing

1          THE WITNESS:  Right.  So at that point in time --

2          THE COURT:  That's not -- I have a question.  That

3    sentence would reflect a disclosure of a defined benefit pension

4    that would have a termination date, either coinciding with the

5    beneficiary or a co-beneficiary, with no residual economic value.

6    But that wasn't the case, was it?  It was an IRA with a market

7    value combined in excess of $85,000.

8          True?

9          THE WITNESS:  I would -- yes.

10          THE COURT:  Okay.  And whose decision was it to decide

11   to reflect it as a monthly payment amount as opposed to the

12   principal value as was disclosed with respect to the other IRA?

13          Who chose to do that?

14          THE WITNESS:  I'm not sure that anyone really -- I think

15   they were just answering questions on pages as they unfolded in

16   the probation report and when they came to it, that's where the

17   question was and that's where they answered it.  Now, they are

18   related -- they're related, so I guess at that point in time, we

19   missed -- we missed the dollar value on the front page but we

20   overstated the valuation on whatever page that was.

21          THE COURT:  Now, to be clear, just -- you had to

22   consider a belief that it might have been possible that both

23   monthly benefit of $750 a month, and the principal balance of

24   approximately $85,000 may have been both furnished to the

25   probation officer and he merely accidentally picked up just the

Evidentiary Hearing

100

1   income amount.

2          Is the $85,000 combined total amount of the IRAs

3   included anywhere in that report?

4          MR. JACOBS:  We believe we gave Mr. Burns some Lincoln

5   Financial documents that actually have that information in it,

6   your Honor, so we are going to have to do a peek.

7          On the instructions for completing the net worth, the

8   Court has already heard our response and that is, it was listed

9   not under bank accounts, CDs, IRAs, 401(k)s.  Instead, it was

10  listed under anticipated assets as X amount a month, although

11  they actually wrote in IRA on the documents.

12          THE WITNESS:  I would offer maybe one other piece of

13  information.  Most of us understand the use of an IRA.  The fact

14  that there is a qualification of when you can take it, when you

15  can't take it without penalty.  And I think probably their

16  understanding of what they are trying to portray on the form was

17  the fact that --

18          MS. PARKER:  Objection, your Honor.

19          THE WITNESS:  -- it's not mine until later.

20          MS. PARKER:  I don't think he can speak to supposedly

21  their state of mind.  If they are not going to take the stand,

22  I'm going to object.

23          THE COURT:  I would like to get the gentleman's

24  statement, if you would like to complete that, sir.  If you would

25  like to complete your statement, please.

1          THE WITNESS:  You know, we know that there is dates when
2   we can take the IRA without penalty and people just look at it
3   from that standpoint.  It's a sacred thing.  You take that money
4   after you retire and for a person that's self-employed, we've got
5   to provide everything for ourselves.  No one -- no one is
6   helping.
7          So I think that might be the reason why, in their mind,
8   it's on that page versus on the front page because it isn't
9   something that we have available for our use right now or don't
10  want to make it available for our use right now unless there is a
11  very compelling reason to do so.
12         THE COURT:  And I appreciate your point.  The only
13  question that I have is that the principal value of the small IRA
14  account was disclosed.  They just chose a different method of
15  reporting it --
16         THE WITNESS:  The annuity side.
17         THE COURT:  -- for the larger accounts.
18         THE WITNESS:  Right.  Because if you look at it, one is
19  an annuity and one is an IRA and most people don't understand the
20  use of one versus the other.
21         THE COURT:  Only a portion of the larger accounts were
22  invested in annuities.
23         THE WITNESS:  Correct.
24         THE COURT:  Not all.
25         THE WITNESS:  Not all of them.  Looks like even Mary Jo

Evidentiary Hearing

102

1  on the -- on that thing there, defines them differently.  It

2  looks like there is a basket of at least four or five different

3  investments.

4       THE COURT:  Indeed.  I'm completed with this witness

5  unless you have any additional questions for the gentleman?

6       MR. JACOBS:  I don't have any, your Honor.

7       THE COURT:  And I just wanted to verify one way or the

8  other if you are correct or if your client's understanding that

9  the principal balance of this account was disclosed in addition

10 to the payment amount.  Was it the $85,000 or just the $750 a

11 month?

12      (Whereupon defense counsel and defendants confer off the

13      record)

14      MR. JACOBS:  I will be putting my client on the stand

15 and I guess I will let Mr. Piazza answer because Miss Wilson did

16 a lot of the financial information and she -- she believes she

17 gave Mr. Burns the actual documents but Mr. Burns informs me he

18 has nothing from Lincoln Financial in his possession.  He does

19 have a lot of other documents and I will refer to Mr. Piazza as

20 to this, your Honor.

21      MR. PIAZZA:  The only thing I can indicate is that my

22 client indicates she did disclose various documents.  She thought

23 those were included.  So that's the only thing I can add.

24      THE COURT:  We can verify that.  Does anyone else have

25 any questions of the gentleman on the stand?

Evidentiary Hearing

1          MR. JACOBS:  No, sir.

2          MR. PIAZZA:  I don't have any other questions

3   understanding the Court gave us the three issues that the Court

4   is inquiring about.

5          THE COURT:  Yes, sir.

6          MR. PIAZZA:  Okay.

7          THE COURT:  Thank you, sir.  I appreciate it.

8          (At 12:52 p.m. - witness excused)

9          THE COURT:  I think we are in a position where we will

10  give you an opportunity to verify the records that the probation

11  officer has just to see if, in addition to the disclosure of the

12  annuitized amount of $750 a month, there was also a disclosure of

13  the approximate $85,000 principal balance of the IRAs.

14          Next question related to two 2006 payments that were

15  reflected in income of $10,406 and $10,000 from two investments,

16  Northwest Mutual Life and one was Hartford Insurance.

17          MR. JACOBS:  We will have to put you on the stand for

18  that.  I'm going to have to put Mr. Wilson on the stand to answer

19  that question for your Honor.

20          THE COURT:  Certainly.

21          MR. JACOBS:  I would recall Gary Wilson.

22          THE COURT:  Good afternoon.

23          THE WITNESS:  Good afternoon, your Honor.

24          THE COURT:  You remain under oath.  If you would just

25  like to have a seat please.

Evidentiary Hearing

1          THE WITNESS:  Thank you.

2                        GARY WILSON

3    Having previously been sworn by the Court, testified as follows:

4                     DIRECT EXAMINATION

5    BY MR. JACOBS:

6    Q.   Mr. Wilson, we're asking you certain questions as directed

7    by the Court.  I don't want you to go off in another direction on

8    me, all right?

9    A.   I'm here.

10   Q.   Okay, thanks.  We're asking specifically about Northwestern,

11   I think it was, Insurance.  Northwestern and Mutual, a total of

12   about $26,000, monies that you had received in the past from

13   them.  Is that fair to say?

14   A.   Yes.

15   Q.   One was a little over ten, the other was a little over

16   eleven, is that --

17   A.   Yes.

18   Q.   All right.  When -- do you recall when you got that money?

19   A.   We cashed those in after -- one was after Gary's graduation

20   for his college fund and the other one, I believe, was for Keri's

21   graduation, college fund.  Mark Ferguson was handling those

22   accounts at that time.

23   Q.   Was it the total amount of monies in the account?

24   A.   Those two accounts, Mark Ferguson set up for their college

25   funds.

Evidentiary Hearing

1  Q.   All right.  So when you like drew the money out of

2  Northwestern, did you draw all that was in the account out?  If

3  you recall.

4  A.   I can't remember that, Steve.  I can't sit here and honestly

5  answer that question.

6  Q.   All right.  You've also heard and we've looked at this

7  Uniform Residential Loan Application, Government's Exhibit A, and

8  you've heard talk about you all having $400,000 in investments.

9       Did you ever have $400,000 in investments?

10 A.   No.

11 Q.   All right.  Document does say life insurance, net cash

12 value, four hundred thousand, face amount, four hundred thousand.

13 It does say that, doesn't it?

14 A.   Everybody can make a mistake.  I believe maybe my wife wrote

15 that down wrong.

16 Q.   Well, first of all, yes, it does -- it does essentially say

17 that?

18       MS. PARKER:  Objection, your Honor.  Why don't we just

19 let Mr. Jacobs take the stand and he can ask the questions and

20 answer them himself.

21       MR. JACOBS:  I can do that and that would be fine, your

22 Honor.  I would much rather do it that way.

23       THE COURT:  Let's -- let's see if Mr. Wilson can furnish

24 the responses and then he can corroborate that with you.

25       MR. JACOBS:  Okay.

Evidentiary Hearing

106

1   BY MR. JACOBS:

2   Q.   Mr. Wilson, since we've been to court, we've talked about

3   this loan application.

4   A.   Yes.

5   Q.   It says four hundred thousand dollar face value life

6   insurance, is that correct?

7   A.   Only if I'm dead.

8   Q.   Only if you're dead.  So it isn't a net surrender cash

9   value?

10  A.   No, it is not.

11  Q.   All right.  What type of policy is it?

12  A.   Term life, only if I'm dead.

13       MR. JACOBS:  I believe I've asked about what the Court

14  inquired about.  I will let -- Miss Parker may have questions for

15  you.

16       MR. PIAZZA:  I have no additional questions on behalf of

17  Sue Wilson and I will incorporate his answers.

18       THE COURT:  Miss Parker, do you have any questions for

19  the gentleman?

20       MS. PARKER:  Yes, your Honor.

21                         CROSS-EXAMINATION

22  BY MS. PARKER:

23  Q.   Maybe I missed something but when you got a 1099 in 2006 or

24  the two 1099s reflecting approximately $26,000 in interest, how

25  much was in those accounts that gave rise to that?

Evidentiary Hearing

107

1 A.    You would have to ask my accountant.  I cannot sit here and

2 answer that, I'm sorry.

3 Q.    Well, you had an opportunity to be aware that that was a

4 question, right?

5 A.    Ask that question again.

6 Q.    That was one of the questions that the Court asked you to

7 answer prior to sentencing.

8 A.    Which was?

9 Q.    To explain what was in that account at that time and then

10 where the money went from there.

11 A.    And this is saying I've got how many thousands of dollars in

12 there?

13 Q.    Approximately $26,000 in interest.  The 1099 of past year

14 tax returns reflecting between the two accounts is approximately

15 $26,000 in interest income.  Now, the judge can do present value

16 calculations.  I don't do those very well.  But there has to be a

17 calculation as to what the interest rate was and how much

18 principal was there to generate that much income and you would

19 have had a statement reflecting that.

20 A.    I would have to say if there was taxes filed in that year

21 and I had my accountant do my taxes, he would be the only person

22 that is going to be able to answer that question because --

23 Q.    No.  That's --

24 A.    -- he did my taxes.  I don't know numbers, I'm sorry.

25 Q.    All right.  Will you listen to my question?

Evidentiary Hearing

108

1  A.    I'm listening.

2  Q.    You would have given your accountant the 1099 which said

3  what your interest income was because that would be reportable on

4  your tax return.  You do not, as far as I understand, need to

5  give him the statement that says anything about the value of the

6  account that caused that 1099 to be issued.  That's the Court's

7  question and it's my question.

8         What was in the account or the two accounts that gave

9  rise to those two 1099s?  The statements would have been mailed

10 to you.

11 A.    I'm sorry.  I would have took those right straight to my

12 accountant.  I just -- I can't answer that.  I cannot answer that

13 because I do not do that.  That's why I hire an accountant.  I do

14 not know.

15 Q.    Well, you were instructed by the Court in an order on

16 October 10th, two months ago now, to find out.  What have you

17 done to find out?

18 A.    You'll have to ask my attorney.  I -- I don't know.

19        THE COURT:  Miss Parker, I have to take about four to

20 five minutes off to address a Grand Jury question.

21        My presumption in originally looking at these materials

22 that those were probably two whole life policies that they

23 probably cashed in at the time that they needed to raise the cash

24 to help their kids in college.

25        The tax treatment of the proceeds wouldn't necessarily

Evidentiary Hearing

109

1  reflect just interest.  Any time that those policies are

2  surrendered, there would be tax, as I recall, on the present

3  value of the policy at the time and I'm not sure whether that

4  would be accurate in this situation or not.

5          We can take up that question here in a couple of

6  minutes.  I will be back in about five minutes and we will go

7  from there.  That will also provide you an opportunity to verify

8  some of the financial information and the calculations on the

9  loss.

10          We will continue until two at that point.  The record is

11  closed.

12          MR. JACOBS:  We will be stopping at two, your Honor?

13          THE COURT:  Yes, sir.

14          MR. JACOBS:  Yes, sir.

15          (At 1:02 p.m. - proceedings recessed)

16          (At 1:24 p.m. - proceedings resumed)

17          THE COURT:  We were in the process of addressing -- we

18  had two remaining items that we were giving attention to.  The

19  first of which was the reporting on the '06 tax return of the

20  Northwestern Mutual Life and Hartford Insurance, trying to get an

21  understanding for what those transactions were.

22          Have you had -- and when I left the courtroom, it

23  appeared as though, Mr. Wilson, who at the time was on the stand,

24  was also attempting to communicate to the accountant who was

25  standing in the back of the courtroom.

Evidentiary Hearing

110

1       MR. JACOBS:  They were -- they wanted to communicate to

2   me what the Court put on the record, that they were cashing in an

3   investment and that money was taxable money from an investment.

4       THE COURT:  Were they life insurance policies or some

5   other investment deal?

6       MR. JACOBS:  I don't know.  Do we know?  Do you know,

7   Jerry?

8       THE ACCOUNTANT:  Judging from the name of the company,

9   Northwestern Life, I would assume it's a life insurance policy.

10      MR. JACOBS:  Assumption that it's a life insurance

11  policy, your Honor.

12      THE COURT:  That was my assumption.

13      MS. PARKER:  May I just interpose an objection?  I think

14  you know the nature of it.

15      THE COURT:  I do.  On the other hand, I had the same

16  assumption as the gentleman.  Which --

17      THE ACCOUNTANT:  Looks like a duck, quacks like a duck.

18      THE COURT:  The only remaining question related to the

19  disclosures concerning the earlier four hundred thousand dollar

20  investment that had been reported on the '09 mortgage

21  application.

22      Did you have any additional questions of Mr. Wilson on

23  that?  We had not completed it.

24      MS. PARKER:  Well, I had a question and I believe as a

25  related one, the mortgage application says $400,000 in life

Evidentiary Hearing

111

1  insurance cash value but below that, it says net worth of

2  businesses owned, $436,000, and that's not included in the

3  disclosure statement.  And that was another aspect of that that I

4  wanted to explore.

5          THE COURT:  We will recall Mr. Wilson and give you an

6  opportunity to complete the examination on that point.

7          Mr. Wilson?

8          MR. JACOBS:  Gary, back up.

9          THE WITNESS:  Sworn in?

10         THE COURT:  Still -- you still remain under oath, sir.

11         THE WITNESS:  Okay.

12         MR. JACOBS:  Your Honor, I would object to this line of

13 questioning.  It wasn't an issue that had been brought up in

14 prior -- before.  It wasn't listed as an objection by Miss Parker

15 to address the value of the business.

16         MS. PARKER:  It was listed in my response.  I will

17 give you the page number if you would like, that it was not

18 included.

19         THE COURT:  It's there.  If you would like to continue.

20         MS. PARKER:  I'm sorry?  Proceed?  Yes, sir.

21         THE COURT:  Proceed with your witness.

22         MS. PARKER:  All right.

23                 CROSS-EXAMINATION (Continued)

24 BY MS. PARKER:

25 Q.   Mr. Wilson, in the mortgage application that you did in, I

Evidentiary Hearing

112

1  believe, April of 2009, you indicated that your net worth of your

2  business was $436,000 -- excuse me, $436,115.32.

3  A.   Is that a resale value, a net value, appraised value?  What

4  kind of value was it?

5  Q.   You filled it out.  I did not.  Is that number --

6  A.   That ain't my writing.  I didn't fill that out but --

7  Q.   All right.  Did you sign it?

8  A.   I don't --

9  Q.   I'm referring to Government's Exhibit A.

10  A.   That's my signature, yes.

11  Q.   At Page 3.  And at Page 4, it says you understand

12  essentially that you're obligated to tell the truth.

13  A.   I signed that.

14  Q.   All right.

15  A.   I didn't read it but I signed it.

16  Q.   Okay.  And you're applying for a mortgage, correct?

17  A.   That would -- is that a business mortgage?  Business or

18  house?

19  Q.   It's a refinance.

20  A.   For what?

21  Q.   Take a look.  It's yours.  Take a look.

22  A.   And I have to get my binoculars out.  And what date was this

23  on?

24  Q.   Well, we will go back to Page 4.

25  A.   '09.

Evidentiary Hearing

1  Q.   Do you see here, purpose of loan?  On Page 1?

2  A.   Lower rate.  It was maybe a mortgage of an existing

3  mortgage?

4  Q.   I'm not --

5  A.   Yes.

6  Q.   I'm not answering your questions.  I'm asking the question.

7  A.   Yes.  To the best of my knowledge, that is a refinancing of

8  an existing mortgage and I may have added more money to that

9  mortgage to come up with that number.

10  Q.   Okay.  My question is, on that day, did you report that the

11  value of your business was $436,115.32?

12  A.   It -- it could be.  That does not include what I owe in

13  inventory.  You know, I might owe $375,000 of that money in

14  inventory to Sun Trust Bank.

15  Q.   All right.  But you had a chance to list your liabilities

16  and your assets, all right, on this form.  You have liabilities

17  and your assets.  And under your -- your assets, you list net

18  worth of business.

19  A.   Pontiac --

20  Q.   No, above that.

21  A.   Oh.

22  Q.   Net worth of business owned, attach financial statements.

23  Am I reading the number correctly or incorrectly?

24  A.   I don't know.

25  Q.   Well, read the number for us.

Evidentiary Hearing

114

1  A.   I see that number but I don't know what it represents.

2  Q.   Well, what is the number?

3  A.   It says four hundred thousand.

4  Q.   All right.  More than four hundred thousand, correct?

5  A.   The bottom line, sub-liquid access, sub-liquid, four hundred

6  twenty-five thousand.  Sub-liquid.

7  Q.   I would like you to go down one, two, three boxes --

8  A.   Okay.

9  Q.   -- to where it says net worth of business.

10  A.   Net worth of business owned, attach financial statement.

11  Q.   What's the dollar figure there?

12  A.   $436,115.32.

13  Q.   When you filled out your financial statement, you filled out

14  this form?

15  A.   Is that a personal financial statement or what?

16  Q.   This is the one you did for the probation office, correct?

17  A.   Okay.

18  Q.   Also did a probation form 48D, Declaration of Defendant or

19  Offender, Net Worth and Cash Flow Statements.  You filled that

20  out and signed it, correct?

21  A.   Correct.

22  Q.   And you signed that in May of 2013.

23  A.   Ah, correct.

24  Q.   And you understood you were required to tell the truth on

25  the financial statement, correct?

Evidentiary Hearing

115

1  A.   Ah, yes.

2  Q.   All right.  And is this the financial statement you filled

3  out?

4  A.   This financial statement does not have the business side of

5  it.  The business side -- if I had the numbers here that showed

6  how much I owed and how much was on accounts receivable, and if I

7  was an accountant, I could probably help you.  I don't know.

8  Q.   Well, let me help you, sir.  Let me help you.

9  A.   Thank you.

10  Q.   I would like to refer you to the page where you list

11  liabilities.  It says, other debts, you list your inventory owed,

12  correct?

13  A.   $229,612, that's correct.

14  Q.   What are you looking at?  I'm sorry.

15  A.   Oh, $142,113, right there.

16  Q.   All right.  So you listed the liability.  Where is the asset

17  side?

18  A.   What number are you trying to get to here?

19  Q.   I'm asking you, on your form, where did you disclose the

20  value of the business?

21  A.   Ah --

22  Q.   It has a value, doesn't it?

23  A.   It's only worth what I owe the bank, $142,000.  If I renig

24  on this loan, you know how much my inventory is worth on the

25  dollar?  Do you?

Evidentiary Hearing

116

1  Q.   No, I'm asking you --

2  A.   Well, I'm going to tell you.  My inventory is worth 25 cents

3  on the dollar if I close my doors right now.  And if you think

4  I'm lying, call NAPA in Detroit and ask them.  I have no value --

5  it might be $425,000.  It might be a million dollars.  It's only

6  what people will give the money for it.  I don't know what you're

7  looking for.  I don't understand your answer.  I'm not an

8  accountant.

9  Q.   I'm -- I know you're not an accountant but when you filled

10  out your mortgage application, did you take your accountant with

11  you?

12  A.   No.

13  Q.   All right.  So when you filled out the mortgage application,

14  you were able to assess a value of $436,000 to your business.

15  Where is anything like that reflected in your financial

16  statement, sir?  Take a look at it.

17  A.   Maybe it's at the bank.  Maybe I told them at the bank my

18  business is worth half a million so I can get my percentage down

19  to three percent that I have to pay it back.  It's all about

20  borrowing money.  It's not -- that value is not a -- it's only

21  worth the person who wants to buy my property.

22        If you want to give me $400,000, Janet, for my business,

23  I will sell it to you.  But I will tell you what, it's only worth

24  $142,000.  If I go to that bank and tell that bank that that

25  business is worth $600,000, I believe it is because somewhere

Evidentiary Hearing

117

1   down the line, that bank is going to be -- that business will be

2   worth $600,000.  I believe that.  I'm a hard worker.  I make

3   money.

4   Q.   All right.

5   A.   But I can prove that as of right now, if Sun Trust would

6   come and get my store tomorrow, they are going to take my keys,

7   they are going to take my inventory and they are going to sell it

8   and if they get $80,000 for it, they're going to say, Gary, you

9   owe me $60,000 on a personal guarantee.

10  Q.   Do you own a franchise?

11  A.   No.

12  Q.   Does your business have good will?

13  A.   I don't understand the question.  What is good will?

14  Q.   Isn't that what you were trying to protect when you were

15  intimidating witnesses, the reputation of your good business?

16  A.   I don't think I ever intimidated anybody in my entire life.

17  Q.   When you -- did you think if somebody could say something,

18  that would harm your business?

19          MR. JACOBS:  Objection, your Honor.

20          THE WITNESS:  I don't understand the question.

21          MR. JACOBS:  Relevance.

22          THE COURT:  Overruled.

23          THE WITNESS:  I don't understand the question.

24  BY MS. PARKER:

25  Q.   All right.  Let me go back through this.  Would you take

Evidentiary Hearing

1  $129,000 for your business today?

2  A.    Yeah.

3  Q.    And walk away.

4  A.    Yes, I would.

5  Q.    Would you sign it over to the government then and we will

6  sell it for that.

7  A.    If I'm clear of everything I owe, you betcha.  If you want

8  my business, you can have it.  But don't come back and get

9  nothing personally out of me.  If that's what you want, I will

10 sign it over tomorrow.  That means you owe Sun Trust Bank

11 $142,000.  That's part of the deal, pay all debts off,

12 everything.

13         THE COURT:  Let's go back to questions and answers

14 specifically related to these issues.

15 BY MS. PARKER:

16 Q.    Yeah.  I'm going to ask you again, if you listed the

17 liability of the business, where did you list the value of the

18 business?

19 A.    I don't know, Janet.  I don't know.  I can't answer that

20 question.  I'm sorry.

21 Q.    Do you agree with me that you did not?

22 A.    I'm not answering that question.  I'm sorry.

23         MS. PARKER:  If the Court would like to review it, I

24 will offer it to the Court.  Otherwise, I'm returning the two

25 documents.

Evidentiary Hearing

119

1        THE COURT:  Any redirect?

2        MR. JACOBS:  Just -- yes, your Honor.

3                    REDIRECT EXAMINATION

4  BY MR. JACOBS:

5  Q.   Mr. Wilson, your pre-sentence report lists business, Rogers

6  City, Michigan, and your address on 3rd Street and on the far

7  right, it says sixty thousand.

8        Was that the value of the business?

9  A.   What year is that, Steve?

10 Q.   No, this is your pre-sentence report.

11 A.   I guess.  I guess.

12 Q.   Okay.  Where did you come up with that guess?

13 A.   I -- read it to me again.

14 Q.   It says -- you're listing assets.  For business, it says

15 $60,000.

16 A.   That's the building.  The building.

17        MS. PARKER:  Your Honor, I think that's directed as the

18 real estate.

19        MR. JACOBS:  That's what I'm asking.

20        THE WITNESS:  Real estate.  Real estate.

21        MS. PARKER:  That's not the business.  There are

22 distinguishable assets.

23        MR. JACOBS:  That's what I was asking the client.

24        THE COURT:  And I'm going to sustain the objection.

25 There are two identified assets, one is the business and one is

Evidentiary Hearing

1   the property itself.

2          MR. JACOBS:  I'm done.

3          MR. PIAZZA:  If I may have a brief moment, your Honor.

4          (Whereupon defense counsel confer off the record)

5          MR. JACOBS:  One more question, your Honor?

6          THE COURT:  Sure.

7   BY MR. JACOBS:

8   Q.   Your net worth statement lists GW & SW, Inc. -- business --

9          MR. BURNS:  Mr. Jacobs, those are her documents.

10  BY MR. JACOBS:

11  Q.   Oh.  Your spouse's net worth statement lists GW & SW, Inc.,

12  Rogers City, Michigan, and the list appears to be $100,000

13  estimate.  Are you aware of that?

14  A.   No.

15         MS. PARKER:  Your Honor, again --

16         THE WITNESS:  I don't know.  I don't know.

17         MS. PARKER:  If the document wants to be given to the

18  Court, fine, but this isn't testimony.

19  BY MR. JACOBS:

20  Q.   Approach the witness, your Honor, and I will let him testify

21  as to what he gave the probation officer.

22         Look at this.  What did you tell the probation officer

23  your business was worth?

24  A.   $100,000.

25  Q.   All right.

Evidentiary Hearing

121

1          MS. PARKER:  I would like to ask that the actual

2    question be read.

3    BY MR. JACOBS:

4    Q.   What did you tell the probation officer --

5          MS. PARKER:  No, no.

6    Q.   -- your GW & SW stock was worth?

7          MS. PARKER:  Yes.

8          MR. JACOBS:  There.

9          THE WITNESS:  $100,000.

10         MR. JACOBS:  I have nothing further on this by the

11   witness, your Honor.

12         THE COURT:  To clarify, if I could get a copy of the

13   2009 mortgage application.  I'm aware of the fact that in 2009,

14   the mortgage application reflected --

15         MS. PARKER:  I have a shrunk-down copy that's eight and

16   a half by eleven.  This is a full-sized copy.

17         THE COURT:  Thank you.  I'm not quickly identifying the

18   location of the --

19         MS. PARKER:  Page 3 on the left-hand side, three

20   quarters of the way down.  It's the handwritten application.

21         THE COURT:  I'm sorry but I'm not identifying it.

22         MS. PARKER:  I'm sorry.  Well, let me give you the copy

23   that I have.  Here, do you want to --

24         MR. JACOBS:  Yeah, you can give that to the Court.

25         THE COURT:  And I'm sorry, Miss Parker, but even with

Evidentiary Hearing

1  this document, I'm not reflecting an assigned value to the

2  business in the amount of four hundred twenty-three thousand.

3         MS. PARKER:  It's $436,115.32.  Net worth of business

4  owned, attach financial statement.

5         THE COURT:  Okay.  Okay.  Mr. Wilson, do you know how

6  that figure -- it's an unusual figure.  It's $436,115.32.

7         THE WITNESS:  Don't quote me but I may have -- when I

8  went to get that loan, I may have went to my accountant and asked

9  him to put me something together to go to the bank and get a

10  loan.  But I'm not sure.  But I know I do not have that type of

11  knowledge to get you those numbers.

12        THE COURT:  You separately identified, quote, real

13  estate owned within that category of $310,000.  Do you know where

14  that figure came from?

15        THE WITNESS:  It could be my house.  It could be the

16  cabin.  It could be the building that the business sets in.

17        THE COURT:  So you would actually be separating out any

18  valuable -- value assignable to the real estate.  And the

19  $436,000 would be in addition.

20        THE WITNESS:  I believe so.

21        THE COURT:  Okay.  Counsel, any questions that may have

22  been occasioned by the Court's --

23        MR. JACOBS:  I will try not to lead.  I've been accused

24  of that today.  I don't know why, your Honor.

25        THE COURT:  On multiple occasions.

Evidentiary Hearing

123

1          MR. JACOBS:  Yes.

2                         REDIRECT EXAMINATION

3    BY MR. JACOBS:

4    Q.    Do you utilize any documents from your accountant when you

5    do the loan application?

6    A.    Yes.

7    Q.    And what sort of documents does he give you?

8    A.    I don't really look at them.  I just pick up the pamphlet,

9    take it with me, give it to the bank and it has everything in

10   there that I need to get a loan at a certain percentage rate.

11   And I don't -- I don't know how that net worth is figured.

12   I -- I -- I don't know.

13   Q.    All right.  But to get to a number of four hundred thousand

14   and some odd cents, you took that from another document, is that

15   fair to say?

16   A.    Yes, that's a copy.

17          MR. JACOBS:  Nothing further, your Honor.

18          THE COURT:  Any questions -- concluding questions, Miss

19   Parker?

20                         RECROSS-EXAMINATION

21   BY MS. PARKER:

22   Q.    Did you ask your accountant for a net worth of the business

23   when you prepared your financial statement to the probation

24   officer?

25   A.    He helped us on some of it.  But I'm not sure what parts.

Evidentiary Hearing

1  Q.   Do you know whether you got a financial statement regarding

2  the net worth of the business so you could fill out your

3  financial statement?

4  A.   It was copied from something.  I would had to have gotten

5  something from somewhere.

6  Q.   What --

7  A.   I don't have the knowledge to give you those numbers.

8  Q.   To the probation office?

9  A.   I would have given them to Marvin, yes.  That would have

10 been copied from another form onto Marvin's form so that he would

11 have that, yes.  Where those numbers come from, I cannot tell

12 you.  I don't know how.

13 Q.   I'm not asking where they came from.  I'm asking, did you go

14 back and get a new statement regarding the value of the business

15 and put it on your probation form?

16 A.   I'm not a hundred percent sure but I think I did.  I would

17 have had to.  I -- I don't know.

18          MS. PARKER:  Your Honor --

19          THE WITNESS:  I'm not a hundred percent sure.

20          MS. PARKER:  I would submit that the Court can examine

21 the form and if you can find it, more power to you.

22          THE COURT:  You're excused.  Thank you.

23          THE WITNESS:  Thank you.

24          (At 1:50 p.m. - witness excused)

25          THE COURT:  I think we have the additional evidence

Evidentiary Hearing

125

1  related to the issues.  I guess I would ask very briefly, Mr.

2  Jacobs, we've worked our way through the testimony concerning the

3  disclosure of the $750 per month, the fact that the principal

4  balances on those IRAs were not disclosed.  We've worked our way

5  through the testimony concerning the assigned values to the

6  business.

7          I don't find any of the valuation questions of a

8  particular concern.  It's simply those two issues.

9          MR. JACOBS:  Yes, sir.

10          Sir, I would understand that it was a good faith mistake

11  in putting down the X amount of money per month, giving a certain

12  date, that the parties were actually aware of the IRAs and

13  just -- and actually listed the information to the Probation

14  Department and didn't put it in the correct column.  And didn't

15  put it in the correct form.  But they disclosed the information.

16  They are not trying to hide assets in this situation and that's

17  really what the Court has to find that we're hiding assets and

18  trying to somehow mislead the Court.

19          Secondly, as to this loan application, your Honor, I

20  hope I'm never held subject to the rigors of a loan application

21  that I did five years ago today because of, people puff.  People

22  lie on loan applications when they are refinancing their house

23  and they say their assets are greater than what they really are.

24          In fact -- well, maybe this Court hasn't but most people

25  sit there and have the loan officer do it for you and you just

Evidentiary Hearing

126

1 sign.  And to say, oh, the pre-sentence report is so much

2 different than the loan application, well, first of all, that

3 loan application was five years ago and it is just that, a loan

4 application.

5        Lastly, I think we did explain the income received from

6 Northwestern and Mutual and again, just a mistake listing on a

7 loan application saying cash surrender value of four hundred

8 thousand.  Nowhere did they say there were $400,000 in

9 investments.  Well, they did list life insurance at $400,000 but

10 it was term insurance.

11        I don't -- I believe in this situation, the Court cannot

12 find that my clients -- my client purposely failed to disclose

13 any financial information in any attempt to defraud the Court in

14 this matter.

15        That's all, your Honor.

16        MR. PIAZZA:  I would incorporate the arguments.  You

17 know, one line the Court does find that they listed the asset of

18 income coming in as retirement which would lead to, you know --

19 and lists the stock, you know.  It is there if you really look

20 for it.

21        There is nothing, you know, intentional on the part of

22 my client.  And as far as the rest, you know, how much something

23 was worth five years ago as to what it is worth today, the Court

24 knows the values of businesses in various counties and various

25 small towns, how they, you know, can drastically fall overnight.

Evidentiary Hearing

127

1          So there is nothing here for an intentional act because

2     my -- you know, we indicated in my brief, you know, we supplied

3     the documents to the Probation Department, you know.  Assets go

4     up and down throughout the years.  They did the best they can.

5          Thank you.

6          THE COURT:  The government?

7          MS. PARKER:  Your Honor, I think at the very best, what

8     you can say for Gary Wilson is, he acknowledged he was willing to

9     puff or whatever -- I believe that was the term he used -- to get

10    the interest rate he wanted on a mortgage.  Why would one think

11    that he wasn't willing to hide his assets all of a sudden when

12    it's in his interest to do that, too?  There is no reason to

13    think that he would only lie to a bank and not lie to a probation

14    officer.  There is no basis for that.

15         I don't think we need to get lost in the minutia here.

16    I think the big issues are what need to be kept in mind, that if

17    you look at the financial statements in the pre-sentence report,

18    it doesn't list the second house.  It lists it as real estate.

19    Look at the mortgage application.  It lists a mortgage-free

20    residence worth $172,000.

21         The value of the business, it's not reflected.  The

22    stock is listed as $100,000.  And the inventory indebtedness is

23    listed as a greater amount, offsetting it and -- and more than

24    offsetting it.  There is nothing ascribed to the value of the

25    business in the report.

Evidentiary Hearing

128

1       The Court has already addressed, I believe, the 401(k).

2  It's -- it's too convenient to say, well, we put it somewhere

3  else.  We didn't understand.  They listed the small IRA in the

4  correct place, did not list the much larger assets of that nature

5  in the same place.

6       But I think it's also important to look at their

7  financial statements and see how they've voluntarily reduced and

8  artificially reduced their income to try to give rise to a

9  negative cash flow.  Sue outright -- Sue Wilson quits.  Gary

10 Wilson now reports his monthly income is less than it was every

11 year for which we have tax returns.

12      They -- again, they modify things, lower the amounts.

13 I'm not worried about the cash value of the life insurance --

14 term life insurance and stuff like that but what I think when you

15 look at these various things and then you see that even with all

16 this understatement and withholding of information, they have

17 $300,000 in assets, it doesn't make any sense.  I mean, that's

18 what's in their pre-sentence reports.  $300,000 in assets without

19 even listing all their assets.  And yet they purport to be living

20 a negative cash flow and I think the whole purpose of that is to

21 lead the probation officer to the conclusion that they shouldn't

22 be required to pay a fine and restitution.

23      They have enough liquid assets to pay -- or enough

24 assets, not necessarily liquid, excuse me -- but enough assets to

25 pay restitution in full and still pay towards the fine.  If you

Evidentiary Hearing

129

1    liquidated everything they had, I'm not asking the Court to do

2    that, but I'm asking the Court to look at what they did and how

3    it all aligns with their interests in trying to avoid having a

4    financial penalty that would require them to eat into some of

5    those assets.

6           THE COURT:  The question that we have in applying this

7    last guideline variable was whether or not the information, the

8    financial information that was disclosed was accurately

9    furnished.

10          We have a good explanation concerning the earlier

11   disposition of the Northwest Mutual Life and Hartford Life

12   Insurance Company.  Those were whole life policies that were

13   cashed in order to make sure that they were able to make a

14   contribution to their kids' college.

15          I also am accepting of the idea that it was just shear

16   naivete when they disclosed to the bank in 2009 that they had

17   life insurance benefits with a cash surrender value of four

18   hundred thousand.  It was just a mistake.  And besides that, it

19   isn't a representation that was made to the Court.  It was a

20   representation that was made to the bank.  Just a mistake.  Naive

21   mistake.

22          I'm not quite so convinced with respect to the omission

23   of the two IRA accounts which are later disclosed, the one in Sue

24   Wilson's name for $35,874 in September of 2013 and $49,415.44.

25   I'm not satisfied that the disclosure of the calculation

Evidentiary Hearing

130

1   reflecting a monthly payment amount, which I initially

2   interpreted as a defined benefit calculation, is in any way fair.

3   The documentation they were furnished was very clear.  It refers

4   to IRAs.  They got it right with respect to a small one.  They

5   got it wrong with respect to two major ones with an economic

6   value of over $80,000.

7          You only get there -- you only get to a way of imputing

8   or calculating a monthly benefit by selecting a possible

9   retirement date and then asking someone to do a calculation.

10  Now, if the point here was to determine what their possible

11  retirement benefit might be, that calculation makes all the sense

12  in the world.

13         On the other hand, everyone with an IRA or 401(k) is

14  quite aware, that the invested portion of that 401(k) is the

15  assigned economic value.  That's what comes on the reporting

16  sheets monthly or quarterly or semi-annually and it's the figure

17  that they identified with the smaller account and not the larger

18  account.

19         Last question is -- and I would respectfully conclude

20  that that was a misstatement, that I don't think was in error.

21  It was a clear misrepresentation of the circumstances in my

22  view.

23         Similarly, they have assigned $100,000 to the GW & SW

24  Incorporated, a separate assigned value of $60,000 to the land

25  itself.  So giving them the benefit of the doubt, they've

Evidentiary Hearing

131

1   disclosed a market value of $160,000 for the land and the
2   business, net of an obligation to the bank of a hundred forty-two
3   thousand and change.  So roughly net of the debt of about
4   $22,000.
5           I accept Mr. Wilson's point which is the market value of
6   the inventory, in a liquidation circumstance, would be very low
7   but we've got to compare that, on the other hand, with as early
8   as 2009, well past the financial meltdown at that point, he was
9   representing to the bank that the market value of the business
10  inclusive of inventory, was $423,000.
11          It doesn't go from $423,000 in 2009 to $22,000 in 2013,
12  without some reasonable explanation other than, trying to hide a
13  value from the probation officer who was trying to make a
14  decision concerning restitution and the propriety of a fine.  And
15  that's the conclusion that I reach from the evidence that we've
16  received.
17          Now, the only other challenges were to the Pochmaras'
18  financials.  They were more modest in scope.  It is of no
19  particular moment to the Court that they used the proceeds from
20  the sale of their GW & SW stock, to be applied against their
21  residential mortgage.  And of no particular moment that they had
22  advanced a significant amount of additional funds beyond the
23  required monthly payment for a period of time before that.
24          Is that at all significant to the government?
25          MS. PARKER:  I'm sorry, your Honor.  I didn't hear the

1  question.  I was looking for my Pochmara materials.  I'm sorry.

2       THE COURT:  One -- one of the -- in your commentary in

3  your supplemental papers, you refer to the fact that

4  approximately $80,000 of the G.W.S.W. stock sale proceeds were

5  applied against the mortgage plus a certain amount of money that

6  was advanced monthly for a period of time that was greater than

7  the monthly payment.

8       Does it matter?

9       MS. PARKER:  No.

10      THE COURT:  Okay.  I agree.

11      MS. PARKER:  I was just trying to analyze what was

12  given.

13      THE COURT:  The only remaining question that I've got is

14  as to the disposition of the John Hancock and Northeastern

15  Michigan Community Mental Health Services.  We reflect that in

16  the approximate range of thirty-two thousand.  My -- the figures

17  reflect that as being -- that account as having a value of

18  fifty-two thousand.  There is a $22,000 spread there where there

19  is no explanation and that would all have been relatively

20  recently.

21      MS. PARKER:  I think there is two different numbers.

22  One was the value, as I recall -- and maybe I'm butting in and

23  you weren't directing your attention to me -- but as I understand

24  the documents, the value of what was in that Northeastern

25  Community account was fifty-four thousand and it was the

1    thirty-two thousand that was used to offset the fraud resulting

2    from the misrepresentation as to the marital status.

3            THE COURT:  We're on the same page.

4            MS. PARKER:  All right.

5            THE COURT:  So that's just the remaining question that I

6    would have concerning the Pochmaras' materials.

7            MR. RUPP:  Judge, with regard to the difference of the

8    $22,000, I have spoken with Maxine and she has provided, to my

9    knowledge, the documentation in her possession or that she was

10   able to get a hold of.

11           The explanation I offered in my original sentencing

12   memorandum is that the remainder that wasn't eaten up by taxes

13   and penalties for early disbursement was used to pay towards debt

14   on a truck and a camper, debt that they are still paying on after

15   the camper was repossessed, as well as additional medical bills,

16   primarily, I think, for Robert's benefit but Maxine had also gone

17   through, I believe, a knee replacement.

18           THE COURT:  Whose vehicle?

19           MR. RUPP:  I believe it was a joint vehicle.  As I

20   understand it, the truck and the camper were repossessed by the

21   credit union at the same time.  They were able to pay off most if

22   not all of the debt on the truck.  There is remaining deficiency

23   on the camper.

24           After repossession, the bank sold it for approximately

25   half of its value and we provided the letter with my original

Evidentiary Hearing

134

1    sentencing memorandum, at least -- excuse me, at least that they

2    received from the credit union indicating that they still owed

3    that money.

4            THE COURT:  And any proofs you wish to offer on the

5    point?

6            MR. RUPP:  I don't have anything additional beyond what

7    I've submitted, your Honor.

8            THE COURT:  Any arguments on the point from the

9    government?

10           MS. PARKER:  Yes, your Honor.  There is very little

11   documentation.  The documentation regarding the payment on the

12   camper shows a total of six hundred payments -- $600 in payments.

13   That's it.  If you look at -- they've made the first of the

14   payments at the time of their conviction and the most recent one,

15   they surrendered their interest in it in the camper in October

16   based on what's attached to Mr. Rupp's pleadings.  I believe it's

17   Attachment B.  And then they apparently surrendered it in

18   October.

19           They don't make any payments until after they are

20   convicted and it's a grand total of $600 on that.  There is no

21   documentation regarding the camper or -- excuse me -- the truck,

22   or the medical expenses.  So I don't think that answers the

23   question of where did the twenty-two thousand plus or minus go.

24           MR. RUPP:  I think the limited payments on the camper

25   further demonstrate the fact that they don't have this money.

Evidentiary Hearing

135

1   They are tapped out.  She is doing the best she can to pay her

2   debts.  She lost her job through Community Mental Health as a

3   result of the -- the fraudulent use of her insurance benefits and

4   she hasn't rested on her laurels while this case has been

5   pending.  She has gone out and found other employment.

6           THE COURT:  And I -- I appreciate your point.  The

7   issue, frankly, was simply to corroborate the $22,000.  I'm

8   satisfied at this juncture in examining the circumstance that

9   there was not an effort on her part to obstruct justice.  You've

10  offered a plausible explanation.

11          I think Miss Parker's point, which is that it would be

12  quite easy to corroborate the use of the $22,000 with some sort

13  of documentary evidence which she didn't do.  But try to obstruct

14  justice?  I can't reach that conclusion in quite the same way

15  that I have with respect to the information received from the

16  Wilsons.  So I would not score 3C1.1 with respect to the

17  Pochmaras.

18          Now, that reaches conclusions on all of what I've

19  referred to as the common guideline questions that remained at

20  issue.  We don't have time to complete the sentencing hearing

21  today.

22          We will continue on January the 27th of 2014, nine a.m.,

23  unless we have any particular challenges.

24          MR. PIAZZA:  I'm sorry, your Honor, what time?

25          THE COURT:  Nine a.m.  If defense counsel have any

Evidentiary Hearing

136

1  particular concerns, or Miss Parker, concerning the availability

2  of the date, I would greatly appreciate if you would take that up

3  with our case manager and we will proceed on that date.

4          MS. PARKER:  Could we have just a moment, your Honor?

5  May I confer with counsel?

6          THE COURT:  Yes.

7          (Whereupon counsel confer off the record)

8          MR. PIAZZA:  Thank you, your Honor.

9          MS. PARKER:  Thank you, your Honor.  Nothing further.

10          MR. KOELZER:  Thank you, your Honor.

11          THE COURT:  Record is closed.  Thank you.

12          (At 2:11 p.m. - proceedings adjourned)

13                              *****

14

15

16

17

18

19

20

21

22

23

24

25

Evidentiary Hearing

137

1                          *CERTIFICATE OF COURT REPORTER*

2

3

4              I, PEG L. GOODRICH, Official Court Reporter

5        in and for the United States District Court, Eastern

6        District of Michigan, appointed pursuant to the

7        provisions of Title 28, United States Code, Section

8        753, do hereby certify that the foregoing proceedings

9        held before the HONORABLE THOMAS L. LUDINGTON, District

10       Court Judge, is a true and correct transcript of my

11       stenotype notes in the matter of UNITED STATES OF AMERICA

12       v ROBERT POCHMARA, MAXINE POCHMARA, GARY WILSON and SUE

13       WILSON, File No. 12-20607, held on Monday, December 9, 2013.

14

15

16

17

18                              s/Peg L. Goodrich
19                              Peg L. Goodrich, CSR, RPR, RMR
                                Federal Official Court Reporter
20                              United States District Court
                                Eastern District of Michigan
21

22    Date:  February 26, 2013
23           Bay City, Michigan

24

25